Annette W. Jarvis (Utah State Bar No. 01649)
Peggy Hunt (Utah State Bar No. 06060)
Michael F. Thomson (Utah State Bar No. 09707)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
         armington.jeff@dorsey.com

*Proposed Attorneys for Debtor Naartjie Custom Kids, Inc.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| In re:<br><br>NAARTJIE CUSTOM KIDS, INC.,<br><br>Debtor. | Case No. _____<br><br>Chapter 11<br><br>Judge _____ |
|---|---|

**DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, AND 503
AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL ORDERS
AUTHORIZING (I) THE DEBTOR TO HONOR PREPETITION OBLIGATIONS
TO AND CONTINUE PREPETITION PRACTICE WITH A CERTAIN CRITICAL
VENDOR AND CERTAIN SHIPPERS; (II) AUTHORIZING ALL APPLICABLE
BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS; AND (III) SCHEDULING A FINAL
HEARING TO CONSIDER ENTRY OF A FINAL ORDER**

Naartjie Custom Kids, Inc. ("Naartjie" or "Debtor"), the debtor in possession in the above captioned bankruptcy case, by and through its proposed counsel, submits this motion (the "Motion") for entry of an interim order substantially in the form submitted concurrently herewith (the "Order") pursuant to sections 105(a), 363, 503(b)(9), and 507(a)(2) of title 11 of the United

States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Rules") (i) authorizing, but not directing, the Debtor to (a) honor certain prepetition obligations to a Chinese vendor critical to the Debtor's operations (the "Chinese Critical Vendor" or "Target Ease") as well as prepetition obligations to three shippers who deliver goods to the Debtor's stores and customers (the "Shippers"), and (b) continue during the post-petition period the Debtor's prepetition practices with the Chinese Critical Vendor and the Shippers; (ii) authorizing all applicable banks and other financial institutions to honor and process related checks and transfers; and (iii) scheduling a final hearing to consider entry of a final order. This Motion is supported by the *Notice of Hearing on First Day Motions* (the "Omnibus Notice"), and the *Declaration of Jeff Nerland in Support of Chapter 11 Petition and First Day Motions* (the "Omnibus Declaration"), filed concurrently herewith and incorporated by reference. In further support of the Motion, the Debtor states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a), 363, 503(b)(9), and 507(a)(2) of the Bankruptcy Code and Rules 6003 and 6004.

## GENERAL BACKGROUND

3. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Utah (the "Court").

4.      No trustee, examiner, or official committee of unsecured creditors has been appointed in this case. The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      A detailed discussion of the Debtor's history, description of its businesses, its assets and liabilities, and the events that led to its need for bankruptcy relief are set forth in the Omnibus Declaration.[1]

6.      Founded in Cape Town, South Africa in 1989, Naartjie is a children's clothing brand that embraces bright, colorful, kid-friendly clothes. Naartjie designs, manufactures and sells children's clothing, accessories and footwear for ages newborn through 10 years old.

7.      Naartjie opened its first store in the United States in March 2001, currently owns and operates eighty-two retail stores in the United States and South Africa, and has a rapidly expanding e-commerce business serving customers in over thirty countries worldwide. Today, Naartjie's corporate headquarters are located in Salt Lake City, Utah, with merchandising headquartered in Burlingame, California and the Naartjie Design Studios and South African retail operations in Cape Town, South Africa. Naartjie's net revenue for the fiscal year ended on February 1, 2014 was $54.4 million.

## THE CRITICAL VENDOR AND SHIPPERS

*The Chinese Critical Vendor*

8.      The Chinese Critical Vendor, Target Ease International, is a Chinese corporation that works with manufacturers in China (the "Local Manufacturers") to produce and supply

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Omnibus Declaration.

