Annette W. Jarvis (Utah State Bar No. 01649)
Peggy Hunt (Utah State Bar No. 6060)
Michael F. Thomson (Utah State Bar No. 9707)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
       hunt.peggy@dorsey.com
       thomson.michael@dorsey.com
       armington.jeff@dorsey.com

*Proposed Attorneys for Debtor Naartjie Custom Kids, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| In re:                          | Case No. _____ |
|---------------------------------|-------------------------------|
| NAARTJIE CUSTOM KIDS, INC.,     | Chapter 11                    |
|         Debtor.                 | Judge _____  |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING BUT NOT DIRECTING PAYMENT OF PRE-PETITION WAGES, SALARIES, AND RELATED OBLIGATIONS AND TAXES; (II) DIRECTING ALL BANKS TO HONOR CHECKS AND TRANSFERS FOR PAYMENT OF PRE-PETITION EMPLOYEE OBLIGATIONS; AND (III) SCHEDULING A FINAL HEARING TO CONSIDER ENTRY OF A FINAL ORDER**

Naartjie Custom Kids, Inc. ("Naartjie" or "Debtor"), the debtor in possession in the above captioned bankruptcy case, by and through its proposed counsel, submits this motion (the "Motion") for entry of an emergency order substantially in the form submitted concurrently herewith (the "Order") pursuant to sections 105(a), 363(b) and 507(a)(4)-(5) of title 11 of the

United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Rules") (i) authorizing but not directing the Debtor to pay, in its discretion and subject to available funding, pre-petition wages, salaries, and related obligations and taxes, and (ii) directing all banks to honor checks, wire transfers, drafts, ACH debits, and other transfers drawn on the Debtor's bank accounts for payment of pre-petition employee obligations; and (iii) scheduling a hearing to consider entry of a final order.  This Motion is supported by the *Notice of Hearing on First Day Motions* (the "Omnibus Notice"), and the *Declaration of Jeff Nerland in Support of Chapter 11 Petition and First Day Motions* (the "Omnibus Declaration"), filed concurrently herewith and incorporated by reference.  In further support of the Motion, the Debtor states as follows:

## JURISDICTION AND VENUE

1.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.  The statutory bases for the relief requested herein are sections 105(a), 363(b) and 507(a)(4)-(5) of the Bankruptcy Code and Rule 6003.

## BACKGROUND

3.  On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Utah (the "Court").

4. No trustee, examiner, or official committee of unsecured creditors has been appointed in this case. The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. Founded in Cape Town, South Africa in 1989, Naartjie is a children's clothing brand that embraces bright, colorful, kid-friendly clothes. Naartjie designs, manufactures and sells children's clothing, accessories and footwear for ages newborn through 10 years old.

6. Naartjie opened its first store in the United States in March 2001, currently owns and operates eighty-two retail stores in the United States and South Africa, and has a rapidly expanding e-commerce business serving customers in over thirty countries worldwide. Today, Naartjie's corporate headquarters are located in Salt Lake City, Utah, with merchandising headquartered in Burlingame, California and the Naartjie Design Studios and South African retail operations in Cape Town, South Africa. Naartjie's net sales for the fiscal year ended on February 1, 2014 were $54.4 million.

7. The events leading up to the Petition Date and additional facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration.

8. Naartjie currently employs approximately 595 individuals (collectively, the "Employees") in its stores, distribution center, merchandising center, and corporate headquarters, including approximately 101 full-time and 494 part time employees.

9. Naartjie pays its employees on a biweekly basis, with the exception of its employees located in New York State (the "New York Employees") who are statutorily required to be paid weekly.

10. Naartjie last paid its New York Employees on September 5, 2014 for services rendered by those employees through August 30, 2014. Naartjie last paid all other employees, with the exception of the New York Employees (the "Non-New York Employees" and together with the New York Employees, the "Employees"), on August 29, 2014 for services rendered by those employees through August 23, 2014. Naartjie's next payroll for its Employees is due to be paid on September 12, 2014 (the "September 12 Payroll"). On that date, the Debtor's New York Employees expect to be paid for their services rendered from August 31, 2014 through September 6, 2014, and the Non-New York Employees expect to be paid for their services rendered from August 24, 2014 through September 6, 2014.

