Annette W. Jarvis (Utah State Bar No. 01649)
Michael F. Thomson (Utah State Bar No. 09707)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
        armington.jeff@dorsey.com

*Proposed Attorneys for Debtor Naartjie Custom Kids, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 14-29666 |
| NAARTJIE CUSTOM KIDS, INC., | Chapter 11 |
| Debtor. | The Honorable William T. Thurman |

### DECLARATION OF JEFF NERLAND IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Jeff Nerland, hereby declare as follows:

1.     I am over the age of 18 and am mentally competent.  I make this Omnibus Declaration (the "Omnibus Declaration") in support of the motions and applications requesting various types of relief (collectively, the "First Day Motions")[1] filed by Naartjie Custom Kids, Inc. (the "Debtor" or "Naartjie") in the above-captioned case (the "Chapter 11 Case").

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the applicable First Day Motions.

2.      I am a currently a Senior Director at Sierra Constellation Partners ("SCP").  On August 4, 2014, I was appointed by the Debtor to serve as the Chief Restructuring Officer for the Debtor.  In such capacity, I am fully cognizant of all facets of Debtor's operations.  As such, except as otherwise indicated, all facts set forth in this Omnibus Declaration are based upon my personal knowledge of Debtor's operations and finances, information learned from my review or relevant documents, and information supplied to me by other members of Debtor's management and Debtor's various business and legal advisors.  If called upon to testify as to the content of this Omnibus Declaration, I could and would do so.

3.      On September 12, 2014, the ("Petition Date"), the Debtor filed a voluntary Chapter 11 petition for relief.  The Debtor has filed its First Day Motions to allow it to operate effectively in the Chapter 11 Case.  The relief sought in the First Day Motions is critical to the Debtor's business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that the Debtor is provided the opportunity to reorganize successfully.

4.      This Omnibus Declaration is intended to provide the Court with background information regarding the Debtor, as well as the context for the initial relief sought by the Debtor.  Accordingly, the Omnibus Declaration is organized into two parts (a) an overview of the Debtor's business and the events leading up to the Chapter 11 Case, and (b) an explanation of the relief sought in the First Day Motions.

**BACKGROUND**

5.      Founded in Cape Town, South Africa in 1989, Naartjie is a children's clothing brand that embraces bright, colorful, kid-friendly clothes.  Naartjie designs, manufactures, and sells children's clothing, accessories, and footwear for ages newborn through 10 years old.

2

6.      Naartjie opened its first store in the United States in March 2001, currently owns and operates eighty-two retail stores in the United States and South Africa, and has a rapidly expanding e-commerce business serving customers in over thirty countries worldwide.  Today, Naartjie's corporate headquarters are located in Salt Lake City, Utah, with merchandising headquartered in Burlingame, California and the Naartjie Design Studios and South African retail operations in Cape Town, South Africa.  Naartjie's net sales for the fiscal year ended on February 1, 2014 were $54.4 million.

7.      The Naartjie brand came to the United States in 2001 and achieved instant success, driven by its unique fashion take, affordable price points, and kid-friendly designs. From 2008 to 2010, Naartjie rapidly expanded its U.S. retail footprint by opening over 10 stores per year.  Despite an expanding retail presence across the U.S., Naartjie's financial performance began to worsen as a result of deteriorating economic conditions, increased discounting by competitors, and weakening performance of specific stores and geographical locations.

8.      On October 17, 2013, Naartjie obtained a secured term loan in the amount of $4 million from Salus Capital Partners, LLC or one or more of its affiliated entities (collectively, "Salus").

9.      Naartjie is unable to pay its main supplier, Target Ease International (the "Chinese Critical Vendor"), a Chinese corporation that works with manufacturers in China to produce and supply approximately 75% of all of the products sold by the Debtor.  Naartjie needs additional funding to pay Target Ease International so that it can continue its operations and obtain the goods needed to sell during the upcoming holiday season.

10.     Naartjie attempted to obtain additional financing outside of bankruptcy, but has been unable to do so.  In order to continue operating, Naartjie needs to obtain the additional financing from Victory Park Capital Advisors, LLC ("Victory Park") and restructure its organization, something it will be unable to do outside of the Chapter 11 Case.  An immediate and critical need exists for the Debtor to obtain funds in order repay certain prepetition debt to facilitate the restructuring of the Debtor.  Without such funds, the Debtor will not be able to, among other things, pay its payroll, pay other direct operating expenses, or obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtor's business operations, its estate, creditors, vendors, suppliers, customers, and employees.

## FIRST DAY MOTIONS

11.     The Debtor has commenced its Chapter 11 Case in response to the debt obligations discussed above.  The Debtor's transition into its Chapter 11 proceedings must be comprehensively and effectively organized to ensure that it will be able to operate smoothly in bankruptcy and be afforded the opportunity to successfully emerge from the Chapter 11 Case.  Accordingly, it is critical that the Debtor maintains strong relationships with its customers, employees, vendors, creditors, and other governmental entities, and such other parties that enable the Debtor to conduct its business.  To maintain and foster these relationships, it is important to minimize the distractions to the Debtor's business operations that could result from the Debtor petitioning for Chapter 11 relief.

12.     I have reviewed and am generally familiar with the contents of each of the First Day Motions.  Based on that familiarity and information supplied to me by other members of the Debtor's management and the Debtor's various business and legal advisors, I believe that the

4

relief sought in each of the First Day Motions is necessary to enable the Debtor to operate in

their Chapter 11 Case with minimal disruption or loss of productivity or value.  I also believe

that the First Day Motions are vital to the Debtor's successful reorganization and are in the best

interest of the Debtor and its creditors.

       13.    The First Day Motions include the following pleadings filed by the Debtor in the

Chapter 11 Case:

    a.  *Debtor's Motion Pursuant to 11 U.S.C. §§ 105, 363, and 503 and Fed. R. Bankr. R. 6003 and 6004 for Interim and Final Orders Authorizing (I) the Debtor to Honor Prepetition Obligations to and Continue Prepetition Practice with a Certain Critical Vendor and Certain Shippers; (II) Authorizing all Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Scheduling a Final Hearing to Consider Entry of a Final Order* (the "Critical Vendors Motion").*

    b.  *Emergency Motion for Interim and Final Orders (I) Authorizing but not Directing Payment of Pre-Petition Wages, Salaries, and Related Obligations and Taxes; (II) Directing All Banks to Honor Checks and Transfers for Payment of Pre-Petition Employee Obligations; and (III) Scheduling a Final Hearing to Consider Entry of a Final Order* (the "Wages and Employee Obligations Motion").*

    c.  *Emergency Motion for Order Authorizing Debtor to Continue Use of its Existing Bank Accounts and Existing Business Forms* (the "Cash Management Motion").*

    d.  *Motion for Entry of Interim and Final Orders: (I) Authorizing, but not Directing, Debtor to (A) Maintain Existing Insurance Programs and (B) Pay all Obligations*

*in Respect Thereof; (II) Directing Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests; and (III) Scheduling a Final Hearing to Consider Entry of a Final Order* (the "<u>Insurance Motion</u>").

e.  *Debtor's Motion for Entry of Interim and Final Orders: (I) Authorizing, but not Directing, the Debtor to Pay Certain Pre-Petition Sales, Use, Customs, Income, Property, and Other Miscellaneous Taxes and Fees; (II) Granting Related Relief; and (III) Scheduling a Final Hearing to Consider Entry of a Final Order* (the "<u>Taxes Motion</u>").

f.  *Debtor's Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service to the Debtor on Account of Pre-Petition Invoices, (II) Approving the Debtor's Proposed Form of Adequate Assurance of Future Payment, (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance, and (IV) Scheduling a Final Hearing* (the "<u>Utilities Motion</u>").

g.  *Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtor to Honor Certain Prepetition Customer Obligations and to Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business; (II) Authorizing Payment of Credit Card Processing Fees; and (III) Scheduling a Final Hearing to Consider Entry of a Final Order* (the "<u>Customer Programs Motion</u>").

h.  *Debtor's Motion for Interim and Final Orders (I) Authorizing Debtor in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361,*

6

*362, 363, and 364; (II) Granting Liens, Security Interests, and Superpriority*

*Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic*

*Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "<u>DIP</u>

<u>Motion</u>") (and collectively with the foregoing motions and applications, the "<u>First</u>

<u>Day Motions</u>").

