Annette W. Jarvis (Utah State Bar No. 01649)
Peggy Hunt (Utah State Bar No. 6060)
Michael F. Thomson (Utah State Bar No. 9707)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
           hunt.peggy@dorsey.com
           thomson.michael@dorsey.com
           armington.jeff@dorsey.com

*Proposed Attorneys for Debtor Naartjie Custom Kids, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 14-29666 |
| NAARTJIE CUSTOM KIDS, INC., | Chapter 11 |
| Debtor. | Judge William T. Thurman |

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (I) AUTHORIZING DEBTOR IN POSSESSION TO OBTAIN POSTPETITION FINANCING (II) AUTHORIZING USE OF CASH COLLATERAL; (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (IV) GRANTING ADEQUATE PROTECTION; (V) MODIFYING THE AUTOMATIC STAY; AND (VI) SCHEDULING A FINAL HEARING**

Naartjie Custom Kids, Inc. ("Naartjie" or "Debtor"), the debtor in possession in the above captioned bankruptcy case, by and through its proposed counsel, submits this motion (the "Motion") for entry of an order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507: (i) authorizing post-petition financing, (ii) authorizing use of cash collateral, (iii) granting liens and providing superpriority administrative expense status, (iv) granting adequate protection, (v)

modifying the automatic stay, and (vi) scheduling a final hearing, in connection with debtor in possession financing to the Debtor by Salus Capital Partners, LLC (the "<u>DIP Lender</u>" or "<u>Salus</u>").[1]  This Motion is supported by the *Declaration of Jeff Nerland in Support of the Debtor's Chapter 11 Petition and First Day Motions* (the "<u>Omnibus Declaration</u>").  In further support of the Motion, the Debtor respectfully represents:[2]

### RELIEF REQUESTED

The Debtor requests an order approving the use of property of the estate other than in the ordinary course of business and approving the Debtor's incurring of debt.  Specifically, the Debtor requests an order (1) authorizing the Debtor to enter into the DIP Loan (as defined herein) with the DIP Lender in accordance with the terms in the DIP Term Sheet and the proposed interim order (the "<u>Interim Order</u>"), and the Final Order (as defined herein), and to take all actions necessary to consummate the DIP Loan, (2) authorizing and approving the Debtor to grant priming liens on all of its current and future property as collateral and super priority claims in connection with the DIP Loan, (3) authorizing and approving the use of cash collateral, (4) approving modification of the automatic stay to the extent necessary to implement and enforce the terms and provisions of the DIP Loan, and (5) scheduling a final hearing (a "<u>Final Hearing</u>") for entry of an order granting the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing.

---

[1]   The DIP Lender includes Salus and such other lenders as Salus may select.  Salus shall also act as administrative agent for the DIP Lender (the "<u>DIP Agent</u>").

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Term Sheet.

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157(b) and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory bases for the relief requested herein are 11 U.S.C. §§ 105, 361, 362, 363, and 364, and Federal Rules of Bankruptcy Procedure 2002, 4001, 6004, 9014, and 9019, and the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Utah, Central Division (the "Court").

## STATEMENT OF FACTS

3.      On September 12, 2014, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "Petition Date").  During the pendency of its chapter 11 case (the "Bankruptcy Case"), the Debtor is operating and managing its business as a debtor-in-possession pursuant to sections 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code")

4.      As described in the Debtor's *Withdrawal of Debtor's DIP Financing Motion* [Docket No. 30], on the Petition Date, the Debtor had an agreement with Victory Park Capital Advisors, LLC ("Victory Park"), to lend the Debtor $8,500,000.  Despite Victory Park's agreement to provide a debtor-in-possession loan, and absent any material change in the Debtor's financial condition, on Saturday, September 13, 2014, the day after the Debtor had filed its voluntary petition initiating this bankruptcy case, Victory Park informed the Debtor that it had changed its mind and would no longer fund a debtor-in-possession loan.

5.      Upon being informed by Victory Park of its decision not to fund a debtor-in-possession loan on Saturday morning, the Debtor immediately began negotiations with Salus, the

Debtor's senior secured lender, to provide working capital to the Debtor while the parties work to facilitate an orderly liquidation.

6.      Those negotiations culminated in the execution of the DIP Term Sheet and led to the filing of this Motion.

### A.  **DIP Financing with DIP Lender**

7.      The Debtor is seeking authority to enter into a debtor in possession financing transaction with the DIP Lender, in which the DIP Lender will lend up to $1,000,000 to the Debtor (the "DIP Loan").  The Debtor will grant the DIP Lender a perfected first priority security interest in all of its assets to secure the DIP Loan, and will grant the DIP Lender a superpriority administrative claim.  A true and correct copy of the Debtor-in-Possession Credit Facility Term Sheet, which contains the material terms of the DIP Loan, is attached hereto as **Exhibit A** (the "DIP Term Sheet").  The Debtor and the DIP Lender have agreed that the transactions contemplated by the DIP Loan shall be documented by a Debtor in Possession Credit Agreement (the "DIP Credit Agreement") in accordance with the DIP Term Sheet but otherwise in substantially the form of the Credit Agreement dated as of October 17, 2013 (as amended to date, and together with all related loan and security documentation, the "Pre-Petition Credit Agreement"), and shall be subject to the terms and conditions contained therein.

8.      The Debtor's need to use Cash Collateral and to obtain credit pursuant to the DIP Facility is immediate and critical in order to enable the Debtor to continue operations and to administer and preserve the value of its estate.  The ability of the Debtor to finance its operations, maintain business relationships, to pay its employees, protect the value of its assets and otherwise finance its operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtor, its estate, its creditors and equity holders, and the possibility for a

successful administration of the Case. The Debtor does not have sufficient available sources of working capital and financing to operate its businesses or to maintain its properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

9. The Debtor is seeking interim approval of the DIP Loan so that sufficient funds are available to provide the Debtor with the working capital it needs to operate. As described in more detail herein, the Debtor will pledge all of its assets to secure the DIP Loan with first priority perfected liens and grant the DIP Lender super priority administrative claims. Further, the Debtor will have the use of cash collateral pursuant to budgets to be provided to the DIP Lender, with a 10% variance allowed.

10. In support of the relief requested herein, the Debtor relies on this Motion and the Omnibus Declaration, and all supporting pleadings and evidence filed therewith.

**B. Summary of Provisions of DIP Loan from DIP Lender**

11. The DIP Lender will not make the DIP Loan without a first priority security interest in all of the Debtor's property and super priority administrative claims. The Debtor has been unable to identify any lender or strategic investor other than the DIP Lender that will provide the Debtor the financing it desperately needs.

12. In general, the proceeds of the DIP Loan are to be used as follows: (i) to pay fees, costs and expenses of the DIP Facility, including payment of Agent's reasonable attorney's fees and other out of pocket expenses; (ii) to pay to the Agent as adequate protection payments in respect of the diminution in the value of the Agent's and Pre-Petition Lenders' liens in the pre-petition collateral, post-petition interest on the Pre-Petition Debt at the post default rate under the Pre-Petition Credit Agreement; (iii) to pay post-petition operating expenses of the Borrower incurred in the ordinary course of business (including purchases of inventory); (iv) to pay costs and expenses of administration of the Chapter 11 Case, including payment of approved

professional fees; and (v) to pay other amounts as specified in the Budget and/or operative documentation and allowed by the Bankruptcy Court, in the case of (iii) through (v), in amounts and categories consistent with the Budget.[3]

13.    Among other items, the DIP Term Sheet provides:

"All amounts owing by the Borrower under the DIP Facility will be secured by a first priority priming perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Borrower, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, owned real property, proceeds of leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, senior to and priming all pre-petition liens (including liens securing the Pre-Petition Debt), subject only to (i) valid, perfected and enforceable liens of record as of the date of the commencement of the Chapter 11 Case disclosed to and acceptable to the Agent (other than liens securing the Pre-Petition Debt ("*Permitted Liens*")), and (ii) the Carve-Out.[4]

14.    The Debtor is unable to obtain the required funds in the form of: unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code; an administrative expense pursuant to section 364(a) or 364(b) of the Bankruptcy Code; unsecured debt having the priority afforded by section 364(c)(1) of the Bankruptcy Code; or secured debt as described in section 364(c)(2) or 364(c)(3) of the Bankruptcy Code except as set forth in this Motion and the proposed Interim Order.  The terms of the DIP Loan are the best the Debtor has been able to identify, are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duty, and are supported by reasonably equivalent value and fair consideration.  The DIP Loan has been negotiated in good faith and at arm's length among the Debtor, the DIP Agent, and the DIP Lender.  The Debtor, through its investment banker, investigated other options, but only the proposal from the DIP Lender was

---

[3]   *See* DIP Term Sheet at p. 4.

[4]   *See* DIP Term Sheet at p. 6.

sufficient to satisfy the Company's needs and allow the Debtor to orderly liquidate its estate to

for the benefit of its creditors.

