Annette W. Jarvis (Utah State Bar No. 01649)
Peggy Hunt (Utah State Bar No. 6060)
Michael F. Thomson (Utah State Bar No. 9707)
Jeffrey M. Armington (Utah State Bar No. 14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
          hunt.peggy@dorsey.com
          thomson.michael@dorsey.com
          armington.jeff@dorsey.com

*Proposed Attorneys for Debtor Naartjie Custom Kids, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re: | Bankr. Case No. 14-29666 |
| NAARTJIE CUSTOM KIDS, INC., | Chapter 11 |
| Debtor. | The Honorable William T. Thurman |

**DEBTOR'S MOTION FOR ORDERS (I)(A) AUTHORIZING ENTRY INTO AGENCY AGREEMENT, (B) AUTHORIZING BID PROTECTIONS, (C) AUTHORIZING BIDDING PROCEDURES AND AUCTION AND (D) SCHEDULING SALE HEARING AND APPROVING NOTICE THEREOF, (II) AUTHORIZING (A) SALE OF ASSETS AND (B) STORE CLOSING SALES AND (III) GRANTING RELATED RELIEF**

Naartjie Custom Kids, Inc. ("Naartjie" or "Debtor"), the debtor in possession in the above captioned bankruptcy case hereby submits this motion (the "Motion"), pursuant to Sections 105(a), 363, 364, 365, 503, 507 and 554 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing and approving (I)(A) the entry into that certain

Agency Agreement, substantially in the form attached hereto as **Exhibit A**,[1] with the joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Stalking Horse"), (B) authorizing bid protections for the Stalking Horse, (C) authorizing the bidding procedures and related auction and (D) scheduling a sale hearing and approving notice thereof (the "Bidding Procedures Order") and (II) authorizing and approving the Transaction (the "Sale Order") and (III) granting related relief.  In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157.

2.     The statutory bases for the relief requested herein are sections 105, 363, 364, 365, and 554 of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, and 6007, and the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Utah, Central Division (the "Court").

## GENERAL BACKGROUND

3.     On September 12, 2014, the Debtor filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case.  An official committee of unsecured creditors (the "UCC") was appointed in this case on the date of this motion, September 22, 2014.

---

[1]     A draft of the Agency Agreement is attached hereto as **Exhibit A** in an unexecuted form.  The Debtor intends to file with the Court a fully executed copy of the Agency Agreement, which will be substantially similar to **Exhibit A** hereto, and will include all exhibits thereto, no later than September 24, 2014.

4.      Founded in Cape Town, South Africa in 1989, Naartjie is a children's clothing brand that embraces bright, colorful, kid-friendly clothes. Naartjie designs, manufactures and sells children's clothing, accessories and footwear for ages newborn through 10 years old.

5.      Naartjie opened its first store in the United States in March 2001, currently owns and operates eighty-two retail stores in the United States and South Africa, and has a rapidly expanding e-commerce business serving customers in over thirty countries worldwide. Today, Naartjie's corporate headquarters are located in Salt Lake City, Utah, with merchandising headquartered in Burlingame, California and the Naartjie Design Studios and South African retail operations in Cape Town, South Africa. Naartjie's net revenue for the fiscal year ended on February 1, 2014 was $54.4 million.

6.      Additional information about the Debtor's business, the events leading up to the Petition Date and the facts and circumstances surrounding the Debtor's chapter 11 case can be found in the First Day Declaration on file in this case. The First Day Declaration is incorporated by reference as if fully set forth herein.

## FACTS SPECIFIC TO THE RELIEF REQUESTED

7.      After a history of declining  sales and the failed refinancing processes, the Debtor has concluded that the best way to maximize value for the benefit of all interested parties is to conduct a prompt and orderly Store Closing Sales (as defined below) at all of the Debtor's retail locations through the retention of a professional liquidator. The decision to liquidate was reached after a lengthy process in which the Debtor considered and explored all reasonable alternatives. Salus Capital Partners, LLC (the "Secured Lender") supports the decision to liquidate, including the entry by the Debtor into the Agency Agreement with the Stalking Horse or other successful bidder after an auction and all of the relief requested herein.

8.      In order to liquidate its business as expeditiously as possible, the Debtor has filed this Motion seeking authority to conduct a chain-wide store closing sales (the "Store Closing Sales") and liquidate its (i) inventory and (ii) furniture, fixtures and equipment (each, an "Asset Class" and collectively, the "Assets").

