Annette W. Jarvis (Utah State Bar No. 01649)
Peggy Hunt (Utah State Bar No. 06060)
Michael F. Thomson (Utah State Bar No. 09707)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
       hunt.peggy@dorsey.com
       thomson.michael@dorsey.com
       armington.jeff@dorsey.com

*Proposed Attorneys for Debtor Naartjie Custom Kids, Inc.*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 14-29666 |
| NAARTJIE CUSTOM KIDS, INC., | Chapter 11 |
| Debtor. | Judge William T. Thurman |

---

### NOTICE OF AUCTION RESULTS AND ENTRY INTO AGENCY AGREEMENT

---

Naartjie Custom Kids, Inc. ("Naartjie" or "Debtor"), the debtor in possession in the

above-captioned bankruptcy case, by and through its proposed counsel, hereby files this notice of

the result of the auction authorized by the Court to be conducted in accordance with the Order

*(I)(A) Authorizing Entry into Agency Agreement, (B) Authorizing Bid Protections, (C)*

*Authorizing Bidding Procedures and Auction, and (D) Scheduling Sale Hearing and Approving Notice Thereof* [Docket No. 107] ("Bidding Procedures Order").[1]

1.      On September 12, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Utah (the "Court").   The Debtor continues to operate its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

2.      An official committee of unsecured creditors was appointed in this case on September 22, 2014.

3.      On October 1, 2014, the Court entered the Bidding Procedures Order and scheduled the Auction for October 2, 2014.

4.      Prior to the Auction the Debtor determined there were three qualified bidders: Great American Group, LLC ("GA"); a joint venture comprised of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC ("GB"); and a joint venture comprised of Tiger Capital Group, LLC and SB Capital Group, LLC ("Tiger").   GA and GB attended the auction in person; Tiger appeared by telephone.

5.      In accordance with the terms set forth in the Bidding Procedures Order, the Debtor held an auction of the assets on October 2, 2014, at the offices of its counsel, Dorsey & Whitney LLP (the "Auction").   GA and GB attended the Auction; Tiger appeared at the Auction by telephone.

---

[1]   All capitalized terms not otherwise defined in this Notice shall have the meaning ascribed to them in the Bidding Procedures Motion or Agency Agreement, as applicable.

6.      Prior to the Auction a bid by GA was determined by the Debtor to be the highest and best bid for the Merchandise.

7.      The Stalking Horse Bid guaranteed that the Debtor would receive an amount equal to eighty percent (80%) of the aggregate Cost Value of Merchandise.

8.      After 116 overbids to the Stalking Horse Bid during the course of the 12 hour Auction, the Successful Bid, made by GA, (the "Successful Bidder") guarantees that the Debtor will receive an amount equal to 116.8% of the aggregate Cost Value of the Merchandise.[2]

9.      This substantial bid increase during the course of the Auction represents approximately $2.576 million in additional value that will inure to the benefit of the Debtor's estate.

10.     A redlined copy of the Agency Agreement, without exhibits, between the Debtor as Merchant and the Successful Bidder against the version of agency agreement reflecting the Stalking Horse Bid is attached hereto as **Exhibit A**.

11.     A redlined copy of the proposed Approval Order, without exhibits, against the version of proposed approval order reflecting in the Stalking Horse Bid is attached hereto as **Exhibit B**.

---

[2]     GB is the Back-Up Bidder, whose final bid guaranteed that the Debtor would receive an amount equal to 116.6% of the aggregate Cost Value of the Merchandise.

DATED this 3rd day of October, 2014.

**DORSEY & WHITNEY LLP**

*/s/ Jeffrey M. Armington*
Annette W. Jarvis
Peggy Hunt
Michael F. Thomson
Jeffrey M. Armington
*Proposed Attorneys for Debtor Naartjie*
*Custom Kids, Inc.*

# <u>EXHIBIT A</u>

**Formatted: Right**

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is entered into as of this 22~~nd~~ __nd__ day of ~~September~~October, 2014, by and between **NAARTJIE CUSTOM KIDS, INC.**, a Utah corporation and debtor and debtor in possession ("Merchant"), and ~~a joint venture comprised by~~ ~~GORDON BROTHERS RETAIL PARTNERS~~GREAT AMERICAN GROUP, LLC, a ~~Delaware~~California limited liability company~~, and **HILCO MERCHANT RESOURCES, LLC, a Delaware limited liability company (collectively,**~~ (the "Agent"; and collectively with Merchant, the "Parties").

## RECITALS

WHEREAS, on September 12, 2014 , Merchant filed a voluntary petition for relief under chapter 11 of Title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Utah, Central Division (the "Bankruptcy Court"). Merchant's chapter 11 case is currently pending before the Bankruptcy Court under case number 14-29666~~ (the "Bankruptcy Case").~~

WHEREAS, Merchant operates certain retail stores in the United States and desires that Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's retail store location(s) identified on Exhibit A-1 attached hereto (each individually a "Store", and collectively the "Stores") and in Merchant's Distribution ~~Center~~Centers identified on Exhibit A-2 attached hereto (each individually a "Distribution Center", and collectively the "Distribution Centers"), ~~inclusive of In-~~ ~~Transit Merchandise (defined below) that is received in the Stores on or before the In-Transit~~ ~~Receipt Deadline (defined below),~~ and (b) selling all of the Owned FF&E (as hereinafter defined) located in the Stores, Merchant's Distribution Center and Merchant's corporate offices (subject to Section 15 below), in each case by means of a "going out of business", "store closing", "sale on everything", "everything must go", or similarly themed sale (as further described below, the "Sale").

WHEREAS, on September 22, 2014, Merchant filed the *Debtor's Motion for Orders (I)(A) Authorizing Entry into Agency Agreement, (B) Authorizing Bid Protections, (C) Authorizing Bidding Procedures and Auction and (D) Scheduling Sale Hearing and Approving Notice Thereof, (II) Authorizing (A) Sale of Assets and (B) Store Closing Sales and (III) Granting Related Relief* (the "Sale Motion"), pursuant to which it sought authorization of bidding procedures (including an auction (the "Auction") in connection with the Sale;

WHEREAS, on October 1 2014, the Bankruptcy Court entered an order approving such bid procedures and scheduling the Auction for October 2, 2014; and

WHEREAS, at the Auction, Agent was named the successful bidder;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Definitions and Exhibits

1.1    Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
|---|---|
| Additional Agent Merchandise | Section 8.9(a) |
| Additional Taxes and Penalties | Section 8.3(a) |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(c)(ii) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent's Fee | Section 3.1(b) |
| Agent's FF&E Commission | Section 15(a) |
| Agent Claim | Section 12.5 |
| Agent Collateral | Section 16.11(a) |
| Agent Indemnified Parties | Section 8.3(a) |
| Agreement | Preamble |
| Applicable General Laws | Section 2(c) |
| Approval Order | Section 2(b) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1(c) |
| Bid Protections | Section 16.12(b) |
| Bidding Procedures Order | Section 10.1(b) |
| Break-Up Fee | Section 16.12(b) |
| Central Services | Section 4.1 |
| Committee | Section 3.1(a) |
| Competing Bid | Section 16.12(a) |
| Cost Factor | Section 3.1(e) |
| Cost Factor Threshold | Section 3.1(e) |
| Cost File | Section 5.3(a) |
| Cost Value | Section 5.3(a) |
| DC Goods Receipt Deadline | Section 5.2(a) |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Section 3.3(c)(i) |
| Distribution Center | Recitals |
| Distribution Center Merchandise | Section 5.2(b) |
| Distribution Center Services | Section 4.1 |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| Excluded Defective Merchandise | Section 5.2(b) |
| Excluded Pricing Adjustments | Section 3.1(c)(ii) |

2

| | |
|---|---|
| Existing Vendors | Section 8.9(a) |
| Expenses | Section 4.1 |
| Expense Reimbursement | Section 16.12(b) |
| E-Commerce Platform | Section 8.10 |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 8.7(b)(i) |
| Final Reconciliation Settlement Date | Section 8.7(b)(i) |
| Force Majeure Event | Section 8.8 |
| FF&E Commission Option | Section 15(a) |
| FF&E Disposition Budget | Section 15(a) |
| FF&E Disposition Expenses | Section 15(a) |
| FF&E Guaranty Amount | Section 15(a) |
| FF&E Guaranty Option | Section 15(a) |
| FF&E Sale Election Deadline | Section 15(a) |
| FF&E Sale Option | Section 15(a) |
| Gross Rings | Section 5.3(b)(vi) |
| Gross Rings Period | Section 5.3(b)(vi) |
| Guaranteed Amount | Section 3.1(a) |
| Guaranty Percentage | Section 3.1(a) |
| Hazardous Materials | Section 15(d) |
| ~~In-Transit Receipt Deadline~~ | ~~Section 5.2(a)~~ |
| ~~In-Transit Merchandise~~ | ~~Section 5.2(b)~~ |
| Initial Guaranty Payment | Section 3.3(a) |
| Inventory Date | Section 5.1(a) |
| Inventory Reconciliation Date | Section 3.3(a) |
| Inventory Taking | Section 5.1(a) |
| Inventory Taking Instructions | Section 5.1(a) |
| Inventory Taking Service | Section 5.1(a) |
| Lease Extension Motion | Section 10.1(d) |
| Lender | Section 3.3(ef) |
| Letter of Credit | Section 3.1(h) |
| Liquidation Sale Laws | Section 2(c) |
| Lowest Location Price | Section 3.1(e)(i) |
| Membership Program Discount | Section 8.6(b) |
| Merchandise | Section 5.2(a) |
| Merchandise Ceiling | Section 3.1(d) |
| Merchandise Threshold | Section 3.1(d) |
| Merchant | Preamble |
| Merchant's Designated Account | Section 3.3(a) |
| Merchant Consignment Goods | Section 5.4 |
| Merchant Indemnified Parties | Section 8.3(a) |
| Net FF&E Proceeds | Section 15(a) |
| Non-CAM Trash Removal Charges | Section 4.1 |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 15(a) |
| Owned FF&E Guaranty Amount | Section 15(a) |

3

| | |
|---|---|
| Parties | Preamble |
| Payment Date | Section 3.3(a) |
| POS | Section 3.1(e)(i) |
| Per Store Lowest Price | Section 5.3(a) |
| Prevailing Discount Adjustment | Section 5.3(b)(iii) |
| Proceeds | Section 3.3(b) |
| ~~Reconciled DC Merchandise Receipts~~ | ~~Section 5.1(b)~~ |
| ~~Reconciled In-Transit Merchandise~~ | |
| ~~Receipts~~ | ~~Section 5.1(b)~~ |
| Remaining Merchandise | Section 3.2 |
| Retail Price | Section 3.1(e)(i) |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3(a) |
| Sales Tax Account | Section 8.3(a) |
| ~~Sharing Amount~~ | ~~Section 3.1(b)~~ |
| ~~Sharing Threshold~~ | ~~Section 3.1(b)~~ |
| ~~Shipping Variance~~ | ~~Section 5.1(b)~~ |
| ~~Shipping Variance Response~~ | ~~Section 5.1(b)~~ |
| Signage Costs | Section 16.12(b) |
| Store(s) | Recitals |
| Third Party | Section 4.1 |
| Third Party Vendors | Section 8.9(a) |
| UCC | Section 8.9(c) |
| Vacate Date | Section 6.2 |
| WARN Act | Section 9.1 |

Formatted: Tab stops:  2.78", Left

1.2    <u>Exhibits</u>.  The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| <u>Exhibit</u> | <u>Section Reference</u> | <u>Description</u> |
|---|---|---|
| Exhibit A-1 | Recitals | Stores |
| Exhibit A-2 | Recitals | Distribution Center |
| Exhibit 3.1(d) | Section 3.1(d) | Merchandise Ceiling/Threshold Adjustment |
| Exhibit 3.1(e) | Section 3.1(e) | Cost Factor Adjustment |
| Exhibit 3.3(a) | Section 3.3(a) | Merchant's Designated Account |
| Exhibit 3.3(h) | Section 3.3(h) | Form of Letter of Credit |
| Exhibit 4.1(a) | Section 4.1(a) | Store Occupancy Expense Schedule |
| Exhibit 5.1(a) | Section 5.1 | Inventory Taking Instructions |

4

Exhibit 5.2(b)(1) Section 5.1(b)        Distribution Center Merchandise
Exhibit 5.2(b)(1) Section 5.1(b)        In Transit Merchandise
         Exhibit 8.1                    Section 8.1        Sale Guidelines
Exhibit 10.1(b)    Section 10.1(b)      Form of Bidding Procedures Order
Exhibit 10.1(c)    Section 10.1(c)      Form of Approval Order
Exhibit 11.1(d)    Section 11.1(c)      Pre-Existing Liens
Exhibit 11.1 (l)   Section 11.1(l)      Pending Matters
Exhibit 11.1 (o)   Section 11.1(o)      Extraordinary POS Activity

Section 2.    <u>Appointment of Agent/Liquidation Sale Laws/Approval Order</u>

(a)    <u>Appointment of Agent</u>.  Effective on the date hereof and subject to the entry of the Approval Order, Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of Merchant's Owned FF&E at the Stores and Distribution Center, in accordance with the terms and conditions of this Agreement.

(b)    <u>Approval Order</u>. ~~Within two (2) business days~~<u>Immediately</u> after the execution of this Agreement, Merchant shall ~~file an expedited motion with~~<u>notify</u> the Bankruptcy Court~~, which motion shall of the designation of Agent as the successful bidder at the Auction and~~ seek entry of an order, <u>inter alia</u>, approving this Agreement~~, including, but not limited to, the Bid Protections,~~ and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof~~, in all events subject to Merchant's solicitation and receipt of Competing Bids in accordance with Section 16.12(a) hereof~~ (the "<u>Approval Order</u>"). The Approval Order shall be in substantially the form annexed hereto as <u>Exhibit 10.1(c)</u>, and otherwise be reasonably satisfactory to the Merchant and Agent, and provide, <u>inter alia</u>, that:

(i)    this Agreement (and each of the transactions contemplated hereby) is approved in its entirety;

(ii)    Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby;

(iii)    Agent shall be entitled to sell all Merchandise ~~and the~~, Additional Agent Merchandise,<u> Merchant Consignment Goods and Owned FF&E</u> hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise ~~or the Proceeds~~<u>, Additional Agent Merchandise, Merchant Consignment Goods, Owned FF&E, the Proceeds or any proceeds of the foregoing</u> attaching only to the Guaranteed Amount and other amounts to be received by Merchant under this Agreement;

(iv)    Agent shall have the right to use the Stores and<u>/or the Distribution Center and</u> all related Store<u> and/or Distribution Center</u> services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the

Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order with respect to the Assets;

(v)   Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "going out of business", "store closing," "sale on everything," "everything must go," or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without compliance with the Liquidation Sale Laws, subject to compliance with the Sale Guidelines and Approval Order;

(vi)   Agent shall be granted a limited royalty-free license and right to use until the Sale Termination Date the trademarks, trade names, logos and, customer lists, website, URL, mailing lists and email lists relating to and used in connection with the operation of the Stores and the E-Commerce Platform, solely for the purpose of advertising the Sale in accordance with the terms of this Agreement;

(vii)   all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement;

(viii) all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct or advertising of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or otherwise impedes the conduct or advertising of the Sale;

(ix)   the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement;

(x)   Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement;

(xi)   Agent shall be authorized to include Additional Agent Merchandise in the Sale;

(xii)  subject to Agent having satisfied its obligations hereunder, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of Bankruptcy Code senior to all other superpriority claims, including, without limitation, to the superpriority claims of the Lender; provided that until the Merchant receives payment in full of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, any superpriority claim granted to Agent hereunder (excluding any such claim for the Break-

6

~~Up Fee and Expense Reimbursement (including Signage Costs) under Section 16.12 hereof),~~ shall be junior and subordinate in all respects to the security interests and superpriority claims of Lender but solely to the extent of the amount of the unpaid portion of the Guaranteed Amount, ~~the Sharing Amount (if any),~~ Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder;

(xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16.11 hereof without the necessity of filing financing statements to perfect the security interests;

(xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted;

(xv) Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest;

(xvi) this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and that Agent is entitled to the protection of Section 363(m) of the Bankruptcy Code;

(xvii)        Agent's performance under this Agreement will be, and payment of the Guaranteed Amount ~~and the Sharing Amount, if any,~~ under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xviii) this Agreement is approved pursuant to Section 363 of the Bankruptcy Code; and

(xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Sections 363(m) and 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(c)        Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "going out of business", "store closing", "sale on everything", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental

7

authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business," "store closing" or similar-themed sales (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order.

(d)   Authority.  Except as otherwise specifically provided in this Agreement, Agent shall have no authority, and shall not represent that it has any authority, to enter into any contract, agreement, or other arrangement or take any other action by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent.

Section 3.    Guaranteed Amount and Other Payments

3.1    Payments to Merchant and Agent.

(a)    As a guaranty of Agent's performance hereunder, in addition to the payment of Expenses (as provided for in Section 4.1 hereof), Agent guarantees that Merchant shall receive ~~the sum of eighty~~an amount (the "Guaranteed Amount) equal to one-hundred sixteen and eight tenths on one percent ~~(80%)~~ 116.8%) (the "Guaranty Percentage") of the aggregate Cost Value of Merchandise ~~(the "Guaranteed Amount").~~.  The Guaranteed Amount will be calculated based upon the product of (x) Guaranty Percentage *multiplied by* (y) the aggregate Cost Value of the Merchandise (in the case of (y), as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking by the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, in consultation with Lender ~~(or in~~and the ~~case~~Official Committee of ~~Distribution Center Merchandise counted in~~ Unsecured Creditors (the ~~manner and at the times provided in Section 5.1(b) hereof, the aggregate Cost Value of the Distribution Center Merchandise as determined in accordance with the inventory counting procedures set forth herein),~~"Committee"), (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement), ~~(C) the aggregate Cost Value of In Transit Merchandise included in the Sale; and (D~~and (C) the aggregate Cost Value of Returned Merchandise not otherwise included in the Inventory Taking. Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

~~(b)    To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, plus (y) Expenses of the Sale, plus (z)(i) an amount equal to six percent (6%) of the aggregate Cost Value of the Merchandise included in the Sale and (ii) six percent (6%) of the aggregate sale Proceeds attributable to the sale of Additional Agent Merchandise included in the Sale (the aggregate of (z)(i) and (ii) being collectively defined as the "Agent's Fee"; and the sum of (x), (y) and (z) being collectively defined as the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Merchant (Merchant's share of Proceeds beyond the Sharing Threshold is the "Sharing Amount") and fifty percent (50%) to Agent. Agent shall pay the Sharing Amount, if any, to Merchant (or its designee), on the first business day after the completion of the Final Reconciliation conducted pursuant to Section 8.7(b) and shall remit such payment to the Merchant's Designated Account.~~

~~(c)~~(b)   Intentionally omitted.