3

approximately 75% of all of the products sold by the Debtor. The Debtor's annual purchases from the Chinese Critical Vendor total approximately $15,500,000.00. The Chinese Critical Vendor is the single source of specialized products which the Debtor orders in such great quantities that it would be impossible for the Debtor to find immediate replacements. The Debtor uses a unique "overdye" process in its products which gives it a substantial advantage over its competitors. The Chinese Critical Vendor is instrumental in making sure the Local Manufacturers follow this process. Furthermore, supplying goods to the Debtor is the Chinese Critical Vendor's entire business. The Chinese Critical Vendor pays the smaller Local Manufacturers from the proceeds it receives from the Debtor.

9. As of the Petition Date, the Debtor had outstanding prepetition purchase orders with the Chinese Critical Vendor for goods that had not yet been delivered as of the Petition Date, which goods are integral to the Debtor's ongoing business operations. As of the Petition Date, the total outstanding amount owed to the Chinese Critical Vendor is approximately $3,432,331.11 (the "Critical Vendor Claim"). The Critical Vendor Claim is comprised of $2,157,968.25, which is owed to the Chinese Critical Vendor based on the value of goods received by the Debtor within the 20-day period prior to the Petition Date (the "503(b)(9) Critical Vendor Claim").

10. During the next month the Debtor will need to receive season-specific inventory from the Chinese Critical Vendor to stock its retail stores in advance of the holiday season. Sales during the holiday season are critically important to the Debtor's business operations. During the year 2013, the Debtor generated approximately 38.3% of its annual revenue during the

4

holiday season. Obviously, any disruption during this vital sales period would adversely impact the Debtor's reorganization to the detriment of the Debtor's creditors.

11. The Chinese Critical Vendor coordinates the manufacturing and shipping from China of all of the products produced by the Local Manufacturers and also serves as a quality controller for the Debtor by ensuring that products made by the Local Manufacturers, which are created through a unique "overdying" process, meet Naartjie's exacting standards. This quality control is vitally important to maintaining Naartjie's status as a premium brand in the children's clothing marketplace.

12. If the Debtor fails to honor its outstanding obligations to the Chinese Critical Vendor, the Chinese Critical Vendor may refuse to supply to the Debtor goods that are essential to the Debtor's business and maintaining the value of the Debtor's assets. The Debtor intends to purchase approximately $6.1 million of goods for the holiday season, and plans to purchase $5.7 million of those goods from the Chinese Critical Vendor, so any interruption with the Debtor's business relationship with the Chinese Critical Vendor would irreparably harm the Debtor's business operations.

13. Also, absent prompt payment of the Critical Vendor Claim, the Chinese Critical Vendor risks defaulting under loan covenants with its lenders in China. Any default could allow those banks to exercise available remedies in China with potentially catastrophic consequences to the Chinese Critical Vendor and to the Local Manufacturers, including forcing the Chinese Critical Vendor out of business and unable to supply any further goods to the Debtor.

14. Attached as **Exhibit A** hereto is an email dated September 10, 2014, sent from Francis Chan, Target Ease's owner, to Glenn Wood, Naartjie's CEO, and copied to Jeffrey

Nerland, Naartjie's CRO, which states that Target Ease has already used up every finance facility from its bank and has been awaiting payment from Naartjie.[2] Mr. Chan emphasizes the severity of Target Ease's cash crunch by stating:

> Dear Glenn, you should know that I seldom talk like this, but we are facing a big big cash flow problem now.[3]

15.     Further, in recognition of the nature of the Debtor's symbiotic and co-dependent relationship with the Chinese Critical Vendor, the Debtor's proposed debtor-in-possession lender, Victory Park Capital Advisors, LLC ("Victory Park") has ear-marked a portion of its debtor-in-possession term loan to pay the Critical Vendor Claim in full to ensure that the Chinese Critical Vendor can continue to provide goods to the Debtor.

### *The Shippers*

16.     During the course of its business operations, the Debtor relies on two of the Shippers to transport the Debtor's retail inventory from the port where such goods are brought from China to the United States, to the Debtor's various retail stores—W.J. Byrnes & Co. ("Byrnes") and Mid-America Overseas, Inc. ("Mid-America").