11. Naartjie's New York Employees are then scheduled to be paid on September 19, 2014 (the "September 19 Payroll") for their services rendered from September 7, 2014 through September 13, 2014. Naartjies's Non-New York Employees are next scheduled to be paid on September 26, 2014 (the "September 26 Payroll" and, together with the September 12 Payroll and the September 19 Payroll, the "Payrolls") for their services rendered from September 7, 2014 through September 20, 2014

**RELIEF REQUESTED**

12. The continued, uninterrupted service of the Employees is essential to the Debtor's reorganization efforts. The Debtor recognizes that any delay in paying outstanding wages, salaries, and other compensation due to the Employees as of the Petition Date, or failure by the Debtor to continue its practices, programs, and policies with respect to Employee benefits could severely disrupt the Debtor's relationship with its Employees, impair morale at this critical juncture, and disrupt the Debtor's business operations.

4

13. Accordingly, by this Motion, the Debtor seeks an order authorizing, but not directing, the Debtor to: (a) pay all pre-petition Employee claims for wages, salaries, paid time off, and other accrued compensation; (b) make all payments for which Employee payroll deductions were withheld pre-petition; (c) reimburse all pre-petition Employee business and other expenses; (d) make pre-petition contributions and pay benefits under certain Employee benefit plans; (e) honor workers' compensation programs; (f) pay other miscellaneous Employee-related costs including but not limited to processing costs and fees; (g) continue Employee programs with respect to paid time off; and (h) continue certain health, welfare, savings, and other benefit programs (collectively, the "<u>Employee Obligations</u>"), as described more fully below, and (i) scheduling a hearing to consider entry of a final order.

14. Furthermore, because it is difficult for the Debtor to determine with precision the accrued pre-petition amount for many of the Employee Obligations, to the extent that the Debtor subsequently determines that there are any additional outstanding Employee Obligations related to the programs and policies described herein, the Debtor requests authority to pay such prepetition amounts.

**A.** **<u>Employee Wage and Salary Claims, Deductions, and Payroll Taxes</u>**

15. The Debtor respectfully requests the entry of an Order authorizing it to pay the amounts detailed below to or for the benefit of its Employees for the September 12 Payroll and for the portions of the September 19 Payroll and the September 26 Payroll attributable to its Employees' pre-Petition Date services and for the prior payroll checks, which have not yet been negotiated (the "<u>Employee Wage Claims</u>"). The Debtor uses ADP Payroll Services ("<u>ADP</u>") to process its payroll, calculate paychecks, administer all payroll deductions and tax withholdings,

5

and file related tax returns. ADP withdraws Employees' net pay amounts from the Debtor's account in a lump sum and issues checks and direct deposits drawn on ADP's own accounts to Employees.

16. The gross amount of the September 12 Payroll is approximately $313,000,[1] which includes: (a) net payroll amounts to be paid directly to Naartjie's Employees totaling approximately $230,000 (including regular compensation, overtime, and other compensation earned); (b) amounts to be deducted and paid on behalf of Employees, including state and federal payroll taxes, unemployment, Medicare and Social Security deductions in the approximate amount of $74,000; (c) employer taxes in the approximate amount of $4,000; and (d) deductions for individual health savings flexible spending accounts, and medical, dental, and vision insurance in the approximate amount of $5,000.

17. All of the September 12 Payroll is attributable to the Employees' pre-Petition Date efforts.

18. The gross amount of the September 19 Payroll is expected to be approximately $8,000, which includes: (a) net payroll amounts to be paid directly to Naartjie's New York Employees totaling approximately $6,000 (including regular compensation and other compensation earned); (b) amounts to be deducted and paid on behalf of New York Employees, including state and federal payroll taxes, unemployment, Medicare and Social Security

---

[1] The Debtor transfers the amount of each payroll to ADP in advance of every payroll date to facilitate prompt distributions to its Employees on such payroll date. Consequently, prior to the Petition Date, the Debtor transferred the amount of the September 12 Payroll to ADP to meet the Debtor's payroll obligations. Although it is unclear whether the amounts transferred to ADP prior to the Petition Date constitute property of the Debtor's estate, out of an abundance of caution, the Debtor requests authority from the Court to distribute the September 12 Payroll to its Employees.

deductions in the approximate amount of $1,830; and (c) employer taxes in the approximate amount of $170.