## A.  The Critical Vendors Motion

14.     The Chinese Critical Vendor, Target Ease International (the "<u>Chinese Critical</u>

<u>Vendor</u>"), is a Chinese corporation that works with manufacturers in China (the "<u>Local</u>

<u>Manufacturers</u>") to produce and supply approximately 75% of all of the products sold by the

Debtor.  The Debtor's annual purchases from the Chinese Critical Vendor total approximately

$15,500,000.00.  The Chinese Critical Vendor is the single source of specialized products which

the Debtor orders in such great quantities that it would be impossible for the Debtor to find

immediate replacements.  The Debtor uses a unique "overdye" process in its products which

gives it a substantial advantage over its competitors.   The Chinese Critical Vendor is

instrumental in making sure the Local Manufacturers follow this process.   Furthermore,

supplying goods to the Debtor is the Chinese Critical Vendor's entire business.  The Chinese

Critical Vendor pays the smaller Local Manufacturers from the proceeds it receives from the

Debtor.

15.     As of the Petition Date, the Debtor had outstanding prepetition purchase orders

with the Critical Vendor for ordinary goods that had not yet been delivered as of the Petition

Date, which the Debtor believes are integral to the Debtor's ongoing business operations.  As of

the Petition Date, the total outstanding amount owed to the Critical Vendor is approximately

$3,432,331.11 (the "Critical Vendor Claim"). The Critical Vendor Claim is comprised of $2,157,968.25, which is owed to the Chinese Critical Vendor based on the value of goods received by the Debtor within the 20-day period prior to the Petition Date (the "503(b)(9) Critical Vendor Claim").

16.     During the next month the Debtor will need to receive season-specific inventory from the Chinese Critical Vendor to stock its retail stores in advance of the holiday season. Sales during the holiday season are critically important to the Debtor's business operations. During the year 2013, the Debtor generated approximately 38.3% of its annual revenue during the holiday season. Any disruption during this vital sales period would adversely impact the Debtor's reorganization to the detriment of the Debtor's creditors.

17.     The Chinese Critical Vendor coordinates the manufacturing and shipping from China of all of the products produced by the Local Manufacturers and also serves as a quality controller for the Debtor by ensuring that products made by the Local Manufacturers, which are created through a unique "overdying" process, meet Naartjie's exacting standards. This quality control is vitally important to maintaining Naartjie's status as a premium brand in the children's clothing marketplace.

18.     If the Debtor fails to honor its outstanding obligations to the Chinese Critical Vendor, the Chinese Critical Vendor may refuse to supply to the Debtor goods that are essential to the Debtor's business and maintaining the value of the Debtor's assets. The Debtor intends to purchase approximately $6.1 million of goods for the holiday season, and plans to purchase $5.7 million of those goods from the Chinese Critical Vendor, so any interruption with the Debtor's

business relationship with the Chinese Critical Vendor would irreparably harm the Debtor's business operations.

19.    Also, absent prompt payment of the Critical Vendor Claim, the Chinese Critical Vendor risks defaulting under loan covenants with its lenders in China.  Any default could allow those banks to exercise available remedies in China with potentially catastrophic consequences to the Chinese Critical Vendor and to the Local Manufacturers, including forcing the Chinese Critical Vendor out of business and unable to supply any further goods to the Debtor.

20.    Attached as **<u>Exhibit A</u>** to the Critical Vendors Motion is an email dated September 10, 2014, sent from Francis Chan, Target Ease's owner, to Glenn Wood, Naartjie's CEO, and copied to me, which states that Target Ease has already used up every finance facility from its bank and has been awaiting payment from Naartjie.[2]  Mr. Chan emphasizes the severity of Target Ease's cash crunch by stating:

> Dear Glenn, you should know that I seldom talk like this, but we
> are facing a big big cash flow problem now.[3]

21.    Further, in recognition of the nature of the Debtor's symbiotic and co-dependent relationship with the Chinese Critical Vendor, the Debtor's proposed debtor-in-possession lender, Victory Park Capital Advisors, LLC ("<u>Victory Park</u>") has ear-marked a portion of its debtor-in-possession term loan to pay the Critical Vendor Claim in full to ensure that the Chinese Critical Vendor can continue to provide goods to the Debtor.

---

[2]    *See* **<u>Exhibit A</u>** to Critical Vendors Motion.

[3]    *See id.*

*The Shippers*

22.     During the course of its business operations, the Debtor relies on three shippers who deliver goods to the Debtor's stores and customers (the "Shippers").  Two of the Shippers transport the Debtor's retail inventory from the port where such goods are brought from China to the United States, to the Debtor's various retail stores—W.J. Byrnes & Co. ("Byrnes") and Mid-America Overseas, Inc. ("Mid-America").

23.     The third Shipper, United Parcel Service of America, Inc. ("UPS"), primarily delivers the Debtor's internet sales to the Debtor's customers.  The Debtor uses a proprietary software application with UPS which was written to link the Debtor's customer delivery details directly into the UPS system.  If the Debtor were forced to use alternative means of shipping it would take a substantial amount of time to write another software application and negotiate rates with the new shipper, causing a shipment delay ranging from a week to ten days.  Thus, UPS is critical to the Debtor's business continuity.

24.     As of the Petition Date, the total outstanding amount owed to each of the Shippers is as follows: (a) Byrnes is owed approximately $2,350.50 (the "Byrnes Claim"); (b) Mid-America is owed approximately $237,652.91, of which $157,284.76 is based on the value of services provided to the Debtor within the 20-day period prior to the Petition Date (the "Mid-America Claim"); and (c) UPS is owed approximately $70,537.63, all of which is based on the value of services provided to the Debtor within the 20-day period prior to the Petition Date (the "UPS Claim" and, together with the Byrnes Claim and the Mid-America Claim, the "Shipper Claims").

25.    As a retail company, the Debtor relies heavily on the Shippers to transport inventory to its retail stores and customers.  At any point in time, the Shippers are likely to be in possession of certain of the Debtor's goods and have claims for transportation and related services related thereto.  It is essential to the Debtor's continued viability and the success of its business that it maintains the reliable and efficient flow of products to its retail stores and customers.  Moreover, the Debtor believes that the Shippers could, in certain instances, argue they are entitled to possessory or similar liens for the storage and/or transport of the goods in their possession as of the Petition Date, and might refuse to deliver or release such goods before their claims have been satisfied and their liens discharged.

26.    Accordingly, it is imperative that the Debtor be authorized to pay the prepetition Shipper Claims to ensure the essential services provided by the Shippers are available to the Debtor without interruption, and preserve to the fullest extent possible the Debtor's relationship with its customers and, in turn, the value of the Debtor's business for the benefit of its estate and its creditors. The Debtor estimates that, as of the Petition Date, the aggregate amount of Shipper Claims to be satisfied pursuant to this Motion is approximately $315,000.00.  As with the Critical Vendor Claim, Victory Park has recognized the critical role of the Shippers in the Debtor's business by earmarking a portion of its debtor-in-possession term loan to pay the Shipper Claims in full to ensure that the Shippers can continue to provide services to the Debtor.

*Importance to Debtor*

27.    Without the goods provided to the Debtor by the Chinese Critical Vendor, which goods are then transported to the Debtor's stores by the Shippers, the Debtor's business operations will fail.

28.     The relief requested in the Critical Vendors Motion is necessary to avoid immediate and irreparable harm to the Debtor.  The payments proposed in the Critical Vendors Motion are essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize.