C. **Required Disclosures under the Guidelines for Cash Collateral & Financing Motions & Stipulations, Bankruptcy Rule 4001(c) and the Local Rules of this Court.**

15. The proposed DIP Term Sheet contains the following provisions requiring

disclosure under the Guidelines for Cash Collateral & Financing Motions & Stipulations,

Bankruptcy Rule 4001(c), and the Local Rules of this Court.[5]

| Disclosure Content and Related Bankruptcy Rule | Description |
|---|---|
| Commitment and Disbursements 4001(c)(1)(B) | **DIP Term Sheet ("The DIP Facility" Section)**: Commitment: A non-amortizing revolving credit facility (the "_DIP Facility;_" advances of funds under the DIP Facility being referred to herein as "_DIP Loans_") made available to the Borrower in a principal amount of up to $1,000,000 (the "_Commitment_"). The DIP Loans shall be available to the Borrower within the limits of the Borrowing Base and in all events subject to the Budget (each as defined below). All loans outstanding under the DIP Facility shall become due and payable on the Termination Date (as hereinafter defined). <br><br>**DIP Term Sheet ("Borrowing Base; Budget" Section):** All borrowings under the DIP Facility will be subject to a borrowing base (the "_Borrowing Base_") calculated as follows: <br><br>"_Borrowing Base_" means, at any time of calculation, the aggregate amount of (i) the Cost of Eligible Inventory, net of Inventory Reserves, multiplied by the Appraised Value of Eligible Inventory, multiplied by 90%, minus (ii) Availability Reserves (including a reserve in respect of the Carve Out and the outstanding balance of the Pre-Petition Debt). <br><br>The DIP Facility shall be further limited in accordance with the Borrower's 13-week cash flow budget (the "_Budget_") depicting on a weekly basis Borrower's receipts, expenses, disbursements, availability, DIP Facility balance, and other information typical for budgets of this type or required by the Agent, which shall be in form and substance acceptable to the Agent and approved by the Agent in its sole discretion prior to the closing of the DIP Facility. The Budget will be in the form of the DIP Forecast dated September 16, 2014, 2014 annexed hereto as **Exhibit 1**, with such |

---

[5]   In the event of any discrepancy between this summary and the terms of the DIP Term Sheet or the Proposed Interim Order, the DIP Term Sheet or the Proposed Interim Order shall control.

| | |
|---|---|
| | modifications (if any) as are agreed to by the Borrower and the Agent. The Budget shall be updated by the Borrower from time to time (provided that such updated Budget shall be in form and substance acceptable to the Agent and approved by the Agent in its sole discretion), but in any event not less than on a weekly basis (with delivery to the Agent on or before Wednesday of each weekly operating period); provided that each weekly update shall roll the Budget forward for an additional weekly period such that the Budget continues to depict at all times a rolling 13-week period. The Borrower shall be required to comply with the Budget in all respects for purposes of the DIP Facility, subject to the permitted variances described under the heading "Budget Compliance" below. |
| Interest 4001(c)(1)(B) | **DIP Term Sheet ("Interest Rates; Default Interest" Section)**: Interest Rate: Prime Rate plus 9.75% with an interest rate floor of 13%. Interest shall be due and payable monthly in cash in arrears. <br><br> **DIP Term Sheet ("Default Interest" Section)**: Default Interest: During the continuance of an Event of Default with respect to the DIP Loans (as defined in the loan documentation), all DIP Loans, interest, fees and other amounts outstanding will bear interest at a rate that is 3.50% per annum greater than the rate otherwise applicable to the DIP Loans. |
| Term 4001(c)(1)(B) | **DIP Term Sheet ("Termination Date" Section)** and **Proposed Interim Order (Section 22)**: Term: The earliest of (i) December 31, 2014 (the "_Maturity Date_"), (ii) the effective date of a plan of reorganization confirmed by the Bankruptcy Court, (iii) consummation of the sale of all or a substantial portion of the assets of the Borrower under section 363 of the Bankruptcy Code, (iv) 45 days after the Petition Date if the Final Order (as defined herein) has not been entered by that date, or (iv) the occurrence of an event of default under the DIP Facility after the expiration of all applicable grace or cure periods (the "_Termination Date_"). |
| Events of Default 4001(c)(1)(B) | **DIP Term Sheet ("Event of Default" Section)** and **Proposed Interim Order (Section 23)**: Each of the following shall constitute an Event of Default, unless otherwise waived by the Agent in its sole discretion: <br><br> In addition to the events of default currently in the Pre-Petition Credit Agreement, the loan documentation will contain events of default customary for similar debtor in possession financings and other events of default deemed by the Agent appropriate to the specific transaction (and subject to customary notice and cure provisions to be agreed), including, without limitation: (i) failure to make payments when due; (ii) noncompliance with covenants, including, without limitation, failure to comply with the Budget within agreed upon variances; (iii) breaches of representations and warranties; (iv) failure to satisfy or stay execution of judgments in excess of specified amounts; (v) the existence of certain materially adverse employee benefit or environmental liabilities; (vi) impairment of loan documentation or security; (vii) the occurrence of a |

| | |
|---|---|
| | Material Adverse Effect or Material Adverse Change; (viii) change of ownership or control of the Borrower; (ix) Borrower filing of a complaint or objection to any of the Pre-Petition Lenders' claims with respect to the Pre-Petition Debt or any liens securing the Pre-Petition Debt; (x) dismissal of the Chapter 11 Case or conversion to a chapter 7 case; (xi) appointment of a chapter 11 trustee; (xii) appointment of a responsible officer (excluding the Borrower's chief restructuring officer) or examiner with enlarged powers relating to the operation of the business of the Borrower; (xiii) granting of relief from the automatic stay to permit foreclosure on any assets of the Borrower constituting Collateral; (xiv) entry of an order granting any super-priority claim which is senior or pari passu with the Lenders' claims under the DIP Facility or the Pre-Petition Lenders' adequate protection super priority administrative claims; (xv) entry of an order amending, supplementing or otherwise modifying either Order without the consent of the Agent; (xvi) reversal, vacation or stay of the effectiveness, or modification without the consent of the Agent of either Order (or any other order of the Bankruptcy Court affecting the DIP Facility); (xvii) if the Final Order is not entered by the Bankruptcy Court within 30 days after the Petition Date; (xviii) the filing of a motion to sell all or substantially all of the Borrower's assets without the consent of the Lenders; (xix) the filing of any plan of reorganization which either does not provide for the payment in full of all of the Pre-Petition Debt and the DIP Loans under the DIP Facility, or to which Agent and Lenders have not consented in writing; (xx) any cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all material respects; and the failure of the Borrower to achieve any of the milestones set forth in the DIP Term Sheet. |
| Priority or Liens 4001(c)(1)(B)(i) | **DIP Term Sheet ("Security" Section)**:  The DIP Loan shall be secured by: a first priority priming perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Borrower, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, owned real property, proceeds of leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, senior to and priming all pre-petition liens (including liens securing the Pre-Petition Debt), subject only to (i) valid, perfected and enforceable liens of record as of the date of the commencement of the Chapter 11 Case disclosed to and acceptable to the Agent (other than liens securing the Pre-Petition Debt ("_Permitted Liens_")), and (ii) the Carve-Out.  **DIP Term Sheet ("Priority" Section)**:   All amounts owing by the Borrower under the DIP Facility will at all times constitute allowed super-priority administrative expense claims in the Chapter 11 Case under section |

364(c)(1) of the Bankruptcy Code, having priority over all pre-petition and post-petition liabilities, including administrative expenses of the kind specified in, in Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 1114, or otherwise, subject only to the Carve Out.

This priority (and the liens described below) will be junior and subordinate only to: (i) the payment of estate professional fees and disbursements incurred in the Chapter 11 Case to the extent such fees and disbursements are in accordance with the Budget and approved by the Bankruptcy Court, which amounts shall be funded into escrow each week in accordance with the Budget, provided that there is sufficient Availability under the DIP Facility, the Termination Date has not occurred and no Event of Default has occurred and is continuing, (ii) subsequent to an Event of Default, the payment of approved fees of estate professionals and any Ch. 7 trustee that may be appointed in the Bankruptcy Case in an amount not to exceed $200,000 (which amount shall be funded into escrow on the Closing Date), and (iii) U.S. Trustee fees pursuant to 28 U.S.C. § 1930 (collectively, the "*Carve-Out*").

Any amounts funded into escrow and not used to fund the payment of estate professional fees and disbursements incurred in the Chapter 11 Case are to be applied to the Obligations under the DIP Facility.  No portion of the Carve-Out shall be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Pre-Petition Lenders under the Pre-Petition Credit Agreement, the Agent, the Lenders, and/or challenging or raising any defenses to the obligations under the Pre-Petition Credit Agreement, the DIP Loans or other obligations under the DIP Facility or the liens of the pre-petition agent, the pre-petition lender, or the Agent and Lenders.

**Proposed Interim Order (Section 12)**:  *Prepetition Agent – Adequate Protection Liens*.  The Prepetition Agent (for itself and the ratable benefit of the Prepetition Secured Parties) is hereby granted, pursuant to Bankruptcy Code sections 361 and 363, valid and perfected replacement and additional security interests in, and liens on all of the Debtor's right, title and interest in, to and under all DIP Collateral (the "Adequate Protection Liens").   The Adequate Protection Liens granted to the Prepetition Agent shall secure the Prepetition Secured Obligations.  The Adequate Protection Liens are and shall be valid, binding enforceable and fully perfected as of the date hereof and subordinate and subject to (i) the DIP Liens, (ii) the Prepetition Permitted Liens (as and to the extent such Prepetition Permitted Liens are senior to the Prepetition Secured Liens immediately prior to the Petition Date), and (iii) the DIP Carve Out.

*Treatment of Adequate Protection Liens.*  Other than as set forth herein or as further ordered by the Court, the Adequate Protection Liens shall not be

| | |
|---|---|
| | made subject to or *pari passu* with any lien or with any lien or security interest heretofore or hereinafter granted in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law in the Chapter 11 Case or any Successor Case.  The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or any Successor Case.<br><br>**Proposed Interim Order (Section 13)**:  *Superpriority Claim of Prepetition Agent*.  As further adequate protection of the interests of the Prepetition Agent and Prepetition Secured Parties with respect to the Prepetition Secured Obligations, the Prepetition Agent is hereby granted (for itself and the ratable benefit of the Prepetition Secured Parties) an allowed administrative claim against the Debtor's estate under sections 503 and 507(b) of the Bankruptcy Code (the "<u>Adequate Protection Superpriority Claims</u>") to the extent that the Adequate Protection Liens do not adequately protect against any diminution in the value of the Prepetition Agent's interests in the Prepetition Collateral.<br>*Priority of Adequate Protection Superpriority Claims*.  The Adequate Protection Superpriority Claim granted to the Prepetition Agent and Prepetition Secured Parties shall be junior to the DIP Carve Out, Prepetition Permitted Liens (as and to the extent such Prepetition Permitted Liens are senior to the Prepetition Secured Liens immediately prior to the Petition Date), the DIP Liens, the DIP Superpriority Claim and the Adequate Protection Liens, and shall otherwise have priority over administrative expenses of the kinds specified in or ordered pursuant to sections 503(b), and 507(b) of the Bankruptcy Code. |
| Adequate Protection or Priority of Prepetition Claims 4001(c)(1)(B)(ii) | **DIP Term Sheet ("Use of Cash Collateral and Adequate Protection for Pre-Petition Lenders" Section)**:  Adequate protection will be afforded to the Pre-Petition Lenders in the form of (i) administrative expense priority status, (ii) replacement liens on all post-petition assets, to the extent of the diminution of value of any pre-petition collateral and the use of cash collateral, in each case, junior only to the liens of the Agent and Lenders under the DIP Facility, and (iii) payment of interest (computed at the post default interest rate) on the Pre-Petition Debt and professional fees and expenses, all accruing and payable under the Pre-Petition Credit Agreement and payable monthly in arrears and payments of principal on the Prepetition Debt from proceeds of collateral.<br><br>**Proposed Interim Order (Section G)**:  <u>*Adequate Protection*</u>. Adequate protection shall be provided to the Prepetition Agent and the Prepetition Secured Lenders, by the Adequate Protection Liens to secure the Adequate Protection Superpriority Claims with respect to the Prepetition Secured Obligations.  For the avoidance of doubt, the Adequate Protection Liens |

and the Adequate Protection Superpriority Claims each shall be junior in all respects to the DIP Liens and the DIP Carve Out, and the Adequate Protection Superpriority Claims are junior in all respects to the DIP Superpriority Claim.