9.      The Debtor believes that commencing the store closing sales will maximize value for the Debtor's estate while minimizing the administrative expenses incurred in this chapter 11 case.  Further, pursuant to that certain Term Sheet for a Senior Secured Debtor-In-Possession Credit Facility dated September 16, 2014, the terms of which were approved by that certain *Interim Order (I) Authorizing Debtor in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364; (II) Granting Liens, Security Interests, and Superpriority Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 66] (the "DIP Order"), the Debtor has agreed (a) to enter into the Agency Agreement no later than September 19, 2014, which deadline was extended, to the date of this Motion, September 22, 2014, (b) entry by the Bankruptcy Court of the Bidding Procedures Order no later than October 1, 2014, (c) conduct of the Auction and the selection of a winning bid no later than October 2, 2014, (d) conduct of the Sale Hearing and entry by the Bankruptcy Court of the Approval Order no later than October 3, 2014 and (e) closing of the transaction contemplated by the Agency Agreement by no later than one (1) day after the entry of the Approval Order.

10.      In order to streamline and expedite the liquidation process, the Debtor, in consultation with its Secured Lender, solicited bids from liquidators. As a result of this process, the Debtor determined that the Stalking Horse bid represented the highest and best offer as of the

date hereof, and thus it is in the best interests of the Debtor, the estate, creditors and other parties-in-interest to enter into the Agency Agreement.

11.     Pursuant to the Agency Agreement, the Stalking Horse will serve as the Debtor's exclusive agent to (a) sell all of the merchandise (the "Merchandise") located at (or to be shipped to) all of the Debtor's retail locations and, if requested by the Stalking Horse, through catalog and e-commerce platforms (the "Sale") and (b) dispose of any owned fixtures, furnishings and equipment (the "Owned FF&E"), free and clear of all liens, claims, and encumbrances, in the Debtor's retail locations, distribution center, call center and corporate offices (together with the Sale, the "Transaction").

12.     The following chart briefly summarizes certain material provisions of the Agency Agreement.  The chart is qualified by reference to the Agency Agreement attached hereto as Exhibit A, and each capitalized term in the following chart that is not otherwise defined in this Motion has the meaning ascribed to such term in the Agency Agreement.

| *Merchandise:* | "Merchandise" means all new, first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant and customarily sold to customers in the ordinary course of Merchant's business, including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date; (iii)(x) in the event Agent elects to exercise its rights to use the E-Commerce Platform as a sales platform in accordance with Section 8.10 of the Agency Agreement, Distribution Center Merchandise located in the Distribution Center on the Sale Commencement Date; or (y) in the event Agent does not elect to exercise its rights to use the E-Commerce Platform as a sales platform in accordance with Section 8.10 of the Agency Agreement, Distribution Center Merchandise received in the Stores on or prior to the date that is twenty-eight (28) days after the Sale Commencement Date (the "DC Goods Receipt Deadline"); (iv) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto); and (v) In-Transit Merchandise received in the Stores on or before the date that is twenty-eight (28) days after the Sale Commencement Date (the "In-Transit Receipt Deadline"). Notwithstanding the foregoing, "Merchandise" shall not |
|---|---|

| | |
|---|---|
| | include (i) goods that belong to sublessees, licensees, or concessionaires of Merchant; (ii) goods held by Merchant on memo, on consignment, or as bailee; (iii) Excluded Defective Merchandise; (iv) Additional Agent Merchandise; (v) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Stores and Distribution Center; (vi) in the case of Section 5.2(a)(iii)(y) of the Agency Agreement, Distribution Center Merchandise that does not arrive in the Stores on or prior to the DC Goods Receipt Deadline; and/or (vii) In-Transit Merchandise that does not arrive in the Stores on or prior to the In-Transit Receipt Deadline. |
| **Additional Agent Merchandise:** | The Agent shall have the right to include Additional Agent Merchandise (of like, kind and quality as currently being sold by the Debtor, the substantial majority of which to be acquired from the Debtor's existing vendors. The costs of such Additional Agent Merchandise shall be an Expense of the Sale, and the proceeds from the sale of the Additional Agent Merchandise shall constitute "Proceeds" and shall be subject to the sharing formula discussed below. |
| **Option to Elect to Use Merchant's E-Commerce Site:** | The Agent shall have the right to elect to sell the Merchandise and Additional Agent Merchandise through the Merchant's E-Commerce website. |
| **Guaranty:** | As a guaranty of the Stalking Horse Bidder's performance under the Stalking Horse Agreement, the Stalking Horse Bidder guarantees that the Proceeds of the Sale shall equal 80% of the Aggregate Cost Value of the Merchandise. |
| **Inventory Threshold:** | The Guaranty Percentage is based on the Cost Value of the Merchandise not being (i) less than $6,800,000 or (ii) greater than $7,500,000. The Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) to the Agency Agreement to the extent the aggregate Cost Value of the Merchandise falls outside these parameters. |
| **Expenses:** | The Stalking Horse Bidder will be responsible for all Expenses arising and accruing during and attributable to the Sale, which include (*inter alia*) Base Payroll, inclusive of commissions, for Retained Employees, costs of security, Retention Bonuses for Retained Employees, and Occupancy Expenses. |
| **Agent's Base Fee:** | The Agent's Base Fee is 6% of Aggregate Cost Value of the Merchandise, plus 6% of the aggregate sale Proceeds attributable to the Additional Agent Merchandise. |
| **Payments to Debtor:** | To the extent that Proceeds (including the Proceeds from the sale of the Additional Agent Merchandise) exceeds the sum of (x) the Guaranteed Amount, plus (y) the Expenses plus (z) the Agent's Base Fee (the sum of (x), (y) and (z) the "<u>Sharing Threshold</u>", then all remaining Proceeds above the Sharing Threshold shall be shared fifty |