8

(d)(c)  The Guaranteed Percentage has been fixed based upon the Merchant's representation that (i) the aggregate Cost Value of the Merchandise is not less than $6.8 million (the "Merchandise Threshold") and not greater than $7.5 million (the "Merchandise Ceiling"); provided that, solely for purposes of determining whether the aggregate Cost Value of the Merchandise included in the Sale is less than the Merchandise Threshold or greater than the Merchandise Ceiling, no adjustment shall be made to the applicable Cost Value to account for the effect of any Prevailing Discount Adjustment or Excluded Pricing Adjustment. To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than or greater than the Merchandise Threshold or Merchandise Ceiling, as applicable, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranteed Percentage shall be adjusted in accordance with Exhibit 3.1(d) attached hereto. Any adjustment to the Guaranteed Percentage provided for under this Section 3.1(d) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, but not limited to, any adjustment provided for under Section 3.1(e) hereof.

(e)(d)  The Guaranty Percentage has also been fixed based upon the assumption that the aggregate Cost Value of the Merchandise in the Sale as a percentage of Retail Price of the Merchandise included in the Sale (without taking into account any Prevailing Discount Adjustment and/or Excluded Price Adjustments) (the "Cost Factor") shall not be greater than thirty-seven and one half five percent (37.5%)(35%) (the "Cost Factor Threshold"). In the event that the Cost Factor is greater than the Cost Factor Threshold, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranty Percentage shall be adjusted (in addition to any applicable adjustment hereunder) in accordance with Exhibit 3.1(e). Any adjustment to the Guaranteed Percentage provided for under this Section 3.1(e) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, but not limited to, any adjustment provided for under Section 3.1(d) hereof. For purposes of this Agreement:

(i)  "Retail Price" means, with respect to each item of Merchandise, determined as of the Sale Commencement Date, the lowest of the lowest ticketed, file price, marked, shelf price, hang-tag, stickered, PLU, or other hard-marked price as of the Sale Commencement Date, excluding in all instances any and all temporary point of sale ("POS") activity and Excluded Price Adjustments. For purposes of calculating Retail Price, if an item of Merchandise has more than one ticketed, file price, marked, shelf price, hang-tag, stickered, PLU, or other hard-marked price, or if multiple items of the same SKU are have different ticketed, file, marked, shelf, hang-tag, stickered, PLU, or other hard-marked prices and such pricing does not otherwise qualify as an Excluded Price Adjustment, the lowest ticketed, file price, marked, shelf price, hang-tag, stickered, PLU, or other hard-marked price on any such item shall prevail for such item or for all such items within the same SKU, as the case may be, that are located within the same location (as the case may be, the "Lowest Location Price"), unless it is reasonably determined by Merchant orand Agent that the applicable Lowest Location Price was mismarked, normal course markdowns had not been reflected or taken, or such item was priced because it was damaged or marked as "as is," in which case the correct price shall control; provided, however, in determining the Lowest Location Price with respect to any item of Merchandise at a Store, the Lowest Location Price shall be determined based upon the lowest

9

Retail Price for such item on a per Store basis.  No adjustment to Retail Price shall be made with respect to different Retail Prices for items located in different Stores.

(ii)    "Excluded Price Adjustments" means the following discounts or price adjustments offered by the Merchant: (i) point of sale discounts or similar adjustments regardless of duration); (ii)  employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) adjustments for damaged, defective or "as-is" items; (vi) coupons (Merchant's or competitors'), catalog, website, or circular prices, or "buy one get one" type discounts; (vii) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (viii) obvious ticketing or marking errors; (ix) instant (in-store) or mail in rebates; or (x) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations.

(f)(e)    To ensure accurate sales audit functions, ~~as well as accurate calculations of the Sharing Amount, if any,~~ Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores.

3.2    Payments to Agent.  Subject to Agent's obligation to pay in full the Guaranteed Amount, ~~the Sharing Amount (if any),~~ and all Expenses, Agent shall be entitled to retain any remaining Proceeds ~~(inclusive of the Agent's Fee)~~.(   Provided that no Event of Default has occurred and continues to exist on the part of Agent, all Merchandise and Additional Agent Merchandise remaining at the conclusion of the Sale ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims, and encumbrances of any kind or nature~~; provided, however, the proceeds realized upon a sale or other disposition of the Remaining Merchandise shall constitute Proceeds hereunder for purposes of, *inter alia*, calculating the Sharing Amount (if any) due Merchant.~~.. Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo.

3.3    Time of Payments; Proceeds; Control of Proceeds

(a)    On the first business day after entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount (the "Initial Guaranty Payment") equal to eighty percent (80%) of the product of (i) the Guaranty Percentage *multiplied by* (ii) the estimated aggregate Cost Value of the Merchandise to be included in the Sale as reflected on Merchant's books and records at the close of business on the last business day immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount"); provided that, the Estimated Guaranteed Amount payable by Agent on the Payment Date shall be calculated based on Merchandise located in the Stores and the Distribution ~~Center~~Centers as of the close of business on the last business day immediately preceding the Sale Commencement Date~~, and shall expressly exclude any In-Transit Inventory not then located at a Store or Distribution Center.~~. On the Payment Date, the Initial Guaranty Payment shall be made by wire transfer of immediately available funds to the account designated on Exhibit 3.3(a) attached hereto (the "Merchant's Designated Account"). The balance of the Guaranteed Amount, ~~if any (including any portion of the Guaranteed Amount attributable to any In-Transit Inventory counted, reconciled and reported as part of the Final Inventory Report),~~ shall be paid by Agent by wire transfer of immediately

10

available funds to the Merchant's Designated Account on the earlier of: (x) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise counted by the Inventory Taking Service following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by Agent and Merchant, in consultation with Lender (the "Final Inventory Report"), and (y) the date that is thirty (30) days after the Sale Commencement Date (in the case of (y) above, Agent shall tender payment of the undisputed portion only on account of any remaining portion of the Guaranteed Amount). In the event of a dispute as to the calculation of the portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof, and Agent's failure to pay such balance or undisputed portion shall entitle the Merchant and the Lender (individually or collectively) to draw upon the Letter of Credit in accordance with Section 3.3(i) hereof to the extent of such balance or undisputed portion.  Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion. In the event that the Initial Guaranty Payment is either less than or exceeds the Guaranteed Amount, as applicable, Agent or Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the sum of the Initial Guaranty Payment.

For purposes of this Agreement, "Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Merchandise (inclusive of any In Transit Merchandise included in the Sale) made under this Agreement whether in the Stores or through Merchant's E-Commerce Platform site (to the extent Agent makes elects to use the E-Commerce Platform pursuit to Section 8.10 hereof), and all service revenue received by Merchant from the Stores and/or through the E-Commerce Platform, in each case during the Sale Term and exclusive of Sales Taxes; (ii) the total amount (in dollars) of all sales of Additional Agent Merchandise (exclusive of Sales Taxes); (iii) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term relating to the Merchandise and Additional Agent Merchandise; and (iv) any and all proceeds received by Agent from the disposition of Remaining Merchandise. For the avoidance of doubt: (1) proceeds from the sales at Merchant's Stores or through the E-Commerce Platform for periods prior to the Sale Commencement Date; (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 hereof (subject to Agent's right to receive the commission under Section 5.4 below); (3) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring prior to the Sale Commencement Date; (4) proceeds from the sale or other disposition of Owned FF&E (subject to Agent's right to receive the FF&E Commission under Section 15 below) or the FF&E Guaranty Amount, as applicable; and (5) payments made by Agent on account of the Guaranteed Amount, the Sharing Amount (if any),, Expenses, the Letter of Credit, shall, in each case, not constitute "Proceeds" hereunder.

(b)    All Proceeds shall be controlled by Agent in the manner provided for below:

(i)    Prior to the date Agent establishes the Agency Accounts (see clause (ii) below), all Proceeds (including credit card Proceeds) shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Stores, which accounts shall be designated for the deposit of Proceeds (including all cash, credit card payments, checks and similar items of payment, deposits and any

11

other amounts contemplated by this Agreement (including proceeds from the sale of Additional Agent Merchandise)), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). Subject to the provisions of Section 16.11 hereof, the Approval Order shall provide (a) that Merchant grants to Agent a first priority security interest in and lien upon each Designated Deposit Account to the extent of any Proceeds and any other amounts payable to Agent deposited therein, and (b) for turnover to Agent of any such Proceeds (and any other amounts payable to Agent deposited therein) in accordance with the terms and provisions of this Agreement and the Approval Order, as applicable. If, notwithstanding the provisions of this Section, Merchant or Lender receives or otherwise has dominion over or control of any Proceeds, or other amounts due to Agent (including proceeds from the sale of Additional Agent Merchandise), Merchant and Lender shall hold the same and other amounts in trust for Agent, and shall not deposit such Proceeds or other amounts due Agent hereunder in any account except a Designated Deposit Account or as otherwise instructed by Agent. Until such time as Agent establishes the Agency Accounts (see clause (ii) below), Merchant, Agent, the Committee and Lender shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement that are deposited into the Designated Deposit Accounts.

(ii)      After payment of the Initial Guaranty Payment and delivery of the Letter of Credit, Agent may establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds (including credit card Proceeds), and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement, and the distribution of amounts payable hereunder; provided that, in the event (a) Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, and (b) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds and/or other amounts payable to Agent under this Agreement, then Merchant, Agent, the Committee and Lender shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other such amounts. Upon request, Agent shall deliver to Merchant and Lender copies of all bank statements and other information relating to the Agency Accounts; provided that, in the event Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, Merchant shall deliver to Agent copies of all bank statements and other information relating to such accounts to enable Agent to track and trace deposited funds that constitute Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement. The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

12

(iii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, and Merchant identification number(s) and existing bank accounts for credit card Proceeds solely for purposes of the Sale, and for processing transactions relating to Additional Agent Merchandise. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures.  Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds (and proceeds from Additional Agent Merchandise) for Agent's own account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to Merchandise and Additional Agent Merchandise sold during the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received, prior to, during or after the Sale Term.

(iv)    Commencing on the first business day following the Payment Date, and continuing on each business day thereafter, Merchant shall promptly pay to Agent by wire transfer of immediately available funds all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales), and proceeds from Additional Agent Merchandise that are deposited into the Designated Deposit Accounts for the prior day.  Agent shall, within a reasonable period of time after the date of each such payment by Merchant, notify Merchant and Lender of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of any undisputed shortfall.

(c)    Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after two (2) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after two (2) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(d)    All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later than 2:00 p.m. (prevailing Eastern Time) on the date that such payment is due; provided that, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (prevailing Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

13

(e)      Upon Agent's failure to timely pay (i) the Adjustment Amount in the event the Guaranteed Amount exceeds the Initial Guaranty Payment, (ii) the ~~Sharing Amount (if any),~~ (iii) Expenses, or (iv) other undisputed amounts due by Agent under this Agreement, Lender or Merchant, as applicable, shall be entitled to immediately draw upon the Letter of Credit to the extent of such undisputed amount.

(f)      If, and to the extent, the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder (as determined pursuant to the express terms of this Agreement) and such funding or payment cannot be recovered by the Agent from Merchant under Section 3.3(a) or Section 3.3(d), by means of an offset or otherwise, then Merchant agrees (or if Merchant shall be unable to or otherwise for any reason fails to, and Salus Capital Partners, LLC, in its capacity as administrative agent and collateral agent (the "Lender"), has received such payment, the Lender agrees) to reimburse such undisputed amount of such overfunded amount to Agent within two (2) business days of written demand thereof by Agent.

(g)      Guaranty Security.  To secure payment of the balance of any unpaid portion of the Guaranteed Amount, ~~Sharing Amount (if any),~~ Expenses and other amounts due to Merchant hereunder, Agent shall deliver to ~~Lender, as Merchant's designee~~Merchant, an irrevocable standby letter of credit, substantially in the form of Exhibit 3.3(h) attached hereto, in an original stated amount equal to the aggregate of (x) twenty percent (20%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date~~, but excluding for purposes hereof the In Transit Merchandise~~), and (y) three (3) weeks' estimated Expenses (the "Letter of Credit"). The Letter of Credit shall name Merchant ~~and Lender,~~ as ~~Merchant's designee, as co-beneficiaries.~~beneficiary. The Letter of Credit shall be delivered ~~to Lender, as Merchant's designee~~Merchant, no later than the second business day following the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant~~and~~, Lender and the Committee.  In the event that Agent fails to timely pay any undisputed amount hereunder in respect of the Guaranteed Amount, ~~Sharing Amount (if any), Additional Agent Merchandise Fee (if any)~~ and/or Expenses as required under this Agreement, Merchant~~and/or Lender, as Merchant's designee,~~ shall be entitled to draw on the Letter of Credit to fund such undisputed amount or obligation after five (5) business days' written notice to Agent. ~~Lender,~~Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount; provided, however, until the Final Reconciliation has been completed, under no circumstances shall the face amount of the Letter of Credit be reduced to an amount less than two (2) ~~weeks~~weeks' estimated Expenses (and Merchant~~and Lender~~ shall cooperate with respect to each such request). The Letter of Credit shall expire no earlier than sixty (60) days after the Sale Termination Date; provided that, if, as of the tenth (10th) business day prior to the scheduled expiration date of the Letter of Credit, there remains any unresolved dispute as to the Guaranteed Amount~~, Sharing Amount,~~ and/or Expenses, Agent shall cause the expiration date of the Letter of Credit to be extended for successive thirty (30) day intervals (or such other longer duration as Merchant~~, Lender,~~ and Agent may agree) until the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount~~, Sharing Amount,~~ and/or Expenses have been paid to Merchant. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10~~))~~) business days prior to the expiration date of the Letter of Credit (as may have been

14

extended previously), Merchant ~~and Lender~~ shall have the right to make a drawing under the Letter of Credit in an amount equal to the amount(s) Merchant asserts are then owing to Merchant. After completion of the Final Reconciliation and payment in full of all amounts owing by Agent (including but not limited to the Guaranteed Amount, ~~the Sharing Amount,~~ and Expenses), Merchant ~~and Lender~~ shall surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated. ~~Upon Lender's receipt of payment in full of its claims against the Merchant, Lender shall promptly deliver the Letter of Credit to Merchant and take all reasonable steps necessary to remove itself as a named co-beneficiary thereunder.~~

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Formatted:** Body Text,Style 65, Left, Indent: First line:  0", Tab stops: Not at  0" +  0.5" + 1" +  1.5" +  2" +  2.5" +  3" +  3.5" +  4" + 4.5" +  5" +  5.5" +  6" +  6.5"

<u>Section 4.</u>      <u>Expenses of the Sale</u>

4.1      <u>Expenses</u>.  Agent shall be unconditionally responsible for all "Expenses", which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent and/or Merchant and/or Lender may review or audit the Expenses at any time.  Agent shall be obligated to pre-fund any payroll-related expenses consistent with Merchant's customary payroll funding practices and timing. In addition, Agent agrees that it shall pre-fund an amount equal to fourteen (14) days per diem Occupancy Expenses on the second business day after the Sale Commencement Date, which amount Merchant and Lender agree shall be applied to and credited against any per diem Occupancy Expense obligation for the month of October. As used herein, "Expenses" shall mean the Store-level (and where expressly applicable, Distribution Center-level) operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)      (i) actual Occupancy Expenses for the Stores on a per location and per diem basis in an amount up to the aggregate per diem per location amount set forth on <u>Exhibit 4.1(a)</u> hereto; <u>provided</u>, <u>however</u>, in the event there are any non-cash items included in Exhibit 4.1(a), such items shall not be available to Merchant to offset any per diem shortfall(s) in any other category/line item, *plus* (iiiii) the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale to the extent set forth on <u>Exhibit 4.1(a)</u>, *plus* (iviii) the portion of any percentage rent obligations attributable to the sale of Additional Agent Merchandise during the Sale to the extent set forth on <u>Exhibit 4.1(a)</u> (in each case as determined in the manner described in the definition of "<u>Occupancy Expenses</u>" below in this Section 4.1);

(b)      actual wages and commissions for all Store-level and Distribution Center-level Retained Employees used in conducting the Sale; <u>provided</u> <u>that</u>, Agent shall only be obligated to pay 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the wages for Retained Employees used during the Inventory Taking;

(c)      actual amounts payable by Merchant for benefits for Retained Employees (including payroll taxes, FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) for Store-level and Distribution Center-level Retained Employees used in the Sale, in an amount up to sixteen and two-tenths percent (16.2%) of base payroll (including commissions) for all Retained Employees in the Stores and the Distribution Centers (the "<u>Benefits Cap</u>");

(d)      Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)      all costs and expenses associated with Agent's on-site supervision of the Stores and Distribution Center, including but not limited to any and all fees, wages, bonuses, deferred compensation, taxes, and third party payroll costs and expenses of Agent's field personnel, travel to, from or between the Stores and Distribution Center, and all out-of-pocket and commercially reasonable expenses relating thereto;

16

(f)        banners, sign walkers, and in-Store signs that are produced for the Sale;

(g)        promotional costs including, without limitation, email blasts, television, ROP, other advertising and direct mail attributable to the Sale and ordered or requested by Agent;

(h)        the costs and expenses of obtaining additional supplies used at the Stores and Distribution ~~Center~~Centers as may be required by Agent in the conduct of the Sale;

(i)        Intentionally omitted;

(j)        postage/overnight delivery/courier charges to and from or among the Stores to the extent relating to the Sale;

(k)        credit card and bank card fees, chargebacks, and discounts attributable to the Sale at the Stores or through the E-Commerce Platform;

(l)        any and all costs of moving, transferring, or consolidating Merchandise and/or Additional Agent Merchandise between the Stores;

(m)        a pro rata portion for the Sale Term of Merchant's premiums in respect of general liability, casualty, property, inventory, and other insurance policies attributable to the Merchandise and the Stores and Distribution ~~Center (in the case of the Distribution Center, solely to the extent Agent makes the election under Section 8.10 below; otherwise such costs shall be at the sole cost and expense of Merchant);~~Centers ;

(n)        third-party payroll processing fees for the Stores and the E-Commerce Platform;

(o)        armored car service and security personnel;

(p)        actual cost of Agent's capital, reasonable legal expenses, letter of credit fees and insurance (as provided in Section 12.4 hereof);

(q)        Intentionally omitted;

(r)        Agent's  50% of the third party fees and costs of the Inventory Taking

(s)        Central Service Expenses in an amount equal to $5,000.00 per week (pro-rated for partial weeks) for the Sale Term (payable to Merchant) in respect of the cost of Merchant providing Central Services in accordance with Section 8.1 hereof;

(t)        Store cash thefts and other Store cash shortfalls in registers;

(u)        Intentionally omitted;

17

(v)    any costs and expenses incurred in connection with the acquisition (including costs of goods) and delivery of any Additional Agent Merchandise;

(w)    ~~solely to~~ the ~~extent Agent makes the election under~~E-Commerce Expense Reimbursement provided for in Section 8.10 below~~, Distribution Center Expenses~~;

(x)    costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale;

(y)    ~~solely~~Costs and expenses postage, overnight delivery or other shipping charges related to the ~~extent Agent makes the election under Section 8.10 below, incremental costs~~operation of ~~maintaining and operating Merchant's website in connection with the~~ the E-Commerce Platform ~~as provided for in Section 8.10~~and delivery of Merchandise and Additional Agent Merchandise to the consumers; and

(z)    the actual costs and expenses of Agent providing such additional services as the Agent deems appropriate for the Sale.