17.     The third Shipper, United Parcel Service of America, Inc. ("UPS"), primarily delivers the Debtor's internet sales to the Debtor's customers. The Debtor uses a proprietary software application with UPS which was written to link the Debtor's customer delivery details directly into the UPS system. If the Debtor were forced to use alternative means of shipping it would take a substantial amount of time to write another software application and negotiate rates

---

[2] *See* **Exhibit A**.

[3] *See id.*

with the new shipper, causing a shipment delay ranging from a week to ten days. Thus, UPS is critical to the Debtor's business continuity.

19. 18. As of the Petition Date, the total outstanding amount owed to each of the Shippers is as follows: (a) Byrnes is owed approximately $2,350.50 (the "Byrnes Claim"); (b) Mid-America is owed approximately $237,652.91, of which $157,284.76 is based on the value of services provided to the Debtor within the 20-day period prior to the Petition Date (the "Mid-America Claim"); and (c) UPS is owed approximately $70,537.63, all of which is based on the value of services provided to the Debtor within the 20-day period prior to the Petition Date (the "UPS Claim" and, together with the Byrnes Claim and the Mid-America Claim, the "Shipper Claims").

19. As a retail company, the Debtor relies heavily on the Shippers to transport inventory to its retail stores and customers. At any point in time, the Shippers are likely to be in possession of certain of the Debtor's goods and have claims for transportation and related services related thereto. It is essential to the Debtor's continued viability and the success of its business that it maintains the reliable and efficient flow of products to its retail stores and customers. Moreover, the Debtor believes that the Shippers could, in certain instances, argue they are entitled to possessory or similar liens for the storage and/or transport of the goods in their possession as of the Petition Date, and might refuse to deliver or release such goods before their claims have been satisfied and their liens discharged.

20. Accordingly, it is imperative that the Debtor be authorized to pay the prepetition Shipper Claims to ensure the essential services provided by the Shippers are available to the Debtor without interruption, and preserve to the fullest extent possible the Debtor's relationship

with its customers and, in turn, the value of the Debtor's business for the benefit of its estate and its creditors. The Debtor estimates that, as of the Petition Date, the aggregate amount of Shipper Claims to be satisfied pursuant to this Motion is approximately $315,000.00. As with the Critical Vendor Claim, Victory Park has recognized the critical role of the Shippers in the Debtor's business by earmarking a portion of its debtor-in-possession term loan to pay the Shipper Claims in full to ensure that the Shippers can continue to provide services to the Debtor.

### *Importance to Debtor*

21. Without the goods provided to the Debtor by the Chinese Critical Vendor, which goods are then transported to the Debtor's stores by the Shippers, the Debtor's business operations will fail.

22. The relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor. The payments proposed herein are essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize.

## RELIEF REQUESTED

23. By this Motion, the Debtor seeks entry of an order authorizing, but not directing, the Debtor, in its business judgment and sole discretion, to (i) pay the Critical Vendor Claim in the amount of approximately $3,432,331.11, of which the Debtor proposes to pay $1,274,362.86 immediately upon entry of an interim order approving this Motion with the remaining $2,157,968.25 to be paid by October 10, 2014, (ii) pay the Shipper Claims in an amount not to exceed $315,000.00; (iii) continue during the post-petition period the Debtor's prepetition practices with the Chinese Critical Vendor and the Shippers; and (iv) schedule a final hearing to consider entry of a final order.

24. The Debtor contemplates making such payments to the Chinese Critical Vendor and the Shippers on the condition that the Chinese Critical Vendor and the Shippers agree to supply the Debtor post-petition according to the same trade terms that existed prepetition or on terms that are otherwise acceptable to the Debtor. The Debtor reserves the right to negotiate more favorable trade terms with the Chinese Critical Vendor and/or the Shippers as a condition of payment of any Critical Vendor Claim or the Shipper Claims.