19. The gross amount of the September 26 Payroll is expected to be approximately $313,000, which includes: (a) net payroll amounts to be paid directly to Naartjie's Employees totaling approximately $230,000 (including regular compensation, overtime, and other compensation earned); (b) amounts to be deducted and paid on behalf of Employees, including state and federal payroll taxes, unemployment, Medicare and Social Security deductions in the approximate amount of $74,000; (c) employer taxes in the approximate amount of $4,000; and (d) deductions for individual health savings flexible spending accounts, and medical, dental, and vision insurance in the approximate amount of $5,000.

20. The September 26 Payroll for the Non-New York Employees covers a 14-day period ending on September 20, 2014, which includes 4 days that occurred before the Petition Date. The September 19 Payroll for the New York Employees covers a 7 day period ending on September 13, 2014, which includes 4 days that occurred before the Petition Date. Thus, the Debtor estimates that approximately 4/14, or $89,429 of the gross amount of the September 26 Payroll will be attributable to the Employees' pre-petition services and approximately 4/14 or $65,714 of the net payroll amount of the September 26 Payroll to be paid directly to the Non-New York Employees will be attributable to the Non-New York Employees' pre-petition services. Similarly, the Debtor estimates that approximately 4/7, or $4,571 of the gross amount of the September 19 Payroll will be attributable to the New York Employees' pre-petition services and approximately 4/7 or $3,429 of the net payroll amount of the September 19 Payroll

to be paid directly to the New York Employees will be attributable to the New York Employees' pre-petition services.

21. There are approximately $2,179.20 in payroll checks for prior payroll periods that had not been negotiated by the Debtor's Employees as of the Petition Date.

22. Thus, as of the Petition Date, the Debtor owes approximately $299,143 in net Employee Wage Claims attributable to the Employees' pre-Petition Date services. If the $230,000 in net Employee Wage Claims owed for the September 12 Payroll is deducted, the Debtor owes approximately $69,143 in net Employee Wage Claims.

23. In order to minimize the personal hardship the Employees will suffer if the Debtor's pre-petition Employee payroll obligations are not paid when due, and to maintain Employee morale during this critical time, the Debtor seeks authority to pay all accrued but unpaid pre-petition Employee compensation.

24. The Debtor believes that none of the Employees will receive payments in excess of the $12,475 priority claim amount established pursuant to section 507(a)(4) of the Bankruptcy Code. The highest gross payroll obligation for a single Employee for the September 12 Payroll period is approximately $9,615. The Debtor estimates that 4/14 of this amount, or $2,747 will be attributed to pre-Petition Date services for the September 26 Payroll. Thus, the highest gross total payroll obligation to a single employee is approximately $12,362.

**B.** **Payroll Taxes**

25. The Debtor is required by law to withhold from Employee paychecks amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state, or local

taxing authorities. In addition, the Debtor is required to pay from its own funds Social Security and Medicare taxes, and, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes"). ADP calculates all Payroll Taxes due for a given pay period and debits that amount from Debtor's operating account in a lump sum prior to each pay date. ADP in turn remits the Payroll Taxes to the appropriate taxing authorities and files the related periodic information returns when due.

26.     As of the Petition Date, the Debtor estimates that approximately $44,372 of accrued pre-petition Payroll Taxes remain unpaid. The Debtor seeks authority to pay this amount, via direct debit by ADP, and to continue to honor and process all pre-petition obligations with respect to Payroll Taxes on a post-petition basis in the ordinary course of business.

C.     **Manager Bonuses**

27.     In the ordinary course of its business, the Debtor has a firmly established bonus program for each of its store managers and district managers. Under this program, store managers and district managers receive additional compensation if the stores under their direction meet certain monthly performance based goals that are tied to sales and payroll (the "Manager Bonuses"). If the targets are met the managers and store managers receive 80% of the Manager Bonus after it is earned in the applicable month, while the remaining 20% of the Manager Bonus is held by Naartjie until the end of the fiscal year and can be lost by the managers if performance metrics are not met during the remainder of the year. As of the Petition Date, the Debtor estimates that it does not have any unpaid manager bonuses in its bank

accounts. However, in the event that any pre-petition Manager Bonuses remain unpaid, the Debtor requests authority to continue its pre-Petition Date practice and pay out the withheld 20% of the Manager Bonuses in the ordinary course of its business and to continue its Manager Bonus program post-petition.