**B.  The Wages and Employee Obligations Motion**

29.     As of the Petition Date, Naartjie employed approximately 595 individuals (collectively, the"Employees") in its stores, distribution center, merchandising center, and corporate headquarters, including approximately 101 full-time and 494 part time employees. Continued service by the Employees is vital to Naartjie's ongoing operations.

30.     Naartjie pays its Employees on a biweekly basis, with the exception of its employees located in New York State (the "New York Employees") who are statutorily required to be paid weekly.

31.     Naartjie last paid its New York Employees on September 5, 2014 for services rendered by those employees through August 30, 2014.  Naartjie last paid all other employees, with the exception of the New York Employees (the "Non-New York Employees" and together with the New York Employees, the "Employees"), on August 29, 2014 for services rendered by those employees through August 23, 2014.  Naartjie's next payroll for its Employees is due to be paid on September 12, 2014 (the "September 12 Payroll").  On that date, the Debtor's New York Employees expect to be paid for their services rendered from August 31, 2014 through September 6, 2014, and the Non-New York Employees expect to be paid for their services rendered from August 24, 2014 through September 6, 2014.

32.     Naartjie's New York Employees are then scheduled to be paid on September 19, 2014 (the "September 19 Payroll") for their services rendered from September 7, 2014 through September 13, 2014.   Naartjies's Non-New York Employees are next scheduled to be paid on September 26, 2014 (the "September 26 Payroll" and, together with the September 12 Payroll and the September 19 Payroll, the "Payrolls") for their services rendered from September 7, 2014 through September 20, 2014.

33.     The continued, uninterrupted service of the Employees is essential to the Debtor's reorganization efforts.  Any delay in paying outstanding wages, salaries, and other compensation due to the Employees as of the Petition Date, or failure by the Debtor to continue its practices, programs, and policies with respect to Employee benefits could severely disrupt the Debtor's relationship with its Employees, impair morale at this critical juncture, and disrupt the Debtor's business operations.

34.     The Debtor's corporate employees are being asked to commit a substantial amount of their time to the Debtor's reorganization efforts, which is critical to a successful reorganization.  Similarly, the Debtor relies on its employees in its stores to continue to generate revenue to support the Debtor's business.  Any disruption to the Debtor's operations from employee resignations or lack of morale could have significant negative effects on the Debtor's reorganization to the detriment of all parties.

35.     The Debtor uses ADP Payroll Services ("ADP") to process its payroll, calculate paychecks, administer all payroll deductions and tax withholdings, and file related tax returns. ADP withdraws Employees' net pay amounts from the Debtor's account in a lump sum and issues checks and direct deposits drawn on ADP's own accounts to Employees.

13

36.    The Debtor has sufficient funds to pay the amounts described in the Wages and Employee Obligations Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, and anticipated post-petition financing and access to cash collateral.  Also, under the Debtor's existing cash management system, the Debtor can readily identify checks, wire transfers, drafts, ACH debits, and other transfers drawn on the Debtor's bank accounts as relating to an authorized payment in respect of the Employee Obligations. Accordingly, the Debtor believes that prepetition payments not authorized by the Court will not be honored inadvertently.

### Employee Wage and Salary Claims, Deductions, and Payroll Taxes

37.    As of the Petition Date, the Employees were owed or had accrued in their favor, various sums from Naartjie for the September 12 Payroll and for the portions of the September 19 Payroll and the September 26 Payroll attributable to its Employees' pre-Petition Date services and for the prior payroll checks, which have not yet been negotiated (the "Employee Wage Claims").

38.    The gross amount of the September 12 Payroll is approximately $313,000,[4] which includes: (a) net payroll amounts to be paid directly to Naartjie's Employees totaling approximately $230,000 (including regular compensation, overtime, and other compensation earned); (b) amounts to be deducted and paid on behalf of Employees, including state and federal payroll taxes, unemployment, Medicare and Social Security deductions in the approximate

---

[4]    The Debtor transfers the amount of each payroll to ADP in advance of every payroll date to facilitate prompt distributions to its Employees on such payroll date.  Consequently, prior to the Petition Date, the Debtor transferred the amount of the September 12 Payroll to ADP to meet the Debtor's payroll obligations.  Although it is unclear whether the amounts transferred to ADP prior to the Petition Date constitute property of the Debtor's estate, out of an abundance of caution, the Debtor requests authority from the Court to distribute the September 12 Payroll to its Employees.

amount of $74,000; (c) employer taxes in the approximate amount of $4,000; and (d) deductions

for individual health savings flexible spending accounts, and medical, dental, and vision

insurance in the approximate amount of $5,000.

39.    All of the September 12 Payroll is attributable to the Employees' pre-Petition

Date efforts.

40.    The gross amount of the September 19 Payroll is expected to be approximately

$8,000, which includes: (a) net payroll amounts to be paid directly to Naartjie's New York

Employees totaling approximately $6,000 (including regular compensation and other

compensation earned); (b) amounts to be deducted and paid on behalf of New York Employees,

including state and federal payroll taxes, unemployment, Medicare and Social Security

deductions in the approximate amount of $1,830; and (c) employer taxes in the approximate

amount of $170.

41.    The gross amount of the September 26 Payroll is expected to be approximately

$313,000, which includes: (a) net payroll amounts to be paid directly to Naartjie's Employees

totaling approximately $230,000 (including regular compensation, overtime, and other

compensation earned); (b) amounts to be deducted and paid on behalf of Employees, including

state and federal payroll taxes, unemployment, Medicare and Social Security deductions in the

approximate amount of $74,000; (c) employer taxes in the approximate amount of $4,000; and

(d) deductions for individual health savings flexible spending accounts, and medical, dental, and

vision insurance in the approximate amount of $5,000.

42.    The September 26 Payroll for the Non-New York Employees covers a 14-day

period ending on September 20, 2014, which includes 4 days that occurred before the Petition

15

Date.  The September 19 Payroll for the New York Employees covers a 7 day period ending on

September 13, 2014, which includes 4 days that occurred before the Petition Date.  Thus, the

Debtor estimates that approximately 4/14, or $89,429 of the gross amount of the September 26

Payroll will be attributable to the Employees' pre-petition services and approximately 4/14 or

$65,714 of the net payroll amount of the September 26 Payroll to be paid directly to the Non-

New York Employees will be attributable to the Non-New York Employees' pre-petition

services.  Similarly, the Debtor estimates that approximately 4/7, or $4,571 of the gross amount

of the September 19 Payroll will be attributable to the New York Employees' pre-petition

services and approximately 4/7 or $3,429 of the net payroll amount of the September 19 Payroll

to be paid directly to the New York Employees will be attributable to the New York Employees'

pre-petition services.

43.     There are approximately $2,179.20 in payroll checks for prior payroll periods that

had not been negotiated by the Debtor's Employees as of the Petition Date.

44.     Thus, as of the Petition Date, the Debtor owes approximately $299,143 in net

Employee Wage Claims attributable to the Employees' pre-Petition Date services.   If the

$230,000 in net Employee Wage Claims owed for the September 12 Payroll is deducted, the

Debtor owes approximately $69,143 in net Employee Wage Claims.

45.     In order to minimize the personal hardship the Employees will suffer if the

Debtor's pre-petition Employee payroll obligations are not paid when due, and to maintain

Employee morale during this critical time, the Debtor seeks authority to pay all accrued but

unpaid pre-petition Employee compensation.

46.     The Debtor believes that none of the Employees will receive payments in excess of the $12,475 priority claim amount established pursuant to section 507(a)(4) of the Bankruptcy Code.  The highest gross payroll obligation for a single Employee for the September 12 Payroll period is approximately $9,615.  The Debtor estimates that 4/14 of this amount, or $2,747 will be attributed to pre-Petition Date services for the September 26 Payroll.  Thus, the highest gross total payroll obligation to a single employee is approximately $12,362.