**Proposed Interim Order (Section 12):** Adequate Protection Liens. *Prepetition Agent – Adequate Protection Liens.* The Prepetition Agent (for itself and the ratable benefit of the Prepetition Secured Parties) is hereby granted, pursuant to Bankruptcy Code sections 361 and 363, valid and perfected replacement and additional security interests in, and liens on all of the Debtor's right, title and interest in, to and under all DIP Collateral (the "Adequate Protection Liens"). The Adequate Protection Liens granted to the Prepetition Agent shall secure the Prepetition Secured Obligations. The Adequate Protection Liens are and shall be valid, binding enforceable and fully perfected as of the date hereof and subordinate and subject to (i) the DIP Liens, (ii) the Prepetition Permitted Liens (as and to the extent such Prepetition Permitted Liens are senior to the Prepetition Secured Liens immediately prior to the Petition Date), and (iii) the DIP Carve Out. *Treatment of Adequate Protection Liens.* Other than as set forth herein or as further ordered by the Court, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or with any lien or security interest heretofore or hereinafter granted in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law in the Chapter 11 Case or any Successor Case. The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or any Successor Case.

| | |
|---|---|
| Validity of Liens 4001(c)(1)(B)(iii) | **DIP Term Sheet ("Events of Default; Bankruptcy Milestones" Section, Item ix)**: Borrower filing of a complaint or objection to any of the Pre-Petition Lenders' claims with respect to the Pre-Petition Debt or any liens securing the Pre-Petition Debt.<br><br>**DIP Term Sheet ("Priority" Section)**: No portion of the Carve-Out shall be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Pre-Petition Lenders under the Pre-Petition Credit Agreement, the Agent, the Lenders, and/or challenging or raising any defenses to the obligations under the Pre-Petition Credit Agreement, the DIP Loans or other obligations under the DIP Facility or the liens of the pre-petition agent, the pre-petition lender, or the Agent and Lenders.<br><br>**Proposed Interim Order (Section E(iii))**: The Debtor admits, stipulates, |

| | |
|---|---|
| | acknowledges and agrees that The Debtor (for itself and its estate only, and without limiting the rights of other parties in interest under paragraphs 33 and 34 of this Interim Order), and the Prepetition Secured Parties acknowledge and agree that: (a) as of the Petition Date, the Prepetition Secured Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected, (b) as of the Petition Date, the Prepetition Secured Liens have priority over any and all other liens, if any, on the Prepetition Collateral, subject only to certain other liens otherwise permitted by the Prepetition Credit Agreement and only to the extent any such other liens otherwise permitted by the Prepetition Senior Credit Documents were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition Secured Liens as of the Petition Date (the "<u>Prepetition Permitted Liens</u>") (d) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor; (e) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Secured Liens or the Prepetition Secured Obligations exist, and no portion of the Prepetition Secured Liens or the Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Debtor and its estate has no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees arising out of, based upon or related to the Prepetition Credit Agreement or otherwise; (g) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Secured Obligations exceeded the amount of those obligations, and accordingly the Prepetition Secured Obligations are allowed secured claims within the meaning of section 506 of the Bankruptcy Code, of not less than $3,722,300 as of September 12, 2014, together with accrued and unpaid and hereafter accruing interest, fees (including, without limitation, attorneys' fees and related expenses), costs and other charges. |
| Waivers of Automatic Stay 4001(c)(1)(B)(iv) | **DIP Term Sheet ("Events of Default; Bankruptcy Milestones" Section, Item xiii)**: Unless otherwise waived in writing by the DIP Agent in its sole discretion, the following shall constitute an Event of Default: granting of relief from the automatic stay to permit foreclosure on any assets of the Borrower constituting Collateral.<br><br>**Proposed Interim Order (Section 16)**: *Modification of Automatic Stay*. The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions |

|  | of this Interim Order, including, without limitation, to:  (a) permit the Debtor to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the Adequate Protection Superpriority Claims; and (b) authorize the Debtor to pay, and the DIP Agent and Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.<br><br>**Proposed Interim Order (Section 24(b))**: Any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified so that three (3) business days after the Termination Declaration Date (the "<u>Remedies Notice Period</u>"), the DIP Agent and the DIP Lenders shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Credit Agreement and this Interim Order and shall be permitted to satisfy the DIP Superpriority Claim and the DIP Liens, subject only to the DIP Carve Out and Prepetition Permitted Liens (as and to the extent such Prepetition Permitted Liens are senior to the Prepetition Secured Liens immediately prior to the Petition Date).   During the Remedies Notice Period, the Debtor shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.  Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order and the DIP Agent and the DIP Lenders shall be permitted to exercise all remedies set forth herein, in the DIP Credit Agreement and as otherwise available at law against the DIP Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Agent with respect thereto pursuant to the DIP Credit Agreement, or this Interim Order. |
| Waivers or Modifications Regarding Plan Filing<br><br>4001(c)(1)(B)(v) | **DIP Term Sheet ("Events of Default; Bankruptcy Milestones" Section, Items xix)**:  See description of such section in connection with disclosures required by Bankruptcy Rule 4001(c)(1)(B).<br><br>**Proposed Interim Order (Section 39)**: <u>Discharge Waiver</u>.  The Debtor expressly stipulates, and the Court finds and adjudicates that, none of the DIP Obligations, the DIP Superpriority Claim or the DIP Liens shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been paid in full in cash on or before the effective date of a confirmed plan of reorganization.  The Debtor expressly stipulates, and the Court finds and adjudicates that, none of the Adequate Protection Liens or Adequate Protection Superpriority Claims shall be |

| | |
|---|---|
| | discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Adequate Protection Superpriority Claims and claims secured by the Adequate Protection Liens have been paid in full in cash on or before the effective date of a confirmed plan of reorganization.  The Debtor shall not propose or support any plan or sale of all or substantially all of the Debtor's assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of all DIP Obligations, Prepetition Secured Obligations (if any), and Adequate Protection Superpriority Claims.  The DIP Superpriority Claim and the DIP Liens, and the Adequate Protection Superpriority Claims and Adequate Protection Liens, shall not be affected in any manner by the entry of an order confirming a plan in the Chapter 11 Case or any Successor Case. |
| Deadlines<br><br>4001(c)(1)(B)(vi) | **DIP Term Sheet ("Events of Default; Bankruptcy Milestones" Section)**:<br><br>   i.  No later than September 19, 2014, the Borrower shall have entered into an acceptable Agency Agreement with a nationally known retail liquidation firm for the closure of the Borrower's retail store locations (the "<u>Closing Stores</u>") acceptable to the Agent (with all terms and conditions of such Agency Agreement acceptable to the Agent and Lenders in their sole discretion), which Agency Agreement shall serve as a stalking horse bid in an auction for the right to conduct such store closing sales at the Closing Stores (the "<u>Auction</u>");<br><br>  ii.  No later than September 22, 2014, Borrower shall have filed with the Bankruptcy Court (i) a motion for approval of bidding procedures (including the solicitation of higher and better offers and scheduling the conduct of the Auction), and (ii) a motion seeking approval of such Agency Agreement under section 363 of the Bankruptcy Code and the conduct of the liquidation sales (the "*<u>Store Closing Sale Motion</u>*"), all of the same to be satisfactory in form and substance to the Agent and the Lenders in their sole discretion (the Agency Agreement to be executed by the Borrower and the winning bidder at the Auction being referred to herein as the "<u>Agency Agreement</u>").<br><br> iii.  Bankruptcy Court approval of the Store Closing Bidding Procedures Motion by no later than October 1, 2014;<br><br> iv.  The conduct of the Auction for the right to conduct the closing of the Closing Stores by no later than October 2, 2014;<br><br>  v.  Bankruptcy Court approval of the Store Closing Sale Motion by |

| | |
|---|---|
| | no later than October 3, 2014; |
| | vi.  Closing of the transaction contemplated by the Agency Agreement by no later than one days after the entry of the Store Closing Sale Order. |
| Waivers of Nonbankruptcy Law<br><br>4001(c)(1)(B)(vii) | **DIP Term Sheet ("Priority" Section)**:  See description of such section in connection with disclosures required by Bankruptcy Rule 4001(c)(1)(B)(i).<br><br>**Proposed Interim Order (Section E(iii))**:  See description of such section in connection with disclosures required by Bankruptcy Rule 4001(c)(1)(B)(iii).<br><br>**Proposed Interim Order (Section 13)**:  See description of such section in connection with disclosures required by Bankruptcy Rule 4001(c)(1)(B)(i). |
| Releases and Waivers of Causes of Action<br><br>4001(c)(1)(B)(viii) | **DIP Term Sheet ("Priority" Section)**:  See description of such section in connection with disclosures required by Bankruptcy Rule 4001(c)(1)(B)(iii).<br><br>**Proposed Interim Order (Section E(iii))**:  See description of such section in connection with disclosures required by Bankruptcy Rule 4001(c)(1)(B)(iii).<br><br>**Proposed Interim Order (Section 7(b))**:  Other than as set forth herein or as further ordered by the Court, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Chapter 11 Case or any Successor Case.  The DIP Liens shall not be subject to challenge under sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.<br><br>**Proposed Interim Order (Section 33)**: Reservation of Certain Third Party Rights and Bar of Challenges and Claims.<br>          (a)     The stipulations, findings, representations and releases contained in this Interim Order or the Payoff Letter with respect to the Prepetition Secured Parties and the Prepetition Secured Obligations shall be binding upon all parties-in-interest, any trustee appointed in the Chapter 11 Case and any Successor Case and any Statutory Committee |