| | percent (50%) to the Debtor (any such amount recovered by the Debtor in excess of the Guaranteed Amount being the "Sharing Amount") and fifty percent (50%) to the Stalking Horse Bidder (any such amount recovered by the Stalking Horse Bidder in excess of the Agent's Base Fee being the "Agent's Additional Fee"). |
|---|---|
| ***Payments to the Stalking Horse Bidder:*** | After sufficient Proceeds have been generated to reach the Agent's Base Fee (i.e. the Guaranteed Amount plus Expenses), the Stalking Horse Bidder shall receive such excess Proceeds up to the amount of the Agent's Base Fee.  In addition, if additional Proceeds are generated from the Sale after payment of the Agent's Base Fee, the Stalking Horse Bidder shall be entitled to retain the Agent's Additional Fee. |
| ***Sale Term:*** | Subject to entry of the Sale Approval Order, the Sale shall commence at the Stores on the first day after entry of the Sale Approval Order by the Court, which shall be entered no later than October 3, 2014, and the Sale shall be completed on or before January 15, 2015. |
| ***Conditions Precedent:*** | (i) All representations and warranties of the Debtor and the Stalking Horse Bidder under the Stalking Horse Agreement shall be true and correct and no Event of Default shall have occurred at and as of the date of the Stalking Horse Agreement and as of the Sale Commencement Date;<br>(ii) the Debtor shall have obtained any necessary consent to the Sale from their the Prepetition Secured Lender and DIP Lender; and<br>(iii) the Court shall have entered the Approval Order in form and substance acceptable to the Stalking Horse Bidder, the Debtor, and the Lender Agent. |
| ***Employee Matters:*** | The Stalking Horse Bidder may use the Debtor's employees in the conduct of the Sale to the extent the Stalking Horse Bidder deems expedient.  The Stalking Horse Bidder shall identify any such employees (each a "Retained Employee") prior to the Sale Commencement Date.  Retained Employees shall at all times remain employees of the Debtor, and shall not be considered or deemed to be employees of the Stalking Horse Bidder. |
| ***Events of Default:*** | (i) The Debtor's or the Stalking Horse's failure to perform any of their respective material obligations under the Stalking Horse Agreement, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party;<br>(ii) Any representation or warrant made by the Debtor or the Stalking Horse Bidder proves untrue in any material respect as of the date made and throughout the Sale Term; or<br>(iii) The Sale is terminated or materially interrupted or impaired at the Stores for any reason other than (i) an Event of Default by the Stalking Horse Bidder, or (ii) any other material breach or action by the Stalking Horse Bidder not authorized under the Stalking Horse Agreement. |
| ***Break-Up Fee:*** | A Break-Up Fee in the amount of $75,000, plus reimbursement of |

|  | counsel fees in the amount not to exceed $30,000; plus reimbursement for signage costs of up to $65,000 (provided however, the signs shall be given to the successful bidder). |
|---|---|

13.    The Stalking Horse bid is subject to overbid.  As part of the consideration for entry into the Agency Agreement, the Debtor requests authority to pay the Stalking Horse a break-up fee of $75,000 and the reimbursement of expenses incurred in an amount that is not to exceed $30,000, which will be payable to the Stalking Horse in certain circumstances where the Stalking Horse is not the successful bidder after the Auction (as defined below).