"Expenses" shall not include: (i) Central Service Expenses in excess of the amount set forth in Section 4.1(s); (ii) Excluded Benefits; (ii) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Section 4.1(a) hereof; (iii) costs associated with providing Distribution Center ~~Expenses (except to~~Services in excess of the ~~extent Agent makes the election~~ amounts set forth in Section 4.1 E-Commerce Expense Reimbursement provided for under Section 8.10 below~~in which case Agent shall be responsible for payment in accordance with section 4.1(w) only)~~; (iv) costs of maintaining and operating Merchant's website in connection with the E-Commerce Platform ~~(except to~~in excess of E-Commerce Expense Reimbursement in excess of the ~~extent Agent makes the election~~ amounts provided for under Section 8.10 below ~~in which case Agent shall be responsible for payment in accordance with section 4.1(y) only)~~; or ~~(iii~~iv) any costs, expenses or liabilities arising during the Sale Term, other than the Expenses listed above.  All costs or expenses related to the Sale not included as Expenses shall be paid by Merchant promptly when due during the Sale Term.  Notwithstanding anything to the contrary herein, (x) to the extent that any Expense listed in Section 4.1 is also included on Exhibit 4.1(a), then Exhibit 4.1(a) shall control and such Expense shall not be double counted. Except as provided in this Section 4.1 and Section 8.10, no Expenses shall be paid with respect to any distribution center/warehouses other than the ~~Distribution Center Expenses~~E-Commerce Expense Reimbursement provided for in Section 8.10.

As used herein, the following terms have the following meanings:

"Central Service Expenses" means costs and expenses for Merchant's Central Services.

"Central Services" means those Merchant central administrative services necessary for the conduct and support of the Sale, including, but not limited to, use or and access to Merchant's: (i) inventory control system, (ii) payroll system, (iii ) accounting system, (iv) office facilities, (v) central MIS and POS services, (vi) cash reconciliation, (vii) central

18

administrative services and personnel to process and perform sales audit, banking, and other normal course administrative services customarily provided to or for the benefit of operating the Distribution ~~Center~~Centers and/or the Stores, (~~vi~~viii) such other central office services reasonably necessary for the Sale, and (~~vii~~ix) to use reasonably sized offices located at Merchant's central office facility to effect the Sale.

~~"Distribution Center Expenses" means, solely to the extent Agent either (i) makes the election under Section 8.10 below, Agent shall pay to Merchant an amount up to $5,000 per week (prorated for partial weeks) on account of Distribution Center Services; provided that, Agent shall only be liable at a per diem rate of up to $714 per day in respect of Merchant's provision of Distribution Center Services during the period of the Sale during which the Agent is utilizing the Distribution Center, in each case for the period commencing on the Sale Commencement Date and concluding on the earliest to occur of (x) the Sale Termination Date or (y) the Vacate Date for the Distribution Center. Agent shall pay Merchant any such Distribution Center Expense amount that may be due on a weekly basis as part of the weekly Sale reconciliation provided for under Section 8.7(a) hereof.~~

"Distribution Center Services" means those services customarily performed by Merchant in operating and maintaining the Distribution ~~Center~~Centers in the ordinary course of business and in the course of receiving and distributing ~~merchandise~~Merchandise and supplies to the Stores, as more fully described in Section 8.10, including, but not limited to, with respect to (i) payroll and related employee benefits of all Distribution Center employees as may be designated from time to time by Agent; (ii) the handling, receiving, in-take, storage, ticketing and processing of any Merchandise, and Distribution Center Merchandise, and In Transit (but excluding incremental costs incurred in connection with Additional Agent Merchandise ~~at the Distribution Center; (iii)~~, (ii) any required supplies in connection with the foregoing; (~~iv~~iii) any Central Services required to operate and maintain the Distribution ~~Center~~Centers during the Sale Term applicable thereto; ~~and (v) only of Agent does~~ to the extent not ~~make the election under~~provided for in Section 8.10 ~~hereof.; and (iv) the costs of~~ moving, transferring, or consolidating Merchandise between the Distribution ~~Center~~Centers and the Stores.

"Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

"Occupancy Expenses" means rent, percentage rent, common-area maintenance, landlord promotional fees, real estate and use taxes, HVAC, utilities, telecom/telephone charges, point-of-sale systems maintenance, store security systems, routine repairs and maintenance, taxes and licenses, costs of all local, long-distance, and international telephone, satellite broadband connections, T-1 lines, broadband internet, and other telecommunications services, trash removal (to the extent excluded as a fixed charge component of lease obligation), snow removal, and ordinary course third-party cleanings, pest control services, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(a) attached hereto and in an amount up to the specific

amounts set forth on Exhibit 4.1(a) attached hereto and calculated in accordance with Section 4.1(a), plus any percentage rent obligations incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise ~~(including In-Transit Merchandise that arrives in the Stores prior to the In-Transit Receipt Deadline)~~ and (y) Additional Agent Merchandise included in the Sale. Merchant and Agent agree that Exhibit 4.1(a) shall specify the actual applicable percentage and any applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s). Merchant and Agent further agree that in the event Exhibit 4.1(a) does not specify the actual applicable percentage and/or the applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s), Agent shall have no obligation to pay percentage rent other than as set forth on Exhibit 4.1(a). Notwithstanding anything to the contrary set forth in this Agreement, Merchant and Agent further agree that to the extent that, in connection with the conduct of the Sale and/or Agent's vacating of the Stores (but not in connection with the disposition of any unsold Owned FF&E or other non-Merchandise assets being abandoned or otherwise disposed of by Merchant), Merchant incurs additional trash removal charges at a Store, other than the fixed charge component of Merchant's lease obligation for a particular Store provided for on Exhibit 4.1(a) (the "Non-CAM Trash Removal Charges"), such Non-CAM Trash Removal Charges shall be paid by Agent as an Expense of the Sale, in addition to any trash removal charges as may be set forth in Exhibit 4.1(a) hereof.

"Third-party" means, with reference to any Expenses, a party that is not affiliated with or related to Merchant.

4.2    Payment of Expenses. From and after the Sale Commencement Date, Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7(a) below, based upon invoices and other documentation reasonably satisfactory to Merchant and Agent.

Section 5.    Inventory Valuation; Merchandise.

5.1    Inventory Taking.

(a)    Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU-level and Retail Price physical inventory of the Merchandise located in the Stores and the Distribution ~~Center~~Centers (collectively, the "Inventory Taking"). Subject to the availability of the Inventory Taking Service, Merchant and Agent shall use commercially reasonable efforts to complete the Inventory Taking as follows: (x) as to Merchandise located in the Stores, in each Store no later than twenty one (21) days after the Sale Commencement Date; (y) with regard to Distribution Center Merchandise, ~~(i) in the event Agent elects to exercise its rights to use the E-Commerce Platform as a sales platform in accordance with Section 8.10 hereof, in the Distribution Center,~~ on a date and in accordance with counting procedures that shall be mutually agreeable to the Parties, ~~or (ii) in the event Agent does not elect to exercise its rights to use the E-Commerce Platform as a sales platform in accordance with Section 8.10~~

20

hereof, at such times and in the manner provided in Section 5.1(b) below (the date of the Inventory Taking at each location being the "Inventory Date" for such location). Merchant and Agent shall jointly employ RGIS or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking in the Stores (and if applicable, the Distribution Center). The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed upon by Merchant (in consultation with the Lender) and Agent and made a part of this Agreement as Exhibit 5.1(a) (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service. The balance of such fees and expenses shall be paid by Merchant. Except as provided in the immediately preceding sentence, Merchant and Agent shall each bear their respective costs and expenses related to the Inventory Taking; provided that, Agent shall be obligated to pay fifty percent (50%) of the payroll and related benefit costs (subject to the Benefits Cap) for Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining fifty percent (50%) of the payroll and related benefit costs for Retained Employees used during the Inventory Taking. Merchant, Agent, the Committee and Lender shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the Inventory Taking in each of the Stores, the applicable Store shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking has been completed, as agreed by Merchant and Agent. Merchant and Agent further agree that until the Inventory Taking in each particular Store is complete, Agent shall not (i) transfer any Merchandise to or from that Store, (ii) deliver any Additional Agent Merchandise to such Store, (iii) move Merchandise within or about the Stores, or (iv) remove any Merchant hang tags, price tickets, inventory control tags, or other indicia of pricing affixed to or related to any Merchandise. Agent and Merchant (in consultation with the Lender) shall use their reasonable best efforts to reconcile the Inventory Taking (including, but not limited to, the determination of the aggregate Cost Value of the Merchandise), within ten (10) days after its completion. In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following completion of the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof.

(b)   If Agent does not elect to exercise its rights to use the E-Commerce Platform as a sales platform in accordance with Section 8.10 hereof, Distribution Center Merchandise received at a Store after the Inventory Date for such Store shall be counted and reconciled within five (5) business days after receipt of such goods in the Stores in accordance with the procedures set forth hereinbelow ("Reconciled DC Merchandise Receipts"). In-Transit Merchandise received at a Store after the Inventory Date for such Store shall be counted and reconciled within five (5) business days after receipt of such goods in the Stores in accordance with the procedures set forth hereinbelow ("Reconciled In-Transit Merchandise Receipts"). Absent prior notification and agreement of Merchant, failure to report any variance between the received shipment from the respective shipping documents (each a "Shipping Variance"), within such five (5) business day period shall, result in such receipts being confirmed received consistent with the applicable shipping documents. Merchant shall have five (5) business days to verify a timely issued Shipping Variance (each a "Shipping Variance Response"), and absent prior notification and agreement of Agent, failure to respond to an asserted Shipping Variance

~~within such five (5) business day period shall result in such Shipping Variance being deemed valid. If Merchant timely issues a Shipping Variance Response that disputes the asserted Shipping Variance, Merchant and Agent shall cooperate with each other to verify and resolve such dispute; provided that, in the event Merchant and Agent are unable to resolve such dispute within ten (10) business days from Agent's receipt of a Shipping Variance Response from Merchant (or such greater period as Merchant and Agent may mutually agree), such dispute shall be resolved in the manner provided for resolution of disputes under Section 8.7(b)(ii) hereof. Distribution Center Merchandise (where applicable) and In Transit Merchandise received at a Store prior to the Inventory Date for such Store shall be counted using Gross Rings or as part of the Inventory Taking, as applicable.~~(b)    [Intentionally Omitted]

    5.2   <u>Merchandise Subject to this Agreement</u>.

       (a)   For purposes of this Agreement, including but not limited to the calculation of the Guaranteed Amount, "<u>Merchandise</u>" means all new, first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant and customarily sold to customers in the ordinary course of Merchant's business, including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores ~~on the Sale Commencement Date; (iii)(x) in the event Agent elects to exercise its rights to use the E-Commerce Platform as a sales platform in accordance with Section 8.10 hereof, Distribution Center Merchandise located in the Distribution Center on the Sale Commencement Date; or (y) in the event Agent does not elect to exercise its rights to use the E-Commerce Platform as a sales platform in accordance with Section 8.10 hereof, Distribution Center Merchandise received in the Stores on or prior to the date that is twenty eight (28) days after the Sale Commencement Date (the "DC Goods Receipt Deadline"); (iv~~<u>and the Distribution Centers on the Sale Commencement Date; and (iii)</u> Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto~~; and (v) In-Transit Merchandise received in the Stores on or before the date that is twenty eight (28) days after the Sale Commencement Date (the "In-Transit Receipt Deadline")~~<u>)</u>. Notwithstanding the foregoing, "Merchandise" shall not include (i) goods that belong to sublessees, licensees, or concessionaires of Merchant; (ii) goods held by Merchant on memo, on consignment, or as bailee; (iii) Excluded Defective Merchandise; (iv) Additional Agent Merchandise; <u>and</u> (v) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Stores and Distribution Center~~; (vi) in the case of Section 5.2(a)(iii)(y) above, Distribution Center Merchandise that does not arrive in the Stores on or prior to the DC Goods Receipt Deadline; and/or (vii) In Transit Merchandise that does not arrive in the Stores on or prior to the In Transit Receipt Deadline~~.

       (b)   As used in this Agreement, the following terms have the respective meanings set forth below:

           "<u>Defective Merchandise</u>" means any item of Merchandise identified and agreed upon by Merchant and Agent as defective in that it is damaged, defective, scratched, soiled, ripped, torn, stained, faded, discolored, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mis-mated or near-sized, parts, items typically sold as a set which are incomplete, or gift with purchase items, or otherwise affected by other similar defenses rendering it not first quality. Sample merchandise and merchandise on display in the

22

Stores shall not per se be deemed to be Defective Merchandise.

"Distribution Center Merchandise" means those items of inventory identified on Exhibit 5.2(b)(1) that were located in Merchant's Distribution ~~Center, and solely, which and shall be delivered by Merchant to the Stores as directed by Agent after the Sale Commencement Date or, in the event Agent does not make the election provided for under Section 8.10 below, handled in accordance with Agent's instructions; provided, however, it is agreed and understood that between the date of this Agreement and the Sale Commencement Date, Merchant shall have the right to allocate and distribute Merchandise identified on Exhibit 5.2(b)(1) to the Stores. Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation of the Distribution Center Merchandise and In Transit Merchandise to the Stores not later than two (2) days after~~ Centers on the Sale Commencement Date.

Formatted: Font color: Auto

"Excluded Defective Merchandise" means (a) any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose, (b) any item of Defective Merchandise for which the parties cannot mutually agree upon a Cost Value, and/or (c) packaway merchandise. Excluded Defective Merchandise located in the Stores shall be identified and counted during the Inventory Taking and thereafter removed from the sales floor and segregated. To the extent that goods in the Distribution ~~Center~~ Centers or in transit to the Stores constitute Excluded Defective Merchandise and such goods arrive at the Stores despite Merchant's covenant not to ship such goods to the Stores, such goods shall be identified during the Inventory Taking or, to the extent such goods arrive in a Store after the Inventory Date for such Store, such goods shall be reasonably identified by Agent within five (5) business days of receipt of at such Store.

~~"In Transit Merchandise" mean items of inventory that were ordered by Merchant in the ordinary course of business as identified on Exhibit 5.2(b)(2) annexed hereto, which inventory was in transit to the Stores as of the Sale Commencement Date, but which may be received in the Stores prior to the In Transit Receipt Deadline.~~

5.3    Valuation.

(a)    For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, other than the Additional Agent Merchandise, the lower of (i)(x) the lower of the Merchant's actual cost of such item and (y) the cost of such item as reflected in the SKU for such item of Merchandise as reflected on Merchant's inventory item master cost file, entitled "invStr-SKU_~~20140922~~20141002" (together with all updated files received on or prior to the Sale Commencement Date, the "Cost File") and (ii) the Retail Price.

(b)    Anything in Section 5.3(a) to the contrary notwithstanding, Merchant and Agent further agree as follows:

~~(ii)    The Cost Value and Retail Price of any item of Merchandise that is not in a Store as of the twenty first (21st) day following the Sale Commencement Date (e.g., goods arriving in the Stores after the Sale Commencement Date from Merchant's~~

~~Distribution Center and/or any drop-ship vendor, or any other In Transit Merchandise)~~
~~shall be the otherwise applicable Cost Value and Retail Price of such item (determined in~~
~~accordance with Sections 5.3(a) above and 3.1(e)), *multiplied by* the inverse of the~~
~~prevailing Sale discount in effect on the date such item arrives in the Store (the~~
~~"Prevailing Discount Adjustment"). Agent shall use commercially reasonable and good~~
~~faith efforts to coordinate and schedule shipments of Distribution Center Merchandise~~
~~and In Transit Merchandise from the Distribution Center to the Stores so as to minimize,~~
~~where practicable (i.e., giving due consideration to the needs and capacity of the Stores)~~
~~the effect of the Prevailing Discount Adjustment;~~

~~(iv)~~ (i)  Defective Merchandise shall be valued by mutual agreement of the
parties; if the parties are unable to so agree, or if an item is determined to be Excluded
Defective Merchandise, such goods shall be excluded from the Sale and treated as
Excluded Defective Merchandise for all purposes hereunder, including, without
limitation, calculation of the Guaranteed Amount, and Proceeds ~~and the Sharing Amount~~;

(~~v~~iii)   Excluded Pricing Adjustments shall not be taken into account in
determining the Cost Value of any item of Merchandise;

(~~vi~~iv)  If the Sale commences prior to the completion of the Inventory
Taking at any Store or the Distribution Center, then for the period from the Sale
Commencement Date until the Inventory Taking for such Store (the "Gross Rings Period"),
Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less
applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings") and (ii)
cash reports of sales within such Store, and or E-Commerce Platform utilized by the
subject Distribution Center. Agent and Merchant shall keep a strict count of register
receipts and reports to determine the actual Cost Value and Retail Price of the
Merchandise sold by SKU.  All such records and reports shall be made available to
Merchant and Agent during regular business hours upon reasonable notice.   Any
Merchandise included in the Sale using the Gross Rings method shall be included in
Merchandise using the actual Cost Value of the Merchandise sold plus one and one-half
percent (1.5%) shrink provision.

5.4    Excluded Goods.  Merchant shall retain all rights and responsibility for any goods
not included as "Merchandise" hereunder and shall remove, at Merchant's expense, such goods
from the Stores and the Distribution ~~Center~~Centers prior to the Sale Commencement Date, or as
soon thereafter as reasonably practicable. If Merchant so elects at the beginning of the Sale
Term, Agent shall accept those goods not included as "Merchandise" hereunder and as identified
by Merchant for sale ~~(including for these purposes any Distribution Center Merchandise that~~
~~does not arrive in the Stores on or prior to the DC Goods Receipt Deadline and/or In Transit~~
~~Merchandise that does not arrive in the Stores on or prior to the In Transit Receipt Deadline) as~~
~~"Merchant Consignment Goods"~~as "Merchant Consignment Goods".   Merchant Consignment
Goods shall be sold at prices mutually agreed upon by Merchant and Agent.  Agent shall retain
twenty percent (20%) of the sale price (less applicable Sales Taxes) for all sales of Merchant
Consignment Goods, and Merchant shall receive eighty percent (80%) of the sale price (less
applicable Sales Taxes) in respect of sales of Merchant Consignment Goods. Merchant shall

24

receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly reconciliation by Merchant and Agent pursuant to Section 8.7(a) below.  Except as expressly provided in this Section 5.4, Agent shall have no cost, expense, or responsibility in connection with any goods not included in Merchandise, including but not limited to sales commissions and percentage rent.