25. In the event that the Chinese Critical Vendor or the Shippers refuse to perform their obligations during the pendency of the Debtor's chapter 11 case, the Debtor reserves the right to seek an order from the Court deeming any payment by the Debtor to the Chinese Critical Vendor and/or the Shippers pursuant to relief obtained under this Motion to be a post-petition advance that the Debtor may recover from the Chinese Critical Vendor and/or the Shippers in cash or goods, and upon recovery by the Debtor, any prepetition claim of the Chinese Critical

Vendor and/or the Shippers paid after the Petition Date shall be reinstated in the amount so recovered as a general unsecured claim.

26.     The Debtor additionally seeks an order authorizing all applicable banks and financial institutions to receive, process, honor and pay all checks presented for payment and electronic transfers with respect to payments authorized by this Motion, regardless of whether such payments were presented before or after the Petition Date.

## BASIS FOR RELIEF

**A.    The Relief Requested Is Supported by Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity.**

27.     Section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Court may exercise its equitable power under section 105(a) "to authorize the payment of prepetition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization."[4]

28.     The doctrine of necessity supports the relief requested in this Motion. The "doctrine of necessity" is "a general rubric for the proposition that a court can authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor."[5]

---

[4] *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) (authorizing critical vendor payments to select suppliers inventory suppliers to debtor who was an athletic shoe retailer when debtor testified that without new merchandise from the critical vendors, the debtor would be unable to reorganize); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 1989) (setting forth the power of a bankruptcy court to authorize the payment of prepetition debt, where such payment is "essential to the survival of the debtor" under section 105) (internal citation omitted).

[5] *In re Motor Coach Indus. Int'l, Inc.*, 2009 WL 330993, at n.5 (D. Del. Feb. 10, 2009); *see also Ionosphere*, 98 B.R. at 176-77 (finding the doctrine of necessity applicable in chapter 11 cases).

29. Payment of the Chinese Critical Vendor Claim is essential to the Debtor's continued operations and the value of the Debtor's business and assets. The Chinese Critical Vendor is the only source from which the Debtor can procure goods without interruptions, delays, or shutdowns in the Debtor's business operations. Since the Debtor is facing the immediate need for these goods going into the holiday season, which is the critical season for its survival and revenues, the timely procurement of these goods, of a quality essential to maintain the Debtor's brand, is necessary for the survival of the Debtor's business and, therefore, essential for any reorganization of the Debtor under Chapter 11.

30. In the Debtor's business judgment, failure to pay the Critical Vendor Claim would result in the Chinese Critical Vendor either refusing to or being unable to provide the Debtor goods post-petition. This would result in potentially catastrophic interruptions, delays, or shutdowns in the Debtor's operations, jeopardizing the Debtor's entire business and the Debtor's ability to maximize the value of its assets through a reorganization in this case. Absent the payment of the Critical Vendor Claim, the Chinese Critical Vendor may seek to enforce against the Debtor legal remedies under Chinese law for the Debtor's outstanding obligations to the Chinese Critical Vendor. Finally, in recognition of the necessity of paying the Chinese Critical Vendor the amounts it is owed at the inception of this case and the importance of this relationship to the success of the Debtor's business, the Debtor's post-petition financier, Victory Park, has specifically ear-marked sufficient funds to pay the Critical Vendor Claim in full from the proceeds of the debtor-in-possession loan.

31. Because the Debtor is the Chinese Critical Vendor's sole customer, the Debtor's failure to honor its outstanding obligations to the Critical Vendor would result in a complete

failure of the Chinese Critical Vendor's business operations. Such failure would most likely lead to harm, interruption, or failure of the Local Manufacturers' business operations as well, thus destroying the entire supply chain of the Debtor.

32. Similarly, it is imperative that the Debtor be authorized to pay the prepetition Shipper Claims to ensure the essential services provided by the Shippers are available to the Debtor without interruption, and preserve to the fullest extent possible the Debtor's relationship with its customers and, in turn, the value of the Debtor's business for the benefit of its estate and its creditors.