**D.** **Reimbursement Obligations**

28. In the ordinary course of their duties on behalf of the Debtor, various employees may from time to time incur certain ordinary business expenses on behalf of the Debtor for which they are customarily reimbursed by the Debtor, or such expenses may be charged directly to the Debtor but the employee may be obligated on the expense if it is not paid by the Debtor (collectively, the "Reimbursement Obligations"). Although the Debtor requests that Employees submit reimbursement requests promptly, not all Employees do so. Consequently, it is difficult for the Debtor to estimate the amount of Reimbursement Obligations outstanding as of the Petition Date. Thus, to the extent that Reimbursement Obligations are owed and to avoid harming Employees who incurred the Reimbursement Obligations and may become personally liable for such expenses, the Debtor requests authority to pay, at its discretion, such Reimbursement Obligations in full in the ordinary course of business.

**E.** **Health, Welfare, and Other Benefits**

29. In the ordinary course of its business, the Debtor makes the following benefits programs available to its employees (collectively, the "Health and Welfare Benefits")

| Benefit | Provider |
|---|---|
| **Health Insurance** | **Cigna** |
| **Dental Insurance** | **MetLife** |

| Life Insurance | Cigna |
|---|---|
| Flexible Spending Account | Self-funded[2] |
| Health Savings Account | Cigna |
| Supplemental Life Insurance | Humana |

30. The Debtor's health insurance plan is self-funded by contributions from the Debtor and by withholding from the Employees' payroll, and is administered on behalf of the Debtor by Cigna. The premiums and fees for the other Health and Welfare Benefits are paid for by withholding from the Employees' payroll.

31. Employees are eligible to participate in the Health and Welfare Benefits programs after roughly 30 days of employment with the Debtor. The Employees receiving the Health and Welfare Benefits are required to pay certain amounts toward those benefits as a pre-tax payroll deduction. The Debtor's annual cost of providing the Health and Welfare Benefits is approximately $451,000.

32. As of the Petition Date, the Debtor estimates that approximately $0 in prepetition obligations on account of the Health and Welfare Benefits are accrued and unpaid. However, there may be additional amounts related to the pre-petition period that will come due post-petition. Thus, the Debtor seeks authority to pay any such amounts on account of the pre-petition period and to continue such benefits post-petition in the ordinary course.

F.  **Paid Time Off**

---

[2] The flexible spending account is self-funded by employee contributions, which are deducted from paychecks and held by the Debtor. The Debtor then pays claims for the benefit of the Employees as such claims arise.

33. The Debtor maintains an employee benefit policy pursuant to which Employees are provided with certain paid time off, which encompasses vacation days, sick time, personal days and holiday leave ("PTO"). The amount of PTO provided generally depends on each Employee's length of service with the Debtor and full-time or part-time status.

34. Certain of the Debtor's Employees may have accrued and unused PTO as of the Petition Date. Accordingly, the Debtor seeks an order authorizing, but not directing, the Debtor to honor all liabilities to its Employees with respect to PTO that arose prior to the Petition Date and to continue its pre-petition policies with respect thereto post-petition in the ordinary course of business.

### G.    Workers' Compensation Obligations

35. Under applicable state law, the Debtor is required to maintain workers' compensation insurance policies and programs to provide Employees with workers' compensation coverage for injury claims arising from or related to their employment with the Debtor (the "Workers' Compensation Programs").

36. The Debtor currently insures its workers' compensation liabilities through a policy with Travelers. The Debtor's total annual cost for providing the Workers' Compensation Programs is approximately $87,000. As of the Petition Date, the Debtor believes that it is current on all pre-petition obligations relating to its Workers' Compensation Programs. However, certain obligations related to the pre-petition period may not yet be due.

37. Thus, the Debtor seeks entry of an Order authorizing, but not directing, the Debtor to continue to maintain its Workers' Compensation Programs and to pay any pre-petition

obligations that may exist in connection with the Workers' Compensation Programs in the ordinary course of business.

## BASIS FOR RELIEF REQUESTED

38. It is appropriate and necessary for the Court to allow the Debtor to pay the Employee Obligations as set forth above to continue the Debtor's business operations and to avoid jeopardizing the Debtor's commercial relationships with its Employees. Payment of those obligations is warranted pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), 1107(a), and 1108.