### Payroll Taxes

47.     Naartjie is required by law to withhold from Employee paychecks amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state, or local taxing authorities.  In addition, the Debtor is required to pay from its own funds Social Security and Medicare taxes, and, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").  ADP calculates all Payroll Taxes due for a given pay period and debits that amount from Debtor's operating account in a lump sum prior to each pay date.  ADP in turn remits the Payroll Taxes to the appropriate taxing authorities and files the related periodic information returns when due.

48.     As of the Petition Date, approximately $44,372 of accrued pre-petition Payroll Taxes remain unpaid.

### Manager Bonuses

49.     In the ordinary course of its business, the Debtor has a firmly established bonus program for each of its store managers and district managers.  Under this program, store

managers and district managers receive additional compensation if the stores under their direction meet certain monthly performance based goals that are tied to sales and payroll (the "Manager Bonuses").  If the targets are met the managers and store managers receive 80% of the Manager Bonus after it is earned in the applicable month, while the remaining 20% of the Manager Bonus is held by Naartjie until the end of the fiscal year and can be lost by the managers if performance metrics are not met during the remainder of the year.  As of the Petition Date, the Debtor estimates that it does not have any unpaid manager bonuses in its bank accounts.

### Reimbursement Obligations

50.      In the ordinary course of their duties on behalf of the Debtor, various employees may from time to time incur certain ordinary business expenses on behalf of the Debtor for which they are customarily reimbursed by the Debtor, or such expenses may be charged directly to the Debtor but the employee may be obligated on the expense if it is not paid by the Debtor (collectively, the "Reimbursement Obligations").  Although the Debtor requests that Employees submit reimbursement requests promptly, not all Employees do so.  Consequently, it is difficult for the Debtor to estimate the amount of Reimbursement Obligations outstanding as of the Petition Date.

### Health, Welfare and Other Benefits

51.      In the ordinary course of its business, the Debtor makes the following benefits programs available to its employees (collectively, the "Health and Welfare Benefits"):

| Benefit | Provider |
|---|---|
| Health Insurance | Cigna |
| Dental Insurance | MetLife |
| Life Insurance | Cigna |
| Flexible Spending Account | Self-funded[5] |
| Health Savings Account | Cigna |
| Supplemental Life Insurance | Humana |

52.    The Debtor's health insurance plan is self-funded by contributions from the Debtor and by withholding from the Employees' payroll, and is administered on behalf of the Debtor by Cigna.  The premiums and fees for the other Health and Welfare Benefits are paid for by withholding from the Employees' payroll.

53.    Employees are eligible to participate in the Health and Welfare Benefits programs after roughly 30 days of employment with the Debtor.  The Employees receiving the Health and Welfare Benefits are required to pay certain amounts toward those benefits as a pre-tax payroll deduction.    The Debtor's annual cost of providing the Health and Welfare Benefits is approximately $451,000.

54.    As of the Petition Date, the Debtor estimates that approximately $0 in prepetition obligations on account of the Health and Welfare Benefits are accrued and unpaid.  However, there may be additional amounts related to the pre-petition period that will come due post-petition.

---

[5]    The flexible spending account is self-funded by employee contributions, which are deducted from paychecks and held by the Debtor.  The Debtor then pays claims for the benefit of the Employees as such claims arise.

**Paid Time Off**

55.     The Debtor maintains an employee benefit policy pursuant to which Employees are provided with certain paid time off, which encompasses vacation days, sick time, personal days and holiday leave ("PTO"). The amount of PTO provided generally depends on each Employee's length of service with the Debtor and full-time or part-time status.

56.     Certain of the Debtor's Employees may have accrued and unused PTO as of the Petition Date.

**Workers' Compensation Obligations**

57.     Under applicable state law, the Debtor is required to maintain workers' compensation insurance policies and programs to provide Employees with workers' compensation coverage for injury claims arising from or related to their employment with the Debtor (the "Workers' Compensation Programs").

58.     The Debtor currently insures its workers' compensation liabilities through a policy with Travelers. The Debtor's total annual cost for providing the Workers' Compensation Programs is approximately $87,000. As of the Petition Date, the Debtor believes that it is current on all pre-petition obligations relating to its Workers' Compensation Programs. However, certain obligations related to the pre-petition period may not yet be due.

**C.  The Cash Management Motion**

59.     On the Petition Date, the Debtor maintained bank accounts with Wells Fargo Bank, N.A. ("Wells Fargo"), U.S. Bank National Association ("U.S. Bank"), Bank of America ("BOA"), BB&T, MB Financial Bank, J.P. Morgan Chase Bank ("Chase") and Zions Bank. A list of the Debtor's various bank accounts in the United States and Canada, as well as the last

four digits of the account numbers, is attached to the Cash Management Motion as **Exhibit A**

(collectively, the "Bank Accounts").  All of the Bank Accounts are maintained at financially

stable banking institutions with FDIC insurance.

60.    The Debtor maintains detailed and accurate records of all disbursements and

transfers flowing between the Bank Accounts, including all checks that are written on its

accounts.  The Debtor's banks allow the Debtor to easily monitor its Bank Accounts'

balances and activities, generate reports, hold and release checks, stop payments, transfer

funds and send wires.

61.    In the course of its operations, the Debtor maintains a cash management system

(the "Cash Management System") to receive and disburse funds.  A schematic of the Debtor's

Cash Management System is attached to the Cash Management Motion as **Exhibit B** and is

described below.

62.    During the pendency of its bankruptcy case, the Debtor intends to fund

operations from existing cash and post-petition payments, all of which will run through the

Bank Accounts.  If the Debtor is required to close all existing Bank Accounts immediately, the

Debtor would need to expend resources and time to establish the requisite number of new bank

accounts in an expedient manner to fulfill its business requirements.  This disruption to the

ordinary financial affairs of the Debtor would be prejudicial to the Debtor's estate and its

creditors.

63.    The Debtor's Bank Accounts are integral to its continued business operations.

For example, the Bank Accounts allow the Debtor to: (a) monitor and control all of its

receipts and disbursements efficiently; (b) pay vendors; (c) pay its employees; and (d)

otherwise fund and operate its business on a daily basis.  If the Debtor is required to close all existing Bank Accounts immediately, the Debtor would need to expend resources and time to establish the requisite number of new bank, which delay and disruption would be prejudicial to the Debtor's operations and its relationship with creditors, vendors and employees.

**United States Cash Management System**

64.     In the the ordinary course of business, receipts from the Debtor's stores come in primarily through either cash or credit card transactions.  The Debtor utilizes depository accounts for each of its stores to deposit cash from such stores.  Those store depository accounts are located at a variety of financial institutions, including U.S. Bank, BOA, BB&T, MB Financial, and Chase.

65.     On a nightly basis, the funds in the depository accounts for BB&T, MB Financial and Chase are swept directly into the Debtor's depository account located at Wells Fargo, with an account ending in 3204 (the "Concentration Account").

66.     Also on a nightly basis, the funds in the depository account of U.S. Bank are swept into a main U.S. Bank sweep account, and from there, the funds are swept on a nightly basis into the Wells Fargo Concentration Account.  Similarly, the funds in the BOA depository account are swept on a nightly basis into a BOA sweep account, and from there, the funds are swept on a nightly basis into the Concentration Account.

67.     Additionally, after processing by the appropriate credit card companies, credit card payments by customers at the Debtor's various stores are also deposited directly into the Concentration Account.

68.     Thereafter, on a daily basis, the Debtor's funds in the Concentration Account are swept into the Debtor's main account at Wells Fargo, with an account number ending in 8413 (the "Main Account").  From this Main Account, the Debtor: (a) makes payments to vendors via check or wire transfer; (b) pays sales taxes to the appropriate taxing authorities pursuant to electronic funds transfers; (c) transfers funds to another Wells Fargo account ending in 4423 to meet the Debtor's payroll obligations; and (d) transfers funds to another Wells Fargo account ending in 8421 to write manual checks for things such as paying employees without bank accounts or  paying terminated employees their last paychecks.