(each, a "Challenge Party"), unless and solely to the extent that (i) the Debtor received from a Challenge Party notice of a potential Challenge (defined below) during the Challenge Period (defined below) and (ii) the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.  For purposes of this paragraph 33:  (a) "Challenge" means any claim  against any of the Prepetition Secured Parties on behalf of the Debtor or the Debtor's creditors and interest holders, or any objecting to or challenging of the stipulations, findings or Debtor's Stipulations set forth herein, including, but not limited to those in relation to:  (i) the validity, extent, priority, or perfection of the security interests and liens of any Prepetition Secured Party; (ii) the validity, allowability, priority, or amount of the Prepetition Secured Obligations (including any fees included therein); (iii) the secured status of the Prepetition Secured Obligations; or (iv) any liability of any of the Prepetition Secured Parties with respect to anything arising from any of the respective Prepetition Credit Agreement; and (b) the "Challenge Period" means (i) with respect to any party-in-interest other than the Statutory Committee for unsecured creditors, the period from the Petition Date until the date that is seventy five (75) calendar days after the entry of this Interim Order and (ii) with respect to the Statutory Committee for unsecured creditors, the period from the date such Statutory Committee is formed until the date that is thirty (30) calendar days thereafter.

(b)     During the Challenge Period, a Challenge Party shall be entitled to determine whether a basis to assert a Challenge exists.  If a Challenge Party identifies a basis to assert a Challenge, it must notify the Debtor, the DIP Agent and the Prepetition Secured Parties during the Challenge Period of its demand that the Debtor initiate an action or adversary proceeding relating thereto and from the date that the Debtor, the DIP Agent and the Prepetition Secured Parties are so notified, the Debtor shall have five (5) days to notify the Challenge Party of whether the Debtor intends to initiate such action (or a settlement in lieu of an adversary proceeding) and ten (10) days to initiate such action.  If the Debtor notifies such Challenge Party that the Debtor does not intend to initiate an action, settlement, or adversary proceeding, the Challenge Party shall have ten (10) days from the receipt of such notice to seek standing to initiate an action or adversary proceeding.  Nothing herein shall be deemed to grant standing in favor of any Challenge Party absent further order of this Court.   The Debtor, if timely notified of a potential Challenge, shall retain authority to prosecute, settle or compromise such Challenge in the exercise of its business judgment and subject to any applicable further order of court.

(c)     Upon the expiration of the Challenge Period (subject to such ten (10) day periods described above) (the "Challenge Period Termination Date"), without the filing of a Challenge:  (A) any and all such Challenges and objections by any party (including, without limitation, any Statutory Committee, any Chapter 11 trustee, and/or any examiner or other estate representative appointed in the Case, and any Chapter 7 trustee

|  | and/or examiner or other estate representative appointed in any Successor Case), shall be deemed to be forever waived, released and barred, (B) all matters not subject to the Challenge, and all findings, Debtor's Stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to each Prepetition Secured Parties' claims, liens, and interests shall be of full force and effect and forever binding upon the Debtor, the Debtor's bankruptcy estate and all creditors, interest holders, and other parties in interest in the Chapter 11 Case and any Successor Case; and (C) any and all claims or causes of action against the Debtor or the Prepetition Secured Parties relating in any way to the Debtor or the Prepetition Credit Agreement shall be forever waived and released by the Debtor's estate, all creditors, interest holders and other parties in interest in the Chapter 11 Case and any Successor Case. |
|---|---|
|  | **Proposed Interim Order (Section 36):**  Section 506(c) Claims.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any Successor Case at any time shall be charged against the DIP Agent, the DIP Lenders or the DIP Collateral, the Prepetition Agent, the Prepetition Secured Parties or the Prepetition Secured Liens pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise. |
| Indemnification 4001(c)(1)(B)(ix) | **DIP Term Sheet ("Indemnification" Section)**: The DIP Facility documentation will contain indemnity provisions in favor of the Agent and Lenders customary for similar debtor in possession financings.<br><br>**Proposed Interim Order (Section 27)**:  Indemnification.<br><br>(a)      The Debtor shall indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their respective shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Credit Agreement, the DIP Facility or the transactions contemplated thereby and by this Interim Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Credit Agreement and as further described therein and herein, or in connection with the Case, any plan, or any action or inaction by the Debtor, in each case except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity includes indemnification for each of the DIP Agent's and the DIP Lenders' exercise of discretionary rights granted under the DIP Facility.  In all such litigation, or the preparation |

| | |
|---|---|
| | therefor, each of the DIP Agent and the DIP Lenders shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtor agrees to promptly pay the reasonable fees and expenses of such counsel. |
| | (b)      DIP Indemnity Account.  Upon the conclusion of the Remedies Notice Period, the Debtor shall pay $100,000 from proceeds of the DIP Collateral into an indemnity account (the "DIP Indemnity Account") subject to first priority liens of the DIP Agent.  The DIP Indemnity Account shall be released and the funds applied in accordance with paragraph 18 of this Interim Order upon the earlier to occur of (a) the receipt by the DIP Agent and each DIP Lender of a release from the Debtor and its estate acceptable to the DIP Agent and each DIP Lender in its sole discretion and (b) the closing of an "exit financing" or similar financing or transaction to which the Debtor and the DIP Agent are parties on terms and conditions acceptable to the DIP Agent in its sole discretion. |
| Releases, Waivers, or Limitations of Any Right Under § 506(c) 4001(c)(1)(B)(x) | **DIP Term Sheet ("Events of Default; Bankruptcy Milestones" Section)**: (a) Borrower filing of a complaint or objection to any of the Pre-Petition Lenders' claims with respect to the Pre-Petition Debt or any liens securing the Pre-Petition Debt; (b) dismissal of the Chapter 11 Case or conversion to a chapter 7 case; (c) appointment of a chapter 11 trustee; (d) appointment of a responsible officer (excluding the Borrower's chief restructuring officer) or examiner with enlarged powers relating to the operation of the business of the Borrower; (e) granting of relief from the automatic stay to permit foreclosure on any assets of the Borrower constituting Collateral; (f) entry of an order granting any super-priority claim which is senior or pari passu with the Lenders' claims under the DIP Facility or the Pre-Petition Lenders' adequate protection super priority administrative claims; (g) the filing of a motion to sell all or substantially all of the Borrower's assets without the consent of the Lenders; (h) the filing of any plan of reorganization which either does not provide for the payment in full of all of the Pre-Petition Debt and the DIP Loans under the DIP Facility, or to which Agent and Lenders have not consented in writing; (i) any cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all material respects.

**Proposed Interim Order (Section E(ii))**: *Prepetition Obligations*.  As of September 12, 2014, the aggregate outstanding principal amount owed by the Debtor under the Prepetition Credit Documents was not less than $3,722,300 (collectively, together with any interest, fees, costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Credit Agreement, including all "Obligations" as described in the Prepetition Senior Credit Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Secured Obligations").  As more fully set forth in the Prepetition Credit Documents, prior to the Petition |

Date, the Debtor granted first-priority security interests in and liens on substantially all of its personal property, including accounts, inventory, equipment and general intangibles (as more fully set forth in the Prepetition Credit Agreement, the "Prepetition Collateral") to the Prepetition Agent, for the benefit of the Prepetition Secured Parties (collectively, the "Prepetition Secured Liens") to secure repayment of the Prepetition Secured Obligations.

**Proposed Interim Order (Section E(iii))**:  See description of such section in connection with disclosures required by Bankruptcy Rule 4001(c)(1)(B)(iii).

**Proposed Interim Order (Section H)**: *Sections 506(c) and 552(b)*.  In light of the DIP Agent's and the Prepetition Secured Lender's agreement to subordinate its liens and superpriority claims, as applicable, to the DIP Carve Out (as defined herein), upon entry of the Final Order, the DIP Agent and the Prepetition Secured Lenders are entitled to a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

**Proposed Interim Order (Section 6 (xv))**: The DIP Collateral includes: (xvi) effective upon the entry of the Final Order, the Debtor's rights under section 506(c) of the Bankruptcy Code and the proceeds thereof.

**Proposed Interim Order (Section 36)**:  Section 506(c) Claims.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any Successor Case at any time shall be charged against the DIP Agent, the DIP Lenders or the DIP Collateral, the Prepetition Agent, the Prepetition Secured Parties or the Prepetition Secured Liens pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

| | |
|---|---|
| Granting of Certain Liens 4001(c)(1)(B)(xi) | Inapplicable. |
| Cross-Collateralization Local Rule 4001-2(a)(1)(A) | Inapplicable |
| Provisions Binding the Estate | *See* "Validity of Liens" above pursuant to Rule 4001(c)(1)(B)(iii) |

| | |
|---|---|
| Local Rule 4001-2(a)(1)(B) | |
| Waiver of 552(b) Rights<br><br>Local Rule 4001-2(a)(1)(C) | *See* "Releases, Waivers, or Limitations of Any Right Under § 506(c)" above pursuant to Rule 4001(c)(1)(B)(x).<br><br>**Proposed Interim Order (Section 38):** <u>Section 552(b)</u>. The DIP Agent shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. Subject to the entry of the Final Order, the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the DIP Agent, Prepetition Agent, or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral. |
| Granting Liens of Section 5 Claims<br><br>Local Rule 4001-2(a)(1)(D) | Inapplicable |
| Prepetition and Postpetition Secured Debt<br><br>Local Rule 4001-2(a)(1)(E) | Inapplicable |
| Disparate Treatment of Debtor and Committee Professionals<br><br>Local Rule 4001-2(a)(1)(F) | Inapplicable |
| Priming Liens Without Consent<br><br>Local Rule 4001-2(a)(1)(G) | Inapplicable |
| Summary of Loan Local Rule 4001-2(a)(2) | All essential terms provided by this Local Rule are set forth above. |

**LEGAL ARGUMENT**

**A.    Legal Standard**

**1.    Bankruptcy Code Section 363(b)(1).**

Bankruptcy Code section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate..."