**The Proposed Bidding Procedures and Auction**

14.    In order to maximize value for the estate and the Debtor's creditors, as well as to ensure a fair and transparent opportunity for all potentially interested parties to participate in the Sale process, the Debtor and its advisors will seek to hold an auction at 10:00 a.m. prevailing Mountain Time on October 2, 2014 (the "Auction"), pursuant to the Bidding Procedures that will be attached to the Bidding Procedures Order as Exhibit 1 ("Bidding Procedures").  The Bidding Procedures will provide that the Debtor may, with the consent of the Secured Lender, at any time prior to the conclusion of the Auction, (a) modify the Bidding Procedures and (b) determine the highest and/or best offer.

15.    Subject to the Bankruptcy Court's availability and docket, the Debtor has proposed the following timeline:

      a.    Delivery of the Auction Notice (as defined below) no later than September 24, 2014;

      b.    Deadline to object to the Motion no later than September 29, 2014;

      c.    Entry by the Bankruptcy Court of the Bidding Procedures Order no later than October 1, 2014;

d.  Bid Deadline (as defined below) of 4:00 p.m. prevailing Mountain time on October 1, 2014;

e.  The conduct of the Auction and the selection of a winning bid no later than October 2, 2014; and

f.  Conduct of the Sale Hearing, entry by the Bankruptcy Court of the Approval Order and closing of the Transaction no later than October 3, 2014.

16.     Within 2 days of the filing of this Motion, the Debtor will serve a notice of proposed auction (the "Auction Notice") by personal service, regular mail, electronic mail or facsimile upon: (a) the Office of the United States Trustee for the District of Utah (the "U.S. Trustee"); (b) counsel to the Secured Lender; (c) all parties who are known to assert a security interest, lien, or claim in any of the Merchandise; (d) all the Debtor's landlords; (e) all applicable federal, state, and local taxing authorities; (f) all applicable county and state consumer protection agencies; (g) all applicable state attorneys general; (h) all other government agencies required to receive notice under the Bankruptcy Rules; (i) the 20 largest unsecured creditors of the Debtor; (j) the UCC; (k) any other party that files a notice of opposition in the case and (l) any other party appearing on the Debtor's creditor matrix (collectively, the "Notice Parties").

17.     Objections to the Motion must be in writing, conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court and served upon the Notice Parties by personal service, regular mail, electronic mail or facsimile, received no later than September 29, 2014 at 4:00 p.m. prevailing Mountain Time.

18.     Any bidder that desires to make a bid will deliver written copies of its Competing Bid to the Debtor, so as to be received by each of the Notice Parties not later than 4:00 p.m. prevailing Mountain Time on October 1, 2014 (the "Bid Deadline").  Pursuant to the terms of the

Agency Agreement, in order for a bid to constitute a "Competing Bid", such bid must (i) be in an amount greater than (x) the Guaranty Percentage, plus a percentage of the aggregate Cost Value of the Merchandise equivalent to the Bid Protections, plus (y) an additional overbid amount equal to not less than 1.0% of the aggregate cost value of the Merchandise, (ii) provide for the bidder to reimburse the Stalking Horse for the Signage Costs, and (iii) include a draft agency agreement that is in form and substance substantially similar to the Agency Agreement, including a copy of such agency agreement marked to show all changes from the Agency Agreement.  Bid increments during the Auction shall be 0.1% unless otherwise agreed to by the Debtor and the Secured Lender.  Each capitalized term in this paragraph that is not otherwise defined in this Motion has the meaning ascribed to such term in the Agency Agreement.

## RELIEF REQUESTED AND BASIS THEREFOR

19.    By this Motion, the Debtor seeks the entry of two orders authorizing and approving:

a. the Bidding Procedures Order, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, (a) authorizing entry into Agency Agreement, (b) authorizing Bid Protections, (c) authorizing Bidding Procedures and setting the time, date and place of the Auction and (d) approving the form of Auction Notice and (ii) setting a hearing (the "Sale Hearing"), to be held on October 3, 2014, to consider the entry of the Approval Order; and

b. following the Sale Hearing, the Debtor requests the entry of the Approval Order, pursuant to Sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code and Bankruptcy Rule 6004, approving (i) the Agency Agreement and any Agency Transaction Agreement with the parties submitting the highest and/or otherwise

best bid at the Auction, as determined by the Debtor with the consent of the

Secured Lender (each a "Successful Bidder") and (ii) the Transaction in relation

to the Store Closing Sales and waiving the Debtor's compliance with state and

local laws, statutes, rules, ordinances and/or lease provisions restricting the Store

Closing Sales.

## APPLICABLE AUTHORITY

**A.      Authorizing Entry into Agency Agreement, Bid Protections and Bidding
         Procedures and Auction**

20.     Ample authority exists for the approval of the proposed sale of the Debtor's

assets.  Section 363 of the Bankruptcy Code authorizes a debtor to use or sell assets of the estate

other than in the ordinary course of business, free and clear of liens, claims and encumbrances,

provides. In relevant part, section 363 of the Bankruptcy Code states that "[t]he trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1); *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales

not in the ordinary course of business may be by private sale or by public auction."). Further,

pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §

105(a).