5.5    ~~Distribution Center Services.~~

~~(a)    On and after the Sale Commencement Date, and subject to Agent's election under Section 8.10 hereof, Agent shall be responsible for allocating and designating the shipment of the Distribution Center Merchandise to the Stores. Notwithstanding anything to the contrary herein, except as provided in Section 4.1(e), (h), (m), and (w), Agent shall not be responsible to pay any cost or expenses associated with the operation of the Distribution Center.~~

~~(b)    Subject to Agent's election under Section 8.10, and if such election is made Agent's obligation to pay Distribution Center Expenses in accordance with Section 4.1 hereof shall be limited to the period commencing on the Sale Commencement Date and concluding on the earliest to occur of (i) the Sale Termination Date or (ii) the Vacate Date for the Distribution Center. Merchant agrees and covenants that it shall be responsible for performing and providing all Distribution Center Services with respect to all Distribution Center Merchandise and In Transit Merchandise (where and if applicable) located at, or to be received at the Distribution Center. Not later than two (2) days after the Sale Commencement Date, Agent and Merchant shall agree (in consultation with the Lender) on an allocation schedule for shipment of all Distribution Center Merchandise and In Transit Merchandise (where and if applicable) from the Distribution Center to the Stores, as and to the extent applicable.~~

5.5    [Intentionally Omitted].


Section 6.    Sale Term.

6.1    Term.    The Sale shall commence at each of the Stores on the first ~~business~~calendar day after the entry of the Approval Order, but not later than October 3, 2014 (the "Sale Commencement Date").  Agent shall complete the Sale and vacate the premises of each Store and Distribution ~~Center~~Centers in favor of Merchant or its representative or assignee on or before January 15, 2015 (the "Sale Termination Date"). The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "Sale Term". The Sale Termination Date as to any Store or the Distribution ~~Center~~Centers may be (a) extended by mutual written agreement of Agent and Merchant, in consultation with the Lender or (b) accelerated by Agent, in which case Agent shall provide Merchant and the Lender with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice").  If Agent fails to provide Merchant and the Lender with timely notice of an acceleration of the Sale Termination Date for a Store, Agent shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice.

6.2    Vacating the Closing Stores and Distribution Center. Subject to the terms

25

of Section 6.1 hereof, Agent shall provide Merchant and the Lender with not less than seven (7) days' advance written notice of its intention to vacate any Store or Distribution ~~Center~~Centers (as to each such Store and/or Distribution Center, as applicable, the "Vacate Date"). On the Vacate Date, Agent shall vacate such Store and/or Distribution ~~Center~~Centers in favor of Merchant or its representatives or assignee, (subject to Agent's right to abandonment) remove all Remaining Merchandise (including any unsold Additional Agent Merchandise) from the Store and/or Distribution Center, and leave such Store and Distribution Center in "broom clean" condition (ordinary wear and tear excepted) subject to the right to abandon, neatly in place, any unsold Owned FF&E. Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store or the Distribution Center subject to Vacate Notice shall continue only until the earlier of the (a) applicable Vacate Date for such Store or Distribution Center, or (b) Sale Termination Date. All assets of Merchant used by Agent in the conduct of the Sale (*e.g.*, FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores and/or Distribution Center, to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent. Any reference in this Section 6 to vacating the Stores and/or Distribution ~~Center~~Centers means vacating the Stores and/or Distribution Center, as applicable, in favor of Merchant, its representatives, or assignee and shall not mean vacating possession or disclaimer of lease in favor of the landlord or owner of the Store and/or Distribution ~~Center~~Centers premises. Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent, or licensee thereof) to any Store and/or Distribution ~~Center~~Centers during the Sale Term, ordinary wear and tear excepted. Agent shall have the right to abandon in place any asset of Merchant.

Section 7.    Intentionally Omitted.

Section 8.    Conduct of the Sale.

    8.1    Rights of Agent and Merchant. Subject to the Approval Order and the Sale Guidelines, Agent shall be permitted to conduct a "going out of business", "store closing" or similarly themed sale at the Stores and the Distribution ~~Center~~Centers throughout the Sale Term. Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Approval Order, all governing laws and applicable agreements to which Merchant is a party. Agent shall conduct the Sale in accordance with the Sale Guidelines annexed hereto as Exhibit 8.1 and approved by the Approval Order, whether by in-store promotion, media advertising, or other promotional materials. Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business, so long as Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency. In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the following rights, limited by the Sale Guidelines:

        (a)    except as otherwise provided in the Approval Order, to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages, or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws;

26

provided, however, to the extent that Agent extends the hours of operation at one or more of the Stores beyond the hours historically operated by Merchant, which results in additional utilities charges and increased Occupancy Expenses in excess of the average utilities charges and Occupancy Expenses for such Stores over the twelve (12) months preceding the Sale Commencement Date, Agent shall reimburse Merchant the amounts, if any, of such additional costs and such additional costs shall constitute Expenses.;

(b)     to use without charge during the Sale Term (except where otherwise designated as an Expense pursuant to Section 4.1 hereof), (i) all furniture, fixtures and equipment, (ii) bank accounts, (iii) Store-level and/or Distribution Center-level (and to the extent available, corporate) computer hardware and software, (iv) customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data), (v) existing supplies located at the Stores and/or Distribution Center, (vi) intangible assets (including Merchant's names, logos, and tax identification numbers), (vii) Stores' and/or Distribution CenterCenters keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores and the Distribution Center, and (viii) any other assets of Merchant located at the Stores and/or Distribution CenterCenters (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and return to Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)     subject to Agent's payment (if applicable) in accordance with Sections 4.1(s) and (xw) above in respect of Central Services and Distribution Center Services, Merchant agrees and covenants that it shall be responsible for performing and providing to Agent such Central Services necessary or incident to the conduct of the Sale, including, but not limited to, use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house; provided, however, that, in the event Agent expressly requests Merchant to provide services other than those normally provided to the Stores and/or Distribution Center and relating to the sale of Merchandise by Merchant in the ordinary course of business and as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)     to establish Sale prices and implement advertising, signage (including exterior banners and signs and sign walkers), and promotional programs consistent with the sale theme described herein, and as otherwise provided in the Approval Order and the Sale Guidelines, as and where applicable (including, without limitation, by means of media advertising, A-frame, interior and exterior banners, use of sign walkers and similar signage).

(e)     once the Inventory Taking is complete at both the transferring Store and the receiving Store, to transfer Merchandise between and among the Stores;

        (f)    to supplement the Merchandise at the Stores with Additional Agent Merchandise in accordance with Section 8.9 hereof; and

        (g)    to conduct the Sale in accordance with the Sale Guidelines attached hereto as <u>Exhibit 8.1</u>.

    8.2    <u>Terms of Sales to Customers</u>.  Subject to Agent's compliance with applicable law (as determined with reference to the Approval Order), all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized credit and debit cards.  Agent shall accept and honor coupons during the Sale Term, if any, as well as groupons and Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term. Merchant shall reimburse Agent in cash for all amounts related to coupons, as well as groupons and Merchant's employee discount terms, during each weekly sale reconciliation provided for in Section 8.7; <u>provided that</u>, Merchant shall only be obligated to reimburse Agent for Merchant's coupons, as well as groupons and Merchant's employee discount terms, honored by Agent during the first thirty (30) days of the Sale. Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term, so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

    8.3    <u>Sales Taxes</u>.  (a)  During the Sale Term, all sales, excise, gross receipts, and other taxes attributable to sales of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E and collected by Agent in trust for Merchant at time of sale and paid over to Merchant. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "<u>Sales Taxes Account</u>").  If Agent does not timely remit Sales Taxes to Merchant, Merchant shall be permitted to immediately draw on the Letter of Credit in the full amount of Sales Taxes collected by Agent in the preceding week.  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Notwithstanding anything to the contrary herein, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "<u>Additional Taxes and Penalties</u>").  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  Agent shall add Sales Tax to the sales price of all Additional Agent Merchandise

28

sold and Agent shall collect Sales Taxes attributable to the sales of Additional Agent Merchandise and deposit such amounts into existing accounts, trust accounts, or other accounts designated by Agent, for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant and its officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties (including but not limited to all Additional Taxes and Penalties) that Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and remit them to Merchant and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, the Lender, any taxing authority, or any other party, and Merchant (and Lender to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent and its officers, directors, employees, agents and Supervisors (collectively, "Agent Indemnified Parties") from and against all claims, demands, assessments, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.

(b)      Without limiting the generality of Section 8.3(a) hereof, the Parties agree that because Agent will conduct the Sale solely as agent for Merchant, the various payments that this Agreement contemplates (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4      <u>Supplies</u>.  Agent shall have the right to use all existing supplies necessary to conduct the Sale (<u>e.g.</u>, boxes, bags, and twine, but not gift certificates, rain checks, merchandise credits, or the like) located at the Stores and/or the Distribution Centers at no charge to Agent.  In the event that additional supplies are required in any of the Stores or, subject to Agent's election under Section 8.10, the E-Commerce Platform, during the Sale Term, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; <u>provided</u>, <u>however</u>, that if reasonably requested by Agent, Merchant shall assist Agent in obtaining supplies, at Agent's expense, from Merchant's vendors at Merchant's usual and customary costs for such supplies. Merchant does not warrant that Merchant's existing supplies as of the Sale Commencement Date are adequate for purposes of the Sale.

8.5      <u>Returns of Merchandise</u>.  During the first ten (10) days of the Sale, Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "Returned Merchandise").  Agent shall maintain and deliver to Merchant a detailed Returned

Merchandise log, including copies of all relevant merchandise receipts and credits, and shall mark the Returned Merchandise in such a fashion so as to render such merchandise readily identifiable by Merchant and Agent. Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise. To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise and for purposes of the calculation of the Guaranteed Amount and shall be valued at the Cost Value and Retail Price applicable to such item. Subject to Merchant's reimbursement to Agent of the amount of any store credit or refund granted for any such Returned Merchandise, the aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly. If the Returned Merchandise is not first quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Cost Value attributable thereto; provided that, in the event Merchant and Agent cannot agree on the Cost Value to be attributed to any particular item(s) of Returned Merchandise, than such item(s) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder. Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the weekly Sale reconciliation pursuant to Section 8.7(a) hereof. Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the final Sale reconciliation provided for under Section 8.7(b) hereof.

      8.6.    Gift Cards; Merchandise Credits; Membership Program.

      (a)    During the first thirty (30) days of the Sale, Agent shall accept Merchant's gift cards, gift certificates, merchandise credits and other similar Merchant-issued credits, if any. Merchant shall reimburse Agent in cash for gift card, gift certificate, merchandise credit, and other similar Merchant issued credit amounts redeemed during the Sale Term as part of the weekly sale reconciliation provided for in Section 8.7(a).

      (b)    To the extent Merchant maintains any customer membership or customer loyalty discount programs, said customers may take advantage of discounts afforded customers in connection with Merchant's customer membership or customer loyalty discount programs ("Membership Program Discounts") in addition to the then-prevailing Sale discounts being offered by Agent (for example, a "take an additional 10% off" Membership Program Discount" may be combined with Agent's 30% prevailing sale discount, such that the affected customer would receive an effective  discount of 37%); provided further that, Merchant shall reimburse Agent in cash for the incremental increased discount received as a consequence of the recognition of such Membership Program Discounts (on a weekly basis as part of each weekly reconciliation).

      8.7.    Sale Reconciliation.

      (a)    Weekly Reconciliation. On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant (in consultation with Lender) shall cooperate to reconcile Expenses, Gross Rings, and

such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), pursuant to procedures agreed upon by Merchant (in consultation with Lender) and Agent.  On a weekly basis, Agent shall also provide Merchant (and a copy to Lender) with a report (in electronic format acceptable to Merchant) of all sales of Additional Agent Merchandise, which report shall detail by Store, at a minimum, gross and net sales and type of items sold. To ensure accurate sales audit functions, ~~as well as accurate calculations of the Sharing Amount,~~ Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores.

(b)     Final Reconciliation.

(i)     Within thirty (30) days after the Sale Termination Date applicable to the last Store in which the Sale is concluded, Agent and Merchant (in consultation with the Lender) shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, Expenses, and any other accountings required hereunder (the "Final Reconciliation"). Within five (5) days after completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent (the "Final Reconciliation Settlement Date").  In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 8.7(b)(ii) hereof.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant (in consultation with the Lender) and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes, Expenses, and other Sale-related items to review and audit such records.

(ii)     In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.  In the event of a dispute as to (x) or (y) above, Agent shall extend the Letter of Credit in accordance with the provisions of Sections 3.4 or 4.2(b) hereof, as applicable.  If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the applicable expiration date (as may have been extended previously), Merchant and/or Lender shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the undisputed amounts Merchant asserts are then owing to Merchant.

8.8     Force Majeure.  If any casualty, act of war or terrorism, or act of God prevents the conduct of business in the ordinary course at any Store and/or Distribution Center for a period in excess of ten (10) consecutive days (a "Force Majeure Event"), such Store and/or Distribution Center and the Merchandise located at such Store and/or Distribution Center shall be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be

31

reduced to account for any Merchandise eliminated from the Sale that is not the subject of insurance proceeds or consolidated by Agent into another Store(s) and/or Distribution ~~Center~~Centers and, to the extent Agent has paid the Guaranteed Amount, Merchant (or Lender, to the extent Lender has received such amount(s)), to the extent such insurance proceeds are actually received, shall reimburse Agent for the amount by which the Guaranteed Amount is so reduced prior to the end of the Sale Term.  If a Store and/or Distribution Center is eliminated from the Sale due to a Force Majeure Event, Agent will use its commercially reasonable efforts to transfer therefrom all Merchandise that is not the subject of insurance proceeds and include such Merchandise in the Sale at other Stores and/or Distribution Center.

8.9    Additional Agent Merchandise

(a)    Agent shall be entitled to include in the Sale additional merchandise procured by Agent which is of like kind, and no lesser quality to the Merchandise located in the Stores ("Additional Agent Merchandise").  Agent agrees that Additional Agent Merchandise, if any, shall be procured from either Merchant's existing vendors ("Existing Vendors") or third party vendors who are not Existing Vendors ("Third Party Vendors") that sell merchandise of like kind, and no lesser quality to the Merchandise; provided that, Additional Agent Merchandise, if any, procured from Third Party Vendors shall not exceed an amount equal to ten percent (10%) of the Merchandise (calculated at original invoice cost); provided further that, in the event Agent desires to include Additional Agent Merchandise that is not of like kind and of equal quality to the Merchandise, the inclusion of any such merchandise shall be subject to the mutual agreement of Agent and Merchant. Agent shall be responsible for payment of the costs associated with procuring any Additional Agent Merchandise. Agent shall pay for all costs and expenses related to, or incurred in connection with, the marketing and sale of the Additional Agent Merchandise as an Expense of the Sale. Agent further agrees that if it elects to include Additional Agent Merchandise in the Sale, Agent shall not utilize the Distribution Center for the receipt, processing, handling and distribution of such Additional Agent Merchandise as part of the Sale.

(b)    The Additional Agent Merchandise shall be at all times subject to the control of Agent.  If requested by Agent, Merchant shall, at Agent's expense as an Expense, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)    Any transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant.  Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code in effect in the State of Utah (the "UCC"). ~~Subject to Agent's obligation to pay the Sharing Amount, if any,~~ Agent is hereby granted a first priority security interest in (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise (and

32

any proceeds from the sale thereof) as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise proceeds).

(d)     Lender hereby consents to the payments to Agent of Additional Agent Merchandise proceeds.

(e)     In order to distinguish the Additional Agent Merchandise from the Merchandise located in the Stores, Agent shall affix distinctive tags and/or other identifying markings on all items of Additional Agent Merchandise, which shall enable Merchant and Agent to distinguish sales of the Additional Agent Merchandise from sales of the Merchandise. Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Merchandise has been included in the Sale.

8.10    E-Commerce Platform. In addition to, and without limiting, any other provision of this Agreement, Merchant hereby grants Agent a royalty-free license (exclusive during the Sale Term) to use Merchant's ~~e-commerce site~~E-Commerce platform and related platform ("E-Commerce Platform"), to the extent available, to fulfill customer orders for purchases/sales of Merchandise (in Agent's capacity as Agent hereunder).   All proceeds of such sales shall constitute Proceeds under this Agreement. Merchant shall provide Agent with reasonable assistance with respect to the functionality of the site and the fulfillment of Merchandise sales; provided, however, that Agent shall ~~pay Merchant (as an Expense, which shall be in addition to all other Expenses contemplated by this Agreement) for the expenses incurred and funded by Merchant after the Sale Commencement Date that are directly attributed to and allocable to the continued operation and maintenance of the E-Commerce Platform (but only to the extent such post-Sale Commencement Date expenses are not otherwise included as an Expense of the Sale under Section 4.1 hereof (including, but not limited to as part of Central Services)) in the event Agent elects to avail itself of such license rights. In the event Agent elects to exercise its rights to use the E-Commerce Platform as a sales platform, as distinguished from use thereof as a store locator or for Sale related advertising, (x) Agent shall provide Merchant with written notice of such election exercise not later than one (1) day prior to the Sale Commencement Date, (y)~~reimburse Merchant for the following expenses incurred in connection with providing Distribution Center Services and  the use and operation of the E-Commerce platform: the fixed costs incurred for the following categories: (a) payroll and related employee benefits of managerial employees of the Distribution Centers and E-Commerce Platform, including: (i) vice president of E-Commerce Platform;: (ii) marketing manager; (iii) chief merchant; (iv) merchandise office manager; (v) internet sales manager; and (vi) assistant sale managers; (b) marketing expenses related to the E-Commerce Platform related to forwarding sites; and (c) amounts payable to third party providers in connection with maintaining the E-Commerce Platform and keeping it on-line, in an aggregate amount not to exceed $15,000 per week (collectively, the "E-Commerce Expense Reimbursement") (which shall be in addition to all other Expenses contemplated by this Agreement).  Agent shall use the E-Commerce Platform as a sales platform, and Merchant and Agent shall mutually agree on the date and procedures required to complete the Inventory Taking at the affected Distribution Center(s). ~~In the event Agent elects not to exercise its rights to use the E-Commerce Platform as a sales platform,~~

Merchant agrees that it shall not complete any sales for its own account utilizing the E-Commerce Platform during the Sale Term.