33. For these reasons, payment of the Critical Vendor Claim and the Shipper Claims is essential to the Debtor's business operations, the Debtor's ability to preserve the value of its assets, and its ability to successfully reorganize.

**B.    The Relief Requested Is Supported by Section 363 of the Bankruptcy Code.**

34. The relief requested is additionally supported by section 363 of the Bankruptcy Code. Pursuant to section 363(b), a debtor may, in the exercise of its sound business judgment and after notice and a hearing, use property of the estate outside of the ordinary course of business.[6] Under the relief contemplated by this Motion, the Chinese Critical Vendor to whom the Debtor would pay the Critical Vendor Claim and the Shippers to whom the Debtor would pay the Shipper Claims would provide post-petition goods and services to the Debtor under the ordinary trade terms, thereby protecting and preserving the Debtor's business and allowing the

---

[6] 11 U.S.C. § 363(b)(1); *see also Ionosphere*, 98 B.R. at 175 (affirming that payment of prepetition claims to protect and preserve a debtor's business and to reorganize was consistent with section 363).

Debtor to reorganize. Therefore, the use of estate funds for payment of the Critical Vendor Claim and the Shipper Claims is appropriate under section 363 of the Bankruptcy Code.

**C.    Section 503(b)(9) Supports Administrative Expense Priority for the Majority of the Critical Vendor Claim.**

35.    Pursuant to section 503(b)(9) of the Bankruptcy Code, a debtor may incur, and the Court, after notice and a hearing, shall allow, as administrative expenses, among other things, "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).

36.    The bulk of the Debtor's outstanding obligations to the Chinese Critical Vendor, $2,157,968.25 out of $3,432,331.11, are on account of goods received by the Debtor in the ordinary course of its business, within 20 days prior to the Petition Date.  This portion of the Critical Vendor Claim is referred to herein as the "503(b)(9) Critical Vendor Claim."

37.    Thus, the 503(b)(9) Critical Vendor Claim is entitled administrative expense priority under section 503(b)(9) of the Bankruptcy Code and must be paid in order to confirm a plan of reorganization. *See* 11 U.S.C. §§ 507(a)(2) and 1129(a)(9).

38.    Accordingly, the Debtor merely seeks to pay the 503(b)(9) Critical Vendor Claim as it becomes due in the ordinary course of business and upon implementation of the trade terms, rather than waiting to pay said Claim at the time of confirmation of a plan of reorganization.  For the reasons discussed above, it is vital, which confirmation will not occur without satisfaction of the Critical Vendor Claim and the Debtor's continued relationship with the Chinese Critical Vendor.

**D. Payment of the Shipper Claims Will Mitigate the Risk of Shippers Asserting Possessory Liens on the Debtor's Goods.**

39. In its business judgment, the Debtor believes that its failure to pay the Shipper Claims could result in the assertion of possessory liens by the respective Shippers under applicable state law with respect to any goods in their possession. Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code,[7] is expressly excluded from the automatic stay otherwise imposed by section 362(a) of the Bankruptcy Code.

40. Thus, the Shippers may assert lien rights and refuse to release goods in their possession unless and until the Shipper Claims are satisfied. Therefore, notwithstanding the automatic stay, the Shippers may be entitled to assert and perfect liens against the Debtor's property, which would entitle them to payment ahead of general unsecured creditors in any event; and could hold the property subject to the asserted liens pending payment, to the direct detriment of the Debtor and its estate.

41. Furthermore, to the extent that the amount of a Shipper Claim is less than the value of any property securing such claim, the Shipper holding lien rights arguably would be a fully secured creditor. In general, pursuant to section 506 of the Bankruptcy Code, fully secured creditors are entitled to receive payment in full of their prepetition secured claims pursuant to any confirmed plan of reorganization, and the post-petition interest accruing on such claims to the extent such claims are over-secured. Consequently, payment of such claims will give the Shippers no more than that to which they otherwise would be entitled under a plan of

---

[7] Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that ... permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection .... " 11 U.S.C. § 546(b)(l)(A).

reorganization and save the Debtor the interest costs that otherwise may accrue on the claims during this case.