### A. Certain of the Employee Obligations are Entitled to Priority Treatment

39. First, sections 507(a)(4) and (5) of the Bankruptcy Code entitle the vast majority of the Employee Obligations to treatment as priority claims. To confirm a chapter 11 plan, the Debtor must pay priority claims in full.[3]

40. If this Motion is granted, the Debtor believes no Employee will receive a payment in excess of the $12,475 limit on priority claims for accrued but unpaid Employee Obligations pursuant to sections 507(a)(4) and (5) of the Bankruptcy Code. The maximum gross obligation for any one Employee for pre-petition services is $12,362. Thus, granting the relief sought herein would affect only the timing of payments to Employees, and would not adversely affect recoveries for general unsecured creditors. The Debtor submits that payment of the Employee Obligations at this time would serve to enhance the value of the Debtor's estate for the benefit of all interested parties.

### B. Payment of Certain of the Employee Obligations is Required by Law

---

[3] *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (i) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual and (ii) contributions to employee benefit plans).

41. The Debtor also seeks authority to pay payroll taxes and deductions to the appropriate entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Certain deductions, such as contributions to employee benefits programs and child support and alimony payments, are not property of the Debtor's estate because the Debtor has withheld such amounts from Employees' paychecks on behalf of other parties.[4] Further, federal and state laws require the Debtor to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authorities.[5] Because the Payroll Taxes and deductions are not property of the Debtor's estate, the Debtor requests that the Court authorize them to transmit (through ADP, where applicable) the deductions and Payroll Taxes to the proper parties in the ordinary course of business.

42. Similarly, state laws require the Debtor to maintain the Workers' Compensation Programs. If the Debtor fails to maintain the Workers' Compensation Programs, state laws may prohibit the Debtor from operating in those states. Because payment of all liabilities related to the Workers' Compensation Programs is crucial to the Debtor's continued operations, the Debtor requests that the Court authorize them to pay all such liabilities in the ordinary course of business.

---

[4] *See* 11 U.S.C. § 541(b).

[5] *See, e.g., Beiger v IRS*, 496 U.S. 53, 61 (1990) (finding that federal law requiring a debtor to withhold federal tax from employee wages created a trust relationship between the debtor and the United States); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).

43. Courts have authorized payment of pre-petition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so.[6]

44. In addition, the Court may authorize payment of pre-petition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a), which codifies the inherent equitable powers of the Bankruptcy Courts, empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[7] Under section 105(a), courts may permit pre-plan payments of pre-petition obligations when essential to the continued operation of a Debtor's business. Specifically, the Court may use its power under section 105(a) to authorize payment of pre-petition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").[8]

45. This flexible approach is particularly critical where pre-petition creditors – here, the Employees – provide services to the Debtor that would be unavailable if the Debtor did not satisfy its prepetition obligations. In *In re Structurlite Plastics Corp.*,[9] the bankruptcy court stated that "a bankruptcy court may exercise its equity powers under 105(a) of the Bankruptcy

---

[6] *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to justify payment of pre-petition wages); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 of the Bankruptcy Code to allow contractor to pay pre-petition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to Debtor).

[7] 11 U.S.C. § 105(a).

[8] *See Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) ("unequal treatment of pre-petition debts when necessary for rehabilitation" is appropriate); *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that bankruptcy court can authorize payment of pre-petition claims if necessary to continued operation of the debtor); *Ionosphere*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (relying on 11 U.S.C. § 363 to allow contractor to pay prepetition claims of suppliers because the payments were necessary).

[9] 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988).

15

Code to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the Debtor and payment of creditors in full or at least proportionately.'"[10] The court explained that "a per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."[11]

46. The majority of the Debtor's Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtor is not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtor is unable to satisfy the Employee Obligations, morale and loyalty will be jeopardized at a time when the continued support of Employees is critical. It is essential to the Debtor's ability to reorganize that it be able to preserve morale and continue operating its business. Thus, payment of the Employee Obligations falls under the "necessity of payment" doctrine. Employees are critical to the Debtor's reorganization efforts. Should the Employee Obligations remain unpaid, workers will likely be unwilling to continue working for the Debtor, thereby significantly reducing the Debtor's chances of a successful reorganization.