69.     The Debtor also maintains a reserve account at Wells Fargo (the "Wells Fargo Reserve Account"), which acts as a backstop to the Main Account and is funded with approximately $60,000 in restricted cash, as well as an additional $14,000 to serve as collateral for the Debtor's Canadian Main Account (defined below).

**Canadian Cash Management System**

70.     In Canada, the Debtor maintains a Wells Fargo operating account, with an account number ending in 8413 (the "Canadian Main Account").  This account is funded from receipts of Canadian transactions with the Debtor, which are mostly online retail transactions. From this Canadian Main Account, the Debtor makes payments to its Canadian vendors that want to be paid in Canadian money.

71.     The Debtor also has another Canadian account, with an account number ending in 8400.  This account is funded from the Canadian Main Account, and the purpose of this account is to pay Canadian vendors who want to be paid in United States money.

72.    As set forth above, the Wells Fargo Reserve Account maintains $14,000 that serves as collateral for the Canadian Main Account.

**The Debtor's Business Forms**

73.    In the ordinary course of business, the Debtor uses several varieties of business forms.  To minimize expense to the estate and to avoid any confusion with user/customers, employees, and third parties, the Debtor respectfully requests that the Court authorize the Debtor to continue to use all business forms, including without limitation, checks, letterhead, customer forms, purchase orders, contracts, and invoices (collectively, the "Business Forms"), as such forms were used by the Debtor immediately prior to the Petition Date, without reference to the Debtor's status as debtor in possession.

74.    Preparing, ordering and purchasing new Business Forms will be an unnecessary cost and burden to the Debtor with no discernible benefit to the estate.

**D.  The Insurance Motion**

75.    In connection with the operation of its business, the Debtor maintains comprehensive insurance programs (the "Insurance Programs") that include a variety of policies through several different insurance carriers (the "Insurance Carriers").  A description of the Insurance Programs is given below.

76.    Debtor maintains the Insurance Programs to protect its stores, inventory, and company against risks that may arise in the course of its business.  The Insurance Programs include the following types of coverage:

a. <u>General Liability</u> – This policy provides $10,000,000 of general liability coverage and has a premium amount of $32,150 per year, payable in 10 monthly installments.

b. <u>Property</u> – This policy provides $26,971,593 of various types of property coverage. The premium amount for this policy is $40,969 per year, payable in 10 monthly installments.

c. <u>Auto</u> – This policy provides $2,000,000 of coverage which includes liability protection, personal injury protection, uninsured/underinsured motorist protection, comprehensive, and collision coverage. The premium amount for this policy is $4,422 per year, payable in 10 monthly installments.

d. <u>Umbrella</u> – This policy provides $5,000,000 of coverage. The premium amount for this policy is $13,274 per year, payable as a 25% down payment upon renewal, and then 9 monthly installments.

e. <u>D&O</u> – This policy provides $11,100,000 of coverage in the form of D&O insurance, employment practices insurance, crime protection, and Side A Only excess insurance. This policy has been temporarily extended for two months, through October 15, 2014, to avoid a lapse in coverage, with an annual policy renewal pending. The annual premium for August 15, 2013 – August 15, 2014 was $33,963. The premium amount for the extension from August 15, 2014 – October 15, 2014 is $5,672. This premium is due annually.

f. <u>International</u> – This policy provides a total of $12,725,555 of coverage in the form of general liability coverage, auto insurance, property insurance as well as

other various types of insurance for Naartjie's international business operations. The premium for this policy is $17,215 per year. This premium is due annually.

77.    Debtor has incurred and continues to incur certain obligations relating to the Insurance Programs (such obligations, including those which accrued prior to the Petition Date, are referred to herein as the "Insurance Obligations"). The different categories of Insurance Obligations include the following: (i) fixed-rate premiums based on a rate established by each Insurance Carrier, which are generally payable in fixed monthly installments; (ii) deductibles and other fees related to the Insurance Programs; and (iii) payments to insurance agents and brokers, who assist Debtor with the procurement and negotiation of the Insurance Programs.

78.    During the 12 months preceding the Petition Date, the Insurance Obligations paid by Debtor include approximately $141,993 in premiums. As of the Petition Date, the Debtor is current on all premium payments for current and previous policy periods.

79.    The Debtor expects to make further payments that are the direct obligations of the Debtor during the anticipated timeframe of the Chapter 11 Case. Most of the insurance policies have premium payments remaining for the current policy period, which are payable on an installment basis. The Debtor expects such premiums to come due prior to the conclusion of this Chapter 11 Case.

80.    Continuation of the Insurance Programs is imperative to Naartjie's continued operation and ability to restructure, and payment of the Insurance Obligations is essential to ensure that the value of the Debtor's estate is maintained and to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize. The Debtor needs to minimize the risks associated with operating its business. Even a brief delay or suspension in the

Debtor's ability to pay the Insurance Obligations could create significant risk that the Debtor would void or otherwise lose the benefits of the Insurance Programs.

81.     Risks to the Debtor posed by any disruption of its insurance coverage include, among other things: (i) possible incurrence of direct liability for payment of claims that would otherwise have been payable by the Insurance Carriers under the Insurance Programs; (ii) possible incurrence of material costs or losses that would otherwise have been reimbursed by the Insurance Carriers under the Insurance Programs; (iii) consequences to the Debtor's ability to conduct business in jurisdictions that require the Debtor to maintain certain insurance coverage; (iv) the possible inability to obtain equivalent coverage from alternative sources; and (v) possible incurrence of higher costs in order to re-establish lapsed insurance policies or obtain new insurance coverage.

**E.  The Taxes Motion**

82.     In connection with the operation of its business, the Debtor (i) incurs and/or collects taxes, including sales, use, income, property and other miscellaneous taxes (collectively, the "Taxes"); (ii) incurs business license and permit fees in connection with obtaining licenses and permits necessary to operate its business, miscellaneous fees, and other similar assessments (collectively, the "Fees"); and (iii) remits such Taxes and Fees to various taxing, licensing, and other regulatory authorities (collectively, the "Taxing Authorities"; each a "Taxing Authority") as they become due.

83.     Paying the Taxes and Fees will benefit the Debtor's estate and its creditors by allowing the Debtor's operations to continue without interruption, and paying the taxes will not harm the Debtor's estate or stakeholders.  Absent the relief requested in the Taxes Motion, the

Debtor's business could be significantly disrupted.  Granting the relief requested in the Taxes Motion will enhance the likelihood of the Debtor's successful rehabilitation, and maximize the value of the estate assets for the benefit of the Debtor's creditors.

84.     The Debtor is current on substantially all of the Taxes and Fees that have become due as of the Petition Date.  However, because certain of the Taxes and Fees are paid on a periodic basis (and in arrears), there is, in many instances, a delay between the time when the Debtor incurs an obligation to pay the Taxes and Fees and the date such Taxes and Fees become due.  Various Taxing Authorities may, therefore, have claims against the Debtor for Taxes and Fees that have accrued but remain unpaid as of the Petition Date or that will come due during the pendency of the Chapter 11 Case.   The Debtor's obligations on account of these Taxes and Fees are discussed in greater detail below.

85.     The Debtor has sufficient funds to pay the amounts described in the Taxes Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, and anticipated post-petition financing and access to cash collateral.  Also, under the Debtor's existing cash management system, the Debtor can readily identify checks, wire transfers, drafts, ACH debits, and other transfers drawn on the Debtor's bank accounts as relating to an authorized payment in respect of the Taxes and Fees.  Accordingly, the Debtor believes that pre-petition payments not authorized by the Court will not be honored inadvertently.