In considering a proposed use of property outside of the ordinary course, courts look at whether the proposed use of the property is in the best interests of the estate based on the facts of the case. *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (9th Cir. BAP 1988) (citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)). This requires an examination of the "business justification" for the proposed use. *Walter*, 83 B.R. at 19 ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business...").

In determining whether the use of estate property outside of the ordinary course of business should be approved, "the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *Id.*; *Continental Air Lines*, 780 F.2d at 1226.

**2.    Bankruptcy Code Sections 364(c) and (d).**

Section 364(c) of the Bankruptcy Code provides: "If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt- (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or

507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."

Section 364(d)(1) provides: "The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

When a debtor's business judgment is consistent with the provisions of and polices underlying the Bankruptcy Code, courts routinely grant a debtor considerable deference in acting in accordance with its business judgment.  *See, e.g., In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (courts have discretion under Bankruptcy Code §364 to permit debtor to exercise reasonable business judgment so long as (i) the terms of the financing agreement do not "leverage the bankruptcy process and powers" and (ii) the financing agreement's purpose is primarily to benefit the estate, and not a party in interest); *see also In re Defender Drug Stores,* 145 B.R. 312, 316-317 (9th Cir. BAP 1992) ("Bankruptcy courts, however, have regularly authorized postpetition financing arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364.  While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.  Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in

interest." (citations omitted)); *In re Berry Good, LLC,* 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) (nearly identical discussion).

### 3. Bankruptcy Code Section 105(a).

Section 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.

### B. Authorizing the Debtor to Obtain the Proposed Post-Petition Financing and Granting Related Relief is Proper.

As discussed above, the proposed DIP Loan will allow the Debtor to obtain the cash it needs to achieve an orderly liquidation of the Debtor's assets while preserving the value of the Debtor's estate for the benefit of creditors.

Based upon all of the above, the Debtor believes that entering into the DIP Loan based on the terms of the DIP Term Sheet reflects a sound and prudent exercise of its business judgment under the circumstances, and is in the best interests of the estate and its creditors. The Debtor therefore seeks a Court order approving these actions.

### CONCLUSION

The relief requested in this Motion should be granted because it is necessary to ensure the orderly liquidation of the Debtor, and because the Debtor believes that granting such relief ultimately will benefit its creditors in this case.

WHEREFORE, the Debtor respectfully requests that the Court enter an order:

1. Authorizing the Debtor to enter into the DIP Loan with the DIP Lender in accordance with the terms in the DIP Term Sheet and the proposed Interim and Final Orders, and to take all actions necessary to consummate the DIP Loan;

2.      Authorizing and approving the Debtor to grant priming liens on all of its current

and future property as collateral and super priority claims in connection with the proposed DIP

Loan;

3.      Authorizing and approving the use of cash collateral;

4.      Approving modification of the automatic stay to the extent necessary to

implement and enforce the terms and provisions of the proposed DIP Loan; and

5.      Granting related relief, including setting a Final Hearing on this Motion.

DATED this 16th day of September, 2014.

**DORSEY & WHITNEY LLP**

_/s/ Annette W. Jarvis_
Annette W. Jarvis
Peggy Hunt
Michael F. Thomson
Jeffrey M. Armington

*Proposed Attorneys for Debtor Naartjie
Custom Kids, Inc.*

# **EXHIBIT A**

**NAARTJIE CUSTOM KIDS, INC.**

**Outline of Terms and Conditions**
**$1,000,000 Senior Secured Debtor-In-Possession Credit Facility**

**September 16, 2014**

The following is as an outline of certain of the material terms of a proposed debtor-in-possession credit facility (as hereinafter described, the "*DIP Facility*") for Naartjie Custom Kids, Inc., a Delaware corporation (as further defined below, the "Borrower"), in connection with the Borrower's filing of a chapter 11 petition under the United States Bankruptcy Code. These proposed terms and conditions are provided for discussion purposes only and do not constitute an offer, agreement or commitment to lend. The actual terms and conditions upon which Salus Capital Partners, LLC ("*Salus*") might extend credit to the Borrower are subject to satisfactory completion of due diligence, credit approval, satisfactory review and execution of documentation and such other terms and conditions as may be determined by Salus and its counsel. This term sheet does not include descriptions of all of the terms, conditions and other provisions that would be contained in the definitive documentation relating to the DIP Facility and it is not intended to limit the scope of discussion and negotiation of any matters not inconsistent with the specific matters set forth herein.

| | |
|---|---|
| **Borrower:** | Naartjie Custom Kids, Inc., a Delaware corporation (the "*Borrower*"), as a debtor and debtor in possession under chapter 11 of the United States Bankruptcy Code (the "*Bankruptcy Code*") pursuant to the case (the "*Chapter 11 Case*") filed in the United States Bankruptcy Court for the District of Utah  (the "*Bankruptcy Court*"). |
| **Administrative Agent:** | Salus Capital Partners, LLC ("*Salus*" or the "*Agent*"). |
| **Lenders:** | Salus and such other lenders as Salus may select (such lenders, including Salus, collectively, the "*Lenders*"). |
| **Pre-Petition Debt:** | The Borrower's existing pre-petition secured indebtedness under the Credit Agreement dated as of October 17, 2013 (as amended to date, and together with all related loan and security documentation, the "*Pre-Petition Credit Agreement*") owing to the agent and lenders thereunder (collectively, the "*Pre-Petition Lenders*") consists of a term loan in the outstanding principal amount of $3,490,000, together with accrued but unpaid interest, fees, costs and expenses relative thereto (the "*Pre-Petition Debt*"). |
| **The DIP Facility:** | A non-amortizing revolving credit facility (the "*DIP Facility;*" advances of funds under the DIP Facility being referred to herein as "*DIP Loans*") made available to the Borrower in a principal amount of up to $1,000,000 (the "*Commitment*"). The DIP Loans shall be available to the Borrower within the limits of the Borrowing Base |

**PROPOSED DIP FACILITY TERM SHEET**

and in all events subject to the Budget (each as defined below). All loans outstanding under the DIP Facility shall become due and payable on the Termination Date (as hereinafter defined).

The DIP Facility shall be documented by a Debtor in Possession Credit Agreement (the "<u>DIP Credit Agreement</u>") in substantially the form of the existing Pre-Petition Credit Agreement, and shall be subject to the terms and conditions contained therein.

**Closing Date:** The date on which the Bankruptcy Court enters the Interim Order (as defined herein). The Closing Date will be as soon as practicable after the date the Chapter 11 Case is filed (the "<u>Petition Date</u>"), but in no event later than September 18, 2014.

**Termination Date:** The earliest of (i) December 31, 2014 (the "<u>Maturity Date</u>"), (ii) the effective date of a plan of reorganization confirmed by the Bankruptcy Court, (iii) consummation of the sale of all or a substantial portion of the assets of the Borrower under section 363 of the Bankruptcy Code, (iv) 45 days after the Petition Date if the Final Order (as defined herein) has not been entered by that date, or (iv) the occurrence of an event of default under the DIP Facility after the expiration of all applicable grace or cure periods (the "<u>Termination Date</u>").

**Financing Orders:** As used herein, "<u>Interim Order</u>" means an Order entered by the Bankruptcy Court consistent with the terms hereof and otherwise satisfactory in form and substance to the Agent in its discretion that authorizes and approves the DIP Facility on the terms described herein (or as amended in a manner acceptable to the Agent). "<u>Final Order</u>" shall mean an Order entered by the Bankruptcy Court consistent with the terms hereof (as potentially modified by agreement of the Borrower and Agent, in their respective discretions) and otherwise satisfactory in form and substance to the Agent, in its discretion, after a final hearing under applicable provisions of the Bankruptcy Code and Bankruptcy Rules, authorizing the DIP Facility on a final basis on the terms described herein (or as amended in a manner acceptable to the Agent), which Order shall not be subject to appeal, reconsideration or review. The Interim Order and the Final Order collectively referred to herein as the "<u>Orders</u>".

2

**PROPOSED DIP FACILITY TERM SHEET**

**Borrowing Base; Budget:**   All borrowings under the DIP Facility will be subject to a borrowing base (the "*Borrowing Base*") calculated as follows[1]:

"Borrowing Base" means, at any time of calculation, the aggregate amount of (i) the Cost of Eligible Inventory, net of Inventory Reserves, multiplied by the Appraised Value of Eligible Inventory, multiplied by 90%, minus (ii) Availability Reserves (including a reserve in respect of the Carve Out and the outstanding balance of the Pre-Petition Debt).

The DIP Facility shall be further limited in accordance with the Borrower's 13-week cash flow budget (the "*Budget*") depicting on a weekly basis Borrower's receipts, expenses, disbursements, availability, DIP Facility balance, and other information typical for budgets of this type or required by the Agent, which shall be in form and substance acceptable to the Agent and approved by the Agent in its sole discretion prior to the closing of the DIP Facility.   The Budget will be in the form of the DIP Forecast dated September 16, 2014, 2014 annexed hereto as **Exhibit 1**, with such modifications (if any) as are agreed to by the Borrower and the Agent.   The Budget shall be updated by the Borrower from time to time (provided that such updated Budget shall be in form and substance acceptable to the Agent and approved by the Agent in its sole discretion), but in any event not less than on a weekly basis (with delivery to the Agent on or before Wednesday of each weekly operating period); <u>provided</u> that each weekly update shall roll the Budget forward for an additional weekly period such that the Budget continues to depict at all times a rolling 13-week period.   The Borrower shall be required to comply with the Budget in all respects for purposes of the DIP Facility, subject to the permitted variances described under the heading "Budget Compliance" below.