21.     Moreover, if a debtor's proposed use of its assets pursuant to section 363(b) of the

Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use

should be approved. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir.

1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (finding that the sale

of substantially all of the Debtor's assets satisfied the sound business reason test); *see also*

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.

1983) ("The rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

22.     The decision to sell assets outside the ordinary course of business is based upon the business judgment of the debtor.  *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir. 1983); *In re Adelphia Communications Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002).  If a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

23.     Disposition of a debtor's inventory by a liquidator acting as a debtor's agent pursuant to store closing and liquidation procedures like those proposed herein is an accepted method for the sale of assets in chapter 11 cases involving retail debtors. *See, e.g. In re Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011); *In re Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011); *In re Goody's LLC*, No. 09-10124 (Bankr. D.

Del. Jan. 21, 2009); *In re Circuit City Stores Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008).

### 1. *Entry into the Agency Agreement is Reasonable and Justified*

a.    The Agency Agreement is Beneficial to the Estate

24.    Entry into the Agency Agreement is a sound exercise of the Debtor's business judgment. The Agency Agreement will provide numerous benefits to the estate and its stakeholders.  First, utilizing a professional liquidating agent with substantial experience and expertise in conducting orderly simultaneous Store Closing Sales will maximize sales for the Debtor in a short amount of time. In particular, the terms of the Agency Agreement provide for a guaranteed return (with an additional increased potential shared recovery) to the estate, which minimizes the Debtor's risks while at the same time motivating the Stalking Horse (or other Successful Bidder) to maximize proceeds from the Store Closing Sales.

25.    Second, entry of the Agency agreement will reduce the Debtor's administrative expenses associated with the store closings because, pursuant to the terms of the Agency Agreement, the agent is obligated to pay certain costs in connection with the Store Closing Sales. If the Agency Agreement were not entered, there would be tremendous harm to all stakeholders. The Debtor and its advisors would also have to devote further time, expense, and efforts in securing an alternative liquidating agent, who then has to become familiar with the Debtor's operations.

26.    Finally, it is more cost effective to allow the Stalking Horse or other Successful Bidder to conduct the Store Closing Sales than for the Debtor to conduct such sales on their own because, among other reasons, the Stalking Horse or other Successful Bidder will reimburse the Debtor for certain expenses of the Store Closing Sales in accordance with the terms of the

Agency Agreement.  These significant cost savings increase the overall recovery to the Debtor's estate.

       b.    <u>The Grant of Security Interest, pursuant to the Agency Agreement, is Appropriate</u>

27.    Pursuant to the terms of the Agency Agreement, certain of the Debtor's obligations thereunder are entitled to the status of superpriority or priority claims in the Debtor's chapter 11 case and that certain of such claims may be properly perfected without the necessity of filing financing statements or further documentation.

28.    The agent's extension of credit, as well as the other financial accommodations, as set forth in the Agency Agreement, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code and, as such, the reversal or modification on appeal of the Court's authorization to consummate the transactions contemplated by the Agency Agreement, and the security interest granted thereunder, should not affect the validity of such transactions unless such authorization has been stayed pending appeal.

29.    The Debtor submits that the consideration provided by the agent pursuant to the Agency Agreement is fair and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act and Uniform Fraudulent Conveyance Act and other applicable Federal and State laws of the United States, any territory or possession, and the District of Columbia.

    ***2.   Entry of the Requested Bid Protections is Reasonable and Justified***

30.    If the Stalking Horse is not the Successful Bidder, the Debtor proposes to provide the Stalking Horse with certain Bid Protections.  The Bid Protections are in consideration for the Stalking Horse conducting its due diligence, entering into the Agency Agreement and agreeing to subject its bid to the Auction. The Bid Protections were negotiated at arm's-length and in good

faith and are necessary to secure the Stalking Horse's participation in the Debtor's sale process. Further, based on discussions with the Stalking Horse, the Debtor believes that the Stalking Horse would not enter into the Agency Agreement without the Bid Protections.

31. The Debtor has determined that providing the Bid Protections to the Stalking Horse is an actual, necessary cost of going forward with the Store Closing Sales. The Bid Protections enable the Debtor to secure an adequate consideration floor for the Merchandise and, thus, ensure that competing bids will be materially higher or better than that contained in the Agency Agreement. Therefore, the Debtor hereby respectfully requests that the Court approve the Bid Protections.