> Formatted: Font: Bold

Section 9.        Employee Matters.

9.1        Merchant's Employees.  Subject to the applicable provisions of the Approval Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's Store employees and at the Distribution Centers in the conduct of the Sale to the extent Agent deems expedient, and Agent may select and, with Merchant, schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such Store employees and Distribution Center Employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.  Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.  Merchant and Agent agree that except to the extent that wages, payroll taxes, benefits, and other costs relating to the employment of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims, and other termination-type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

9.2        Termination of Employees by Merchant.  Agent may in its discretion stop using any Retained Employee at any time during the Sale.  In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for termination "for cause" (such as dishonesty, fraud, or breach of employee duties), in which case the seven (7) day notice period shall not apply; provided, however, that Agent shall immediately notify Merchant of the basis for such "cause".  During the Sale Term, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld).  Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's treatment of such Retained Employees.

9.3        Payroll Matters.  Subject to Section 4.1 hereof, during the Sale Term Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday prior to the date on which such payroll is payable (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained

34

Employees plus related payroll taxes, workers' compensation and benefits for such week, in the amount up to the Benefits Cap.

9.4     Employee Retention Bonuses.    Agent shall pay, as an Expense hereunder, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable) up to a maximum of approximately ten percent (10%) of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause", as Agent shall determine in its sole discretion.  The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its discretion, and shall be processed through Merchant's payroll system. Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within two (2) business days after the Sale Commencement Date.  Agent shall not utilize the Retention Bonus as a mechanism to encourage Retained Employees to act contrary to Merchant's best interests.

Section 10.     Conditions Precedent.

10.1     Conditions to Agent's Obligations.    The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(a)     All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)     On or before October 1, 2014, the Bankruptcy Court shall have entered an order, inter alia, approving the Bid Protections (a "Bidding Procedures Order"), in substantially the form annexed hereto as Exhibit 10.1(b), and which Bidding Procedures Order shall otherwise be in form and substance reasonably satisfactory to the Agent;    (b)    On     No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement (including, without limitation, the Sale);

(c)     The Bankruptcy Court shall have entered the Approval Order, in substantially the form annexed hereto as Exhibit 10.1(c), on or before October 3, 2014;

(d)     The Bankruptcy Court shall have entered one or more interim and/or final orders, inter alia, approving a debtor-in-possession financing or cash collateral facility sufficient, in the opinion of Agent, to enable Merchant to perform its obligations under this Agreement during the Sale Term;

(e)     theThe Lender shall have executed this Agreement in the space provided therefor; and

(df)     Merchant shall have filed a motion  ("Lease Extension Motion") with the Bankruptcy Court seeking issuance of an order, pursuant to Section 365(d)(4) of the Bankruptcy

35

Code, inter alia, extending the Merchant's time to assume or reject the leases for the Stores to a date not sooner that the applicable Sale Termination Date.

10.2    <u>Conditions to Merchant's Obligations</u>. The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(a)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)    Notwithstanding anything in this Agreement or any Agency Document to the contrary, the enforceability of this Agreement is subject in all respects to Merchant's express written approval and acceptance of any Exhibit or Agency Document not fully executed by the parties and attached hereto; and

(c)    The Bankruptcy Court shall have entered the Approval Order.

Section 11.    <u>Representations, Warranties and Covenants</u>.

11.1    <u>Merchant's Representations, Warranties, and Covenants</u>.    Merchant hereby represents, warrants, and covenants in favor of Agent as follows:

(a)    Merchant (i) is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to own, lease, and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Distribution ~~Center~~Centers and each Store is/are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to the entry of the Approval Order, Merchant has the right, power, and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations hereunder.  Subject to the entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Subject to the issuance and entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid, and binding obligation of Merchant, enforceable in accordance with its terms.  Subject to the entry of the Approval Order, no court order or decree of any federal,

36

state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party that has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Other than for any consent as shall be obtained prior to the Sale Commencement Date, and any contracts or agreements identified by Merchant to Agent on or prior to the Sale Commencement Date, no contract or other agreement to which Merchant is a party or by which Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)      Effective as of September 1, 2014, Merchant ceased normal replenishment of Merchandise and supplies in and to the Stores, except Merchant represents that some limited, non-normal course replenishment has been done since September 1, 2014.

(d)      Merchant (i) except as set forth on Exhibit 11.1(d), owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise free and clear of all liens, claims, and encumbrances of any nature; provided that, the liens identified in Exhibit 11.1(d) shall attach to the Guaranteed amount, Sharing Amount, if any, and such other amounts due Merchant hereunder in the same extent and priority that such liens had in the Merchandise and Owned FF&E; and (ii) Merchant shall not create, incur, assume, or suffer to exist any security interest, lien, or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds, in each case, except for such pre-existing liens and security interests as shall have been disclosed by Merchant to Agent and identified in Exhibit 11.1(d) hereof, which liens and security interests shall, pursuant to the Approval Order, attach only to the Guaranteed Amount, the Sharing Amount, the Additional Agent Merchandise Fee, Expenses, and any other amounts payable to Merchant hereunder.

(e)      Merchant has maintained its pricing files at all Stores in the ordinary course of business, and prices charged to the public for goods (whether in-store, by advertisement, or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns, advertised sales, and other customary in-store promotional or clearance activities).   All pricing files and records relative to the Merchandise have been made available to Agent, and Agent has acknowledged that the current pricing files provided as of October 2, 2014, contains certain adjustments related to the discontinuance of POS markdowns in the ordinary course of business and Agent waives and releases Merchant from any purported breach of this representation related thereto.

(f)      Merchant shall ticket or mark all items of inventory received at the Stores prior to the Sale Commencement Date in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

37

(g)     To the best of Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state, and local product safety laws, rules, and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Subject to the provisions of the Approval Order, Agent shall have the right during the Sale Term to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores and the Distribution Center, the assets currently located at the Stores and Distribution Center, and the utilities and other services provided at the Stores and Distribution Center. Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores.  Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(i)     Subject to the Approval Order, Merchant has paid and shall continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Stores' employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Supplies have not been, since September 1, 2014, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

(k)     Since September 1, 2014, Merchant (i) has not (and shall not, up to the Sale Commencement Date) marked up or raised the price of any items of Merchandise, (ii) has not reduced has the price of any items of Merchandise, (iii) has sold inventory during such period at customary prices consistent with the ordinary course of business, and has not promoted or advertised any sales or in-store promotions (including POS promotions) to the public other than as described on Exhibit 11.1(k) (in all cases whether or not consistent with Merchant's ordinary course of business consistent with historic periods), and (iv) has not removed or altered any tickets or any indicia of clearance merchandise or POS promotion, except in the ordinary course of business.

(l)     Except for (i) the Bankruptcy Case and (ii) the matters set forth on Exhibit 11.1(l), no action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(m)     Merchant is not a party to any collective bargaining agreements with its employees. No labor unions represent Merchant's employees at the Distribution ~~Center~~Centers

38

or at any Store. There are currently no strikes, work stoppages, or other labor disturbances affecting the Distribution ~~Center~~Centers or any Store, or Merchant's central office facilities.

(n)    Since September 1, 2014, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(o)    Since September 1, 2014, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein (including as described in Section 11.1(c)), through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business and not promoting or advertising any sales or in-store promotions (including POS promotions) to the public other than as described on Exhibit 11.1(o) (in all cases whether or not consistent with Merchant's ordinary course of business consistent with historic periods); (ii) not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; and (iii) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores.

(p)    To Merchant's knowledge, formed after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(q)    No Store lease or similar occupancy agreement has expired, nor shall expire at any time until the conclusion of the Sale Term in such Store (by its terms or otherwise).

(r)    As of the Sale Commencement Date, the mix of goods (as to type (e.g., clearance or regular) and as to category shall in all material respects be consistent with the respective levels and mixes set forth in the Cost File.

(s)    Merchant has not since September 1, 2014 shipped any Excluded Defective Merchandise from the Distribution ~~Center~~Centers to the Stores.  Merchant will not ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution ~~Center~~Centers to the Stores.

(t)    Merchant (i) at the Sale Commencement Date will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) to consummate the transactions contemplated by this Agreement and the other Agency Documents, (ii) at the Sale Commencement Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the other Agency Documents, and (iii) at the Sale Commencement Date, will not have incurred any obligation, commitment, restriction or liability of any kind which would impair or adversely affect such funds, resources and capabilities.

39

(u)      Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at the Stores except as detailed on Exhibit 11.1(u).

(v)      Merchant shall use its good faith best efforts to prosecute the Lease Extension Motion and obtain the relief contemplated thereby.

11.2    Agent's Representations, Warranties and Covenants.  Agent hereby represents, warrants, and covenants in favor of Merchant as follows:

(a)      Agent (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of ~~Delaware~~California; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)      Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid, and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, provincial, state, or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)      No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)      Agent has acknowledged that the current pricing files provided as of October 2, 2014, contains certain adjustments related to the discontinuance of POS markdowns in the ordinary course of business and Agent waives and releases Merchant from any purported breach of this representation related thereto.

Section 12.      Insurance.

40

12.1    <u>Merchant's Liability Insurance</u>.  Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall use best efforts to cause Agent to be named an additional insured with respect to all such policies.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal, or material change.  In the event of a claim under any such policies, (a) Merchant shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent such claim arises from or relates to the alleged acts or omissions of Merchant or its employees (other than Retained Employees), agents (other than Agent's employees), or independent contractors (other than Agent and Supervisors hired by Agent in conjunction with the Sale) and (b) Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts (which amounts shall constitute Expenses) to the extent such claim arises from or relates to the alleged acts or omissions of Agent or its employees, agents, or independent contractors, including Retained Employees.

12.2    <u>Merchant's Casualty Insurance</u>.  Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft, and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise and/or Additional Agent Merchandise (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal, or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date (as may be extended from time to time as set forth herein) without Agent's prior written consent.

12.3    <u>Worker's Compensation Insurance</u>.  Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4    <u>Agent's Insurance</u>.  As an Expense of the Sale, Agent shall maintain throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance

41

reasonably satisfactory to Merchant.  In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent such claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or Supervisors.

12.5   Risk of Loss.  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Agent shall not be deemed to be a successor employer.  Merchant and Agent agree that, subject to the terms of this Agreement, Agent shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term (an "Agent Claim").  In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement.   To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

Section 13.   Indemnification.

13.1   Merchant Indemnification.  Merchant shall indemnify and hold Agent and each Agent Indemnified Party harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a)   Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)   any failure of Merchant to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)   subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

42

(d)    any consumer warranty or products liability claims relating to Merchandise and/or Additional Agent Merchandise;

(e)    any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act);

(f)    any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; and

(g)    the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent), or representatives.

The indemnification obligations set forth in this Section 13.1 shall be in addition to (and shall not limit) any other indemnification obligations of Merchant set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

13.2    <u>Agent Indemnification</u>.    Agent shall ~~jointly and severally~~ indemnify and hold harmless Merchant and the Merchant Indemnified Parties from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Merchant resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Agent):

(a)    Agent's material breach of or failure to comply with any Safety Laws (as defined in the Approval Order) or any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)    any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, Supervisors, or other officers, directors, or representatives of Agent;

(c)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)    any Agent Claims;

(e)    any Additional Taxes and Penalties arising out of Agent's failure to collect and/or remit to Merchant correct amounts of Sales Taxes (including any such failure resulting from Agent's use of any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale);

43

(h)      the gross negligence, willful misconduct, or fraud of Agent or any of its officers, directors, employees, agents, or representatives; and

(i)      any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Merchandise.

The indemnification obligations set forth in this Section 13.2 shall be in addition to (and shall not limit) any other indemnification obligations of Agent set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

Section 14.    Defaults.

The following shall constitute "Events of Default" hereunder:

(a)      Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)      Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term;

(c)      The filing of a motion by any party to covert or the conversion of the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint or the appointment of a chapter 11 trustee; or

(d)      Subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party (in the case of (a) or (b) above, or the Agent in the case of (c) or (d) above) may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not effected by the defaulting party.

Section 15.    Fixtures.

(a)      With respect to any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking owned by Merchant and located at the Stores, Distribution ~~Center~~Centers and Merchant's corporate offices (collectively, the "Owned FF&E"), Agent shall, at Merchant's election (the "FF&E Sale Option"), either (i) sell the Owned FF&E strictly on a commission basis (the "FF&E Commission Option"), or (ii) sell the Owned FF&E on a guaranteed fee basis (the "FF&E Guaranty Option"); provided that, the FF&E Guaranty Option shall be subject to the Merchant and Agent agreeing on a mutually acceptable FF&E/asset listing. Merchant shall

exercise the aforementioned FF&E Sale Option by written notice to Agent by the date that is not later than ten (10) calendar days after the Sale Commencement Date (such date being defined as the "FF&E Sale Election Deadline"). In the event Merchant elects the FF&E Commission Option, Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds from the sale of such Owned FF&E ("Agent's FF&E Commission"); provided, however, in such case Merchant shall be responsible for payment of expenses incurred in connection with the disposition of the Owned FF&E ("FF&E Disposition Expenses") in accordance with a budget to be mutually agreed upon between Merchant and Agent, in consultation with Lender ("FF&E Disposition Budget"), and all proceeds realized from the disposition of the Owned FF&E, after deduction of applicable sales taxes, Agent's FF&E Commission, and the FF&E Disposition Expenses (collectively, the "Net FF&E Proceeds"), shall be paid to Lender, as Merchant's designee. In the event Merchant elects the FF&E Guaranty Option, Agent shall pay Merchant a lump sum payment in an amount to be agreed upon between Agent and Merchant, in consultation with Lender (hereinafter, the "FF&E Guaranty Amount"), in which case all costs and expenses associated with the disposition of Owned FF&E shall be borne by Agent, and all proceeds realized from the sale or other disposition of the Owned FF&E (after payment of the applicable FF&E Guaranty Amount and net of any applicable sales taxes) shall be retained by Agent for its sole account. In the event that Merchant elects to have someone other than the Agent dispose of the Owned FF&E at one or more of the Distribution Center, corporate offices, and Stores, it is understood that such third party's efforts shall not interfere in any way with Agent's conduct of the Sale.

(b)     Anything in this Agreement to the contrary notwithstanding, Agent shall be authorized to abandon any and all unsold Owned FF&E (and all other furniture, fixtures, and equipment at the Stores, Distribution ~~Center~~Centers and corporate headquarters) in place without any cost or liability to Agent. Agent shall have no responsibility whatsoever with respect to furniture, fixtures, and equipment located at the Stores, Distribution ~~Center~~Centers and/or corporate offices which are not owned by Merchant.

(c)     Merchant hereby represents to Agent that: (i) subject to the Approval Order, all Owned FF&E may be sold by Agent on Merchant's behalf, free and clear of all claims, liens and encumbrances of any kind; and (ii) all such Owned FF&E is devoid of Hazardous Materials.

(d)     Anything in this Agreement to the contrary notwithstanding, Agent will not have any obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any Hazardous Materials that may be located at the Stores, Distribution ~~Center~~Centers and/or Merchant's corporate offices or otherwise. Agent shall have no liability to any party for any environmental action brought: (i) that is related to the storage, handling, treatment, disposition, generation, or transportation of Hazardous Materials, or (ii) in connection with any remedial actions associated therewith or the Stores, Distribution ~~Center~~Centers and/or Merchant's corporate offices. Merchant (and not Agent) shall be solely responsible to remove from the Stores, Distribution ~~Center~~Centers and Merchant's corporate offices all Hazardous Materials. For purposes of this Agreement, the term "Hazardous Materials" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. 9601(14), as a "hazardous substance", (ii)

45

the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste", or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public  health  or welfare or  to the environment or as otherwise requiring special handling, collection,  storage, treatment, disposal, or transportation.

Section 16.    Miscellaneous.

     16.1    Notices.    All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by e-mail, and/or a recognized overnight delivery service, as follows:

         If to Agent:

46

~~Gordon Brothers Retail Partners~~Great American Group, LLC
~~Prudential Tower~~
~~800 Boylston Street~~
~~Boston, MA 02119~~
21860 Burbank Blvd., Suite 300 South
Woodland Hills, CA 91367
Attn:    ~~Michael Chartock~~Mark P. Naughton
Tel:    ~~617.210.7116~~847 943 2086
Email: mnaughton@greatamerican.com~~mchartock@gordonbrothers.com~~

~~————————————and—~~

~~Hilco Merchant Resources, LLC~~
~~5 Revere Drive, Suite 206~~
~~Northbrook, IL 60062~~
~~Attn:   Ian S. Fredericks~~
~~Tel:     847.418.2075~~
~~Email: ifredericks@hilcotrading.com~~

~~With a copy to (which shall not constitute notice):~~

~~Reimer & Braunstein LLP~~
~~Times Square Tower~~
~~Seven Times Square, Suite 2506~~
~~New York, NY 10036~~
~~Attn:   Steven E. Fox, Esq.~~
~~Tel:     212.789.3150~~
~~Email: sfox@riemerlaw.com~~

If to Merchant:

Naartjie Custom Kids, Inc.
3676 W California Ave., Suite D-100
Salt Lake City, UT 84104
Attn:    _____
Tel:     _____
Email:   _____

With a copy to (which shall not constitute notice):

Dorsey & Whitney LLP
136 South Main Street
Suite 1000
Salt Lake City, UT 84101-1655
Attn:    Annette W. Jarvis, Esq.
Tel:     (801) 933-7360

47

> **Formatted:** Normal,Style 140, Indent: Left: 0.5", First line: 0.5", Tab stops: Not at -0.75" + -0.5" + 1"

Email: jarvis.annette@dorsey.com

If to Lender:

Salus Capital Partners, LLC
197 First Avenue, suite 250
Needham Heights, MA 02494
Attn:   Kyle C. Shonak
Tel:    617.420.2663
Email:  kshonak@saluscapital.com

With a copy to (which shall not constitute notice):

Greenberg Traurig, LLP
One International Place
Boston, MA  02110
Attn:   Jeffrey M. Wolf, Esq.
Tel:    617.310.6041
Email: wolfje@gtlaw.com~~wolfje@gtlaw~~

If to the Official Committee of Unsecured Creditors:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA  90067-4003
Attn:   Jeffrey N. Pomerantz
Tel:    310-277-6910
Email:  jpomerantz@pszjlaw.com

> **Formatted:** Indent: Left:  0", First line:  0"
> **Formatted:** Font color: Auto
> **Formatted:** Normal,Style 140, Indent: Left:  0.5", First line:  0.5", Tab stops: Not at  -0.75" +  -0.5" +  1" +  2" +  3.15"

16.2    Governing Law; Consent to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of Utah, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court (and the District Court and Circuit Court of Appeal with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3    Entire Agreement.  This Agreement, the Exhibits hereto, and the Agency Documents (subject, in each instance, to the Approval Order) contain the entire agreement between the Parties with respect to the transactions contemplated hereby and supersede and cancel all prior agreements, including but not limited to all proposals, letters of intent, or representations, written or oral, with respect thereto.