42. Accordingly, the Debtor seeks to pay the undisputed amounts owed on the Shipper Claims in the Debtor's discretion and to discharge any liens on the Debtor's property.

E. **Cause Exists to Authorize All Applicable Banks and Financial Institutions to Honor Checks and Electronic Fund Transfers Related to Satisfaction of the Critical Vendor Claim and Shipper Claims.**

43. Furthermore, the Court should authorize the Debtor to issue new post-petition checks, or effect new electronic fund transfers, on account of such claims and to replace any prepetition checks or electronic fund transfer requests on account of the Critical Vendor Claim or the Shipper Claims that may be dishonored or rejected as a result of the commencement of the Chapter 11 Case.

44. For the foregoing reasons, the interests of the Debtor, its creditors, and other interested parties would be served by granting the Motion and authorizing payments to the Critical Vendor and the Shippers in the manner set forth herein.

## RESERVATION OF RIGHTS

45. Nothing contained herein is intended or should be construed as (i) an admission as to the validity of any claim against the Debtor; (ii) a waiver of the Debtor's rights to dispute any claim on any grounds; (iii) a promise to pay any claim; (iv) an assumption or rejection of any agreement, contract or lease, pursuant to section 365 of the Bankruptcy Code; or (v) otherwise affecting the Debtor's rights under the Bankruptcy Code or applicable non-bankruptcy law. The Debtor expressly reserves its right to contest any claim related to the relief requested herein in accordance with applicable non-bankruptcy law.

## DEBTOR SATISFIES BANKRUPTCY RULE 6003

46. Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting…a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate…."[8] The Debtor submits that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

47. To implement the foregoing successfully, the Debtor respectfully requests a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## CONCLUSION

WHEREFORE, pursuant to 11 U.S.C. §§ 105(a), 363, 503(b)(9), and 507(a)(2), the Debtor respectfully requests the entry of an Order (i) authorizing, but not directing, the Debtor to (a) honor certain prepetition obligations to the Chinese Critical Vendor and the Shippers, and (b)

---

[8] Fed. R. Bankr. P. 6003(b).

16

continue during the post-petition period the Debtor's prepetition practices with the Chinese Critical Vendor and the Shippers; (ii) authorizing all applicable banks and other financial institutions to honor and process related checks and transfers; and (iii) scheduling a final hearing to consider entry of a final order. The Debtor also requests such other relief as is just and proper.

DATED this 12th day of September, 2014.

**DORSEY & WHITNEY LLP**

*/s/ Annette W. Jarvis*
Annette W. Jarvis
Peggy Hunt
Michael F. Thomson
Jeffrey M. Armington

*Proposed Attorneys for Debtor Naartjie Custom Kids, Inc.*

# **EXHIBIT A**

**From:** francis [mailto:francis@targetease.com.hk]
**Sent:** Wednesday, September 10, 2014 1:59 AM
**To:** Glenn Wood
**Cc:** 'Jeff Nerland'
**Subject:** RE: 回覆: Naartjie update and discussion

Dear Glenn,

Thanks for the information on the new investor Victory Park Capital.

Regarding around ONLY one week on the delay of the payment of the Fall 2, it really kills us as it is a huge amount of $1.16 million.
It is because we already used up every finance facilities from the bank and awaiting this payment from you, which the due date is Sept 3.
Before we pay back the money to the bank, we can't make use of the T/R from the bank for our suppliers, although we promised them that part of the Holiday payment can be released to them on/before Sept 8.

Do hope that this Fall 2 payment can be released within today. This is very very urgent.
Dear Glenn, you should know that I seldom talk like this, but we are facing a big big cash flow problem now.

I will call you tonight to discuss about this serious issue.

Very best regards
Francis