47. The importance of a Debtor's employees to its operations has been recognized by courts in this district and others in granting relief similar to the relief requested herein.[12] The Debtor respectfully requests that similar relief is warranted in this Chapter 11 Case.

---

[10] *Id.*

[11] *Id.* at 932.

[12] See e.g., *In re Infinia Corporation, LLC,* Case No. 13-30688 (Bankr. D. Utah Sept. 17, 2013); *In re Revolution Dairy, LLC*, Case No. 13-20770 (Bankr. D. Utah Jan. 27, 2013).

48. For all of the foregoing reasons, the relief requested herein will benefit the Debtor's estate and creditors by allowing the Debtor's business operations to continue without interruption. In the absence of such payments, the Debtor believes that its Employees may seek alternative employment opportunities, perhaps with the Debtor's competitors. Such a development would deplete the Debtor's workforce, hinder the Debtor's ability to operate, and likely diminish creditors' confidence in the Debtor. Moreover, the loss of valuable workers and the recruiting efforts that would be required to replace them would be a massive and costly distraction at a time when the Debtor should be focusing on stabilizing its operations. Accordingly, the Debtor must be able to pursue all reasonable measures to retain its workforce by, among other things, continuing to honor all wages, benefits, and related obligations, including those that accrued prior to the Petition Date.

**C.     Cause Exists To Authorize the Debtor's Financial Institutions To Honor Checks and Electronic Fund Transfers**

49. The Debtor has sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, and anticipated post-petition financing and access to cash collateral. Also, under the Debtor's existing cash management system, the Debtor can readily identify checks, wire transfers, drafts, ACH debits, and other transfers drawn on the Debtor's bank accounts as relating to an authorized payment in respect of the Employee Obligations. Accordingly, the Debtor believes that prepetition payments not authorized by the Court will not be honored inadvertently. Therefore, the Debtor respectfully requests that the Court authorize all applicable financial institutions, when requested by the Debtor, to receive, process, honor, and pay any and all checks, wire

transfers, drafts, ACH debits, and other transfers drawn on the Debtor's bank accounts in respect of the relief requested herein.

### SATISFACTION OF BANKRUPTCY RULE 6003

50. Bankruptcy Rule 6003 empowers this Court to grant relief regarding a motion to pay all or part of a pre-petition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.[13] Immediate and irreparable harm exists where the absence of relief would impair the Debtor's ability to reorganize or threaten its future as a going concern.[14]

51. As described above, the Debtor's workforce is integral to its continued business operations. Failure by the Debtor to satisfy the Employee Obligations in the ordinary course of business from the outset of this Chapter 11 Case will jeopardize loyalty, trust, and morale, possibly causing workers to leave the Debtor's employ and severely disrupting the Debtor's operations at a critical juncture. Moreover, the Debtor's Employees rely on their compensation, benefits, and reimbursement of expenses to pay their living expenses, and failure to pay them in the ordinary course of business could be financially ruinous. Accordingly, the Debtor respectfully submits that it has satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of the Employee Obligations.

### WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

52. Here, for the Debtor to fulfill its fiduciary duty to "protect and preserve the estate," it must maintain a committed workforce. The Debtor's corporate employees are being

---

[13] See Fed. R. Bankr. P. 6003.

[14] *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

18

asked to commit a substantial amount of their time to the Debtor's reorganization efforts, which is critical to a successful reorganization.  Similarly, the Debtor relies on its employees in its stores to continue to generate revenue to support the Debtor's business.  Any disruption to the Debtor's operations from employee resignations or lack of morale could have significant negative effects on the Debtor's reorganization to the detriment of all parties.

53. In order to implement the foregoing relief immediately, to the extent applicable, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## CONCLUSION

WHEREFORE, the Debtor respectfully requests the entry of an Order in the form submitted concurrently herewith authorizing the Debtor to pay the Employee Obligations as described above and scheduling a hearing to consider entry of a final order.  The Debtor also requests such other relief as is just and proper.

DATED this 12th day of September, 2014.

**DORSEY & WHITNEY LLP**

*/s/ Annette W. Jarvis*
Annette W. Jarvis
Peggy Hunt
Michael F. Thomson
Jeffrey M. Armington

*Proposed Attorneys for Debtor Naartjie Custom Kids, Inc.*