86.     The payments proposed in the Taxes Motion are essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize.

**Sales and Use Taxes**

87.     The Debtor, at the time of in-store and online sales of its merchandise, is required to collect a variety of sales and other similar taxes (collectively, the "Sales Taxes") from its customers on behalf of the applicable Taxing Authorities, and periodically remit the Sales Taxes to the applicable Taxing Authorities.

88.     Typically, Sales Taxes accrue as products are sold, and are collected as a statutory percentage of the sale price.   The process by which the Debtor remits Sales Taxes varies depending on the particular Taxing Authority to be paid.  Sales Taxes are remitted to the relevant Taxing Authorities either on the basis of estimated sales tax collections for the coming period, or on the basis of Sales Taxes actually collected from customers, in each case depending on the method required by the relevant Taxing Authority.  Generally, the Debtor pays significant Sales Taxes on a monthly or quarterly basis, depending on the jurisdiction. Certain jurisdictions require the Debtor to prepay estimated Sales Taxes, generally on a monthly basis.  In an average month, the Debtor remits approximately $191,000 to numerous Taxing Authorities, although the amount remitted in any given month varies.

89.     Use Taxes ("Use Taxes") arise when items or services are purchased from vendors who are not registered to collect Sales Taxes for states where such vendors deliver property to or perform services for the Debtor.   In this circumstance, such vendors are not obligated to charge or remit Sales Taxes.  Upon information and belief, I do not believe that the Debtor incurs or remits any Use Taxes in the course of its business, as the Debtor does not routinely purchase tangible personal property or services from vendors that have no nexus to states in which the Debtor operates and does business.

90.     During the calendar year 2013, the Debtor collected and remitted approximately $2.3 Million of Sales Tax.  As of the Petition Date, approximately $224,000 of Sales Taxes have accrued and are owing to various Taxing Authorities.

### U.S. Customs Tax

91.     The Debtor pays certain base taxes to the U.S. Customs Office ("Customs Taxes").  By agreement with U.S. Customs total on average approximately $2,000 per month, and are subject to a year-end true-up for actual activity.  These U.S. Customs Taxes are generally paid in arrears annually in the ordinary course of the Debtor's business.  In addition, the Debtor pays taxes which are assessed as a percentage of the value of goods imported from the Debtor's international vendors. The Debtor accrues these Customs Taxes on a monthly basis.  As of the Petition Date, approximately $148,000 of Customs Taxes have accrued and remain owing to the U.S. Customs Office.

### Personal Property Taxes

92.     Under applicable law, state and local governments in certain jurisdictions where the Debtor operates are granted the authority to levy taxes against the Debtor's personal property (the "Personal Property Taxes").  The Personal Property Taxes are generally paid in arrears annually or semi-annually in the ordinary course of the Debtor's business.  Approximately $108,000 of Personal Property Taxes have accrued and remain unpaid as of the Petition Date, based upon personal property owed during calendar years 2013 and 2014.

### Business License/Permit Fees, Annual Report Fees, and Other Miscellaneous Taxes and Fees

93.     The Debtor must obtain various business licenses, permits, and certificates, and pay corresponding fees in many jurisdictions in which it operates.  In addition, in various

jurisdictions the Debtor pays annual reporting fees to state governments to remain in good standing for purposes of conducting business within the state. The Debtor must also pay miscellaneous business taxes in certain states, including commercial rent taxes, gross receipts taxes, occupancy taxes and business privilege taxes. Certain jurisdictions also impose "false alarm" fees and other similar charges for responding to fire and/or burglar alarms inadvertently triggered in the Debtor's retail stores. I estimate that, as of the Petition Date, there is a de-minimum amount of miscellaneous taxes and fees have accrued and remain owing to various Taxing Authorities.

### F.  The Utilities Motion

94.     In connection with the operation of its business, the Debtor incurs utility expenses in the ordinary course of business for, among other things, water, electricity, gas, internet, telephone, and similar utility products and services (collectively, the "Utility Services") from various utility companies (the "Utility Companies") covering a number of utility accounts. A non-exhaustive list of the Utility Companies is attached to the Utilities Motion as **Exhibit A**.

95.     Uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of the Debtor's chapter 11 efforts. Any interruption of Utility Services, even for a brief period of time, would negatively affect the Debtor's operations, customer relationships, and revenues and profits, seriously jeopardizing the Debtor's reorganization efforts, and ultimately value and creditor recoveries. It is therefore critical that Utility Services continue uninterrupted during this Chapter 11 Case.

96.     Pre-petition, on average, the Debtor spent approximately $721,000 annually for various Utility Services, with an average monthly cost of approximately $60,000.

97.     The Debtor intends to pay post-petition obligations owed to the Utility Companies in a timely manner.  To provide additional assurance of payment for future Utility Services to the Utility Companies, the Debtor proposes to deposit, within ten (10) business days following entry of the Order granting this Motion, a utility deposit (the "Adequate Assurance Deposit") equal to the estimated aggregate cost for two weeks of Utility Service plus an additional $10,000, calculated based upon the Debtor's average utility costs from January 2013 through December 2013.  Based on this methodology, the total amount of the Adequate Assurance Deposit will be $40,000.00.  The chart attached hereto as **Exhibit A** reflects, among other things, the identity of each currently known Utility Company, their address and the type of utility.  The Adequate Assurance Deposit will be placed into a single, segregated, newly-created, interest-bearing account (the "Adequate Assurance Deposit Account").  The Adequate Assurance Deposit shall be held in the Adequate Assurance Deposit Account for the benefit of the Utility Companies during the pendency of this Chapter 11 Case.

98.     The Debtor proposes to establish the Adequate Assurance Deposit Account, in accordance with the terms and conditions of the Debtor's proposed post-petition credit facility and the proposed form of order granting this Motion attached hereto, in the amount of $40,000, which amount is equal to the charges incurred by the Debtor for approximately two weeks of Utility Services from all of the Utility Companies plus an additional $10,000.  The Adequate Assurance Deposit Account will be established by segregating the funds into a separate account at Wells Fargo Bank, N.A. ("Wells Fargo"), to be administered in accordance with the Order.  The Adequate Assurance Deposit Account would serve as a cash security deposit to provide adequate assurance of payment for Utility Services provided to the Debtor post-petition.

99.     In the event the Debtor fails to timely pay for post-petition Utility Services when due in accordance with normal pre-petition invoice terms, a Utility Company would be permitted to submit a payment request (the "Payment Request"), substantially in the form attached to the Utilities Motion as Exhibit B, to Wells Fargo in the amount of the due but unpaid charges for post-petition services, rounded to the nearest $100.00.  The Payment Request requires that the Utility Company: (i) certify that the Debtor defaulted (a "Default") in the payment for post-petition utility services and that the post-petition amounts due on the account of such utility services are outstanding and unpaid; (ii) certify that the amount requested is not and does not relate to a request for additional adequate assurance of payment; (iii) provide Wells Fargo with wire transfer or other payment instructions, as more fully set forth in Exhibit B; and (iv) simultaneously send a copy of the Payment Request to the Debtor and its counsel (which Payment Request shall require that the Utility Company certify that there was a Default) and provide the Debtor with a five (5) day period to cure any default before processing a Payment Request.

100.     Provided that a Payment Request complies with the above conditions, any payments made from the Adequate Assurance Deposit Account shall be made by Wells Fargo in the order that the Payment Requests were actually received by Wells Fargo.

101.     The segregated nature of the Adequate Assurance Deposit Account provides concrete assurance of the Debtor's payment and of its future obligations to the Utility Companies.  Through the date that the Order is entered approving this Motion, the Adequate Assurance Deposit Account shall be maintained with a minimum balance equal to the estimated aggregate cost for two weeks of utility service plus $10,000, as calculated above.