**Budget Compliance:**   Budget compliance shall be tested weekly (on Wednesday of each week, commencing with the second week ending after the filing of the Chapter 11 Case) (i) for the first two (2) weeks of the Budget, on a cumulative basis for such two (2) week period, (ii) for the first three (3) weeks of the Budget, on a cumulative basis for such three (3) week period, (iv) for the first four (4) weeks of the Budget, on a cumulative basis for such four (4) week period, and (iv) thereafter on a cumulative basis for the prior four (4) week period; such Budget testing to include the following in each case subject to a ten percent

---

[1] Definitions to be consistent with the definitions for such defined terms in the Pre-Petition Credit Agreement

3

**PROPOSED DIP FACILITY TERM SHEET**

(10%) percent Budget variance: (1) Total Cash Receipts, (2) Total Operating Expenses, (3) Bankruptcy Related Expenses, and (4) DIP Loan balance and Availability.

**Purpose:** Proceeds of the DIP Loans will be used solely (i) to pay fees, costs and expenses of the DIP Facility, including payment of Agent's reasonable attorney's fees and other out of pocket expenses, (ii) to pay to the Agent as adequate protection payments in respect of the diminution in the value of the Agent's and Pre-Petition Lenders' liens in the pre-petition collateral, post-petition interest on the Pre-Petition Debt at the post default rate under the Pre-Petition Credit Agreement, (iii) to pay post-petition operating expenses of the Borrower incurred in the ordinary course of business (including purchases of inventory), (iv) to pay costs and expenses of administration of the Chapter 11 Case, including payment of approved professional fees, and (v) to pay other amounts as specified in the Budget and/or operative documentation and allowed by the Bankruptcy Court, in the case of (iii) through (v), in amounts and categories consistent with the Budget. Except as expressly agreed by the Agent and set forth in the Interim Order and/or the Final Order, none of the DIP Facility proceeds may be used to investigate or challenge the validity, perfection, priority, extent or enforceability of the DIP Facility, the Pre-Petition Debt, the liens or security interests securing the DIP Facility or Pre-Petition Debt and obligations thereunder, or any claim against the Pre-Petition Lenders under the DIP Facility or the Pre-Petition Credit Agreement.

**Interest Rates; Default Interest:** DIP Loans will bear interest at a rate per annum equal to the Prime Rate plus 9.75% with an interest rate floor of 13%. Interest will be payable monthly in arrears. During the continuance of an Event of Default with respect to the DIP Loans (as defined in the loan documentation), all DIP Loans, interest, fees and other amounts outstanding will bear interest at a rate that is 3.50% per annum greater than the rate otherwise applicable to the DIP Loans.

**Cash Management; Collateral Account:** Borrower shall continue in place all existing cash management and deposit and collection accounts, all in a manner satisfactory to the Agent and Lenders. Unless otherwise agreed by the Agent, all Borrower receipts shall be deposited in accounts subject to control agreements in favor of the Agent, and, commencing on the first day following entry of the Interim Order, swept to accounts controlled by the Agent for application as provided in the DIP Credit Agreement and/or Financing Orders. Payments received shall be applied to the DIP Facility in the manner set forth in the

4

**PROPOSED DIP FACILITY TERM SHEET**

DIP Credit Agreement.

**DIP Facility Exit Fee:** An exit fee equal to 1% of the aggregate Commitments, which fee shall be fully earned on the Closing Date, and due and payable on the Termination Date.

All fees shall be non-refundable and shall be deemed fully earned when paid.

**Mandatory Repayments:** Mandatory repayments of the DIP Loans and a permanent reduction of the Commitments under the DIP Facility shall be required in an amount equal to (i) 100% of the net sale proceeds from non-ordinary course asset sales (including, without limitation, payments received on account of the guaranteed amount and other amounts attributable to the inventory pursuant to the Agency Agreement (as hereinafter defined)), and (ii) 100% of insurance and condemnation proceeds and tax refunds,.  The foregoing mandatory repayments will be applied first to the balance of the DIP Loans, and then to the Pre-Petition Debt, and shall result in a permanent reduction of the DIP Facility.  Nothing herein shall constitute an assent to any proposed asset sale.

In addition, the Borrower shall repay the outstanding DIP Loans (i) to the extent that the outstanding balance of the DIP Loans exceeds the lesser of the aggregate Commitments and the Borrowing Base, and (ii) to the extent required to remain in compliance with the covenants described under "*Affirmative, Negative and Financial Covenants*" below.

**Priority:** All amounts owing by the Borrower under the DIP Facility will at all times constitute allowed super-priority administrative expense claims in the Chapter 11 Case under section 364(c)(1) of the Bankruptcy Code, having priority over all pre-petition and post-petition liabilities, including administrative expenses of the kind specified in, in Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 1114, or otherwise, subject only to the Carve Out.

This priority (and the liens described below) will be junior and subordinate only to: (i) the payment of estate professional fees and disbursements incurred in the Chapter 11 Case to the extent such fees and disbursements are in accordance with the Budget and approved by the Bankruptcy Court, which amounts shall be funded into escrow each week in accordance with the Budget, provided that there is sufficient Availability under the DIP Facility, the

5

**PROPOSED DIP FACILITY TERM SHEET**

Termination Date has not occurred and no Event of Default has occurred and is continuing, (ii) subsequent to an Event of Default, the payment of approved fees of estate professionals and any ch. 7 trustee that may be appointed in the Bankruptcy Case in an amount not to exceed $200,000 (which amount shall be funded into escrow on the Closing Date), and (iii) U.S. Trustee fees pursuant to 28 U.S.C. § 1930 (collectively, the "*Carve-Out*").  Any amounts funded into escrow and not used to fund the payment of estate professional fees and disbursements incurred in the Chapter 11 Case are to be applied to the Obligations under the DIP Facility.  No portion of the Carve-Out shall be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Pre-Petition Lenders under the Pre-Petition Credit Agreement, the Agent, the Lenders, and/or challenging or raising any defenses to the obligations under the Pre-Petition Credit Agreement, the DIP Loans or other obligations under the DIP Facility or the liens of the pre-petition agent, the pre-petition lender, or the Agent and Lenders.

**Security:**

All amounts owing by the Borrower under the DIP Facility will be secured by a first priority priming perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Borrower, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, owned real property, proceeds of leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, senior to and priming all pre-petition liens (including liens securing the Pre-Petition Debt), subject only to (i) valid, perfected and enforceable liens of record as of the date of the commencement of the Chapter 11 Case disclosed to and acceptable to the Agent (other than liens securing the Pre-Petition Debt ("*Permitted Liens*")), and (ii) the Carve-Out.

**Use of Cash Collateral and Adequate Protection for Pre-Petition Lenders:**

Adequate protection will be afforded to the Pre-Petition Lenders in the form of (i) administrative expense priority status, (ii) replacement liens on all post-petition assets, to the extent of the diminution of value of any pre-petition collateral and the use of cash collateral, in each case, junior only to the liens of the Agent and Lenders under the DIP Facility, and (iii) payment of interest (computed at the post default interest rate) on the Pre-Petition Debt and professional fees and expenses, all accruing and payable under the Pre-Petition Credit Agreement and payable monthly in arrears and payments of principal on the Prepetition Debt from proceeds of collateral.

6

| | |
|---|---|
| **Conditions Precedent to the Closing:** | The DIP Facility loan documentation will contain conditions to the closing of the DIP Facility customary for similar debtor in possession financings and other conditions deemed by the Agent to be appropriate to this specific transaction, and in any event including without limitation: |

- All documentation relating to the DIP Facility shall be in form and substance satisfactory to the Agent and its counsel.

- All fees and expenses (including reasonable fees and expenses of counsel to the Agent and the Lenders and Agent's financial advisor 360 Merchant Solutions, LLC) required to be paid to the Agent and Lenders with respect to the DIP Facility shall have been paid.

- All pleadings and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall be in form and substance satisfactory to the Agent.

- The Borrower shall have filed with the Bankruptcy Court (i) a motion to approve the DIP Facility on an interim basis, and (ii) a motion seeking approval of cash management procedures acceptable to the Agent; and all "first-day" and related orders (the "*First Day Orders*") entered by the Bankruptcy Court in the Chapter 11 Case shall be in form and substance satisfactory to the Agent.

- There shall have occurred no material adverse change in (i) the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower since the date of the latest financial statements of the Borrower delivered to Salus (other than the commencement of the Chapter 11 Case and other events previously disclosed in writing and specified in the operative documents), (ii) the ability of the Borrower to perform its obligations under the loan documentation assuming the commencement of the Chapter 11 Case and the approval of the proposed First Day Orders, or (iii) the ability of the Agent and Lenders to enforce the DIP Facility documentation (any of the foregoing being a "*Material Adverse Change*").

- There shall exist no action, suit, investigation, litigation or proceeding (other than the Chapter 11 Case) pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in

7

**PROPOSED DIP FACILITY TERM SHEET**

a Material Adverse Change or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the DIP Facility or the transactions contemplated thereby.

- All governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Agent) and shall remain in effect; and no law or regulation shall be applicable, in the judgment of the Agent, that restrains, prevents or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated thereby.

- The Agent shall have a valid and perfected lien on and security interest in the collateral referred to above under "*Security*", subject only to Permitted Liens and the Carve-Out.

- Funding available on the closing of the DIP Facility shall be sufficient to fund all cash needs of the Borrower outlined in the Budget.

- Entry of the Interim Order.

Without limiting in any way the Agent's discretion consistent with the terms described herein, the Interim Order (except as otherwise provided below) and Final Order shall provide for the following, among other things:

a) That all indebtedness, liabilities and obligations of the Borrower under the DIP Facility whenever and however arising, including without limitation, the loans and all fees, charges and expenses contemplated by this letter or otherwise incurred, including, but not by way of limitation, reasonable fees and expenses of attorneys and other professionals, shall be secured by a first priority lien and security interest in all Collateral, subject only to Permitted Liens and the Carve-Out.

b) That adequate notice under the circumstances has been given to all necessary parties of the hearing pursuant to which the Bankruptcy Court has entered the Orders.

c) As to the Final Order only, no costs, expenses or other charges may be assessed or attributed to Agent or Lenders for the Collateral pursuant to Section 506(c) of the United States

8

**PROPOSED DIP FACILITY TERM SHEET**

Bankruptcy Code or otherwise.

d) A finding that the Agent and the Lenders have acted in good faith.

e) The Borrower shall be permitted to use cash collateral solely in accordance with the Budget, with variances as described above, and shall waive the right to seek the use of cash collateral without the Agent's consent while there any amounts due under the DIP Facility and/or the Agent's and Lender's commitments remain outstanding. The Orders shall provide adequate protection for any diminution in the value of the Collateral due to the use of cash collateral or the grant of the senior liens securing the DIP Facility. Such adequate protection shall include first priority liens granted to Agent and an allowed superpriority claim under Section 507(b) of the Bankruptcy which may be satisfied from all Collateral.