32. The Bid Protections should be approved and accorded superpriority administrative expense status under section 507 of the Bankruptcy Code, because they provide a clear benefit to the Debtor's estate and the Stalking Horse expressly conditioned its willingness to enter into the Agency Agreement upon the Debtor's agreement to, and Court approval of, the Bid Protections.

33. The Debtor submits that the amount of the Break-Up Fee and Expense Reimbursement is reasonable in light of the efforts and expenses that the Stalking Horse has undertaken in its due diligence review, negotiating the terms of the Agency Agreement and preparing for the commencement of the Store Closing Sales.

### 3.  *Entry of the Requested Bidding Procedures is Reasonable and Justified*

34.  The Debtor believes that the solicitation of bids to act as the Debtor's agent in connection with the Store Closing Sales is the best way to maximize the value of the Debtor's Merchandise and the Owned FF&E, and an Auction for all Asset Classes with the Stalking Horse will result in the most beneficial arrangement for the Debtor and its estate. Based on the Auction

results, the Debtor will consummate the Agency Agreement with the Successful Bidder. Accordingly, the Debtor respectfully requests that the Court approve the Bidding Procedures, as set forth in the Bidding Procedures Order.

35. The Agency Agreement, upon which the initial bids, as well as bids at the Auction will be based, enables the Debtor and other parties-in-interest to easily compare and contrast any differing terms of the bids made by the qualified bidders at the Auction. The Debtor reserves the right to amend or otherwise change the terms of the Agency Agreement in such manner as the Debtor deems to be in its best interests after consultation with the Consultation Parties (defined in the Bidding Procedures) and agreement of the Stalking Horse.

36. Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify their creditors of the Auction and the Sale, including a disclosure of the date, time, and place of the Auction, the terms and conditions of the Store Closing Sales, the date, time, and place of the Sale Hearing, and the deadline for filing any objections to the relief requested herein. Within two days of the filing of this Motion, the Debtor will serve the Auction Notice by personal service, regular mail, electronic mail or facsimile upon the Notice Parties.

37. The Debtor will submit a form of Auction Notice reasonably calculated to provide timely and adequate notice of the proposed Store Closing Sales, the Bidding Procedures, the Auction and the Sale Hearing to the Debtor's creditors and all other parties-in-interest that are entitled to notice. Accordingly, the Debtor requests that the Court approve the notice procedures set forth in this Motion, including the form and manner of service of the Auction Notice, and that no other or further notice of the Store Closing Sales, the Bidding Procedures or the Auction is required.

**B.      Scheduling Sale Hearing**

38.      The Debtor requests that the Court hold the Sale Hearing on October 3, 2014. The Debtor has also requested that the Court establish September 29, 2014 at 4:00 p.m. (Mountain) as the deadline for objections to the Motion and the Approval Order.

39.      As mentioned above, the Debtor proposes to commence the Store Closing Sales immediately following the Sale Hearing and thereby stem the losses resulting from the continued operation of the Closing Locations. Further, the Debtor believes that it is crucial that they commence the Store Closing Sales on their proposed timeline to maximize value for the Debtor's estate while minimizing administrative expenses.

**C.      The Store Closing Sales**

***1.      Approval of Store Closing Sales Under Section 363 of the Bankruptcy Code is Warranted***

40.      The Debtor, exercising their business judgment and in consultation with its advisors, have determined that it is in the best interests of the Debtor, the estate, creditors, and other parties-in-interest to conduct Store Closing Sales. The Court should authorize the Debtor to do so as set forth herein to stem the losses resulting from continued operations at the Closing Locations and to enable the estate to recover as much as possible from the liquidation.

41.      The Debtor's stores are operating at a significant loss and if the Debtor is not allowed to continue the Store Closing Sales, the estate would suffer significant detriment from the resulting delay, added post-petition expenses, depreciation in the value of the assets, and further time and efforts the Debtor must expend to reformulate a different liquidation strategy. Thus, time is of the essence to preserve and maximize the value of the Debtor's Assets before the Merchandise declines in value and to reduce ongoing administrative expenses.

42.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. *See In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets").

### 2.      *The Sale Of Assets Should Be Free And Clear Of Liens, Claims And Encumbrances*

43.     To facilitate the sale of Assets and in the interest of attracting the best offers, the Debtor requests authority to sell the Assets through the Store Closing Sales on a final, "as is" basis, free and clear of all liens, claims, encumbrances, mortgages, security interests, conditional sales, or title retention agreements, pledges, hypothecations, judgments or claims of any kind or nature and other interests (including, without limitation, all "claims" within the meaning of section 101(5) of the Bankruptcy Code) (collectively, the "Liens") in accordance with section 363(f) of the Bankruptcy Code, with any such Liens in the Assets attaching to the Guaranteed Amount in the same order or priority and with the same force, validity and effect with respect to such Assets prior to the Store Closing Sales.