48

16.4    Amendments.  This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of the ~~parties hereto~~Merchant and Agent; provided, however, that no modification may be made to Sections 3.3(e), 3.3(f), 3.3(g), and 8.8 without the express consent of the Lender.

16.5    No Waiver.  No party's consent to or waiver of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of Agent and Merchant, including but not limited to any chapter 11 or chapter 7 trustee.  ~~Agent~~No party to this Agreement shall ~~not~~ be permitted to assign its obligations under this Agreement.

16.7    Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    Survival.  All representations, warranties, covenants and agreements made herein shall be continuing, shall be considered to have been relied upon by the Parties and shall survive the execution, delivery, and performance of this Agreement.

16.10.    Termination.  This Agreement shall remain in full force and effect until the first to occur of (i) receipt by Merchant of written notice from Agent that any of the conditions specified in Section 10 hereof have not been satisfied or (ii) ~~the acceptance and consummation by Merchant of a transaction constituting a Competing Bid~~termination upon the occurrence of an Event of Default in accordance with Section 14 of this Agreement, or (iii) the expiration of the Sale Term and completion and certification by Merchant and Agent of the Final Reconciliation pursuant to Section 8.7(b) above.  Notwithstanding the foregoing, (a) the representations, warranties, and indemnities of Merchant and Agent contained herein and the provisions of Section 11 above, and (b) any claim arising from a breach of this Agreement prior to its termination, shall survive the termination of this Agreement pursuant to this Section 16.10.

16.11    Agent's Security Interest.

(a)    In consideration of and ~~effective upon~~subject to payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to the ~~Lender,~~

**Formatted:** Font color: Black

49

as Merchant's designeeMerchant, Merchant hereby grants to Agent first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) in the event Merchant elects the FF&E Guaranty Option, the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E after payment of the FF&E Guaranty Amount; or, alternatively, the FF&E Commission; (vi) Agent's percentage share in excess of the Sharing Threshold, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder. Upon entry of the Approval Order, payment of the Initial Guaranty Payment on the Payment Date, and delivery of the Letter of Credit to the Lender, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)     Without any further act by or on behalf of the Agent or any other party (including (without limitation the Lender and Merchant), the Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, provided, however, that (x) until the Merchant receives payment in full of the Guaranteed Amount, the Additional Agent Merchandise Fee, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, the security interest granted to Agent hereunder shall be junior and subordinate in all respects to the security interests of Lender in the Agent Collateral but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, the Additional Agent Merchandise Fee (if any), the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, and (y) upon payment in full of the Guaranteed Amount, the Additional Agent Merchandise Fee (if any), the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to Merchant hereunder, any security interest or lien of the Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent in the Agent Collateral.  Merchant shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(c)     Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(d)     In the event of a Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC.

50

16.12   ~~Break Up Fee; Expense Reimbursement.~~

~~(a)       This Agreement is subject to~~ Any notice required to be provided to Lender under the ~~approval by~~ terms of this Agreement shall also be provided to counsel for the ~~Bankruptcy Court and   Committee of Creditors Holding General Unsecured Claims (the~~ ~~consideration by~~ "Committee").  Any time the ~~Merchant of competing bids that~~Debtor is required to consult with the ~~Merchant, in its sole discretion, deems to be higher or better than~~ Lender under the ~~transactions contemplated by this Agreement (each, a "~~Competing Bid~~").   At any time prior to the entry of the Approval Order, the Merchant may, and the Merchant may cause its advisors, representatives and affiliates to, (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate or have discussions with, any person or entity (in addition to Agent and its affiliates and representatives) in connection with any sale, lease or other disposition of all or any portion of the Merchandise and Owned FF&E; (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such person or entity; and (c) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any person or entity to do or seek to do any of the foregoing.  Merchant agrees that upon the execution~~terms of this Agreement~~, Merchant shall provide Agent with the exclusive right to contact and negotiate with Merchant's vendors with respect to In Transit Merchandise and other Merchant on order goods. Merchant and Agent further agree that in order for a competing bid to constitute a "Competing Bid", such bid must (i) be in an amount greater than (x) the Guaranty Percentage, plus a percentage of the aggregate Cost Value of the Merchandise equivalent to the Bid Protections, plus (y) an additional overbid amount equal to not less than 1.0% of the aggregate Cost Value of the Merchandise, and (ii) contain the agreement by the competing bidder to reimburse Merchant for the Signage Costs.  Bid increments during the auction~~ it shall ~~also~~ be ~~0.1% unless otherwise agreed~~required to ~~by Agent~~consult with the Committee.

~~(b)       In consideration for Agent having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of the assets of Merchant and to compensate Agent as a stalking horse bidder, in the event that this Agreement is terminated under either Section 16.10(i) or (ii) hereof, Merchant shall pay and Agent shall receive, (i) a breakup fee equal to $75,000.00 (the "Break Up Fee"); plus (ii) the reasonable fees and expenses of legal, accounting and financial advisors and out-of-pocket costs and expenses incurred by Agent in connection with conducting due diligence and the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby in an amount not to exceed $30,000.00 (the "Expense Reimbursement"); plus (iii) an amount equal to the reasonable and documented third party costs, fees, and expenses incurred by Agent in acquiring signage and other advertising and promotional material in connection with the Sale (excluding any cost of capital incurred in connection therewith) in an amount not to exceed $65,000 (the "Signage Costs", and together with the Break Up Fee and Expense Reimbursement, the "Bid Protections"); provided that, upon Merchant's reimbursement to Agent for any Signage Costs, Agent shall thereupon be obligated to make any such signage and other promotional materials available to any successful competing bidder; provided further that, the costs of shipping and/or delivery associated with the aforementioned signage shall be borne by the successful competing bidder). Subject to approval of the Bankruptcy Court, the Bid Protections shall have superpriority administrative expense claim status in the Bankruptcy Case~~

pursuant to Section 507 of the Bankruptcy Code, senior to all other administrative expense superpriority or priority claims, and shall be paid in cash upon the earlier of (i) five (5) business days after the termination hereof under section 16.10(i) or (ii) one business day after entry of an "approval order" with respect to a competing transaction if termination hereof under section 16.10(ii).  Agent shall have no right to, nor shall Merchant have any liability with respect to, the Bid Protections for any other reason.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**Formatted:** Font color: Auto

**Formatted:** Heading 3,Style 95,h3, Indent: First line:  1", Tab stops: Not at  0" +  1" +  2" +  2.5" +  3" +  3.5" +  4" +  4.5" +  5" +  5.5" +  6" +  6.5"

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

~~**GORDON BROTHERS RETAIL PARTNERS**~~**GREAT AMERICAN GROUP**, LLC

By: _____
       Name:_____
       Title: _____

~~**HILCO MERCHANT RESOURCES, LLC**~~

~~By:~~ _____
    ~~Name:~~_____
    ~~Title:~~ _____

**MERCHANT:**

**NAARTJIE CUSTOM KIDS, INC.,**
Debtor and Debtor in Possession

By: _____
       Name: _____
       Title: _____

**THE PROVISIONS OF THIS AGREEMENT
ARE HEREBY CONSENTED AND AGREED TO,
INCLUDING SECTIONS 3.3(c), 3.3(d), 3.3(g), 3.3(h),
4.1, 8.3, 8.8, 8.9, 15, 16.11 and 16.12:**

**SALUS CAPITAL PARTNERS, LLC,**
As Lender

By: _____
    Name:  Kyle Shonak

Title:   Executive Vice President-Special Opportunities

# **EXHIBIT B**

SSL COMMENTS 9.24.14

Annette W. Jarvis (Utah State Bar No. 01649)
Peggy Hunt (Utah State Bar No. 6060)
Michael F. Thomson (Utah State Bar No. 9707)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Tel:    (801) 933-7360
Fax:    (801) 933-7373
Email: jarvis.annette@dorsey.com
         hunt.peggy@dorsey.com
         thomson.michael@dorsey.com
         armington.jeff@dorsey.com

*Proposed Attorneys for Naartjie Custom Kids, Inc.*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| In re: | : | |
| | : | Case No. 14-29666 |
| NAARTJIE CUSTOM KIDS, INC., | : | Chapter 11 |
| | : | Hon. William T. Thurman |
| Debtor. | : | |

---

**ORDER PURSUANT TO SECTIONS 105(A), 363, 365 AND 554 OF THE
BANKRUPTCY CODE (I) APPROVING THE DEBTOR'SSSS ENTRY
INTO AGENCY AGREEMENT, (II) AUTHORIZING THE DEBTOR
TO SELL CERTAIN MERCHANDISE THROUGH GOING OUT OF
BUSINESS SALES, (III) AUTHORIZING THE DEBTOR AND
THE AGENT TO ABANDON UNSOLD PROPERTY, (IV)
AUTHORIZING THE SALE OF CERTAIN OF THE DEBTOR'SSSS ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND INTERESTS, AND (V) GRANTING RELATED RELIEF**

Naartjie Custom Kids, Inc., debtor and debtor in possession herein (the "Debtor"), having

filed its "*Motion For Entry Of Orders (I) (A) Approving Auction Procedures, (B) Approving The*

*Form And Manner Of Notice Of Sale, and (C) Scheduling an Auction and Sale Hearing; and (ii)*

*(A) Approving The Sale Or Sale Of The Debtor's Assets, (B) Authorizing The Debtor To Abandon*

*Unsold Property, and (C) Waiving Stay Provisions Pursuant To Bankruptcy Rules 6004(H) And*

*6006(D)*" [~~D.R.~~Docket No. ~~———~~70] (the "Sale Motion"); and it appearing that the relief requested

in the Sale Motion is in the best interests of the Debtor, its estate, its creditors, and other parties in

interest; and it appearing that this Court has jurisdiction over the matters raised by the Sale Motion

pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that consideration of the Sale Motion and

the relief requested therein is a "core" proceeding pursuant to 28 U.S.C. § 157; and adequate notice

of the Sale Motion having been given, and it appearing that no other notice need be given; and the

Debtor and ~~the joint venture comprised of Gordon Brothers Retail Partners, LLC and Hilco~~

~~Merchant Resources, LLC (collectively,~~Great American Group, LLC (the "Agent") having agreed

upon terms and conditions, as set forth in that certain Agency Agreement, dated as of ~~September~~

~~———~~October 2, 2014, substantially in the form attached hereto as Exhibit "A" (the "Agency

Agreement"), for, inter alia, the Agent to act as the Debtor's exclusive agent to conduct "going out

of business", "store closing", "sale on everything", "everything must go", or similarly themed sale

or other disposition (as further described below, the "Sale") of all of Debtor's Merchandise[1]

located at (or to be shipped to) the Debtor's Stores and Distribution ~~Center located within the~~

~~United States~~Centers, each as identified in the Agency Agreement (collectively defined herein as

the "Closing Locations"), with each such sale to be free and clear of any and all liens, claims and

---

[1]     All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Sale
Motion or the Agency Agreement, as applicable. In the event of a conflict between any of the terms and provisions of
this Order, on the one hand, and any of the terms and provisions of the Agency Agreement, on the other hand, the
terms and provisions of this Order shall control.

encumbrances of any kind or nature, and further subject to the terms and provisions of the Agency

Agreement and this Order; and the transactions represented by the Agency Agreement having been

determined to be the highest and best offer for the right to conduct the Sale; and a hearing having

been held on ~~——————,~~ October 1, 2014 (the "Bidding Procedures Hearing"), whereupon the

Court entered its ~~"———————" (the "Bidding Procedures Order") [D.R. No. ____]; and the~~

~~Debtor having filed its "*Declaration of _____ in Support of Approval of Stalking Horse Bid*~~

~~*Protections*", dated September __, 2104 (the "[_____] Declaration") [D.R. No. ____~~ *Order*

*(1)(A) Authorizing Entry Into Agency Agreement, (B) Auhtorizing Bid Protections, (C)*

*Authorizing Bidding Procedures and Auction (D) Scheduling Sale Hearing and Approving Notice*

*Thereof and (II) Granting Related Relief* (the "Bidding Procedures Order") [Docket No. 107]; and

the Debtor having conducted an auction on ~~——————,~~ October 2, 2014 ("Auction") among

Qualified Bidders (as defined in the Bidding Procedures Order); and an approval and sale hearing

having been held on ~~————,~~ October 3, 2014 (the "Approval Hearing") to consider the relief

requested in the Sale Motion and approval of the Agency Agreement and the transactions set forth

therein (collectively, the "Transactions"); and appearances of all interested parties having been

noted on the record of the Approval Hearing; and upon all of the proceedings had before the Court

(including, but not limited to, the testimony and other evidence proffered or adduced at the

Bidding Procedures Hearing, and the Approval Hearing); and the Court having found and

determined that (i) the relief sought in the Sale Motion is in the best interests of the Debtor, its

estate, its creditors, and all parties in interest, and (ii) that the legal and factual bases set forth in the

Sale Motion establish good, sufficient and just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**[2]**:**

A.      **Jurisdiction:** This Court has jurisdiction to consider the Sale Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1134. Approval of the Debtor's entry into the Agency Agreement, and the transactions contemplated thereby is a "core" proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), (N) and (O).

B.      **Venue:** Venue of this chapter 11 case in this District is proper pursuant to 28 U.S.C. § 1409(a).

C.      **Statutory Predicates:** The statutory predicates for the approval of the Agency Agreement and Transactions contemplated therein are Sections 105, 363, 364, 365 and 554 of the Bankruptcy Code and Rules 2002, 4001, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

D.      **Notice:** Proper, timely, adequate and sufficient notice of the Sale Motion and the Approval Hearing has been provided in accordance with Sections 102(1), 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 6006, and in compliance with the Bidding Procedures Order. No other or further notice is required.

E.      **Opportunity to be Heard:** A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion and the Transactions pursuant thereto has been afforded to all interested persons and entities, including, without limitation, the following: (i) ~~any duly appointed~~ the Official Committee of Unsecured Creditors (the "Committee"); (ii) Salus Capital Partners, LLC, as Debtor's pre-petition and post-petition senior secured lender (the "Lender"); (iii) the United States Trustee for the District of Utah; (iv) the Offices of the Attorney

---

[2]         The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact  and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

4

General for each state where the Debtor operates a Closing Location; (v) the Internal Revenue Service; (vi) the Agent; (vii) all landlords for the Closing Locations; (~~vii~~viii) all parties identified by the Debtor as potentially interested purchasers; (~~viii~~ix) all parties who are known to possess or assert an interest in the assets that are the subject of the Agency Agreement (collectively, the "Assets"); (~~ix~~x) all parties who are known to possess or assert a secured claim against the Assets; (xi) the relevant taxing authorities having jurisdiction over any of the Assets; (~~x~~xii) all related government entities that have an interest in regulating the Sale ((i) through (~~x~~xii) collectively, the "Notice Parties"). The notice provided constitutes good and sufficient notice of the Sale Motion and the Approval Hearing, and no other or further notice of the Sale Motion or the Approval Hearing or the entry of this Order need be given.

F.    **Objections Resolved, etc.:**  Objections, if any, to the Sale Motion have been withdrawn, resolved or adjourned and, to the extent not withdrawn, resolved or adjourned, are hereby overruled.

G.    **The Bidding Procedures**: As set forth in the ~~Auction~~Bidding Procedures Orders, and as demonstrated at the Bidding Procedures Hearing, the best interests of the Debtor will be served by this Court granting the relief requested in the Sale Motion, including the approval of the Auction Procedures and the Bid Protections.

H.    **Marketing Process:** As demonstrated by: (i) ~~the _____ Declaration, (ii) the~~ testimony and other evidence proffered or adduced at the Bidding Procedures Hearing and the Approval Hearing, and (~~iii~~ii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Approval Hearing, the Debtor having thoroughly marketed the Assets and ~~have~~having conducted the bidding solicitation fairly, with adequate opportunity for parties that either expressed an interest in acquiring or liquidating the Assets, or who the Debtor believed

may have an interest in acquiring or liquidating the Assets, to submit competing bids. The Debtor

and the Agent have respectively negotiated and undertaken its roles leading to the Sale and the

Transactions and entry into the Agency Agreement in a diligent, non-collusive, fair and good faith

manner.

I.        **Highest and Best Offer:** The Agency Agreement, substantially in the form

attached hereto as Exhibit "A", including the form and total consideration to be realized by the

Debtor pursuant to the Agency Agreement, is (i) the highest and best offer received by the Debtor

for the Assets, (ii) fair and reasonable, and (iii) in the best interests of the Debtor, its estate, its

creditors and all other parties in interest. There is no legal or equitable reason to delay entry into

the Agency Agreement and the Transactions contemplated therein.

J.        **Business Judgment:** The Debtor's decisions to (i) enter into the Agency

Agreement and (ii) perform under and make payments required by the Agency Agreement are

reasonable exercises of the Debtor's sound business judgment consistent with its fiduciary duties

and are in the best interests of the Debtor, its estate, its creditors, and all other parties in interest.

K.        **Personally Identifiable Information:**   The transactions contemplated by the

Agency Agreement do not include the sale or lease of personally identifiable information, as

defined in section 101(41A) of the Bankruptcy Code ("Personally Identifiable Information") (or

assets containing personally identifiable information).

L.        **Time of the Essence:** Time is of the essence in effectuating the Agency Agreement

and proceeding with the Transactions contemplated therein without interruption. Based on the

record of the Bidding Procedures Hearing and the Approval Hearing, and for the reasons stated on

the record at the Approval Hearing ~~and in the _____ Declaration~~, the conduct of the Sale in

accordance with the terms of the Agency Agreement and this Order must be commenced rapidly

6

following entry of this Order to maximize the value that the Agent may realize from the Sale and

concomitantly the value that the Debtor may realize from entering into the Agency Agreement.

Accordingly, cause exists to lift the stay to the extent necessary, as contemplated by Bankruptcy

Rules 4001(a), 6004(h) and 6006(d) and permit the immediate effectiveness of this Order.