102.    Given the nature of the Debtor's business, uninterrupted utility services are essential to the Debtor's ongoing operations, and, therefore, to the success of the Debtor's Chapter 11 efforts.  Indeed, any disruption to the Debtor's service locations by virtue of the cessation of Utility Services by the Utility Companies could bring the Debtor's operations to a grinding halt.  Should one or more of the Utility Companies refuse or discontinue service even for a brief period, the Debtor's operations would be severely disrupted.  Such an interruption would severely damage customer relationships, revenues and profits, and would adversely affect the Debtor's chapter 11 efforts, to the detriment of its estate, creditors, and employees.  It is therefore critical that Utility Services provided to the Debtor continue uninterrupted.

## G.  The Customer Programs Motion

103.    In the ordinary course of its business, the Debtor engages in certain practices (the "Customer Programs") to develop and sustain a positive reputation with its customers.  The Debtor's Customer Programs are typical in its industry, and has been a part of the Debtor's normal business operations for many years.  In general, the Customer Programs are designed to address competitive pressures, encourage sales, ensure customer satisfaction, and generate goodwill for the Debtor.  As such, the Debtor believes that the Customer Programs play an important role in enabling the Debtor to retain existing customers, to attract new customers, and ultimately, to enhance the Debtor's overall profitability.  An overview of the Customer Programs is provided below.

104.    The continuation of the Customer Programs is critical to maintain such customer support and loyalty, and is therefore necessary for the maximization of value in the Chapter 11 case.  I believe that any failure by the Debtor to honor its existing obligations under the

Customer Programs will undermine the Debtor's relationships with its customers and impair the Debtor's ongoing ability to effectively participate in a competitive marketplace.

105.    The success and viability of the Debtor's business depends upon the development and maintenance of customer loyalty.  The commencement of a Chapter 11 Case may create some apprehension on the part of certain customers or potential customers regarding their willingness to continue or commence doing business with the Debtor.  I believe that the requested relief in the Customer Programs Motion will ease these concerns, thus helping the Debtor stabilize its business and preserve the loyalty of its customers.  Similarly, authorizing the payment of the Credit Card Processing Fees will prevent any interruption in the Debtor's ability to process credit card transactions, which if interrupted, could adversely impact the Debtor's ability to complete transactions and generate sales revenue.

106.    The payments proposed in the Customer Programs Motion are essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize.

### Gift Card Program

107.    In the ordinary course of its business, the Debtor offers various gift certificates and gift cards which may be redeemed and applied towards a future purchase of the Debtor's goods (the "Gift Card Program").  These certificates and cards are offered for sale to customers; they may also be used as an alternative to a cash refund to customers who are returning purchases.  As of the Petition Date, I believe that approximately $233,600 in gift cards and certificates had been purchased by or provided to customers but not yet redeemed.

**Credit Card Processing Fees**

108.    In the ordinary course of business, the Debtor is a party to certain agreements with merchant banks that act as third party credit card processors (the "Credit Card Processors") under which the Credit Card Processors accept and process credit card payments made by customers for purchases at Naartjie.  The Credit Card Processors disburse to the Debtor the amounts received from the Debtor's customers, subject to certain adjustments, returns, and refunds, and are compensated by the Debtor through a "net fee" transaction in an ongoing manner (the "Credit Card Processing Fees").  The Credit Card Processing Fees total, on average, about 2% of the sales transaction.  In addition to the "net fee" transactions which are closed out daily, the Credit Card Processing Fees include a monthly fee to provide credit card processing services.  As of the Petition Date, I believe that approximately $55,000 in Credit Card Processing Fees is outstanding.

**Customer Returns and Store Credit**

109.    In the ordinary course of business, the Debtor allows its customers to return or exchange merchandise purchased from the Debtor in accordance with its return policies ("Customer Returns").  Customers are reimbursed for these Customer Returns either by a refund of monies paid to the Debtor (the "Cash Refund"), or by giving the customer an in-store credit for the amount of the purchase price (the "Store Credit") that they can redeem from the Debtor at a later time.  As of the Petition Date, I estimate the amount of potential outstanding Customer Returns to be approximately $118,000.

110.    Cash Refunds. When completing a Customer Return, customers can elect to receive a Cash Refund of monies previously paid.  Cash Refunds are completed either by

refunding the purchase price to the customer in cash, or by crediting the customer's credit card for the amount of the purchase.

111.     <u>Store Credit</u>.   In lieu of receiving a Cash Refund as reimbursement for the Customer Return, customers may elect instead to receive a Store Credit.   These Store Credits may be redeemed and applied towards a future purchase of the Debtor's goods.   As of the Petition Date, I estimate the amount of outstanding Store Credits to be approximately $3,000.

## H.  The DIP Motion

112.     On September 12, 2014, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code.   During the pendency of its chapter 11 case (the "<u>Bankruptcy Case</u>"), the Debtor is operating and managing its business as a debtor-in-possession pursuant to sections 1107 and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

### DIP Financing with DIP Lenders

113.     The Debtor is seeking authority to enter into a debtor in possession financing transaction with Victory Park Capital Advisors, LLC (the "<u>DIP Lenders</u>"), in which the DIP Lenders will lend $8,500,000 to the Debtor (the "<u>DIP Loan</u>").   The Debtor will grant the DIP Lenders a perfected first priority security interest in all of its assets to secure the DIP Loan, and will grant the DIP Lenders a super priority administrative claim. The Debtor and the DIP Lenders have agreed that the transactions contemplated by the DIP Loan may be effected in accordance with and pursuant to the DIP Loan Term Sheet and the entry of an Interim Order and a Final Order without the need for any additional loan documentation.

114.     The DIP Loan will allow the Debtor to pay in full the prepetition debt (the "<u>Prepetition Debt Obligations</u>") owed to Salus Capital Partners, LLC (the "<u>Prepetition Lender</u>")

and provide working capital to the Debtor while the parties work to file and confirm a reorganization plan in the Bankruptcy Case.

115.    The proposed DIP Loan is the first step in an overall restructuring to provide funding for the continued operation of the Debtor and for the ultimate reorganization and exit from bankruptcy by the Debtor.

116.    An immediate and critical need exists for the Debtor to obtain funds in order to repay the Prepetition Debt Obligations to facilitate the restructuring of the Debtor.  Without such funds, the Debtor will not be able to, among other things, pay its payroll, pay other direct operating expenses, or obtain goods and services needed to carry on its businesses in a manner that will avoid irreparable harm to, among other entities, its estate, creditors, vendors, suppliers, customers, and employees.  At this time, the Debtor's ability to finance its operations and the availability to it of sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations are vital to the confidence of the Debtor's vendors and suppliers of other goods and services, to its customers, and to the preservation and maintenance of the going concern value of its estate.

117.    The Debtor is seeking interim approval of the DIP Loan so that sufficient funds are available to pay off the Prepetition Debt Obligations and provide the Debtor with the working capital it needs to operate.  The Debtor needs approximately $[__] to pay off the Prepetition Debt Obligations.  As described in more detail herein and in the DIP Motion, the Debtor will pledge all of its assets to secure the DIP Loan with first priority perfected liens and grant the DIP Lenders super priority administrative claims.  Further, the Debtor will have the use

of cash collateral pursuant to budgets to be provided to the DIP Lenders, with a 10% variance allowed.

118.    The Debtor, the Prepetition Lender, and the DIP Lenders are considering, but in no respect have agreed to, certain stipulations, acknowledgments, discharges, releases, and a deposit to secure indemnity obligations and to reimburse costs and expenses in connection with paying off the Prepetition Debt Obligations.  To the extent these considerations necessitate any changes to the proposed Interim Order, the Debtor will provide the Court with a revised Interim Order as soon as practicable.

**Summary of Provisions of DIP Loan from DIP Lenders**

119.    The DIP Lenders will not make the DIP Loan without a first priority security interest in all of the Debtor's property and super priority administrative claims.  The Prepetition Lender will not provide the necessary financing and will not agree to the priming of its first liens on its collateral.  The Debtor has been unable to identify any lender or strategic investor other than the DIP Lenders that will provide the Debtor the financing it desperately needs.