**Conditions Precedent to Each Loan:**

On the Closing Date and the funding date of each DIP Loan or extension of credit under the DIP Facility the following conditions precedent shall have been satisfied:

• There shall exist no default under the loan documentation.

• The representations and warranties of the Borrower shall be true and correct in all material respects immediately prior to, and after giving effect to, funding.

• The making of such credit extension shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

• No Material Adverse Change shall have occurred.

• To the extent then due and payable, all fees and expenses (including reasonable fees and expenses of counsel and the financial advisor to the Agent) shall have been paid to the Agent.

• The Bankruptcy Court shall have entered the Interim Order and, if such proposed funding date is more than 45 days after the Petition Date, the Final Order, entered on notice to such parties as may be reasonably satisfactory to the Agent, which Interim Order or Final Order, as the case may be, shall be in full force and effect, shall not have been reversed, vacated or stayed and

9

**PROPOSED DIP FACILITY TERM SHEET**

shall not have been amended, supplemented or otherwise modified without the prior written consent of the Agent.

**Representations and Warranties:**

In addition to the representations and warranties currently in the Pre-Petition Credit Agreement, the DIP Facility documentation will contain representations and warranties customary for similar debtor in possession financings and other representations and warranties deemed by the Agent appropriate to the specific transaction.

**Affirmative, Negative and Financial Covenants:**

In addition to the affirmative, negative and financial covenants currently in the Pre-Petition Credit Agreement, the DIP Facility documentation will contain affirmative, negative and financial covenants applicable to the Borrower customary for similar debtor in possession financings and other covenants deemed by the Agent appropriate to the specific transaction, including, without limitation, covenants as to the following (all covenants to be acceptable to the Agent):

- Delivery of all pleadings, motions and other documents filed with the Bankruptcy Court on behalf of the Borrower to the Agent and its counsel.

- Compliance with applicable laws (including, without limitation, the Bankruptcy Code, ERISA and environmental laws), payment of taxes, maintenance of all necessary licenses and permits and trade names, trademarks, patents and other intellectual property presently used in the Borrower's business, preservation corporate existence, maintenance of appropriate and adequate insurance, and inspection of properties, books and records.

- Conduct all transactions with affiliates on terms reasonably equivalent to those obtainable in arm's length transactions, including, without limitation, restrictions on management fees to affiliates.

- Delivery to the Agent and Lenders for approval by the Agent of updated Budgets on a weekly basis as set forth herein, and delivery of monitoring reports reasonably requested by the Agent.

- Financial covenants typical to a transaction of this nature.

- No incurrence or assumption of additional debt or guaranties, no creation of liens, charges or encumbrances or incurrence of additional lease obligations, in each case, beyond agreed upon

10

**PROPOSED DIP FACILITY TERM SHEET**

limits; no incurrence of other super-priority claims; no mergers or consolidations with any other person, no change in the nature of business or corporate structure or creation of new subsidiaries, in each case, beyond agreed upon limits; no amendments to charters or by-laws; no sale, lease or other disposition of assets (including, without limitation, in connection with a sale leaseback transaction) beyond agreed upon terms as set forth herein; no grant of negative pledge on any assets in favor of any person other than the Agent and Lenders; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Borrower.

- No prepayment, redemption, purchase, defeasance, exchange or repurchase of debt, or amendment or modification of the terms of any such debt or other similar agreements entered into by the Borrower, subject to certain exceptions to be agreed.

- No loans, advances, capital contributions or acquisitions; no formation of any joint ventures or partnerships; no additional investments in subsidiaries or any other person, subject to certain exceptions to be agreed.

- Not make or commit to make any payments in respect of warrants, options, repurchase of stock, dividends or any other distributions to shareholders.

- No change in accounting treatment or reporting practices of the Borrower, except as required by GAAP and as permitted by the DIP Facility documentation.

- Not make or permit to be made any change to either Order.

- No payment of any pre-petition claims other than as provided in the First Day Orders, those amounts that are acceptable to the Agent under the above paragraph entitled "*Purpose*," or as may from time to time be approved by the Agent.

- No assertion of any surcharge under section 506(c) of the Bankruptcy Code with respect to the Pre-Petition Lenders' liens.

- No use of the DIP Loans or any cash collateral to assert claims against the Pre-Petition Lenders, the Agent or the Lenders.

- The Agent reserves the right to require the Borrower to engage a

11

financial advisor satisfactory to the Agent to assist the Borrower in the transaction contemplated by the Agency Agreement referred to below, the preparation and implementation of the Budget, financial and collateral reporting and other financial matters.

**Financial Reporting Requirements:** The Borrower shall provide: (i) weekly updates to the Budget as set forth herein; (ii) weekly borrowing base certificates (provided the Borrower will deliver a Borrowing Base Certificate with any request for a borrowing under the DIP Facility) together with a list of disbursements the Borrower intends to pay in the upcoming weekly period each in accordance with the Budget; (iii) monthly financial statements, including balance sheet, income statement and cash flow statement within 30 days of month-end, certified by the Borrower's chief financial officer; (iv) together with each request for a DIP Loan under the DIP Facility, a list in reasonable detail of all disbursements the Borrower intends to pay in the upcoming weekly period with the proceeds of such DIP Loan, all such disbursements to be in accordance with the Budget (subject to permitted variances); (v) annual audited consolidated financial statements of the Borrower within 120 days of year-end, certified with respect to such statements by an independent certified public accountant reasonably acceptable to the Agent; (vi) monthly financial statements filed by the Borrower with the Bankruptcy Court; and (vii) such additional reporting items as reasonably requested by the Agent and the Lenders.

**Other Reporting Requirements:** The loan documentation will contain other reporting requirements customary for similar debtor in possession financings and other reporting requirements deemed by the Lender appropriate to the specific transaction.

**Events of Default; Bankruptcy Milestones:** In addition to the events of default currently in the Pre-Petition Credit Agreement, the loan documentation will contain events of default customary for similar debtor in possession financings and other events of default deemed by the Agent appropriate to the specific transaction (and subject to customary notice and cure provisions to be agreed), including, without limitation: (i) failure to make payments when due; (ii) noncompliance with covenants, including, without limitation, failure to comply with the Budget within agreed upon variances; (iii) breaches of representations and warranties; (iv) failure to satisfy or stay execution of judgments in excess of specified amounts; (v) the existence of certain materially adverse employee benefit or environmental liabilities; (vi) impairment of loan documentation or security; (vii) the occurrence of a Material Adverse Effect or Material Adverse Change; (viii)

12

change of ownership or control of the Borrower; (ix) Borrower filing of a complaint or objection to any of the Pre-Petition Lenders' claims with respect to the Pre-Petition Debt or any liens securing the Pre-Petition Debt; (x) dismissal of the Chapter 11 Case or conversion to a chapter 7 case; (xi) appointment of a chapter 11 trustee; (xii) appointment of a responsible officer (excluding the Borrower's chief restructuring officer) or examiner with enlarged powers relating to the operation of the business of the Borrower; (xiii) granting of relief from the automatic stay to permit foreclosure on any assets of the Borrower constituting Collateral; (xiv) entry of an order granting any super-priority claim which is senior or pari passu with the Lenders' claims under the DIP Facility or the Pre-Petition Lenders' adequate protection super priority administrative claims; (xv) entry of an order amending, supplementing or otherwise modifying either Order without the consent of the Agent; (xvi) reversal, vacation or stay of the effectiveness, or modification without the consent of the Agent of either Order (or any other order of the Bankruptcy Court affecting the DIP Facility); (xvii) if the Final Order is not entered by the Bankruptcy Court within 30 days after the Petition Date; (xviii) the filing of a motion to sell all or substantially all of the Borrower's assets without the consent of the Lenders; (xix) the filing of any plan of reorganization which either does not provide for the payment in full of all of the Pre-Petition Debt and the DIP Loans under the DIP Facility, or to which Agent and Lenders have not consented in writing; (xx) any cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all material respects; and the failure of the Borrower to achieve any of the milestones set forth below (with all dates subject to the Bankruptcy Court's availability and docket):

    i.    No later than September 19, 2014, the Borrower shall have entered into an acceptable Agency Agreement with a nationally known retail liquidation firm for the closure of the Borrower's retail store locations (the "Closing Stores") acceptable to the Agent (with all terms and conditions of such Agency Agreement acceptable to the Agent and Lenders in their sole discretion), which Agency Agreement shall serve as a stalking horse bid in an auction for the right to conduct such store closing sales at the Closing Stores (the "Auction");

    ii.    No later than September 22, 2014, Borrower shall have filed with the Bankruptcy Court (i) a motion for approval of bidding procedures (including the solicitation of higher

BOS 47522460v7

**PROPOSED DIP FACILITY TERM SHEET**

and better offers and scheduling the conduct of the Auction), and (ii) a motion seeking approval of such Agency Agreement under section 363 of the Bankruptcy Code and the conduct of the liquidation sales (the "*Store Closing Sale Motion*"), all of the same to be satisfactory in form and substance to the Agent and the Lenders in their sole discretion (the Agency Agreement to be executed by the Borrower and the winning bidder at the Auction being referred to herein as the "<u>Agency Agreement</u>").

   iii.   Bankruptcy Court approval of the Store Closing Bidding Procedures Motion by no later than October 1, 2014;

   iv.   The conduct of the Auction for the right to conduct the closing of the Closing Stores by no later than October 2, 2014;

   v.   Bankruptcy Court approval of the Store Closing Sale Motion by no later than October 3, 2014;

   vi.   Closing of the transaction contemplated by the Agency Agreement by no later than one days after the entry of the Store Closing Sale Order;

**Confidentiality:**   Since this letter is not a commitment to make a loan, it should not be relied upon by any third party.  Upon the Borrower's acceptance of this letter, the Borrower agrees to (i) certify as correct and to provide the Agent with such financial and other information concerning its business as Agent may from time to time reasonably request, (ii) authorize Agent and any rating agency, credit bureau, bank or other entity contacted by Agent to investigate and release data relating to all aspects of its financial condition, and (iii) hold this proposal confidential and not disclose the contents of this letter to any third party other than their accountants, legal or outside advisors retained in connection with the evaluation of the proposed financing without Agent's prior written consent.