44.     Section 363 of the Bankruptcy Code provides in relevant part that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Where a debtor has shown some "articulated business justification," the sale of assets under section 363 should be approved. *See e.g., Ames Dep't Stores*, 136 B.R. at 359 (holding that going-out-of-business sales are governed by §363(b)).   Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

a.      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

b.      the party asserting the lien, claim, or interest consents;

c.      the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.      the interest is subject to a bona fide dispute; or

e.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5).

45.      The Secured Lender has consented to the Store Closing Sales and has required that the Debtor conduct them in accordance with certain milestones, thereby satisfying section 363(f)(2) of the Bankruptcy Code.

46.      Furthermore, to the extent there are any entities, with an interest in any of the Assets, that have not already consented to the Store Closing Sales, such entity could be compelled to accept a money satisfaction of such interest. Specifically, the Debtor proposes that any Liens asserted against the Merchandise attach to any proceeds realized from the sale of such Merchandise, in the same order of priority and subject to the rights, claims, defenses and objections, if any, of all parties with respect thereto.

*3.      Restrictive Documents and Provisions that May Impede the Store Closing Sales are Unenforceable*

47.      The Debtor leases all of their retail store locations and thus, the Store Closing Sales may be inconsistent with certain provisions of the governing leases or other documents to which the Debtor is a party, whether or not filed of record, with respect to any of the leased Closing Locations, including, for example, reciprocal easements, "go dark" provisions, landlord recapture rights, and other covenants that purport to restrict or prohibit the Debtor from conducting store closing or similar themed sales. Such restrictive provisions are unenforceable in

bankruptcy as they constitute an impermissible restraint on a debtor's ability to effectively administer its estate and maximize the value of its assets under the Bankruptcy Code. *See, e.g., In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (finding that landlord could not recover for breach of covenant to stay open because debtor had a duty to maximize value to the estate by conducting a store closing sale and closing the store); *In re Libson Shops*, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct GOB sale).

48.      Similarly, to the extent there are restrictive provisions in any of the governing leases dictating the manner, method, dimensions relating to or otherwise prohibiting the use of advertising materials or signage to be used relating to the conduct of the Store Closing Sales, the Debtor requests that such restrictive provisions be invalidated as improper interference with the Debtor's ability to effectively conduct the Store Closing Sales and maximize the liquidation value of the Assets.

49.      Accordingly, to the extent that any provisions or restrictions exist in any of the leases governing the Closing Locations, the Debtor respectfully request that the Court invalidate such provisions and authorize the Debtor and/or the Successful Bidder to conduct the Store Closing Sales without interference by any landlords or other persons affected in any way, directly or indirectly, by the Store Closing Sales.

**4.      *The Store Closing Sales Should be Exempt from Federal, State, and Local Laws, Statutes, Rules and Ordinances Relating to Liquidations***

50.      The Debtor may operate their retail locations in states that have state and local laws, statutes, regulations, rules and ordinances governing store closing, liquidation, or similar themed sales, that require long waiting periods, special licenses and permits, or restrictions against bulk sales and augmentation (collectively, the "Liquidation Laws"). However, some state

statutes provide that where a liquidation or bankruptcy sale is court authorized, then a company need not comply with such Liquidation Laws. *See e.g.*, *Tex.Bus. & Com. Code* § 17.91 (2004). Moreover, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies, and the Court has the authority, under section105(a) of the Bankruptcy Code, to permit the Store Closing Sales notwithstanding contrary Liquidation Laws. *See generally Belculfine v. Aloe (In re Shenango Grp., Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) (noting that debtors have unique fiduciary and legal obligations pursuant to the Bankruptcy Code and that state statutes "cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").

51.    The Debtor's ability to use and sell the Merchandise pursuant to section 363 of the Bankruptcy Code, in order to maximize recovery for its estate and creditors, would be severely undermined if the Court does not provide for a waiver of the Liquidation Laws. Requiring that the Debtor comply with each state's applicable local Liquidation Laws would be extremely burdensome and adjudication of disputes with local authorities over the application and interpretation of local laws would be tremendously expensive for the estate.

52.    Moreover, in the context of a bankruptcy proceeding, waiving compliance with Liquidation Laws is appropriate as the Debtor and its Assets are subject to this Court's exclusive jurisdiction and the Court would be able to supervise and ensure proper conduct of the Store Closing Sales. Additionally, governmental units and parties-in-interest will receive notice of this Motion and the opportunity to be heard on any objections.