M. **Sale Free and Clear:** The Debtor is the sole and lawful owner of the Merchandise

and the Assets. The Merchandise and the Assets constitute property of the Debtor's estate and title

thereto is vested in the Debtor's estate within the meaning of Section 541(a) of the Bankruptcy

Code. A sale of the Merchandise and the Assets other than one free and clear (subject to the terms

of the Agency Agreement, and this Order) of liens, claims, encumbrances, defenses (including,

without limitation, rights of setoff and recoupment) and interests, including, without limitation,

security interests of whatever kind or nature, mortgages, conditional Sale or title retention

agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments,

preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments,

orders and decrees of any court or foreign or domestic governmental entity, taxes (including

foreign, state, local and ad valorem taxes), licenses, covenants, restrictions, indentures,

instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or

exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other

liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case,

of any kind or nature (including, without limitation, all "claims" as defined in Section 101(5) of the

Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or

unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or

unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent

or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured,

7

legal or equitable (collectively, "Liens") and without the protections of this Order would hinder the

Debtor's ability to obtain the consideration provided for in the Agency Agreement, and thus,

would impact materially and adversely the value that the Debtor's estate would be able to obtain

for the sale of such Merchandise and Assets. But for the protections afforded to the Agent under

the Bankruptcy Code and this Order, the Agent would not have offered to pay the consideration

contemplated in the Agency Agreement. In addition, each entity with a Lien or other encumbrance

upon the Merchandise and/or the Assets, (a) has consented to the Sale, the sale and disposition of

the Assets in the manner contemplated by the Agency Agreement and this Order or is deemed to

have consented to the Sale, the sale of the Merchandise and Assets, (b) could be compelled in a

legal or equitable proceeding to accept money satisfaction of such interest, or (c) otherwise falls

within the provisions of Section 363(f) of the Bankruptcy Code, and therefore, in each case, one or

more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

Those holders of Liens who did not object, or who withdrew its objections, to the Sale Motion are

deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code. Therefore,

approval of the Agency Agreement and the consummation of the Sale and the Transactions free

and clear of Liens are appropriate pursuant to Section 363(f) of the Bankruptcy Code and are in the

best interests of the Debtor's estate, its creditors and other parties in interest.

N.    **Arms-Length Sale:** The Guaranteed Amount and other consideration to be paid by

the Agent under the Agency Agreement were negotiated at arm's-length and constitute reasonably

equivalent value and fair and adequate consideration for the right to serve as the Debtor's

exclusive agent to conduct the Sale of the Merchandise and other Assets, respectively, under the

Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act

and the laws of the United States, any state, territory, possession thereof or the District of

8

Columbia. The terms and conditions set forth in the Agency Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtor or its creditors under any applicable laws.

O.    **Good Faith:** The Debtor, its members, management and board of directors and, the Agent, its members and its officers, directors, employees, agents and representatives actively participated in the bidding process and acted in good faith. The Agency Agreement was negotiated and entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in Section 363(m) of the Bankruptcy Code. The Agent shall be protected by Section 363(m) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal. The Debtor was free to deal with any other party interested in buying or selling on behalf of the Debtor's estate some or all of the Merchandise and/or the Assets. Neither the Debtor nor the Agent have engaged in any conduct that would cause or permit the Sale or the Transactions, the Agency Agreement or any related action or the transactions contemplated thereby to be avoided under Section 363(n) of the Bankruptcy Code, or that would prevent the application of Section 363(m) of the Bankruptcy Code. The Agent has not violated Section 363(n) of the Bankruptcy Code by any action or inaction. Specifically, the Agent has not acted in a collusive manner with any person and was not controlled by any agreement among bidders. The Agent's prospective performance and payment of amounts owing under the Agency Agreement are each in good faith and for valid business purposes and uses.

P.    **Insider Status:** The Agent is not an "insider" or "affiliate" of the Debtor as those terms are defined in Section 101(31) of the Bankruptcy Code. No common identity of directors or controlling stockholders exists between the Agent and the Debtor.

Q.    **Security Interests:** The liens provided for in the Agency Agreement and this Order to secure the obligations of the Debtor under the Agency Agreement to the Agent are necessary to induce the Agent to agree to terms for the Agency Agreement that maximize value for the Debtor's estate. The absence of such protections would impact materially and adversely the value available to the Debtor in the liquidation of Merchandise in partnership with a liquidation agent. But for the protections afforded to the Agent under the Bankruptcy Code, this Order, and the Agency Agreement, the Agent would not have agreed to pay the Debtor the compensation provided for under the Agency Agreement. In addition, the secured lenders, which hold security interests in the property to which the Agent's security interests attach, have consented to the security interests provided for in the Agency Agreement, subject to the satisfaction of the conditions set forth in the Agency Agreement and in this Order.

R.    **Corporate Authority:** Subject to the entry of this Order, the Debtor (i) has full corporate or other power to execute, deliver and perform its obligations under the Agency Agreement and all other transactions contemplated thereby, and entry into the Agency Agreement has been duly and validly authorized by all necessary corporate or similar action, (ii) has all of the corporate or other power and authority necessary to consummate the transactions contemplated by the Agency Agreement, and (iii) has taken all actions necessary to authorize and approve the Agency Agreement and the transactions contemplated thereby. No consents or approvals, other than those expressly provided for herein or in the Agency Agreement, are required for the Debtor to consummate such Transactions.

S.    **No Successor Liability:** No sale, transfer or other disposition of the Merchandise, the Assets or otherwise pursuant to the Agency Agreement or entry into the Agency Agreement will subject the Agent to any liability for claims, obligations or Liens asserted against the Debtor

10

or the Debtor's interests in such Merchandise or Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories. The Agent is not a successor to the Debtor or its estate.

**T.      No Sub Rosa Plan:** Entry into the Agency Agreement and the transactions contemplated thereby neither impermissibly restructures the rights of the Debtor's creditors, nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtor. Entry into the Agency Agreement does not constitute a *sub rosa* chapter 11 plan.

**U.      Approval Order:** This Order shall constitute the Approval Order as contemplated under the Agency Agreement.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**A.      Sale Motion Granted; Objections Overruled**

1.      The relief requested in the Sale Motion is **GRANTED** as set forth herein.

2.      Any remaining objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections are overruled in all respects and denied.

**B.      The ~~Auction~~Bidding Procedures and Bid Protections**

3.      The Bidding Procedures and Bid Protections are hereby ratified and approved on a final basis.

**C.      The Agency Agreement Is Approved and Authorized**

5.      Subject to the provisions of this Order, the Agency Agreement is approved pursuant to Sections 105 and 363 of the Bankruptcy Code. The Debtor ~~are~~is hereby authorized, empowered and directed to enter into and perform under the Agency Agreement and each of the

transactions contemplated therein (including, without limitation, reaching an agreement and resolution regarding the final reconciliation contemplated by the Agency Agreement (following appropriate consultation with the Lender), which Agency Agreement and resolutions shall be binding on all parties (including, without limitation, the Debtor, the Committee, any successor chapter 7 or chapter 11 trustee, and all other parties in interest) without further order of the Court) is hereby approved in its entirety and is incorporated herein by reference. The failure to include specifically any particular provision of the Agency Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agency Agreement and all of its provisions, payments and transactions, be authorized and approved in its entirety. Likewise, all of the provisions of this Order are non-severable and mutually dependent.

6.      The Debtor is authorized, pursuant to Sections 105 and 363(b) and (f) of the Bankruptcy Code, to retain the Agent to conduct the Sale and to sell the Assets in the manner contemplated by the Agency Agreement.

7.      Each of the Transactions provided for under the Agency Agreement constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and laws of all applicable jurisdictions, including, but not limited to the laws of each state in which the Assets are located. The Transactions approved by this Order are not subject to avoidance pursuant to Section 363(n) of the Bankruptcy Code.

8.      All amounts payable to the Agent under the Agency Agreement shall be payable to the Agent without the need for any application of the Agent therefor or any further order of the Court.

9.      Subject to the provisions of this Order, the Debtor and the Agent are hereby authorized, pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Sale

and consummate the sale of the Assets in accordance with the Agency Agreement and the sale guidelines (the "Guidelines") attached hereto as Exhibit "B", which Guidelines are hereby approved in its entirety.

10.     Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor, the Agent and each of its respective officers, employees and agents are hereby authorized and directed to execute such documents and to take any and all such actions as may be necessary or desirable to carry out the Sale, consummate the sale of the Assets and effectuate or implement the Agency Agreement and each of the transactions and related actions contemplated or set forth therein. The Agent is specifically authorized to act on behalf of the Debtor in connection with the Sale and the sale of the Assets and no other consents or approvals are necessary or required for the Debtor to carry out the Sale, consummate the sale of the Assets, effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein.

11.     The Agent shall not assume, or in any way be liable or responsible for, any claim or liability against any of the Debtor, whether known or unknown, whether asserted or unasserted, whether accrued or unaccrued, whether contingent or not, whether at law or in equity or otherwise, whether existing on the ~~Closing~~Sale Commencement Date or arising thereafter and whether relating to or arising out of the Debtor's business, the Merchandise, the Assets, any excluded assets or otherwise (including, without limitation, (x) liabilities based on any successor liability theory and (y) liabilities relating to the pre-petition or post-petition operation of the Debtor's business, the Merchandise or the Assets (or the use of the Merchandise and/or the Assets). The Agent shall have no successor liability whatsoever with respect to any Liens or claims of any nature that may exist against ~~any of~~ the Debtor (or any predecessor or affiliate of any of the Debtor), including, without limitation, the Agent shall not be and shall not be deemed to be: (i) a successor in interest within

13

the meaning of any law, including any revenue, successor liability, pension, labor, ERISA, bulk-transfer, products liability, tax or environmental law, rule or regulation, or any theory of successor or transferee liability, antitrust, environmental product line, de facto merger or substantial continuity or similar theories; or (ii) a joint employer, co-employer or successor employer with the Debtor, and except as may be provided in the Agency Agreement with regard to the payment of "expenses" of the Sale under Section 4.1 thereof, the Agent shall have no obligation to pay the Debtor's wages, bonuses, severance pay, vacation pay, WARN act claims (if any), benefits or any other payments to employees of the Debtor, including pursuant to any collective bargaining agreement, employee pension plan, or otherwise; provided, that the foregoing shall in no way limit the indemnification obligations of the Agent under Section 13.2 of the Agency Agreement.

## D.   Conduct of the Sale and the Transaction

12.   Except as otherwise provided in the Agency Agreement, pursuant to Section 363(f) of the Bankruptcy Code the Agent shall be authorized to sell all of the Merchandise located or to be located at the Closing Locations and shall be entitled to sell the Assets, in each case free and clear of any and all Liens, including, without limitation, the liens and security interests, as the same may have been amended from time to time, of the Lender (but only to the extent allowed in and pursuant to the Agency Agreement and this Order, as applicable) whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which these chapter 11 cases were commenced, with any presently existing Liens (including, but not limited to, the DIP Liens, the Prepetition Liens, and the Adequate Protection Liens) [3] encumbering all or any portion

---

[3] As such terms are defined in the Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (I) Approving Postpetition Financing, (Ii) Authorizing Use Of Cash Collateral, (Iii) Granting Liens And Providing Superpriority Administrative Expense Status, (Iv) Granting Adequate Protection, (V) Modifying Automatic Stay, And

of the Merchandise, the Assets, or the Proceeds thereof attaching only to the Guaranteed Amount, ~~Sharing Amount,~~ and other amounts payable by Agent to the Debtor under the Agency Agreement, with the same validity, priority, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist. For the sake of clarity, however, nothing in this paragraph is intended to diminish the liens in favor of the Agent, as reflected in the Agency Agreement and this Order, that attach to the Proceeds (as defined in the Agency Agreement) of the Sale.

13.    If any person or entity that has filed financing statements, mortgages, construction or mechanic's liens, *lis pendens* or other documents or agreement evidencing liens on or interests in the Merchandise or the Assets shall not have delivered to the Debtor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of any Liens that the person or entity, except the Lender (subject to Paragraph 35 below), has with respect to the Merchandise and the Assets, each such person or entity is hereby directed to deliver all such statements, instruments, and releases and the Debtor and the Agent are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity asserting the same. The Agent is authorized to file a copy of this Order which, upon filing, shall be conclusive evidence of the release and termination of such interest. Each and every federal, state and local governmental unit is hereby directed to accept any and all documents and instruments necessary or appropriate to give effect to the Sale, the sale of the Assets and the related transactions contemplated by the Agency Agreement.

14.    All entities that are presently in possession of some or all of the Merchandise, the Assets or other property in which the Debtor holds an interest that are or may be subject to the

---

(Vi) Scheduling A Final Hearing entered by this Court on September 18, 2014, docket entry no. 66 (the "Interim DIP Financing Order").

15

Agency Agreement hereby are directed to surrender possession of such Assets or other property to the Agent.

15.    Unless otherwise ordered by the Court, all newspapers and other advertising media in which the Sale may be advertised and all landlords are directed to accept this Order as binding authority so as to authorize the Debtor and the Agent to consummate the Agency Agreement and to consummate the transactions contemplated therein, including, without limitation, to conduct and advertise the Sale in the manner contemplated by the Agency Agreement.

16.    During the Sale Term, Agent shall be granted a royalty-free license to use the Debtor's trade names, trademarks, ~~and~~ logos, and customer, mailing and e-mail lists, websites and social media relating to and used in connection with the operation of the Closing Locations, solely for the purpose of advertising the Sale in accordance with the terms of the Agency Agreement; provided, however, the Agent shall not receive Personally Identifiable Information (as defined in Section 101(41A) of the Bankruptcy Code) from the Debtor.

17.    Pursuant to Section 554(a) of the Bankruptcy Code, the Debtor and the Agent, as applicable, are permitted to abandon property of the Debtor's estate in accordance with the terms and provisions of the Agency Agreement, without the Agent incurring liability to any person or entity that may claim an interest in such abandoned property; provided, however, that unless the Agent otherwise consents, the Debtor may only abandon property located in any Closing Location on or after the applicable Vacate Date. In the event of any such abandonment, all applicable landlords shall be authorized to dispose of such property without any liability to any individual or entity that may claim an interest in such abandoned property, and such abandonment shall be without prejudice to any landlord's right to assert any claim based on such abandonment and without prejudice to the Debtor or other party in interest to object thereto.

16

18.     Before any sale, abandonment or other disposition of the Debtor's computers (including software) and/or cash registers and any other point of sale Owned FF&E located at the Closing Locations (collectively, "POS Equipment") which may contain customer lists, identifiable personal and/or confidential information about the Debtor's employees and/or customers, or credit card numbers ("Confidential Information") takes effect, the Debtor (and not the Agent) shall take such steps as shall be necessary and/or appropriate to remove or cause to be removed the Confidential Information from the POS Equipment, and unless otherwise notified by Debtor in writing to the contrary, the Agent shall be entitled to assume and presume that the Debtor have satisfactorily completed such steps at or prior to the time of any such sale, abandonment or other disposition.

19.     Nothing in this Order or the Agency Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order. Nothing contained in this Order or in the Agency Agreement shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtor to comply with environmental laws consistent with its rights and obligations as Debtor in possession under the Bankruptcy Code. Nothing herein shall be construed to be a determination that the Agent is an operator with respect to any environmental law or regulation. Further, nothing herein permits the Debtor or the Agent to conduct any Sale at a Closing Location beyond the stated expiration under the lease for such Closing Location or extends the term of the lease for such Closing Location. Moreover, the Sale shall not be exempt from, and the Agent shall be required to comply with, laws of general applicability, including,

17

without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws"). Nothing in this Order shall alter or affect the Debtor's and Agent's obligations to comply with all applicable federal safety laws and regulations. Nothing in this Order shall be deemed to bar any Governmental Unit (as defined in Section 101(27) of the Bankruptcy Code) from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtor's or the Agent's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Order, or otherwise. Notwithstanding any other provision in this Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Order shall be deemed to have made any rulings on any such issues.

**E.**     **Disputes Between Government Units and the Debtor or the Agent**

20.     To the extent that the conduct of the Sale is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation Sale, or bulk sale laws (each a "GOB Law", and together the "GOB Laws"), including certain fast pay laws and laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply to the Sale (collectively, the "Liquidation Laws"), the following provisions shall apply:

18

a.   Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Order, the Debtor and the Agent is~~are hereby~~ authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct, advertise, post signs and banners, and otherwise promote the Sale as a "going out of business", "store closing", "sale on everything", "total liquidation", "everything must go", or similarly themed sale (including, without limitation, by means of media advertising, interior and exterior banners, A-frames, and similar signage and the use of sign walkers and street signage) without further consent of any person (other than the Debtor as expressly provided for in the Agency Agreement), in accordance with the terms and conditions of the Agency Agreement, the Guidelines and this Order and without further compliance with the GOB Laws and the Liquidation Laws, except those designed to protect public health and safety.

b.   Provided that the Sale is conducted in accordance with the terms of this Order, the Agency Agreement and the Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered Salesales from itstheir provisions, the Debtor shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and, subject to Paragraphs 20-21 hereofthe provisions of this Order, are authorized to conduct the Sale in accordance with the terms of this Order and the Guidelines without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.

c.   Within five (5) business days of entry of this Order, the Debtor shall serve copies of this Order, the Agency Agreement and the Guidelines via e-mail, facsimile or regular mail, on: (i) the Attorney General's office for each state where the Sale is being held, (ii) the county consumer protection agency or similar agency for each county where the Sale will be held, and (iii) the

19

division of consumer protection for each state where the Sale will be held~~; and (iv) the chief legal counsel for the local jurisdiction~~.

        d.   To the extent there is a dispute arising from or relating to the Sale, this Order, the Agency Agreement, or the Guidelines, which dispute relates to any GOB Laws or Liquidation Laws (a "<u>Reserved Dispute</u>"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within fifteen (15) days following service of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute to counsel for the Debtor and counsel for the Agent at the addresses set forth in the Agency Agreement so as to ensure delivery thereof within one (1) business day thereafter. If the Debtor, the Agent and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "<u>Dispute Resolution Motion</u>").

        e.   In the event a Dispute Resolution Motion is filed, nothing in this Order shall preclude the Debtor, a landlord, the Agent or other interested party from asserting (i) that the provisions of any GOB Laws and/or Liquidation Laws are preempted by the Bankruptcy Code or (ii) that neither the terms of this Order, nor the Debtor's or the Agent's conduct pursuant to this Order, violates such GOB Laws and/or Liquidation Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with the Debtor's or the Agent's ability to conduct or to continue to conduct the Sale pursuant to this Order and the Agency Agreement, absent  further order of this Court. The Court grants authority for the Debtor and the Agent to conduct the Sale pursuant to the terms of this Order, the Agency Agreement, and/or the Guidelines attached hereto and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit shall be entitled to assert any

20

jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Laws or the lack of any preemption of such GOB Laws and/or Liquidation Laws by the Bankruptcy Code. Nothing in this Order shall constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

f.   If, at any time, a dispute arises between the Debtor and/or the Agent and a Governmental Unit as to whether a particular law is a GOB Law and/or Liquidation Law, and subject to any provisions contained in this Order related to GOB Laws and/or Liquidation Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) hereunder by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a GOB Law and/or Liquidation Law shall be made de novo.