120.    The    proposed    DIP    Loan    is    the    first    step    in    an    overall restructuring to provide funding for the continued operation and for the ultimate reorganization and exit from bankruptcy by the Debtor.  The DIP Loan is part of a package that is expected to lead to an agreement on exit financing to the Debtor as part of an overall exit/reorganization strategy for the Debtor.

121.    In general, the proceeds of the DIP Loan are to be used as follows: (1) the Debtor's general working capital and operational expenses; (2) administration of the Debtor's bankruptcy case (in each case of (1) and (2), in accordance with weekly cash collateral budgets);

(3) costs, expenses, closing payments, and other payments in connection with the DIP Loan; and

(4) payment in full of the Prepetition Debt Obligations. *See* DIP Loan Term Sheet at page 1 (Use

of Proceeds), attached to the DIP Motion as **Exhibit 1**.

> 122.   Among other items, the DIP Loan Term sheet provides:

> > "The DIP Loan shall be secured by: (i) a perfected first priority lien on any and all current and future assets of the Debtor of any nature or type whatsoever, including, without limitation, cash, accounts, accounts receivable, goods, instruments, investment property (including, without limitation, ownership interests in corporations, partnerships and limited liability companies), inventory, vehicles, customer lists, trademarks, copyrights, brands, know-how and other intellectual property, plant and equipment, patents, trade secrets, tax assets, real property and/or leasehold rights, personal property, commercial tort claims, any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, excluding causes of action and recoveries pursuant to Chapter 5 of the Bankruptcy Code, all other tangible and intangible assets, and any and all proceeds of the foregoing; (ii) a first priority pledge of the capital stock and/or equity interest held directly or indirectly by the Debtor, , including, without limitation, the equity in ZA One (Pty) Ltd.; and (iii) constructive control over all of the Debtor's bank accounts, solely for the purposes of constituting perfection under applicable non-bankruptcy law (collectively, the "**Collateral**").

DIP Loan Term Sheet at pages 2 and 3 (Collateral).

> 123.   The Debtor is unable to obtain the required funds in the form of: unsecured credit

or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code; an administrative

expense pursuant to section 364(a) or 364(b) of the Bankruptcy Code; unsecured debt having the

priority afforded by section 364(c)(1) of the Bankruptcy Code; or secured debt as described in

section 364(c)(2) or 364(c)(3) of the Bankruptcy Code except as set forth in this Motion and the

proposed Interim Order.   The terms of the DIP Loan are the best the Debtor has been able to

identify, are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent

business judgment consistent with its fiduciary duty, and are supported by reasonably equivalent

value and fair consideration.   The DIP Loan has been negotiated in good faith and at arm's

length among the Debtor, the DIP Agent, and the DIP Lenders.  The Debtor, through its investment banker, investigated other options, but only the proposal from the DIP Lenders was sufficient to satisfy all of the Company's needs and allow the Debtor to continue as a going concern.

124.    **Granting of Priority or Lien under Bankruptcy Code §§ 364(c) & (d):** The DIP Loan Term Sheet provides for the granting of priority and the granting of a lien on all property of the Debtor's estate pursuant to Bankruptcy Code §§ 364(c) and (d) as follows:

a.    The DIP Loan Term Sheet provides that the DIP Loan will be secured by a first priority perfected security interest in the Collateral as described above. *See* DIP Loan Term Sheet at pages 2 and 3 (Collateral).  The DIP Lenders will have a first priority lien on the Collateral (subject to the Carve-Out).

b.    The DIP Loan Term Sheet further provides that the DIP Lenders will have a priority claim under the DIP Loan over all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b) (subject to the Carve-Out). *See* DIP Loan Term Sheet at page 3 (Priority).

c.    Such priority and liens were provided as an essential inducement to the DIP Lenders in consideration for agreeing to enter into the DIP Loan.  Among other things, the DIP Lenders required that the Debtor pledge all of its assets as a condition to providing the funding to the Debtor.

125.    **Use of Proceeds of DIP Loan to Pay Prepetition Debt Obligations:**  The DIP Loan Term Sheet provides that one of the uses of the proceeds of the DIP Loan shall be to pay the Prepetition Debt Obligations. *See* DIP Loan Term Sheet at page 1 (Use of Proceeds).  This is

the only way that a first priority security interest in all the assets of the Debtor can be granted to
the DIP Lenders.

126.    **Waiver or Modification Related to Automatic Stay:** The DIP Loan Term Sheet

provides at page 6 (Default Remedies) that upon five business days' written notice to the Debtor

and their counsel of an Event of Default which is not subsequently cured or waived during such

notice period, the DIP Loan shall mature and:

> "The DIP Agent shall have the right to an emergency hearing upon three (3) business
> days' notice requesting relief from the automatic stay otherwise imposed pursuant to
> Bankruptcy Code § 362 that permits the DIP Agent to realize upon, or to exercise any
> right or remedy with respect to, any portion of the Collateral; provided that in any hearing
> following such notice, the only issue that may be raised by any party in opposition to the
> actions proposed or available to be taken by the DIP Agent shall be whether, in fact, an
> Event of Default has occurred and is continuing."

127.    This provision was included at the DIP Lenders' request as additional protection

to the DIP Lenders in the event of default.

128.    **Waiver or Modification of Authority to Obtain Credit, Use Collateral or File**

**a Plan of Reorganization:**  The DIP Loan Term Sheet at page 5 (Events of Default) provides in

part that it is a default under the DIP Loan if the Debtor files any motion seeking an order:  (a)

permitting working capital or other financing (other than ordinary course trade debt or unsecured

debt) for either Debtor from any person other than the DIP Agent (unless the proceeds of such

financing are to be used to pay in full in cash all obligations arising under the DIP Loan Term

Sheet, the Interim Order and the Final Order); (b) granting a lien on, or security interest in, any

of the Collateral (unless such liens are granted in connection with a financing, the proceeds of

which are to be applied to the payment in full in cash of all obligations arising under the DIP

Loan Term Sheet, the Interim Order and the Final Order); and (c) except as permitted by the DIP

Loan Term Sheet, the Interim Order or the Final Order, permitting the use of any of the Collateral pursuant to Bankruptcy Code § 363(c) without the prior written consent of the DIP Agent. Further, an event of default includes filing or confirmation of a plan of reorganization or liquidation containing terms to which the DIP Agent has not consented in writing.

129.    This provision was included at the DIP Lenders' request as additional protection to the DIP Lenders in the event of default.

130.    **Waiver or Modification Related to Non-Bankruptcy Law and Perfection of Lien:** The DIP Loan Term Sheet at page 3 (Priority) provides that "The Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the DIP Agent or the DIP Lenders." This provision was included at the DIP Lenders' request to facilitate perfection and as additional protection to the DIP Lenders in the event of default.

131.    **Release of Claims Belonging to Estate:** The proposed Interim Order provides for a release by the Debtor in favor of the DIP Lenders, DIP Agent, and certain of their affiliated parties (collectively, the "Releasees") of all claims existing on or before the date of the Interim Order based upon or related to, in whole or in part, the DIP Loan, certain documents related thereto, or certain transactions contemplated thereby (collectively, the "Claims").

132.    The Debtor is not aware of any Claims with respect to the Releasees.

133.    **Waiver of Rights under Bankruptcy Code § 506(c):** The DIP Loan Term Sheet provides at page 6 (Waiver of Bankruptcy Code §506(c)) that: "Subject to the Carve-Out, no administrative costs or expenses shall be charged against or recovered from the Collateral pursuant to Bankruptcy Code § 506(c)." The Carve-Out specifically provides for, *inter alia*, the

payment of fees and expenses of any chapter 7 trustee and any chapter 7 professionals in an aggregate amount not to exceed $25,000. *See* DIP Loan Term Sheet at page 3 (Carve-Out).

    I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

Jeff Nerland