**Indemnification:**   The DIP Facility documentation will contain indemnity provisions in favor of the Agent and Lenders customary for similar debtor in possession financings.

**Expenses:**   The Borrower shall pay (i) all out-of-pocket costs and expenses of the Agent and Lenders (including all reasonable fees, expenses and disbursements of all professionals of the Agent and Lenders,

14

**PROPOSED DIP FACILITY TERM SHEET**

including but not limited to counsel and financial advisors, in connection with the preparation, execution and delivery of the DIP Facility documentation and the funding of all DIP Loans, including, without limitation, all due diligence, audit, appraisal and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the Agent and Lenders in connection with the DIP Facility, the DIP Facility documentation or the transactions contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the loan documentation, and (ii) all costs and expenses of the Agent and Lenders (including reasonable fees, expenses and disbursements of counsel and financial advisors) in connection with the enforcement or protection of any of their rights and remedies under the DIP Facility documentation. The Borrower agrees that it is obligated to pay all expenses promptly notwithstanding the expiration or termination of any approval of the DIP Facility or a decision by the Agent not to provide the DIP Facility.

**Governing Law:**        State of New York.

**Counsel to Lender:**        Greenberg Traurig, LLP

*BOS 47522460v7*

# EXHIBIT 1

**Naartjie Custom Kids, Inc.**

*Cash Flow Forecast*

<span style="color:red">UPDATED 9.16.14</span>

| | | | | | | |
|---|---|---|---|---|---|---|
| Fiscal Period | 8 | 8 | 8 | 9 | | |
| Fiscal Week # | 33 | 34 | 35 | 36 | | |
| **DIP BUDGET** | 1 | 2 | 3 | 4 | | % of Total Op |
| | Week of | Week of | Week of | Week of | Proj Period | Disbursements |
| *Week ending Saturday* | 9/20/14 | 9/27/14 | 10/4/14 | 10/11/14 | TOTAL | |

**CASH FLOW**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Receipts:** | | | | | | |
| Sales | $866,235 | $804,067 | $698,656 | | $2,368,959 | |
| Shipping revenue | 13,755 | 12,756 | 10,926 | | 37,438 | |
| Sales Tax Collected | 56,305 | 52,264 | 45,413 | | 153,982 | |
| Proceeds from Liquidator | - | - | - | 4,249,675 | 4,249,675 | |
| Reimburse Store Rent--October[1] | - | - | - | 592,551 | 592,551 | |
| Total Receipts | 936,296 | 869,088 | 754,995 | 4,842,226 | 7,402,605 | |
| **Operating Disbursements:** | | | | | | |
| Product Disbursements | | | | | | |
| US Customs | - | (285,351) | - | - | (285,351) | 9.7% |
| Freight (MAO) | - | (10,000) | - | - | (10,000) | 0.3% |
| Shipping Expense | (56,223) | (75,000) | (75,000) | - | (206,223) | 7.0% |
| Merchant Fees | (75,000) | - | (70,778) | - | (145,778) | 5.0% |
| Sales Tax | (223,994) | - | (253) | - | (224,247) | 7.7% |
| Total Product Disbursements | (355,217) | (370,351) | (146,031) | - | (871,599) | 29.8% |
| Non-Product Disbursements | | | | | | |
| Payroll[2] | (63,700) | (336,054) | (13,700) | (336,054) | (749,507) | 25.6% |
| Rent[1,3] | - | - | (391,442) | (618,067) | (1,009,509) | 34.5% |
| Insurance | (20,000) | (71,415) | (21,103) | - | (112,518) | 3.8% |
| Phone & Utilities[4] | (7,921) | (47,921) | (7,921) | (9,905) | (73,666) | 2.5% |
| Property Tax | (1,101) | (1,700) | (1,700) | (2,124) | (6,624) | 0.2% |
| Other Operating | (25,000) | (25,000) | (27,934) | (27,849) | (105,782) | 3.6% |
| Total Non-Prod. Disbursements | (117,722) | (482,089) | (463,799) | (993,998) | (2,057,607) | 70.2% |
| Total Operating Disbursements | (472,938) | (852,440) | (609,830) | (993,998) | (2,929,206) | 100.0% |
| **Operating Cash Flow** | **463,358** | **16,648** | **145,165** | **3,848,227** | **4,473,398** | |
| *cumulative* | *463,358* | *480,006* | *625,171* | *4,473,398* | | |
| **Non-Operating Disbursements:** | | | | | | |
| UST Payments | - | (10,000) | - | - | (10,000) | |
| Professional Fee Carve-Out Escrow | - | (200,000) | - | - | (200,000) | |
| Salus - DIP Facility | - | - | (93,875) | - | (93,875) | |
| UCC Fees | (10,000) | (10,000) | (10,000) | (10,000) | (40,000) | |
| Professional Fee Escrow funding[5] | (70,000) | (70,000) | (70,000) | (70,000) | (280,000) | |
| Total Non-Operating Disbursements: | (80,000) | (290,000) | (173,875) | (80,000) | (623,875) | |
| **Net Cash Flow** | **383,358** | **(273,352)** | **(28,710)** | **3,768,227** | **3,849,523** | |
| *cumulative* | *383,358* | *110,006* | *81,296* | *3,849,523* | | |

**LOAN BALANCE**

| | | | | | |
|---|---|---|---|---|---|
| **Prepetition Facility** | | | | | |
| Beginning Balance | 3,722,300 | 3,722,300 | 3,722,300 | 3,722,300 | |
| less: repayment | - | - | - | (3,722,300) | |
| Ending Balance[6] | 3,722,300 | 3,722,300 | 3,722,300 | - | |
| **DIP Facility** | | | | | |
| Beginning Balance | - | - | - | - | |
| add: advances | - | 88,733 | 3,350 | 322,353 | |
| less: repayment | - | (88,733) | (3,350) | (322,353) | |
| Ending Balance[6] | - | - | - | - | |

**CASH -** *controlled account*

| | | | | | |
|---|---|---|---|---|---|
| Beginning Cash | 948,349 | 1,053,707 | 780,355 | 751,645 | |
| less: advances | (552,938) | (1,053,707) | (780,355) | (751,645) | |
| less: Lender Professional fees | (278,000) | - | - | - | |
| less: Lender exit fee | - | - | - | (10,000) | |
| add: excess proceeds | 936,296 | 780,355 | 751,645 | 797,573 | |
| **Ending Cash - US** | **1,053,707** | **780,355** | **751,645** | **787,573** | |

1 Assumes Liquidator Pays October Rent
2 In Week 4 a portion of payroll disbursements will be paid by the liquidator
3 Week 4 Rent disbursements assumes payment of post-petition September rent due (pre-petition stub period unpaid)
4 Week 3 includes $40k in utility deposits
5 Comprised of $25k per wk Stroock; $25k per wk Dorsey; and $20k per wk SCP
6 Assumes Salus pre and post petition debt paid in full the week of October 11

**Naartjie Custom Kids, Inc.**
*Cash Flow Forecast*

<span style="color:red">UPDATED 9.16.14</span>

| | | | | |
|---|---|---|---|---|
| *Fiscal Period* | 8 | 8 | 8 | 9 |
| *Fiscal Week #* | 33 | 34 | 35 | 36 |
| **DIP BUDGET** | 1 | 2 | 3 | 4 |
| | Week of 9/20/14 | Week of 9/27/14 | Week of 10/4/14 | Week of 10/11/14 |
| *Week ending Saturday* | | | | |

**BORROWING BASE**

| | | | | | | |
|---|---|---|---|---|---|---|
| *margin assumptions* | *52.0%* | *52.0%* | *52.0%* | | | |
| **INVENTORY** | | | | | | |
| | | | | | Est Sale Proceeds | |
| Beginning of Period -- On-Hand Inventory | $8,104,059 | $7,653,617 | $7,235,502 | | | |
| less: COGS | (450,442) | (418,115) | (363,301) | | | |
| End of Period -- On-Hand Inventory | 7,653,617 | 7,235,502 | 6,872,200 | Wk 3 Ending Inv | $6,698,730 | |
| Less: On-Hand Inventory Ineligibles | (173,470) | (173,470) | (173,470) | *NOLV* | 79.3% | |
| Total Eligible On-Hand Inventory | 7,480,147 | 7,062,032 | 6,698,730 | *Initial pmnt* | 80.0% | |
| *Inventory advance rate* | *90.00%* | *90.00%* | *90.00%* | Initial Proceeds | $4,249,675 | |
| *NOLV* | *82.10%* | *82.10%* | *82.10%* | | | |
| **TOTAL Inventory Available** | **5,527,080** | **5,218,135** | **4,949,692** | | | |
| | | | | | | |
| **RESERVES** | | | | | | |
| Pre-petition credit facility -- outstanding principal | 3,722,300 | 3,722,300 | 3,722,300 | | | |
| Professional fee Carve-Out | 200,000 | - | - | | | |
| Landlord Lien States (VA and WA - 2 Months) | 94,014 | 94,014 | 94,014 | | | |
| Texas Propety Tax Liability | 9,400 | 9,400 | 9,400 | | | |
| Gift Certificate Liability | 117,958 | 117,958 | 117,958 | | | |
| Store Credit Liability | 1,397 | 1,397 | 1,397 | | | |
| TOTAL Reserves | 4,145,069 | 3,945,069 | 3,945,069 | | | |
| **TOTAL Borrowing Base Availability** | **$1,382,011** | **$1,273,066** | **$1,004,623** | | | |
| | | | | | | |
| Facility Cap | 1,000,000 | 1,000,000 | 1,000,000 | | | |
| | | | | | | |
| NET Available Borrowing Base | 1,000,000 | 1,000,000 | 1,000,000 | | | |
| | | | | | | |
| TOTAL DIP Facility Outstanding | - | - | - | | | |
| | | | | | | |
| **DIP Availability** | **$1,000,000** | **$1,000,000** | **$1,000,000** | | | |