53.     Thus, the Debtor respectfully requests that the Court expressly authorize the Debtor and/or the Successful Bidder to conduct the Store Closing Sales without the added costs and delay of complying with applicable local Liquidation Laws.[2]

### 5.     Sale is Exempt from "Fast Pay" Laws and Regulations

54.     The Debtor may operate in states that have laws and regulations that require the Debtor to pay an employee substantially contemporaneously with his or her termination (the "Fast Pay Laws"). These laws may require the payment to occur either immediately or within a period of only a few days from the date such employee is terminated. The sweeping nature of the Sale contemplated by this Motion will result in a substantial numbers of employees being terminated. While the Debtor intends to pay its terminated employees as expeditiously as possible and under normal payment procedures, the requirements imposed by these state laws and regulations are unworkable in these extraordinary circumstances. The Debtor's payroll systems will simply be unable to process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

55.     As set forth above, the Bankruptcy Code preempts state and local laws that conflict with its underlying policies. Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

56.     It will be necessary to have the Debtor's payroll department calculate individual termination payments, prepare each termination payment check, obtain authorization for each such check and then prepare each such check for mailing. With employee terminations on the

---

[2]     The requested waiver is narrowly tailored to facilitate the successful conduct of the Store Closing Sales. The Debtor is not seeking a general waiver of all state and local laws, but only those specifically governing liquidation or similarly themed sales. The Debtor fully intends to comply with applicable state and local environmental, tax, employment, public health and safety laws, and consumer protection laws (regulating deceptive practices).

scale necessitated by the Sale at the Closing Locations, this process could easily take several days.

57.    Accordingly, the Debtor respectfully submits that in this instance, Fast Pay Laws are at odds with the underlying policies of the Bankruptcy Code and as such, the Debtor should be granted relief from their requirements. *See, e.g.*, *Loehmann's Holdings Inc.*, Case No. 13-14050 (MG) (waiving "fast pay" laws and regulations in connection with approval of store closing sales) [Docket No. 200] (Bankr. S.D.N.Y. Dec. 13, 2013) Filene's Basement, LLC, Case No. 11-13511(KJC) (same) [Docket No. 189] (Bankr. D. Del. Nov. 2, 2011).

**D.    Other Related Relief**

*1.    The Debtor Should be Authorized to Abandon Certain Property at the Closing Locations Following the Conclusion of the Store Closing Sales*

58.    After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. §554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

59.    Pursuant to the Agency Agreement, the Successful Bidder is authorized to sell the Owned FF&E remaining in the locations following the conclusion of the Store Closing Sales. However, the Debtor (or the Successful Bidder) may determine that the costs associated with holding and/or selling certain property and/or the Owned FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all. In such event, the property is of inconsequential value and benefit to the estate and/or may be burdensome to retain.

60.    In order to maximize the value of the Debtor's Assets and to minimize the costs to the estate, the Debtor respectfully requests authority for it and/or in coordination with the

Successful Bidder to abandon any of its remaining Owned FF&E or other property without incurring liability to any person or entity. The Debtor further requests that the landlords of each closing store with any abandoned Owned FF&E or other property be authorized to dispose of such property without liability to any third parties.

### 2. *The Sale of the Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman*

61.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.

62.     Pursuant to the Agency Agreement, the Successful Bidder will be permitted only to use the Debtor's customer lists, mailing lists, emails lists, and web and social networking sites utilized by the Debtor in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restriction requested by the Debtor in order for the Debtor to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data).  Further, to the extent that any Owned FF&E is sold as part of the Sale, the Debtor will erase any customer data contained therein.   Therefore, appointment of a consumer privacy ombudsman is unnecessary.

### <u>REQUEST OF WAIVER OF STAY</u>

63.     The Debtor requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, time is of the essence and it is imperative that the Debtor be able to enter into the Agency Agreement and commence the Store Closing Sales on the

timeline proposed. In order to maximize the value of the Assets and minimize the estate's

unnecessary administrative expenses, the Debtor believes a waiver of the 14-day stay imposed by

Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply, is in the best interest of the

Debtor's estate and stakeholders.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter orders granting the

relief requested in this Motion and such other and further relief as may be just and proper.

DATED this 22nd day of September, 2014.

**DORSEY & WHITNEY LLP**

*/s/ Annette W. Jarvis*
Annette W. Jarvis
Peggy Hunt
Michael F. Thomson
Jeffrey M. Armington
*Proposed Attorneys for Debtor Naartjie*
*Custom Kids, Inc.*