21.   Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the Sale, to the extent that disputes arise during the course of the Sale regarding laws regulating the use of sign-walkers and banner advertising and the Debtor and the Agent are unable to resolve the matter consensually with the Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

22.   Except as expressly provided in the Agency Agreement, the Sale shall be conducted by the Debtor and the Agent notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sale, the rejection of leases, abandonment of assets or "going dark" or similar provisions. The

Agent and landlords of the Closing Locations are authorized to enter into separate agreements and/or side letters ("Side Letters") between themselves modifying the Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords; provided that nothing in such Side Letters affects the provisions of Paragraphs 20-21; and provided, further, that nothing in any Side Letter shall impose any obligation or liability upon the Debtor or its estate that is not in accordance with the terms of the Agency Agreement or this Order without the express written agreement of the Debtor. In the event of any conflict between the Guidelines and any Side Letter, the terms of such Side Letter shall control. In the event of a dispute regarding the Guidelines or any Side Letter, counsel for each of the Debtor, the applicable landlord, and the Agent shall meet and confer to resolve the dispute. In the event that the parties are unable to resolve the dispute, any party seeking relief may request a prompt hearing before the Court to resolve such dispute.

23.     Except as expressly provided for herein or in the Guidelines, and except with respect to any Governmental Unit (as to which Paragraphs 20-21 shall apply), no person or entity, including but not limited to any utility company, internet service provider, landlord, licensor, or creditor or other interested party or any person acting for or on behalf of the foregoing, shall take any action to directly or indirectly prevent, interfere with, impede or otherwise hinder consummation of the Sale, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such Sale, and all such parties and persons of every nature and description, including landlords, licensors, creditors and utility companies and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, or otherwise impeding, the conduct of the Sale and/or (ii) instituting any action or proceeding in any court or administrative body seeking an order or judgment against, among others, the

22

Debtor, the Agent, or the landlords at the Closing Locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sale or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

24.     The Agent shall have the right to use the Closing Locations and all related services, furniture, fixtures, equipment and other assets of the Debtor for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Guidelines, the Agency Agreement and this Order.

25.     The Agent shall be permitted to include in the Sale Additional Agent Merchandise in accordance with the terms and provisions of the Agency Agreement. Any transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Debtor.  Debtor acknowledges that the Additional Agent Merchandise shall be consigned to Debtor as a true consignment under Article 9 of the Uniform Commercial Code in effect in the State of Utah (the "UCC").  Agent is hereby granted a first priority security interest (subject to the subordination provisions set forth below in Paragraph 35 of this Order) in (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise Proceeds, which security interest shall be deemed perfected pursuant to this Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtor as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise Proceeds). Subject to the terms of the Agency Agreement, and solely to the

23

extent applicable, the proceeds of the sales of Additional Agent Merchandise sold at a particular

Closing Location shall be taken into account when calculating any percentage rent due pursuant to

the terms of the applicable lease agreement.

26.    Nothing in this Order shall (a) alter or affect the Debtor's obligations to comply

with Section 365(d)(3) of the Bankruptcy Code or (b) alter or modify the rights of any lessor or

other counterparty to a lease with the Debtor to file an appropriate motion or otherwise seek

appropriate relief if the Debtor ~~fail~~fails to comply with Section 365(d)(3) of the Bankruptcy Code;

provided that the conduct of the Sale in accordance with the Guidelines shall not be a violation of

Section 365(d)(3) of the Bankruptcy Code.

27.    The Agent shall accept as payment gift certificates, gift cards and store

merchandise credits validly issued by the Debtor prior to the Sale Commencement Date in any

transaction conducted in connection with the Sale pursuant to the provisions of Section 8.6 of the

Agency Agreement; provided, however, the Agent shall not be required to accept any mall and/or

landlord-issued gift cards, gift certificates, merchandise credits or other similar items unless

satisfactory arrangements (as determined in the sole and exclusive discretion of Agent) are made

between and among the Agent and the issuer of such items for reimbursement to the Agent for all

such amounts honored during the Sale Term; provided, further, however, that notwithstanding

anything to the contrary in this Order, the Debtor shall not be obligated to reimburse the Agent for

any amounts honored in connection with any gift cards, gift certificates, merchandise credits or

other similar items that were issued by any party other than the Debtor without the express written

agreement of the Debtor.  The Debtor shall reimburse Agent for the amounts honored as part of the

weekly reconciliation provided for and subject to the limitations set forth in Sections 8.6 and 8.7(a)

of the Agency Agreement and this paragraph.

24

28.     The Agent shall accept returns of merchandise sold by the Debtor prior to the Sale Commencement Date for the first ten (10) days of the Sale pursuant to the provisions of Section 8.5 of the Agency Agreement, provided that such return is otherwise in compliance with the Debtor's return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price being offered by the Agent. The Debtor shall reimburse Agent for the amounts honored as part of the weekly reconciliation provided for and subject to the limitations set forth in Sections 8.5 and 8.7(a) of the Agency Agreement.

29.     To the extent applicable, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sale." The Debtor and/or the Agent shall accept return of any goods purchased during the Sale that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within twenty-one (21) days of their purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect. The Debtor shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any goods purchased during the Sale that contain such a latent defect.

30.     Except as expressly provided for in the Agency Agreement, nothing in this Order or the Agency Agreement, and none of the Agent's actions taken in respect of the Sale, the sale of the Assets or the transactions contemplated by the Agency Agreement shall be deemed to constitute an assumption by the Agent of any of the Debtor's obligations relating to any of the Debtor's employees. Moreover, the Agent shall not become liable under any collective bargaining or

employment agreement or be deemed a joint or successor employer with respect to such employees.

31.     The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the collection, reporting and the payment of any and all sales taxes is the sole responsibility of the Debtor. The Debtor is directed to remit all taxes arising from the Sale to the applicable taxing authorities as and when due, provided that in the case of a bona fide dispute the Debtor is only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the taxing authority. For the avoidance of doubt, sales taxes collected and held in trust by the Debtor shall not be used to pay any creditor or any other party, other than the taxing authority for which the sales taxes are collected. The Agent shall collect, remit to the Debtor and account for sales taxes as and to the extent provided in the Agency Agreement. This Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under State law.

32.     Subject to the terms set forth in the Agency Agreement, the Agent is authorized and empowered to transfer the Merchandise and Additional Agent Merchandise between and among the Closing Locations.

**F.     Superpriority Claims and Liens Granted To Agent**

34.     Any amounts owed by Debtor to the Agent under the Agency Agreement shall be granted the status of ~~administrative expense priority~~superpriority claims in ~~the Bankruptcy Cases~~this case pursuant to Section ~~507~~364(~~a~~c) of ~~the~~ Bankruptcy Code. senior to all other superpriority claims.

26

35.     Pursuant to Section 364(d) of the Bankruptcy Code, the Agent shall have, effective upon payment by the Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit, a valid, duly perfected first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 of the Agency Agreement; (v) in the event the Debtor elect the FF&E Guaranty Option, the proceeds realized from the sale or other disposition of Owned FF&E after payment of the FF&E Guaranty Amount; or alternatively, the FF&E Commission; (vi) the Agent's percentage share of such Sharing Amount, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of the Debtor to the Agent under the Agency Agreement. For the avoidance of doubt, the Agent Collateral shall not include the Guaranteed Amount, the Sharing Amount or any other amount payable by the Agent to the Debtor under the Agency Agreement or any proceeds thereof. Upon entry of this Order, payment of the Initial Guaranty Payment and delivery of the Letter of Credit, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation. Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Lender and the Debtor), the Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests; provided, however, that (x) until the Debtor receivereceives payment in full of the Guaranteed Amount, the Sharing

Amount, Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E

Commission) or the FF&E Guaranty Amount, as applicable, and all other amounts due to the

Debtor under the Agency Agreement, the security interest granted to the Agent hereunder shall be

junior and subordinate in all respects to the security interests of the Lender in the Agent Collateral

but solely to the extent and amount of the unpaid portion of the Guaranteed Amount, ~~the Sharing~~

~~Amount (if any),~~ Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent

FF&E Commission) or the FF&E Guaranty Amount, as applicable, and other amounts due to the

Debtor under the Agency Agreement and (y) upon payment in full of the Guaranteed Amount, ~~the~~

~~Sharing Amount (if any),~~ Expenses, the proceeds realized upon a sale of Owned FF&E (less the

Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and all other amounts

due to the Debtor under the Agency Agreement, any security interest or lien of the Lender in the

Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of

the Agent in the Agent Collateral. The Debtor shall cooperate with the Agent with respect to all

filings (including, without limitation, UCC-1 financing statements) and other actions to the extent

reasonably requested by the Agent in connection with the security interests and liens granted under

the Agency Agreement. In the event of a Default by any Debtor under the Agency Agreement, in

any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in

addition to all other rights and remedies, the rights and remedies of a secured party under the

Uniform Commercial Code as the same may be in effect from time to time in the State of Utah.

36.     During the Sale Term applicable to any Closing Location and for purposes of

conducting the Sale at such Closing Location, Agent shall have the right to the unencumbered use

and occupancy of, and peaceful and quiet possession of, such Closing Location and the assets

currently located at such Closing Location, in each case subject to the extent of the Debtor's rights

28

and entitlement to use the same, and the services provided at such Closing Location to the extent the Debtor is entitled to such services, and, subject to the terms of the Agency Agreement, the Debtor shall not assume and assign, reject or otherwise terminate any real property lease or vacate any Closing Location until the applicable Sale Termination Date or Vacate Date.

37.    The Debtor is authorized and directed to execute such documents and take all other actions as may be necessary to release any Liens of any kind against the Assets as such  Liens may have been recorded or may otherwise exist, in accordance with the terms of this Order. Any liens, Liens, interests, liabilities, obligations, claims, charges and interests of any kind asserted under laws, rules,  regulations or governmental or court orders imposing a stamp, transfer tax or similar tax arising from the transfer of the Assets to the Agent shall be filed against the Debtor's estate and shall not be asserted against the Agent. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, all persons and Governmental Units (as defined in Sections 101(27) and 101(41) of the Bankruptcy Code) are hereby enjoined from taking any action against the Agent to recover any claim which such person or Governmental Unit has or may assert against the Debtor (as such claims exist immediately prior to the closing). The Agent has not assumed or otherwise become obligated for any of the Debtor's liabilities. Consequently, all holders of liabilities retained by the Debtor are hereby enjoined from asserting or prosecuting any claim, encumbrance or cause of action against the Agent to recover on account of any such liabilities. Pursuant to Sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, all parties holding any claim, encumbrance or cause of action against the Debtor, its estate or its  assets, the Debtor's employees, former employees and members, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, including such officials maintaining any authority relating to environmental, labor and health and safety laws, and its

29

respective successors or assigns, are hereby permanently and forever barred, restrained and

enjoined from commencing or continuing in any manner any action or other proceeding of any

kind or the employment of any process or any act to collect, offset or recover such claim,

encumbrance or cause of action against the Agent, or that seeks to impose liability upon the Agent

or any affiliate, successor or assign thereof, or against the Assets under the laws of the United

States, any state, territory or possession thereof or the District of Columbia based, in whole or in

part, directly or indirectly, on any theory of law, including, without limitation, any theory of

successor or transferee liability or any liability for pre- or post-petition claim, encumbrance or

cause of action against the Debtor by reason of the disposition of the Assets in the manner

contemplated by the Agency Agreement and this Order, including, without limitation, pre- and

post-petition claims, Liens or causes of action of any federal, state or local governmental entities,

of any current or former employee for claims arising out of employment and termination of

employment, including, without limitation, claims for wages, bonuses, commissions, accrued

vacation, severance, continuation of coverage under COBRA, or pension, welfare, fringe benefits

or any other benefits of any kind including, without limitation, obligations in respect of retiree

medical coverage or benefits.

38.     Each and every federal, state, and local governmental agency or department is

hereby directed to accept any and all documents and instruments necessary and appropriate to

consummate the transactions contemplated by the Agency Agreement and this Order.

39.     The provisions of this Order shall be self-executing, and neither the Debtor nor the

Agent shall be required to execute or file releases, termination statements, assignments, consents,

or other instruments in order to effectuate, consummate and implement the provisions of this

Order. However, the Debtor and the Agent and each of its respective officers, employees and

30

agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtor or the Agent deem necessary or appropriate to implement and effectuate the terms of the Agency Agreement and this Order.

40.     The Agency Agreement and any related agreement may be waived, modified, amended, or supplemented by agreement of the Debtor, the Agent, and the Lender, without further action of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to and effectuates this Order and the Agency Agreement and any related agreement; provided further that the Sale Termination Date shall not be later than _____, 201__,January 15, 2015, unless either: (a) extended by further order of the Court, or (b) the Debtor, Agent, the Lender, and the applicable landlord agree in writing to extend the Sale Termination Date at such landlord's location.

41.     The Agent shall not be obligated to (i) continue or maintain in effect, or assume any liability in respect of any employee pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreement to which any Debtor is a party or has any responsibility therefor, including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment, or (ii) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee pension plan or the termination of any such plan.

**G.     Order Binding**

42.     This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities

31

who may be required by operation of law, the duties of its office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets.

43.     This Order and the terms and provisions of the Agency Agreement shall be binding on all of the Debtor's creditors (whether known or unknown), the Debtor, the Agent and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting an interest in the Merchandise and the Assets, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or other fiduciary, such terms and provisions likewise shall be binding. The provisions of this Order and the terms and provisions of the Agency Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order which may be entered confirming or consummating any plan of reorganization/liquidation for the Debtor or converting the Debtor's case from chapter 11 to chapter 7, and the terms and provisions of the Agency Agreement, as well as the rights and interests granted pursuant to this Order and the Agency Agreement, shall continue in these or any superseding case and shall be binding upon the Debtor, the Agent and their respective successors and permitted assigns, including any trustees or other fiduciaries hereafter appointed as a legal representative of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed in the Debtor's case shall be and hereby is authorized  and directed to operate the business of the Debtor to the fullest extent necessary to permit compliance with the terms of this Order and the Agency Agreement, and the Agent and any such trustee shall be and hereby are authorized and directed to perform under the Agency Agreement upon the appointment of the trustee without the need for further order of this Court.

32

**H.**    **Good Faith.**

44.    Entry into the Agency Agreement is undertaken by the parties thereto in good faith, as that term is used in Section 363(m) of the Bankruptcy Code, and Agent shall be protected by Section 363(m) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal. The reversal or modification on appeal of the authorization provided herein to enter into the Agency Agreement and consummate the transactions contemplated thereby shall not affect the validity of such transactions, unless such authorization is duly stayed pending such appeal. The Agent is entitled to all of the benefits and protections afforded by Section 363(m) of the Bankruptcy Code. The transactions contemplated by the Agency Agreement are not subject to avoidance pursuant to Section 363(n) of the Bankruptcy Code.

**I.**    **Other Provisions**

45.    The Agent is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Order, the various procedures contemplated herein, any issues related to or otherwise connected to the Sale, the Transactions and the Agency Agreement.

46.    Nothing contained in any plan confirmed in the Debtor's chapter 11 case or any order of this Court confirming such plan or in any other order in these chapter 11 case (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agency Agreement or this Order.

47.    Except with respect to any Governmental Unit (as to which the provisions of Paragraphs 20-21 shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Order or the Agency Agreement, including, but not limited to, (i) any

33

claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtor, the landlords and/or the Agent for protection from interference with the Sale and the Transactions, (iii) any other disputes related to the Sale and the Transactions, and (iv) to protect the Debtor and/or the Agent against any assertions of Liens. No such parties or person shall take any action against the Debtor, the Agent, landlords of the Closing Locations, the Sale or the Transactions until this Court has resolved such dispute. This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

48. Notwithstanding Bankruptcy Rules 4001, 6004 and 6006, or any other law that would serve to stay or limit the immediate effect of this Order, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtor and the Agent are free to perform under the Agency Agreement at any time, subject to the respective terms thereof.

49. Any and all bulk sale laws, to the extent applicable, are hereby waived since creditors are protected by the notice provided by the Sale Motion and the jurisdiction of the Court.

50. This Order constitutes an authorization of the conduct of the Debtor and the Agent in connection herewith.

51. All utilities, landlords, creditors and all persons acting for or on its behalf shall not interfere with or otherwise impede the conduct of the Sale and the Transactions or institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which

in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale and the Transactions.

52.      The Debtor shall retain sufficient funds, or make other arrangements satisfactory to the Debtor and the Agent, to enable the Debtor to fully satisfy and perform its obligations under the Agency Agreement and this Order and the Debtor shall be authorized and directed to use those funds to fully satisfy and perform its obligations under the Agency Agreement and this Order.

53.      The Agent is authorized and directed to pay the Lender on the Payment Date (for the benefit of the Debtor) the Estimated Guaranteed Amount in partial satisfaction of the Lender's secured claims, such payment applied in accordance with paragraph 18 of the Interim DIP Financing Order.  In addition, the Debtor is authorized and directed to pay the Lender on each other date on which payment is made by the Agent for the benefit of the Debtor, each other amount payable by the Agent to the Debtor under the Agency Agreement including without limitation, the balance of the Guaranteed Amount, the Sharing Amount, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, all such payments applied in accordance with paragraph 18 of the Interim DIP Financing Order.

53.      54. Immediately upon the Payment Date and on each other date on which payment is to be made by the Agent to or for the benefit of the Debtor, the Debtor is authorized and directed to repay, or cause to be repaid, the Lender's pre- and post-petition senior secured claims, indefeasibly and in cash, by making one or more payments to the Lender.

54.      55. Except as modified hereby, the Interim DIP Financing Order shall remain in full force and effect.

55.      56. Notwithstanding any provisions to the contrary in the any order of the Bankruptcy Court authorizing the Debtor's use of cash collateral order, amounts paid to the Debtor

by the Agent in respect of Central Service Expenses may be used by Debtor solely to pay for Central Services.

56.   57.   To the extent that anything contained in this Order explicitly conflicts with a provision in the Agency Agreement, the Guidelines, or the Interim DIP Financing Order, this Order shall govern and control.

_____

(END OF DOCUMENT)

1743721.2

36

Document comparison by Workshare Compare on Friday, October 03, 2014
1:32:59 AM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\armington.jeff\Desktop\Naartjie\Agency Agreement\Final Agency Agreement\Naartjie - Approval Order (2).doc |
| Description | Naartjie - Approval Order (2) |
| Document 2 ID | file://C:\Users\armington.jeff\Desktop\Naartjie\Agency Agreement\Final Agency Agreement\Naartjie - Revised Approval Order.doc |
| Description | Naartjie - Revised Approval Order |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 45 |
| Deletions | 55 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 100 |