Annette W. Jarvis (Utah State Bar No. 01649)
Peggy Hunt (Utah State Bar No. 6060)
Michael F. Thomson (Utah State Bar No. 9707)
Jeffrey M. Armington (Utah State Bar No. 14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
       hunt.peggy@dorsey.com
       thomson.michael@dorsey.com
       armington.jeff@dorsey.com

*Attorneys for Debtor Naartjie Custom Kids, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankr. Case No. 14-29666 |
| NAARTJIE CUSTOM KIDS, INC., | Chapter 11 |
| Debtor. | The Honorable William T. Thurman |

### DEBTOR'S MOTION FOR ORDER (A) AUTHORIZING DEBTOR TO EXERCISE ITS SHAREHOLDER RIGHTS IN ZA ONE TO ACCOMPLISH THE SALE OF ZA ONE'S ASSETS, (B) AUTHORIZING SALE OF DEBTOR'S ASSETS AND INTELLECTUAL PROPERTY TO TRUWORTHS LIMITED PURSUANT TO 11 U.S.C. § 363(B) AND (F), SUBJECT TO HIGHER AND BETTER OFFERS TO BE SOLICITED AT PUBLIC AUCTION, AND (C) GRANTING RELATED RELIEF

Naartjie Custom Kids, Inc. ("Naartjie" or "Debtor"), the debtor in possession in the above captioned bankruptcy case hereby submits this motion (the "Motion"), pursuant to Sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an Order (a) authorizing the Debtor to exercise its shareholder rights in ZA One

(Pty) Ltd. ("ZA One") to accomplish the sale of ZA One's assets to Truworths Limited ("Truworths"), (b) authorizing the sale of the Debtor's intellectual property and e-commerce business to Truworths pursuant to Sections 363(b) and (f) of the Bankruptcy Code, subject to higher and better offers to be solicited at the Auction, and (c) granting related relief (the "Order"), a proposed version of which is attached hereto as **Exhibit A**. In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157.

2.      The statutory bases for the relief requested herein are sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, and the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Utah, Central Division (the "Court").

## GENERAL BACKGROUND

3.      On September 12, 2014, the Debtor filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case.  An official committee of unsecured creditors (the "UCC") was appointed in this case on September 22, 2014.

4.      Founded in Cape Town, South Africa in 1989, Naartjie is a children's clothing brand that embraces bright, colorful, kid-friendly clothes. Naartjie designs, manufactures and sells children's clothing, accessories and footwear for ages newborn through 10 years old.

5.      The Debtor owns 100% of the 1,426 outstanding shares of ZA One, a South African subsidiary of Naartjie,[1] which operates stores in South Africa and supplies designs to the Debtor.

6.      Additional information about the Debtor's business, the events leading up to the Petition Date and the facts and circumstances surrounding the Debtor's chapter 11 case can be found in the First Day Declaration on file in this case. The First Day Declaration is incorporated by reference as if fully set forth herein.

## FACTS SPECIFIC TO THE RELIEF REQUESTED

7.      On November 3, 2014, the Court entered an *Order Granting Debtor's Motion for Order (a) Authorizing Bidding Procedures and Auction, (b) Authorizing Debtor to Provide Bid Protections to Stalking Horse, (c) Scheduling Sale Hearing and Approving Notice Thereof, and (d) Granting Related Relief* [Docket No. 228] (the "Bidding Procedures Order").

8.      The Bidding Procedures Order approved the bidding procedures attached to the Bidding Procedures Order as Exhibit A (the "Bidding Procedures"), authorized the Debtor to provide Bid Protections to and enter into a Stalking Horse Agreement with a Stalking Horse, approved the form of Auction Notice attached to the Bidding Procedures Order as Exhibit B, authorizing the Debtor to conduct an Auction for the Assets (as defined below) on November 24, 2014 at 10:00 a.m., and scheduled a sale hearing for November 25, 2014 at 2:00 p.m. to approve the sale of the Assets.

9.      Beginning prior to the time when the Debtor filed the motion seeking approval of the Bidding Procedures Order, the Debtor sought to obtain the best price it could find for its stock in or the assets held by ZA One, and all of its intellectual property assets including various

---

[1]      *See* Schedule B [Docket No. 89].

trademarks, copyrights, domain names, customer lists, and related data (the "Intellectual Property Assets"), and the right to acquire the Debtor's e-commerce platform after January 15, 2015 (the "E-Commerce Business" and together with the Debtor's interests in ZA One, and the Intellectual Property Assets, the "Assets").

10.    After diligently canvassing the marketplace for the Assets, with the assistance of Hilco IP Services LLC d/b/a Hilco Streambank as the Debtor's marketing agent,[2] the Debtor has determined, after consultation with and receiving the approval of the UCC, that the "Sale of Business Agreement" attached hereto as **Exhibit B** (the "ZA One Agreement") by and between ZA One as seller and Truworths as purchaser, dated as of November 21, 2014, is the highest and best offer for the Debtor's interests in ZA One and will be designated as the Stalking Horse Agreement for the ZA One Assets and thus it is in the best interests of the Debtor, the estate, creditors and other parties-in-interest to enter into the ZA One Agreement.

11.    Similarly, after canvassing the marketplace for the Intellectual Property Assets and E-Commerce Business, the Debtor has determined, after consultation with and receiving the approval of the UCC, that the "Asset Purchase Agreement" attached hereto as **Exhibit C** (the "US Asset Purchase Agreement") between the Debtor as "Seller" and Truworths as "Buyer," dated as of November 21, 2014, is the highest and best offer for the E-Commerce Business and the Intellectual Property Assets and will be designated as the Stalking Horse Agreement for the E-Commerce Business and the Intellectual Property Assets and thus it is in the best interests of the Debtor, the estate, creditors and other parties-in-interest to enter into the Asset Purchase Agreement.

---

[2]    The Debtor has filed an *ex parte* application to employ Hilco Streambank [Docket No. 206].

12.     The Agreements constitute one indivisible, mutually conditioned transaction and entry into one is conditioned on entry into the other.  Accordingly, the overall purchase price for the assets sold to Truworths through the collective Agreements is fixed at $2,700,000.00, which will be allocated between the two Agreements upon closing of the transactions based on the calculation of the value of the assets sold in the ZA One Agreement.

13.     In general, the ZA One Agreement will convey ZA One's Business (all of ZA One's assets and its assignable liabilities) to Truworths as a going concern.  Regulatory approval for the transaction by South African authorities is expected to take up to two months.  Accordingly, the Closing Date for the transaction will occur after necessary regulatory approval is obtained by Truworths.

14.     The following chart more fully summarizes certain material provisions of the ZA One Agreement.  The chart is qualified by reference to the ZA One Agreement attached hereto as **Exhibit B**, and each capitalized term in the following chart that is not otherwise defined in this Motion has the meaning ascribed to such term in the ZA One Agreement.

| | |
|---|---|
| *Assets:* | **Section 1.1.3**.<br>means the Receivables, the Fixed and Other Assets, the Goodwill, the Intellectual Property, the Continuing Contracts and the Stock |
| *Business:* | **Recital B**.<br>The Seller carries on the business of designing branded children's clothing and marketing such clothing in retail locations in the Republic of South Africa. |
| *Conditions to Closing:* | **Section 3.**<br><br>    **By the Long-stop Date:**<br>(i)    that all of the conditions set out in Section 8.01 of the US Asset Purchase Agreement are fulfilled in all respects in accordance with their respective terms in all respects save for any condition that relates to this Agreement becoming unconditional;<br>(ii)   that the Seller in shareholders' meeting approves the disposal of the Business and the Assets to the Purchaser in terms of section 112 of the Companies Act, and delivers to the Purchaser a certified copy of the special resolution so passed;<br>(iii) that any approval which might be required in terms of the Competition Act for the entering into and implementation of this |

Agreement is duly obtained in writing in accordance with the requirements of the Competition Act to the extent any such approval may be required and, to the extent that such approval is given subject to any condition, that the Parties accept those conditions, such acceptance not to be unreasonably withheld or delayed;

(iv)   that any approval from the Financial Surveillance Department of the South African Reserve Bank for the entering into and implementation of this Agreement and the transactions contemplated herein (including, for the avoidance of doubt, (i) any payments contemplated in this Agreement to be made by the Escrow Agent and (ii) the payments contemplated in clause 11.3) is duly obtained in writing to the extent any such approval may be required;

(v)     that the Transaction Agreements receive final approval by the US Court in the case styled as *In re Naartjie Custom Kids, Inc.*, Case No. 14-29666 (Bankr. D. Utah), including a finding under section 363(m) of the Code and approval by the US Court pursuant to section 363 of the Code of the exercise by the US Company of its voting rights as sole shareholder of the Seller in favour of the acquisition by the Purchaser of the Business;

(vi)   that the Purchaser delivers to the Seller a certified copy of the resolution of its board of directors approving the transactions contemplated in this Agreement and the other Transaction Agreements and authorising the Purchaser to enter into such agreements;

(vii) that the insolvency notices required for the purposes of this sale in terms of section 34 of the Insolvency Act, 24 of 1936, are published in the Government Gazette in South Africa and in a newspaper circulating in the area(s) where the Business is carried on, within the time period specified in 4.1;

(viii)     the giving by FNB of its written consent to the sale by the Seller to the Purchaser or its Nominee of the Business as a single going concern, on the basis contemplated in this Agreement;

(ix)   the giving by the lessors in terms of the existing agreements of lease entered into between such lessors and the Seller (as lessee) in respect of at least 95% of the retail locations included in the Premises (the **Lease Agreements**), of their written consent to the assignment by the Seller of its rights and obligations pursuant to the Lease Agreements to the Purchaser; and

(x)     the Parties enter into an escrow agreement (in a form acceptable to the Parties, each acting reasonably) (the **Escrow Agreement**) with an independent escrow agent (the **Escrow Agent**) appointing such Escrow Agent to perform the role contemplated in clause 11.

**On or prior to 31 December 2014**, either:

the US Company shall have provided to the Seller a cash infusion, in the form of an unsecured, subordinated intercompany loan or an equity contribution (on terms and conditions acceptable to the US Company, the Seller and the Purchaser, after consultation with the UCC, each acting reasonably), of an amount that is at least US$305,000 (three hundred and five thousand United States Dollars); or

(a) the US Company shall have provided to the Seller a cash infusion, in the form of an unsecured, subordinated intercompany loan or an equity

| | |
|---|---|
| | contribution (on terms and conditions acceptable to the US Company, the Seller and the Purchaser, after consultation with the UCC, each acting reasonably), of an amount that is at least US$245,000 (two hundred and forty five thousand United States Dollars) and (b) the Seller shall have obtained an extension of the Seller's Overdraft equal to an amount that is at least US$60,000 (sixty thousand United States Dollars); |
| ***Sale:*** | **Section 6.1**.<br><br>The Seller agrees to sell to the Purchaser or its Nominee and the Purchaser or its Nominee agrees to purchase from the Seller, on the terms of this Agreement, the Business as a single going concern, together with all the assets of every kind, movable and immovable, corporeal and incorporeal and wherever situated, all as at the Closing Date and which shall include, without being limited to, the Assets as at the Closing Date. |
| ***Closing Statement:*** | **Section 8**.<br><br>The Seller shall prepare at its own cost and expense, in good faith acting reasonably, and deliver to the Purchaser on the Business Day immediately following the Fulfilment Date, an estimated closing statement for the Business as at the Closing Date in accordance with the provisions of clauses 8.2, 8.3, 8.4 and 8.4 (the Estimated Closing Statement)<br>. . . .<br><br>The Receivables, the Fixed Assets, the Intellectual Property and the Stock shall be shown on the Estimated Closing Statement at the following values:<br><br>the estimated face value of each of the Receivables shall be its face value as at the Closing Date;<br><br>the estimated book value of each item of the Fixed Assets shall be its book value as at the Closing Date;<br><br>the estimated book value of each item of the Intellectual Property shall be its book value as at the Closing Date; and<br><br>the value of the Stock shall be the value determined for the Stock in terms of clause 7 above.<br><br>For the purposes of clause 8.3, the "book value" of any asset shall be the value of the asset in the Seller's books after allowing for depreciation up to the Closing Date.<br><br>The Liabilities shall be shown on the Estimated Closing Statement at the following values:<br><br>the Seller's Overdraft and each Trade Liability shall be shown at its estimated face value as at the Closing Date; and<br><br>the value of the Employee-related Liabilities shall be the estimated value of the aggregate leave pay, annual bonus payments and any |

|  | other amounts accrued to the transferring employees as at the Closing Date, other than severance pay, determined in accordance with the provisions of clause 17.2.

The Seller shall deliver an updated version of the Estimated Closing Statement (the Closing Statement) to the Purchaser within 5 (five) Business Days from the Closing Date to enable the Purchaser to review it, and if necessary, to raise any queries and discuss any matters arising out of it with the Seller. The provisions of clauses 8.2, 8.3 and 8.4 shall apply to the Closing Statement mutatis mutandis, provided that the Closing Statement shall show the actual (and not estimated) values of the relevant Assets and the Liabilities as at the Closing Date. |
|---|---|
| ***Overall Purchase Price:*** | **Section 9.1**.

The total purchase price of the Business, together with the purchased assets acquired under the US Asset Purchase Agreement, shall be:

USD2,700,000 (two million seven hundred thousand United States Dollars);

<u>less</u> any amount by which the balance of the Seller's Overdraft exceeds the United States Dollar equivalent of R4,000,000 (four million Rand) (converted at the rate of exchange quoted by FNB as the market selling rate of the Rand against the United States Dollar at or around 11:00 AM (CAT) on the Fulfilment Date, as may be certified by a duly authorised officer of FNB) as at the Closing Date; and

<u>less</u> any loss, damage or liability which may be suffered or incurred by the Purchaser as a consequence of any breach by the Seller of the provisions of clause 18.1 and/or the value of any dividend or other distribution (within the meaning of the Companies Act) or repayment of the shareholder's loan made by the Seller to its shareholder during the Interim Period contrary to any of the prohibitions in clause 18.2 |
| ***Net SA Purchase Price:*** | **Section 9.2**.

The **Net SA Purchase Price** shall be the lesser of USD$2,200,000 and:

the sum of the values of all the Receivables, the Fixed and Other Assets, the Intellectual Property, the Stock and the Continuing Contracts as shown in the Final Closing Statement (the **SA Purchase Price**); *minus*

the aggregate value of the Liabilities as shown in the Final Closing Statement. |
| ***US Purchase Price:*** | **Section 9.3**.

The **US Purchase Price** shall be an amount equal to the Overall Purchase Price *minus* the Net SA Purchase Price. |
| ***Payment for the Business:*** | **Section 11**. |

The Purchaser shall pay to the Seller the SA Purchase Price as follows:

On the Closing Date, against compliance by the Seller with its obligations in terms of clause 11.4, the Purchaser shall pay to the Escrow Agent an amount equal to USD$2,200,000 from which the Net SA Purchase Price will be paid to the Seller by the Escrow Agent in accordance with clause 11.1.3 (such amount to be held by the Escrow Agent in escrow pursuant to the terms and conditions of the Escrow Agreement).

On the Closing Date, against compliance by the Seller with its obligations in terms of clause 11.3, the Purchaser or its Nominee shall assume, and discharge on due date, the Liabilities as is required in terms of clause 14.

Within 5 (five) Business Days of the Parties signing the Final Closing Statement and determining the Net SA Purchase Price, the Parties shall deliver a joint written instruction to the Escrow Agent, in accordance with the terms and conditions of the Escrow Agreement, instructing the Escrow Agent to pay (i) to the Seller an amount equal to the Net SA Purchase Price and (ii) to the US Company (on behalf of the Purchaser) any other funds remaining in the Escrow Account.

All amounts payable by the Purchaser or its Nominee or the Escrow Agent to the Seller in terms of this Agreement shall be paid by the Purchaser or its Nominee or the Escrow Agent (as applicable) by depositing such amounts by electronic transfer into such South African bank account as shall be notified in writing by the Seller from time to time. It is recorded that the US Purchase Price shall be paid by the Purchaser in the manner and within the time period recorded in the US Asset Purchase Agreement.

All amounts payable by the Escrow Agent to the Purchaser in terms of this Agreement shall be paid by the Escrow Agent (as applicable) by depositing such amounts into the following South African bank account by electronic transfer:

Name of account holder: Truworths Ltd General 2 Account
Name of Bank:  Standard Bank
Branch:          Cape Town
Branch Code:    02000900
Account number: 070114501

(or such other bank account in South Africa as may be notified in writing by the Purchaser from time to time).

As soon as reasonably practicable after payment of the Net SA Purchase Price in accordance with clause 11.1 has been received by the Seller, the Seller undertakes to pay to the US Company that portion of the Net SA Purchase Price received on the Closing Date which is less than or equal to the aggregate outstanding amount due under its shareholder loans by the Seller to the US Company as at the Closing Date as full repayment, settlement and discharge of all such loans.

| | |
|---|---|
| ***Assignment of Continuing Contracts:*** | **Section 16.** |
| ***Employees:*** | **Section 17.** |
| ***Operations During the Interim Period:*** | **Section 18.** |
| ***Cancellation*** | **Section 20.** |

15.    The US Asset Purchase Agreement, which is the second component of the overall transaction, conveys the Purchased Assets to Truworths including the Intellectual Property Assets, the E-Commerce Business, and the Debtor's rights under the Executory Contracts.

16.    The following chart more fully summarizes certain material provisions of the US Asset Purchase Agreement.   The chart is qualified by reference to the US Asset Purchase Agreement attached hereto as **Exhibit C**, and each capitalized term in the following chart that is not otherwise defined in this Motion has the meaning ascribed to such term in the US Asset Purchase Agreement.

| | |
|---|---|
| ***Bid Protections:*** | $100,000 |
| ***Executory Contracts:*** | **Section 2.01(d)**.<br><br>all of Seller's rights under (i) the web site hosting services contract with Inetz Media Group Inc. ("**Inetz**") in terms of which contract such services are provided to Seller and ZA One and (ii) the license and maintenance agreement with Inetz, to the extent to which such rights are assignable. |
| ***Purchased Assets:*** | **Section 2.01**.<br><br>(a) all Intellectual Property Assets, subject to the license granted to Great American pursuant to the Agency Agreement to use Seller's primary domain name (www.naartjie.com) and website (www.naartjiekids.com) until January 15, 2015;<br><br>(b) all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to the Purchased Assets;<br><br>(c) originals, or where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, |

| | |
|---|---|
| | customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that exclusively relate to the Purchased Assets, other than books and records set forth in Section 2.02(e);<br><br>(d) all of Seller's rights under the Executory Contracts;<br><br>(e) the website and domain name and all related information technology, hardware and software, pertaining thereto, if any of the E-Commerce Business; and<br><br>(f) all goodwill associated with any of the assets described in the foregoing clauses. |
| ***Assumed Liabilities:*** | **Section 2.03**.<br><br>(a) all liabilities and obligations arising under or relating to the Executory Contracts, provided, with respect only to such liabilities and obligations arising on or prior to the Closing Date as contemplated in Section 6.03, Buyer's assumption shall be limited to an aggregate value not exceeding $8,000;<br><br>(b) all liabilities and obligations for Taxes relating to the Purchased Assets or the Assumed Liabilities for any taxable period commencing after the Closing Date; and<br><br>(c) all other liabilities and obligations accruing on or after the Closing Date arising out of or relating to Buyer's ownership or operation of the Purchased Assets from and after the Closing Date. |
| ***US Purchase Price:*** | **Section 2.05**.<br><br>The aggregate purchase price for the Purchased Assets shall be the greater of (i) $500,000 or (ii) $2,700,000 (two million seven hundred thousand United States dollars) less any amounts deducted pursuant to clauses 9.1.2 and/or 9.1.3 of the ZA One Agreement ("**Adjusted Aggregate Purchase Price**") and less the Net SA Purchase Price for the business sold pursuant to the ZA One Agreement (as such term is defined therein) (the "**US Purchase Price**"). The US Purchase Price shall be settled as follows: an amount of $500 000 less the Buyers Bid Deposit shall be paid by the Buyer to the Seller on the Closing Date by wire transfer of immediately available funds to an account, designated in writing by Seller to Buyer no later than two Business Days prior to the Closing Date. The balance of the US Purchase Price, if any, shall be settled when the Net SA Purchase Price is finally |

|  | determined, and shall be transferred to the Seller by the Escrow Agent in terms of clause 11.1.3 of the ZA One Agreement. |
|---|---|
| **_Purchase Price Adjustment:_** | **Section 2.07**.<br><br>The final US Purchase Price shall be the Overall Purchase Price (as defined in 9.1 of the ZA One Agreement) less the Net SA Purchase Price, as determined based on the values in the Final Closing Statement delivered under the ZA One Agreement, and shall be paid to Seller from the Escrow Account, less the $500,000 paid at Closing, in accordance with the terms of the Escrow Agreement. |
| **_Buyer's Bid Deposit:_** | **Section 2.08**.<br><br>$270,000 to be paid into an Escrow Account and kept until one of the conditions described in Section 2.08 of the US Asset Purchase Agreement occurs. |
| **_Closing:_** | **Article III**.<br><br>Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Dorsey & Whitney LLP at 08:00, Mountain Standard Time (equivalent to 16:00 Central African Time) on the Business Day after ZA One delivers the Estimated Closing Statement, as defined in the ZA One Agreement, to Buyer or at such other time, date or place as Seller and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "**Closing Date**".<br><br>Closing Deliverables.<br><br>At the Closing, Seller shall deliver to Buyer the following:<br><br>an assignment, in a form mutually acceptable to Buyer and Seller, and duly executed by Seller, effecting assignment of the Intellectual Property Assets to Buyer (the "**IP Assignment**");<br><br>the Seller Closing Certificate; and<br><br>such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.<br><br>At the Closing, Buyer shall deliver to Seller the following:<br><br>the US Purchase Price, through the instrumentality of the Escrow Agent, at least in part, as set forth in the Escrow Agreement; and<br><br>the Buyer Closing Certificate. |
| **_Assumption of Executory Contracts:_** | **Section 6.03**.<br><br>In connection with Buyer's purchase of the Purchased Assets, Buyer wishes to assume the Executory Contracts.  Seller shall elect to assume the Executory Contracts and assign such assumed Executory Contracts to Buyer |

| | |
|---|---|
| | in accordance with the procedures set forth in Section 365 of the Bankruptcy Code. As part of these procedures, Buyer, as assignee of the Executory Contracts, shall provide adequate assurance that any defaults under the Executory Contracts will be promptly cured and future obligations will be performed. In order to provide adequate assurance, on or prior to the date Seller assumes the Executory Contracts, Buyer shall pay directly to counterparties all amounts necessary to cure any defaults under the Executory Contracts, up to an aggregate value not exceeding $8,000 on the Closing Date. Buyer shall then perform all future obligations of Seller under the Assumed Executory Contracts in accordance with the terms thereof. |
| *Sale Approval Order:* | **Section 6.04**.<br><br>Shall be reasonably acceptable to Buyer and include the provisions described in Section 6.04. |
| *License Termination:* | **Section 7.08**.<br><br>Synclaire License Termination. Seller shall use commercially reasonable efforts to cause the cancellation or termination by Seller of the US Merchandise Licence Agreement dated February 1, 2011, entered into between Seller and Synclaire Brands Inc., ("Synclaire") and pursuant to which agreement Synclaire was provided with a license until December 31, 2015 to use certain trademarks and designs of Seller in relation to the manufacture, distribution and sale of infants and children's footwear, coordinated accessories, such as bags, hats and other related products. Soxnet License Termination. Seller shall use commercially reasonable efforts to cause the cancellation or termination by Seller of the Licence Agreement dated October 28, 2010, entered into between Seller and Soxnext Inc ("Soxnet"). |
| *Conditions to Closing:* | **Article VII**. |
| *Termination:* | **Article IX**. |

## REQUESTED RELIEF

17.     By this Motion, the Debtor seeks entry of an Order authorizing the Debtor to: (a) exercise its shareholder rights in ZA One to enter into the ZA One Agreement and sell ZA One's assets and liabilities; and (b) sell the Debtor's assets and Intellectual Property to Truworths through the US Asset Purchase Agreement pursuant to 11 U.S.C. § 363(b) and (f), subject to higher and better offers to be solicited at auction.

## APPLICABLE AUTHORITY

**A.      Authorizing and Approving the Agreements**

18.     Ample authority exists for the approval of the proposed sale of the Debtor's assets.  Section 363 of the Bankruptcy Code authorizes a debtor to use or sell assets of the estate other than in the ordinary course of business, free and clear of liens, claims and encumbrances, provides. In relevant part, section 363 of the Bankruptcy Code states that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."). Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

19.     In order to approve a sale of a debtor's assets outside the ordinary course of business, the debtor must show that: (a) a sound business reason exists for the sale; (b) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale terms and the Debtor's relationship with the buyer; (c) the sale price is fair and reasonable; and (d) the proposed buyer is proceeding in good faith.  *See In re Med. Software Solutions*, 286 B.R. 431, 439–40 (Bankr. D. Utah 2002).

20.     Moreover, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (finding that the sale of substantially all of the Debtor's assets satisfied the sound business reason test); s*ee also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a §363(b) application expressly find

14

from the evidence presented before him at the hearing a good business reason to grant such an application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

21.     The decision to sell assets outside the ordinary course of business is based upon the business judgment of the debtor. *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir. 1983); *In re Adelphia Communications Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002).  If a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

22.     Here, entry into the Agreements meets all four parts of the applicable test:

*Sound Business Purpose*.

23.     A "presumption of reasonableness" attaches to the decisions of those controlling a debtor's assets.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986). Here, the Debtor has canvassed the market to find potential purchasers for its large remaining assets – the Intellectual Property, its interests in ZA One, and its E-Commerce Business.

24.     The Debtor has determined that entering into the Agreements and selling the applicable Assets is the best way to maximize the value of the Debtor's estate for the benefit of its creditor constituents.

## *Notice is Adequate*

25.     Second, as demonstrated by the *Certificate of Service* [Docket No. 252], notice of the auction, the deadline to object to the sale, the assets to be sold, and of the sale hearing was served on the Debtor's entire creditor matrix.

26.     This Motion will be served on all of the parties who have made an appearance in this case.

27.     Accordingly, the Debtor submits that the above notice procedures are fair, reasonable, and afford notice as required under the Bankruptcy Code under the circumstances.

## *Fair and Reasonable Price*

28.      The process used to canvas the marketplace was fair, reasonable, and has ensured that the $2.7 million purchase price for the assets under the Agreements is a fair and reasonable sale price that was achieved through extensive arms-length negotiation with Truworths and the Agreements represent the best offer for the Debtor's Assets.  In addition, through the proposed Auction, the sale price can only increase – to the benefit of the Debtor's creditor constituents.

## *Good Faith Purchaser*

29.     The Auction process ensures that the Assets will be sold to a good faith purchaser.

30.     Although the Bankruptcy Code does not define "good faith," the Tenth Circuit has determined, in the context of 11 U.S.C. § 363(m), that a "good faith" purchaser is "one that buys in good faith, and for value."  *Tompkins v. Frey (In re Bel Air Assocs., Ltd.)*, 706 F.2d 301, 304 (10th Cir. 1983).

31.     Here, the proposed sale of Assets to Truworths, subject to higher and better offers has been made in good faith and through arms' length transactions.

32.     Furthermore, the proposed sale to Truworths is subject to notice, Court approval, and the absence of higher and better offers.  Through the Auction process approved by the Court, the Debtor will obtain the highest and best price for the Assets that insures that the Assets are sold at a fair and reasonable price to a good faith purchaser for value.

**B.      Sale of the Assets Free and Clear of Interests Except for Assumed Liabilities is Appropriate**

33.     11 U.S.C. § 363(f) states that a Debtor may sell estate property free and clear of interests, if:

>    (i)     applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
>
>    (ii)    such entity consents;
>
>    (iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
>    (iv)    such interest is in bona fide dispute; or
>
>    (v)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

34.     Because Section 363(f) is in the disjunctive, the satisfaction of any one of the requirements enumerated therein will warrant the Debtor's proposed sale of the Assets free and clear of any and all interests.

35.    Here, Truworths has agreed to absorb substantially all of ZA One's liabilities in connection with the ZA One Agreement and to assume all liabilities with the exception of the "Excluded Liabilities"[3] in connection with the US Asset Purchase Agreement.

36.    The Debtor submits that any party holding a lien against the Assets will be adequately protected by the $2.7 million purchase price and any such lien would attach to the net sale proceeds.

37.    Accordingly, sale of the Assets free and clear of all liens, claims, interests, obligations and encumbrances (other than the Assumed Liabilities as defined in the US Asset Purchase Agreement) pursuant to 11 U.S.C. § 363(b) and (f) is appropriate.

**C.    Assumption and Assignment of the Executory Contracts is Appropriate and Consensual**

38.    Under the US Asset Purchase Agreement, the Debtor has agreed to assume and assign all of its rights under "(i) the web site hosting services contract with Inetz Media Group Inc. ("Inetz") in terms of which contract such services are provided to Seller and ZA One and (ii) the license and maintenance agreement with Inetz, to the extent to which such rights are assignable (the "Executory Contracts")."[4]

39.    11 U.S.C. § 365 governs assumption and assignment of the Executory Contracts and provides that an executory contract may be assumed and assigned if any monetary default is cured and if assignee's adequate assurance of future performance is ensured.[5]

---

[3]    US Asset Purchase Agreement, Section 2.04.

[4]    US Asset Purchase Agreement, Section 2.01(d).

[5]    *See* 11 U.S.C. § 365(b) and (f); *In re Windmill Farms, Inc.*, 841 F.2d 1467 (9th Cir. 1988).

40.    Here, the Debtor has obtained Inetz's consent to the assumption and assignment of the Executory Contracts and Truworths has agreed to cure all defaults up to an aggregate value of $8,000 and to perform all future obligations under the Executory Contracts.[6]

41.    Accordingly, in connection with the approval of the sale, the Court should authorize the assumption of the Executory Contracts and their assignment to Truworths or, alternatively, to a Competing Bidder at the Auction (hereinafter Truworths or the Competing Bidder who is designated as the Winning Bidder for the Purchased Assets at the Auction shall be called the "Winning US Asset Bidder").

**D.    The Proposed Order Addresses Consumer Privacy Issues Raised by the Ombudsman**

42.    On November 20, 2014, the Court entered an *Order Approving Appointment of Consumer Privacy Ombudsman* [Docket No. 253] (the "Ombudsman Order"), which appointed Bonnie Glantz Fatell as Consumer Privacy Ombudsman in this case.

43.    Because the US Asset Purchase Agreement contemplates the sale of the personally identifiable information on the Debtor's customers that is contained in the Debtor's customer database, the Debtor has worked with the Consumer Privacy Ombudsman to establish procedures to ensure an appropriate transfer of and use of this information by any Winning US Asset Bidder.

44.    Accordingly, the Debtor has included provisions in the proposed Order granting this Motion to address the Consumer Privacy Ombudsman's concerns.

**E.    The Debtor is Authorized to Exercise its Shareholder Rights in ZA One to Enter Into the ZA One Agreement**

45.    As stated above, the Debtor owns 100% of the outstanding shares in ZA One.

---

[6]    US Asset Purchase Agreement, Section 6.03.

46.      As the owner of 100% of the equity in ZA One, the Debtor can direct ZA One to enter into the ZA One Agreement.

47.      Accordingly, the Debtor seeks authority to exercise its shareholder rights to compel ZA One to sell ZA One's business as a going concern to Truworths as contemplated in the ZA One Agreement, or, alternatively to a Competing Bidder at the Auction and to sell the assets identified in the ZA One Agreement to Truworths, or, alternatively, to a Competing Bidder at the Auction.

## REQUEST OF WAIVER OF STAY

48.      The Debtor requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, time is of the essence and it is imperative that the Court waive the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) to authorize the Debtor's entry into the Agreements.  As explained in the motion seeking entry of the Bidding Procedures Order, the South African regulatory approval process could take a significant amount of time, and the regulatory authority shuts down for an extended period of time from mid-December through mid-January.  Accordingly, it is essential that the 14-day stay be waived to allow ZA One and Truworths or a competing bidder for the assets of ZA One to submit the ZA One Agreement to South African regulatory authorities prior to their month long hiatus.  In order to maximize the value of the Assets and minimize the estate's unnecessary administrative expenses, the Debtor believes a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply, is in the best interest of the Debtor's estate and stakeholders.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that the Court enter orders granting the

relief requested in this Motion and such other and further relief as may be just and proper.

DATED this 21st day of November, 2014.

**DORSEY & WHITNEY LLP**


*/s/ Annette W. Jarvis*
Annette W. Jarvis
Peggy Hunt
Michael F. Thomson
Jeffrey M. Armington
*Attorneys for Debtor Naartjie Custom Kids, Inc.*

## CERTIFICATE OF SERVICE

I certify that on November 21, 2014, the **DEBTOR'S MOTION FOR ORDER (A) AUTHORIZING DEBTOR TO EXERCISE ITS SHAREHOLDER RIGHTS IN ZA ONE TO ACCOMPLISH THE SALE OF ZA ONE'S ASSETS, (B) AUTHORIZING SALE OF DEBTOR'S ASSETS AND INTELLECTUAL PROPERTY TO TRUWORTHS LIMITED PURSUANT TO 11 U.S.C. § 363(B) AND (F), SUBJECT TO HIGHER AND BETTER OFFERS TO BE SOLICITED AT PUBLIC AUCTION, AND (C) GRANTING RELATED RELIEF** (the "Motion") was filed electronically with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system.

I further certify that the parties of record in this case, as identified below, are registered CM/ECF users and were served with the Motion and Notice through the CM/ECF system (collectively, the "ECF Parties"):

- Jeffrey M Armington armington.jeff@dorsey.com
- Darwin H. Bingham dbingham@scalleyreading.net, cat@scalleyreading.net
- Dustin P. Branch dustin.branch@kattenlaw.com,
  donna.carolo@kattenlaw.com;lora.anderson@kattenlaw.com
- Mona Lyman Burton mburton@hollandhart.com,
  ckelly@hollandhart.com;intaketeam@hollandhart.com;slclitdocket@hollandhart.com
- Kenneth L. Cannon kcannon@djplaw.com, khughes@djplaw.com
- Andrew S. Conway Aconway@taubman.com
- J. Gregory Hardman ghardman@snowjensen.com
- Tyler M. Hawkins hawkinst@ballardspahr.com,
  saltlakedocketclerk@ballardspahr.com;brownld@ballardspahr.com
- Annette W. Jarvis jarvis.annette@dorsey.com,
  smith.ron@dorsey.com;slc.lit@dorsey.com;brown.patricia@dorsey.com
- Michael R. Johnson mjohnson@rqn.com, dburton@rqn.com;docket@rqn.com
- Teddy M. Kapur tkapur@pszjlaw.com
- Peter J. Kuhn tr Peter.J.Kuhn@usdoj.gov,
  James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Bria E LaSalle Mertens blmertens@stoel.com, docketclerk@stoel.com
- Frank A. Merola fmerola@stroock.com,
  cgabriel@stroock.com;morozco@stroock.com;mmagzamen@stroock.com;ssiegel@stroock.com;dmohamed@stroock.com
- John T. Morgan tr john.t.morgan@usdoj.gov,
  James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- David L. Pollack pollack@ballardspahr.com
- Jeffrey N. Pomerantz jpomerantz@pszjlaw.com
- Robert S. Prince rprince@kmclaw.com, squilter@kmclaw.com
- Brian M. Rothschild brothschild@parsonsbehle.com, ecf@parsonsbehle.com
- Bradford J. Sandler bsandler@pszjlaw.com
- Engels Tejeda ejtejeda@hollandhart.com,
  tjones@hollandhart.com,slclitdocket@hollandhart.com,intaketeam@hollandhart.com
- Michael F. Thomson thomson.michael@dorsey.com,
  montoya.michelle@dorsey.com;koontz.jennifer@dorsey.com

- United States Trustee USTPRegion19.SK.ECF@usdoj.gov
- Gale K. x6Francis txbk13@utah.gov

I further certify that on November 21, 2014, I caused the Motion to be served on the parties below by email:

thomas.walper@mto.com
jcovey@parrbrown.com
blloyd@parrbrown.com
ian.jacobsberg@hoganlovells.com
alex.eliott@hoganlovells.com
c.vanzuylen@bowman.co.za
m.makola@bowman.co.za
m.krynauw@bowman.co.za
m.schulman@bowman.co.za
k.peter@bowman.co.za
dperess@hilcoglobal.com
jnerland@sierraconstellation.com
riaanvh@psgcapital.com
DavidT@psgcapital.com
mmark@TRUWORTHS.CO.ZA
dpfaff@truworths.co.za
asavahl@truworths.co.za
Fatell@BlankRome.com


DATED this 21st day of November, 2014.

**DORSEY & WHITNEY LLP**

*/s/ Jeffrey M. Armington*
Annette W. Jarvis
Peggy Hunt
Michael F. Thomson
Jeffrey M. Armington
*Attorneys for Debtor Naartjie Custom Kids, Inc.*

# **EXHIBIT A**

*Prepared and Submitted By:*
Annette W. Jarvis (Utah State Bar No. 01649)
Peggy Hunt (Utah State Bar No. 6060)
Michael F. Thomson (Utah State Bar No. 9707)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Tel:     (801) 933-7360
Fax:     (801) 933-7373
Email: jarvis.annette@dorsey.com
         hunt.peggy@dorsey.com
         thomson.michael@dorsey.com
         armington.jeff@dorsey.com

*Attorneys for Naartjie Custom Kids, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In re:<br><br>NAARTJIE CUSTOM KIDS, INC.,<br><br>Debtor. | Bankr. Case No. 14-29666<br><br>Chapter 11<br><br>The Honorable William T. Thurman |

**ORDER GRANTING DEBTOR'S MOTION FOR ORDER (A) AUTHORIZING DEBTOR TO EXERCISE ITS SHAREHOLDER RIGHTS IN ZA ONE TO ACCOMPLISH THE SALE OF ZA ONE'S ASSETS, (B) AUTHORIZING SALE OF DEBTOR'S ASSETS AND INTELLECTUAL PROPERTY TO TRUWORTHS LIMITED PURSUANT TO 11 U.S.C. § 363(B) AND (F), SUBJECT TO HIGHER AND BETTER OFFERS TO BE SOLICITED AT PUBLIC AUCTION, AND
(C) GRANTING RELATED RELIEF**

The matter before the Court is the *Debtor's Motion for Order (a) Authorizing Debtor to Exercise its Shareholder Rights in ZA One to Accomplish the Sale of ZA One's Assets, (b) Authorizing Sale of Debtor's Assets and Intellectual Property to Truworths Limited Pursuant to Sections 363(b) and (f) of the Bankruptcy Code, Subject to Higher and Better Offers to be Solicited at the Auction, and (c) Granting Related Relief* (the "Sale Motion"), filed by Naartjie Custom Kids, Inc. ("Naartjie" or "Debtor");  the debtor in possession in the above captioned bankruptcy case.  In addition the Debtor filed an *Auction Notice and Notice of Sale Hearing* [Docket No. 228] (the "Auction and Sale Notice"), which provided notice of among other things, notice of the November 24, 2014 at 4:00 p.m. deadline for filing responses to the Sale Motion, and notice of a hearing on the Sale Motion on November 25 at 2:00 p.m. (the "Hearing"), and the *Notice of Selection of Stalking Horse Agreements* (the "Stalking Horse Selection Notice"), which provided notice of the Debtor's selection of Truworths Limited ("Truworths" or "Stalking Horse") as the Stalking Horse for the Assets sold through the ZA One Agreement and the US Asset Purchase Agreement (each as defined below), and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and it appearing that this Court has jurisdiction over the matters raised by the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that consideration of the Sale Motion and the relief requested therein is a "core" proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Sale Motion and the Hearing having been given, and it appearing that no other notice need be given; and ZA One Proprietary Limited ("ZA One") and Truworths having agreed upon terms and conditions, as set forth in that certain Sale of Business Agreement, dated as of November 21, 2014, substantially in the form attached hereto as **Exhibit A** (the "ZA One

Agreement"); and the Debtor and Truworths having agreed upon terms and conditions, as set forth in that certain Asset Purchase Agreement, dated as of November 21, 2014, substantially in the form attached hereto as **Exhibit B** (the "US Asset Purchase Agreement" and together with the ZA One Agreement, the "Agreements"); and a hearing having been held on October 29, 2014 (the "Bidding Procedures Hearing"), whereupon the Court entered its *Order Granting Debtor's Motion for Order (A) Authorizing Bidding Procedures and Auction, (B) Authorizing Debtor to Provide Bid Protections to Stalking Horse, (C) Scheduling Sale Hearing and Approving Notice Thereof, and (D) Granting Related Relief* (the "Bidding Procedures Order") [Docket No. 228]; and the Debtor having conducted an auction on November 24, 2014 ("Auction") among Qualified Bidders (as defined in the Bidding Procedures Order); and an approval and the Hearing having been held on November 25, 2014, to consider the relief requested in the Sale Motion and approval of the Agreements and the transactions set forth therein (collectively, the "Transactions"); and appearances of all interested parties having been noted on the record of the Hearing; and upon all of the proceedings had before the Court (including, but not limited to, the testimony and other evidence proffered or adduced at the Bidding Procedures Hearing, and the Hearing); and the Court having found and determined that (i) the relief sought in the Sale Motion is in the best interests of the Debtor, its estate, its creditors, and all parties in interest, and (ii) that the legal and factual bases set forth in the Sale Motion establish good, sufficient and just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

3

(1)    The Sale Motion is **GRANTED** in its entirety and objections, if any, to the Sale Motion have been withdrawn, resolved or adjourned and, to the extent not withdrawn, resolved or adjourned, are hereby overruled;

(2)    The Debtor is **AUTHORIZED** to exercise its shareholder rights to compel ZA One to sell ZA One's business as a going concern to Truworths as contemplated in the ZA One Agreement, or, alternatively to a Competing Bidder at the Auction and to sell the assets identified in the ZA One Agreement to Truworths, or, alternatively, to a Competing Bidder at the Auction;

(3)    The sale of the Purchased Assets (as defined in the US Asset Purchase Agreement) to the Truworths or, alternatively, to a Competing Bidder at the Auction (hereinafter Trusworths or the Competing Bidder who is designated as the Winning Bidder for the Purchased Assets at the Auction shall be called the "Winning US Asset Bidder"), free and clear of all liens, claims, interests, obligations and encumbrances (other than the Assumed Liabilities as defined in the US Asset Purchase Agreement) pursuant to 11 U.S.C. § 363(b) and (f), as explained in the Sale Motion and pursuant to the terms of the US Asset Purchase Agreement, is **APPROVED**;

(4)    The Winning US Asset Bidder shall not incur any liability as a successor to the Debtor unless such liability is expressly assumed by the Winning US Asset Bidder and, to the extent permitted by applicable law permanently enjoining each and every holder of any claim for such liabilities from commencing, continuing, or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against the Winning US Asset Bidder or the Purchased Assets (as defined in the US Asset Purchase Agreement) related thereto;

(5)    The US Purchase Price represents fair value for the Purchased Assets (each as defined in the US Asset Purchase Agreement);

(6)     The Winning US Asset Bidder is a good faith purchaser of the Purchased Assets (as defined in the US Asset Purchase Agreement), and is in a similar line of business as the Debtor;

(7)    The Winning US Asset Bidder will provide notice to all customers in the Debtor's database, in the initial contact with those customers following the Closing Date (as defined in the US Asset Purchase Agreement), that such customers' personally identifiable information is being transferred and will provide those customers with the opportunity to opt out of the transfer.  The Winning US Asset Bidder will provide such notice by email for those customers with known email addresses and such email notice will direct those customers to the Winning US Asset Bidder's privacy policy on the Winning US Asset Bidder's website, and by regular U.S. mail for those customers with mailing addresses and such mailed notice will include a copy of the Winning US Asset Bidder's privacy policy.

(8)    Within 30 days after the Closing Date (as defined in the US Asset Purchase Agreement), the Winning US Asset Bidder shall file a certification with the Court indicating that it has provided the notice described above and opt out right to customers.

(9)    The Winning US Asset Bidder may not disclose, sell or transfer customers' personally identifiable information to any third party for use other than to assist the Winning US Asset Bidder in its business.

(10)    The Court shall retain jurisdiction for the purpose of enforcing the provisions of this Order including, without limitation, compelling delivery of the Purchased Assets to the

5

Winning US Asset Bidder and protecting the Winning US Asset Bidder against any liens, claims, interests, obligations and encumbrances against the Debtor or the Purchased Assets (other than in connection with the Assumed Liabilities as defined in the US Asset Purchase Agreement);

(11)     The Debtor is **AUTHORIZED** to execute, deliver, perform under, consummate and implement the US Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the US Asset Purchase Agreement;

(12)     The Debtor is **AUTHORIZED** to assume and assign all of Debtor's rights under (i) the web site hosting services contract with Inetz Media Group Inc. ("Inetz") and (ii) the Debtor's license and maintenance agreement with Inetz; and

(13)     The fourteen (14) day stay set forth in Federal Rule of Bankruptcy Procedure 6004(h) is **WAIVED**.

_____End of Order_____

# **EXHIBIT B**

**Execution Version**

---

### SALE OF BUSINESS AGREEMENT

---

between

### Z A ONE (PROPRIETARY) LIMITED

and

### TRUWORTHS  LIMITED



# CONTENTS

1.    DEFINITIONS AND INTERPRETATION ..................................................................2
2.    PROVISIONS WHICH TAKE IMMEDIATE EFFECT ............................................10
3.    SUSPENSIVE CONDITIONS ....................................................................................10
4.    SECTION 34 NOTICES ..............................................................................................13
5.    STALKING HORSE PROTECTIONS .......................................................................14
6.    SALE ...........................................................................................................................14
7.    STOCKTAKING .........................................................................................................14
8.    CLOSING STATEMENT ............................................................................................15
9.    PURCHASE PRICE OF THE BUSINESS .................................................................18
10.    VAT ............................................................................................................................19
11.    PAYMENT FOR THE BUSINESS .........................................................................20
12.    DELIVERY ...............................................................................................................21
13.    OWNERSHIP, BENEFIT AND RISK .....................................................................22
14.    LIABILITIES ............................................................................................................23
15.    WARRANTIES AND REPRESENTATIONS ..........................................................23
16.    ASSIGNMENT OF CONTINUING CONTRACTS ................................................24
17.    EMPLOYEES ...........................................................................................................25
18.    INTERIM PERIOD ...................................................................................................27
19.    GENERAL PROVISIONS FOR INDEMNITIES ....................................................28
20.    CANCELLATION .....................................................................................................29
21.    CONFIDENTIALITY ................................................................................................30
22.    GENERAL .................................................................................................................30
23.    ADDRESSES FOR LEGAL PROCESSES AND NOTICES ..................................33
24.    COSTS .......................................................................................................................35
SCHEDULE 1 Continuing Contracts ................................................................................37
SCHEDULE 2 Fixed and Other Assets .............................................................................38
SCHEDULE 3 Warranties ..................................................................................................39
SCHEDULE 4 Employees ..................................................................................................41

**PARTIES**:

This Agreement is made between:

(1) **Z A One (Proprietary) Limited**, a private company registered in accordance with the laws of the Republic of South Africa under registration number 1944/018097/07 (the **Seller**); and

(2) **Truworths Limited**, a public company registered in accordance with the laws of the Republic of South Africa under registration number 1940/013923/06 (the **Purchaser**).

**WHEREAS**

A.    The Seller is a private company registered and incorporated with limited liability in accordance with the company laws of the Republic of South Africa.

B.    The Seller carries on the business of designing branded children's clothing, marketing and selling such clothing in retail locations in the Republic of South Africa.

C.    The Purchaser is a public company registered and incorporated with limited liability in accordance with the company laws of the Republic of South Africa.

D.    The Seller wishes to sell to the Purchaser, which wishes to purchase, the business referred to in paragraph B above as a going concern.

E.    The Parties are entering into this Agreement to record the terms upon which, and the conditions subject to which, the Seller sells and the Purchaser purchases the business referred to in paragraph B above.

**IT IS AGREED AS FOLLOWS:**

1.      DEFINITIONS AND INTERPRETATION

1.1             **Definitions**

For the purposes of this Agreement and the preamble above, unless the context requires otherwise:

1.1.1           **Affiliate** means, with respect to any person, any other person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of (a) the ability to exercise or control the majority of the general voting rights associated with issued securities of that company whether pursuant to a shareholders agreement or otherwise, or (b) the right to appoint or control the appointment or the election of directors who control a majority of the votes at a meeting of the board, or (c) the ability to materially influence the policy of the juristic person in a manner comparable to a person who, in ordinary commercial practice, would be able to exercise an element of control referred to in (a) or (b) above.;

1.1.2           **Agreement** means this sale of business agreement and includes its schedules which shall form part of it;

1.1.3           **Assets** means the Receivables, the Fixed and Other Assets, the Goodwill, the Intellectual Property, the Continuing Contracts and the Stock;

1.1.4           **Bankruptcy Case** means *in re Naartjie Custom Kids, Inc.,* Case No. 14-29666 (Bankr. D. Utah);

1.1.5           **Business** means the Seller's business referred to in paragraph B of the preamble above, consisting of the Assets and the Liabilities, operated as a going concern;

1.1.6           **Business Day** means any day other than a Saturday, Sunday or statutory

holiday in the Republic of South Africa or the State of Utah, United States of America;

1.1.7 **Code** means title 11 of the Code of Laws of the United States of America, also known as the United States Bankruptcy Code;

1.1.8 **Closing Date** means the later of (i) the first Business Day following the delivery of the Estimated Closing Statement, or (ii) 31 (thirty one) calendar days following the latest publication of the notices required in terms of section 34 of the Insolvency Act in accordance with clause 4.1;

1.1.9 **Closing Statement** means the closing statement referred to in clause 8.6;

1.1.10 **Companies Act** means the Companies Act 71 of 2008 (as amended from time to time);

1.1.11 **Competition Act** means the Competition Act 98 of 1998 (as amended from time to time);

1.1.12 **Confidentiality Agreement** has the meaning ascribed to it in clause 21.1.

1.1.13 **Continuing Contracts** means any on-going contracts entered into by the Seller for the purposes of the Business in the ordinary and regular course thereof and which have been entered into and are in force at the Signature Date and are to or will continue according to their terms to remain in force up to and for any period after the Closing Date, including, without being limited to, the material contracts listed in Schedule 1, and **Continuing Contract** shall have a corresponding meaning;

1.1.14 **Due Diligence Investigation** means the comprehensive operational, financial and legal due diligence investigation of the Seller and the US Company to be undertaken by the Purchaser and to be completed as soon as possible after 30 October 2014, but in any event before 20 November 2014;

1.1.15 **Employee-related Liabilities** means the liabilities referred to in clauses 17.2.1, 17.2.2, 17.2.3 and 17.2.4, but as at the Closing Date, not the

Signature Date;

1.1.16          **Escrow Agent** has the meaning ascribed to it in clause 3.1.2.11;

1.1.17          **Escrow Agreement** has the meaning ascribed to it in clause 3.1.2.11;

1.1.18          **Estimated Closing Statement** means the closing statement referred to in clause 8.1;

1.1.19          **Final Closing Statement** means the closing statement referred to in clause 8.10;

1.1.20          **Fixed and Other Assets** means all of the assets of the Seller other than the Receivables, the Goodwill, the Intellectual Property and the Stock, and which include but are not limited to the assets listed in Schedule 2;

1.1.21          **Fulfilment Date** has the meaning ascribed to it in clause 3.6;

1.1.22          **FNB** means First National Bank, a division of FirstRand Bank Limited, being a registered bank and a public company registered in accordance with the laws of the Republic of South Africa under registration number 1929/001225/06;

1.1.23          **Goodwill** means the goodwill attributable to the Business as at the Closing Date;

1.1.24          **IFRS** means International Financial Reporting Standards as issued from time to time by the International Accounting Standards Board or its successor body;

1.1.25          **Insolvency Act** means the Insolvency Act 24 of 1936 (as amended from time to time);

1.1.26          **Interim Period** means the period from the Signature Date up to and including the Closing Date, both days inclusive;

- 4 -

1.1.27          **Intellectual Property** means:

1.1.27.1                    all trade marks owned by the Seller in relation to the Business, whether registered or unregistered, agreements of use, licence agreements and the like, whether written or oral, entered into between the US Company, as registered proprietor, and the Seller, as user, in respect of the "Naartjie", "Naartjie Kids", and other trade marks registered in the name of the US Company, and trade names owned by the Seller in relation to the Business (including, without being limited to, its trade names "Naartjie" and "Naartjie Kids" and the logo comprising that name);

1.1.27.2                    all rights under any patent, letters patent, copyright or design, patterns and logos whether registered or unregistered, and any applications therefor owned by the Seller in relation to the Business;

1.1.27.3                    all technologies, methods, formulations, data bases, trade secrets, know-how, inventions, and other intellectual property owned by the Seller in relation to the Business;

1.1.27.4                    all information files, records, data, plans, contracts and recorded knowledge owned by the Seller in relation to the Business, including customer and supply lists related to the foregoing;

1.1.27.5                    the Business website and all domain names owned by and/or operated by the Seller in relation to the Business; and

1.1.27.6                    to the extent owned by the Seller, the exclusive rights to use the names "Naartjie", "Naartjie Kids" and all such other names used in the operation of the Business in Africa, Australia and Asia;

1.1.28          **Labour Relations Act** means the Labour Relations Act 66 of 1995 (as amended from time to time);

1.1.29          **Liabilities** means the Trade Liabilities, the Seller's Overdraft, all obligations and liabilities under Continuing Contracts and the Employee-related

Liabilities;

1.1.30          **Long-stop Date** means 30 April 2015, or such other date as the Parties may agree in writing;

1.1.31          **Nominee** means a person nominated by a Party by giving notice in writing to that effect to the other Party on or before the Closing Date;

1.1.32          **Net SA Purchase Price** has the meaning set forth in clause 9.2.

1.1.33          **Overall Purchase Price** has the meaning ascribed to it in clause 9.1;

1.1.34          **Parties** means the Seller and the Purchaser, and **Party** means either one of them;

1.1.35          **Premises** means the premises  hired and occupied by the Seller from which the Business is conducted;

1.1.36          **Purchaser Funds** has the meaning ascribed to it in clause 17.6;

1.1.37          **R** or **Rand** means South African Rand, being the lawful currency of the Republic of South Africa;

1.1.38          **Receivables** means all the claims of the Seller against the trade debtors and sundry debtors of the Seller pertaining to the Business as at the Closing Date, and **Receivable** shall have a corresponding meaning;

1.1.39          **SA Purchase Price** has the meaning ascribed to it in clauses 9.1 and 9.2;

1.1.40          **Seller Funds** has the meaning ascribed to it in clause 17.6;

1.1.41          **Seller's Overdraft** means the existing bank overdraft facility which the Seller has with FNB;

1.1.42          **Signature Date** means the last date on which this Agreement is signed by the Parties;

1.1.43          **Stock** means all of the Seller's stock of raw materials, work-in-progress and finished goods pertaining to the Business as at the Closing Date;

1.1.44          **Trade Liabilities** means all the liabilities owed by the Seller as at the Closing Date to any trade creditors of the Seller pertaining to the Business arising from goods or services supplied to the Seller for the Business in the ordinary course of business prior to the Closing Date;

1.1.45          **Transaction Agreements** means this Agreement, the US Asset Purchase Agreement and, to the extent approved by the US Court pursuant to the Code in relation to the Bankruptcy Case, all agreements and documents related to this Agreement and the US Asset Purchase Agreement;

1.1.46          **Transferring Employees** has the meaning ascribed to it in clause 17.1.2;

1.1.47          **UCC** means the unsecured creditors committee formed in terms of the Code;

1.1.48          **US Agency Agreement** means the  US Court-approved Agency Agreement, entered into on 3 October 2014, between the US Company and Great American Group, LLC;

1.1.49          **US Asset Purchase Agreement** means the asset purchase agreement entered into, or to be entered into, on or about the Signature Date, between the US Company and the Purchaser;

1.1.50          **US Company** means Naartjie Custom Kids, Inc., a foreign business corporation registered in accordance with the laws of Delaware under registration number 3900788;

1.1.51          **US Court** means the United States Bankruptcy Court for the District of Utah;

1.1.52          **USD** or **United States Dollars** means United States dollars, being the lawful currency of the United States of America;

1.1.53          **US Purchase Price** has the meaning ascribed to it in clause 9.1; and

1.1.54          **VAT Act** means the Value-Added Tax Act 89 of 1991 (as amended from time

to time).

1.2        **Interpretation**

1.2.1            Unless expressly provided to the contrary or inconsistent with the context, a reference in this Agreement to:

1.2.1.1                  this Agreement or any other agreement, document or instrument, shall be construed as a reference to this Agreement or that other agreement, document or instrument as amended, varied, novated or substituted from time to time;

1.2.1.2                  a clause, sub-clause or Schedule, is to a clause, sub-clause or schedule in this Agreement;

1.2.1.3                  a person, includes any natural person, firm, company, corporation, body corporate, juristic person, unincorporated association, government, state or agency of a state or any association, trust, partnership, syndicate, consortium, joint venture, charity or other entity (whether or not having separate legal personality);

1.2.1.4                  any one gender, whether masculine, feminine or neuter, includes the other two;

1.2.1.5                  the singular, includes the plural and *vice versa*;

1.2.1.6                  a word or expression given a particular meaning, includes cognate words or expressions;

1.2.1.7                  any number of days prescribed, shall be determined by excluding the first and including the last day or, where the last day is a day that is not   Business Day, the next Business Day;

1.2.1.8                  a statutory provision, includes any subordinate legislation made from time to time under that provision and a reference to a statutory

provision includes that provision as from time to time modified or re-enacted as far as such modification or re-enactment applies, or is capable of applying, to this Agreement or any transaction entered into in accordance with this Agreement;

1.2.1.9        any references in this Agreement to any act, regulation, legislation or other enactment are, save where expressly stated otherwise, references to the relevant act, regulation, legislation or enactment of the Republic of South Africa;

1.2.1.10       the words including, include or in particular followed by specific examples shall be construed by way of example or emphasis only and shall not be construed, nor shall it take effect, as limiting the generality of any preceding words, and the *eiusdem generis* rule is not to be applied in the interpretation of such specific examples or general words;

1.2.1.11       the words other or otherwise shall not be construed *eiusdem generis* with any foregoing words where a wider construction is possible.

1.2.2          All the headings and sub-headings in this Agreement are for convenience and reference only and shall be ignored for the purposes of interpreting it.

1.2.3          A term defined in a particular clause or Schedule in this Agreement, unless it is clear from the clause or Schedule in question that application of the term is to be limited to the relevant clause or Schedule, bears the meaning ascribed to it for all purposes of this Agreement, notwithstanding that that term has not been defined in clause 1.1 and, where there is any inconsistency between any term defined in clause 1.1 and any term defined in any clause in, or Schedule to, this Agreement, then, for the purposes of construing such clause or Schedule, the term as defined in such clause or Schedule prevails.

1.2.4          No rule of construction may be applied to the disadvantage of a Party because that Party was responsible for or participated in the preparation of this Agreement or any part of it.

1.2.5          If a definition confers substantive rights or imposes substantive obligations on a Party, such rights and obligations shall be given effect to and are enforceable as substantive provisions of this Agreement, notwithstanding that they are contained in that definition.

## 2.     PROVISIONS WHICH TAKE IMMEDIATE EFFECT

The provisions of this clause 2 and clauses 1, 3, 4, 5, 15, 18, 20, 21, 22, 23 and 24 shall take effect and become operative immediately upon the Signature Date.

## 3.     SUSPENSIVE CONDITIONS

3.1          All the provisions of this Agreement, except for those that take effect and become operative immediately in terms of clause 2, shall be subject to the fulfilment or, where applicable, waiver, of the following suspensive conditions:

3.1.1          that the US Asset Purchase Agreement is entered into by the parties thereto on the Signature Date;

3.1.2          by no later than the Long-stop Date:

3.1.2.1          that all of the conditions set out in Section 8.01 of the US Asset Purchase Agreement are fulfilled in all respects in accordance with their respective terms in all respects save for any condition that relates to this Agreement becoming unconditional;

3.1.2.2          that the Seller in shareholders' meeting approves the disposal of the Business and the Assets to the Purchaser in terms of section 112 of the Companies Act, and delivers to the Purchaser a certified copy of the special resolution so passed;

3.1.2.3          that any approval which might be required in terms of the Competition Act for the entering into and implementation of this Agreement is duly obtained in writing in accordance with the requirements of the Competition Act to the extent any such approval may be required and, to the extent that such approval is given subject

to any condition, that the Parties accept those conditions, such acceptance not to be unreasonably withheld or delayed;

3.1.2.4    that any approval from the Financial Surveillance Department of the South African Reserve Bank for the entering into and implementation of this Agreement and the transactions contemplated herein (including, for the avoidance of doubt, (i) any payments contemplated in this Agreement to be made by the Escrow Agent and (ii) the payments contemplated in clause 11.3) is duly obtained in writing to the extent any such approval may be required;

3.1.2.5    that the Transaction Agreements receive final approval by the US Court in the case styled as *In re Naartjie Custom Kids, Inc.*, Case No. 14-29666 (Bankr. D. Utah), including a finding under section 363(m) of the Code and approval by the US Court pursuant to section 363 of the Code of the exercise by the US Company of its voting rights as sole shareholder of the Seller in favour of the acquisition by the Purchaser of the Business;

3.1.2.6    that the Purchaser delivers to the Seller a certified copy of the resolution of its board of directors approving the transactions contemplated in this Agreement and the other Transaction Agreements and authorising the Purchaser to enter into such agreements;

3.1.2.7    that the insolvency notices required for the purposes of this sale in terms of section 34 of the Insolvency Act, 24 of 1936, are published in the Government Gazette in South Africa and in a newspaper circulating in the area(s) where the Business is carried on, within the time period specified in 4.1;

3.1.2.8    on or prior to 31 December 2014, either:

3.1.2.8.1    the US Company shall have provided to the Seller a cash infusion, in the form of an unsecured, subordinated intercompany loan or an equity contribution (on terms and conditions acceptable to the US Company, the Seller and the

- 11 -

Purchaser, after consultation with the UCC, each acting reasonably), of an amount that is at least US$305,000 (three hundred and five thousand United States Dollars); or

3.1.2.8.2          (a) the US Company shall have provided to the Seller a cash infusion, in the form of an unsecured, subordinated intercompany loan or an equity contribution (on terms and conditions acceptable to the US Company, the Seller and the Purchaser, after consultation with the UCC, each acting reasonably), of an amount that is at least US$245,000 (two hundred and forty five thousand United States Dollars) and (b) the Seller shall have obtained an extension of the Seller's Overdraft equal to an amount that is at least US$60,000 (sixty thousand United States Dollars);

3.1.2.9          the giving by FNB of its written consent to the sale by the Seller to the Purchaser or its Nominee of the Business as a single going concern, on the basis contemplated in this Agreement;

3.1.2.10          the giving by the lessors in terms of the existing agreements of lease entered into between such lessors and the Seller (as lessee) in respect of at least 95% of the retail locations included in the Premises (the **Lease Agreements**), of their written consent to the assignment by the Seller of its rights and obligations pursuant to the Lease Agreements to the Purchaser; and

3.1.2.11          the Parties enter into an escrow agreement (in a form acceptable to the Parties, each acting reasonably) (the **Escrow Agreement**) with an independent escrow agent (the **Escrow Agent**) appointing such Escrow Agent to perform the role contemplated in clause 11.

3.2          The conditions specified in clauses 3.1.2.7, 3.1.2.8 and 3.1.2.9, are stipulated for the benefit of the Purchaser and the Purchaser shall be entitled to waive such conditions at any time on or before the Long-stop Date, or such later date as the Parties may agree in writing on or before the Long-stop Date, provided that no such waiver shall be effective unless it is in writing.

- 12 -

3.3         The condition specified in clause 3.1.2.6 is stipulated for the benefit of the Seller and the Seller shall be entitled to waive it at any time on or before the Long-stop Date, or such later date as the Parties may agree in writing on or before the Long-stop Date, provided that no such waiver shall be effective unless it is in writing.

3.4         The remaining conditions not mentioned in clause 3.2 or 3.3 are incapable of waiver.

3.5         If any of the conditions referred to in clause 3.1 is not fulfilled or, where applicable, waived, on or before the Long-stop Date, or such later date as the Parties may agree in writing on or before Long-stop Date, then the provisions of this Agreement that are suspended shall not take effect unless otherwise agreed in writing by the Parties and the provisions that have taken effect shall fall away with the exception of the provisions of clauses 1, 3, 15, 20, 21, 22, 23 and 24 which shall survive and shall be enforceable under this Agreement.

3.6         The 1st (first) Business Day after which all of the conditions referred to in clause 3.1 are fulfilled or, where applicable, waived, shall be the **Fulfilment Date**. On the Fulfilment Date, all of the provisions of this Agreement which were suspended in terms of clause 3.1 shall also take effect and become operative, and the whole of this Agreement shall accordingly become unconditional.

3.7         The Parties shall use their reasonable commercial endeavours and co-operate with each other to bring about the fulfilment of the conditions referred to in clause 3.1 as soon as is reasonably practicable following the Signature Date.

4.          **SECTION 34 NOTICES**

4.1         As soon as reasonably practicable after the Signature Date, being a day not less than 30 days, nor more than 60 days before the Closing Date, the Seller shall publish the notices required for the purposes of this sale in terms of section 34 of the Insolvency Act.

4.2         If any proceedings contemplated in section 34(3) of the Insolvency Act are instituted against the Seller before the Closing Date, the Seller shall:

4.2.1               discharge the claim(s) made against it in those proceedings; or

4.2.2        if the Seller wishes to defend those proceedings it shall make such arrangements as may be reasonably required by the Purchaser in all the circumstances to secure the payment of the claim(s) in question,

in either case so as to ensure that this Agreement shall not become void against the claimant in those proceedings.

## 5.    STALKING HORSE PROTECTIONS

The provisions of Sections 6.01 (*Bidding Procedures*) and 6.02 (*Bid Protections*) of the US Asset Purchase Agreement shall apply *mutatis mutandis* in relation to, and for the purposes of, this Agreement.

## 6.    SALE

6.1    The Seller agrees to sell to the Purchaser or its Nominee and the Purchaser or its Nominee agrees to purchase from the Seller, on the terms of this Agreement, the Business as a single going concern, together with all the assets of every kind, movable and immovable, corporeal and incorporeal and wherever situated, all as at the Closing Date and which shall include, without being limited to, the Assets as at the Closing Date.

6.2    The acquisition by the Purchaser of the Business in terms of this Agreement constitutes one indivisible, mutually conditioned transaction with the acquisition by the Purchaser in terms of the US Asset Purchase Agreement of the Purchased Assets as defined in the US Asset Purchase Agreement.

## 7.    STOCKTAKING

7.1    As soon as practicable after the close of business on the Fulfilment Date the Seller and the Purchaser shall carry out a stocktaking of the Stock to determine and value, for the purposes of this Agreement, the Stock, and prepare a stocksheet reflecting the results of the stocktaking and sign such stocksheet.  Such stocktaking shall be completed as quickly as possible, but in no event taking more than 3 (three) Business Days.  The cost of the stocktaking shall be borne equally by the parties.

7.2     For the purposes of that stocktaking the Stock shall be determined and valued at the lower of cost and net realisable value, in accordance with IFRS and on the basis of and by applying the Purchaser's accounting principles, policies, operational practices and methods consistent with previous years, which are as follows:

7.2.1       Stock that is 3 months old, is written down by 10%;

7.2.2       Stock that is 6 months old, is written down by 50%; and

7.2.3       Stock that is 12 months old, is written down by 100%.

7.3     The Seller and the Purchaser shall each be entitled to have as many representatives as they may reasonably require to be present throughout the stocktaking, including without being limited to their respective auditors.

7.4     If there exists any dispute between the Parties in regard to the value of the Stock pursuant to the stocktaking, the Seller shall be entitled, following reasonable consultation with the Purchaser, to  instruct an independent international auditing firm, agreed upon within 2 (two) Business Days after receipt of a written request by either of the Parties to do so, or failing agreement within that time period, as appointed by the chairman for the time being of the SA Institute of Chartered Accountants (**Independent Accountant**), acting as an expert and not as an arbitrator, to determine the stocksheet in its sole discretion (acting reasonably) by delivering a copy of such final stocksheet to the Purchaser in writing prior to the Closing Date. The Parties hereby agree that any such final stocksheet delivered to the parties by the Independent Accountant prior to the Closing Date shall be final and binding on the Parties for the purposes of this Agreement, save for manifest error.

8.      **CLOSING STATEMENT**

8.1     The Seller shall prepare at its own cost and expense, in good faith acting reasonably, and deliver to the Purchaser on the first Business Day in South Africa immediately following the completion of the stocktaking referred to in clause 7, an estimated closing statement in respect of the Business as at the Closing Date in accordance with the provisions of clauses 8.2, 8.3, 8.4 and 8.45 (the **Estimated Closing Statement**).

- 15 -

8.2        Subject to the provisions of clauses 8.3, 8.4 and 8.5, the Estimated Closing Statement shall be prepared on the basis of and by applying accounting policies, principles, practices and methods consistent with IFRS and shall reflect the (i) estimated values of the Receivables, the Fixed and Other Assets, the Intellectual Property, the Continuing Contracts and the Trade Liabilities as at the Closing Date and (ii) the estimated value of the Stock as determined in terms of clause 7 above, in each case in accordance with clause 8.3.

8.3        The Receivables, the Fixed and Other Assets, the Intellectual Property, the Stock and the Continuing Contracts shall be shown on the Estimated Closing Statement at the following values:

8.3.1          the estimated face value of each of the Receivables, except to the extent previously written off or provided for as bad or doubtful debts in accordance with the Seller's accounting policies as they were applied in the immediately preceding financial year, shall be its value as at the Closing Date;

8.3.2          the estimated value of each item of the Fixed and Other Assets shall be its book value as at the Closing Date;

8.3.3          the estimated value of each item of the Intellectual Property shall be its book value as at the Closing Date;

8.3.4          the value of the Stock shall be as determined in terms of clause 7 above; and

8.3.5          the value of the Continuing Contracts shall be Rnil.

8.4        For the purposes of clause 8.3, the "book value" of any asset shall be the value of the asset in the Seller's books after allowing for depreciation in accordance with IFRS up to the Closing Date.

8.5        The Liabilities shall be shown on the Estimated Closing Statement at the following values:

8.5.1          the Seller's Overdraft and each Trade Liability shall be shown at its estimated face value as at the Closing Date; and

- 16 -

8.5.2      the value of the Employee-related Liabilities shall be the estimated value of the aggregate leave pay, annual bonus payments and any other amounts other than severance pay, that have actually accrued to the transferring employees as at the Closing Date, determined in accordance with the provisions of clause 17.2; and

8.5.3      any liabilities under Continuing Contracts shall be shown at their estimated face values as at the Closing Date.

8.6      The Seller shall deliver an updated version of the Estimated Closing Statement (the **Closing Statement**) to the Purchaser within 5 (five) Business Days from the Closing Date to enable the Purchaser to review it, and if necessary, to raise any queries and discuss any matters arising out of it with the Seller. The provisions of clauses 8.2, 8.3, 8.4 and 8.5 shall apply to the Closing Statement *mutatis mutandis*, provided that the Closing Statement shall show the respective actual (and not estimated) face, book or determined values of the relevant Assets and the Liabilities as at the Closing Date.

8.7      The Purchaser shall have a period of 10 (ten) Business Days from the date on which the Closing Statement is delivered to it in terms of clause 8.6 in which to query and take up any matters arising out of the Closing Statement which it may wish to query and take up with the Seller.

8.8      Notwithstanding anything to the contrary in this Agreement, during the period of 10 (ten) Business Days referred to in clause 8.7, the Purchaser shall be entitled to inspect the Seller's working papers for the Closing Statement, all of which may be inspected at the offices of the Seller at all reasonable times and upon reasonable notice to the Seller.

8.9      At the end of the period of 10 (ten) Business Days referred to in clause 8.7 the Parties shall be obliged to sign the Closing Statement which will have been delivered to the Purchaser in terms of clause 8.6, subject to any changes which the Purchaser on the one hand and the Seller on the other may agree upon in writing. If the Purchaser raises any query in relation to the Closing Statement pursuant to clause 8.7, and such query is not resolved by the Parties prior to the end of the period of 10 (ten) Business Days referred to in clause 8.7, the Seller shall refer such query to an Independent

Accountant (as defined in clause 7.4) acting as an expert and not as an arbitrator, who in its sole discretion shall make a determination regarding the relevant query for the purposes of finalising the Closing Statement to be signed by the Parties pursuant to this clause 8.9 and whose decision shall be final and binding on the Parties.   The Independent Accountant shall deliver its findings within 20 (twenty) days after such query is referred to it.  All costs of the Independent Accountant shall be borne equally by the parties.

8.10    The Closing Statement to be signed by the Parties or by the Independent Accountant, in the case of any unresolved query, as the case may be, in terms of clause 8.9 shall, in the absence of any manifest error, be final and binding on the Parties and shall become the Final Closing Statement.

9.      **PURCHASE PRICE OF THE BUSINESS**

9.1     The total purchase price of the Business, together with the purchased assets acquired under the US Asset Purchase Agreement, shall be:

9.1.1           USD2,700,000 (two million seven hundred thousand United States Dollars);

9.1.2           less any amount by which the balance of the Seller's Overdraft exceeds the United States Dollar equivalent of R4,000,000 (four million Rand) (converted at the rate of exchange quoted by FNB as the market selling rate of the Rand against the United States Dollar at or around 11:00 AM (CAT) on the Fulfilment Date, as may be certified by a duly authorised officer of FNB) as at the Closing Date; and

9.1.3           less any loss, damage or liability which may be suffered or incurred by the Purchaser as a consequence of any breach by the Seller of the provisions of clause 18.1 and/or the value of any dividend or other distribution (within the meaning of the Companies Act) or repayment of the shareholder's loan made by the Seller to its shareholder during the Interim Period contrary to any of the prohibitions in clause 18.2

        (the **Overall Purchase Price**),

        it being recorded that the Overall Purchase Price was significantly reduced relative to

- 18 -

the originally indicated amount in the letter of intent dated October 31, 2014 following completion of the Due Diligence Investigation in order to make provision for potentially substantial losses, damages or liabilities arising from previously undisclosed or unknown material issues which arose during the Due Diligence Investigation.

9.2     The **Net SA Purchase Price** shall be the lesser of USD$2,200,000 and:

9.2.1         the sum of the values of all the Receivables, the Fixed and Other Assets, the Intellectual Property, the Stock and the Continuing Contracts as shown in the Final Closing Statement (the **SA Purchase Price**); *minus*

9.2.2         the aggregate value of the Liabilities as shown in the Final Closing Statement.

9.3     The **US Purchase Price** shall be an amount equal to the Overall Purchase Price *minus* the Net SA Purchase Price.

9.4     The Overall Purchase Price shall be allocated respectively against (i) the Business in the amount of the Net SA Purchase Price and (ii) the assets purchased in terms of the US Asset Purchase Agreement in the amount of the US Purchase Price. The whole of the SA Purchase Price shall be allocated among the Receivables, the Fixed and Other Assets, the Intellectual Property, the Stock and Continuing Contracts, at their respective values as shown in the Final Closing Statement.

10.     **VAT**

10.1     The Parties agree for the purposes of the VAT Act that:

10.1.1         the Business, including all of the Assets, is sold as a going concern;

10.1.2         all the assets necessary to carry on the Business are sold by the Seller to the Purchaser;

10.1.3         the Business is, and on the Closing Date will be, an income-earning activity; and

10.1.4         the purchase price for the Business referred to in clause 9 is inclusive of value added tax at a rate of 0% (zero percent).

10.2     The Parties record that the sale of the Business falls within the ambit of section 11(1)(e) of the VAT Act and value-added tax is payable at the rate of 0% (zero percent).

10.3     Should the Commissioner of the South African Revenue Service rule that value-added tax is payable in respect of the sale of the Business or the Assets (or any part thereof) at a rate exceeding 0% (zero percent), the Purchaser or its Nominee shall pay such value-added tax to the Seller when the Seller is required to make payment thereof, against delivery of an invoice (as defined in the VAT Act) to the Purchaser or its Nominee.

10.4     Each of the Parties warrants to the other that it is on the Signature Date and will, on the Closing Date, be registered as a vendor in terms of the VAT Act.

11.     **PAYMENT FOR THE BUSINESS**

11.1     The Purchaser shall pay to the Seller the SA Purchase Price as follows:

11.1.1     On the Closing Date, against compliance by the Seller with its obligations in terms of clause 11.4, the Purchaser shall pay to the Escrow Agent an amount equal to USD$2,200,000 from which the Net SA Purchase Price will be paid to the Seller by the Escrow Agent in accordance with clause 11.1.3 (such amount to be held by the Escrow Agent in escrow pursuant to the terms and conditions of the Escrow Agreement).

11.1.2     On the Closing Date, against compliance by the Seller with its obligations in terms of clause 11.3, the Purchaser or its Nominee shall assume, and discharge on due date, the Liabilities as is required in terms of clause 14.

11.1.3     Within 5 (five) Business Days of the Parties signing the Final Closing Statement and determining the Net SA Purchase Price, the Parties shall deliver a joint written instruction to the Escrow Agent, in accordance with the terms and conditions of the Escrow Agreement, instructing the Escrow Agent to pay (i) to the Seller an amount equal to the Net SA Purchase Price and (ii) to the US Company (on behalf of the Purchaser) any other funds

remaining in the Escrow Account.

11.2    All amounts payable by the Purchaser or its Nominee or the Escrow Agent to the Seller in terms of this Agreement shall be paid by the Purchaser or its Nominee or the Escrow Agent (as applicable) by depositing such amounts by electronic transfer into such South African bank account as shall be notified in writing by the Seller from time to time. It is recorded that the US Purchase Price shall be paid by the Purchaser in the manner and within the time period recorded in the US Asset Purchase Agreement.

11.3    All amounts payable by the Escrow Agent to the Purchaser in terms of this Agreement shall be paid by the Escrow Agent (as applicable) by depositing such amounts into the following South African bank account by electronic transfer:

Name of account holder: Truworths Ltd General 2 Account
Name of Bank:  Standard Bank
Branch:         Cape Town
Branch Code:    02000900
Account number: 070114501

(or such other bank account in South Africa as may be notified in writing by the Purchaser from time to time).

11.4    As soon as reasonably practicable after payment of the Net SA Purchase Price in accordance with clause 11.1 has been received by the Seller, the Seller undertakes to pay to the US Company that portion of the Net SA Purchase Price received on the Closing Date which is less than or equal to the aggregate outstanding amount due under its shareholder loans by the Seller to the US Company as at the Closing Date as full repayment, settlement and discharge of all such loans.

12.    **DELIVERY**

12.1    Against the obligations referred to in clause 11.1 being performed the Seller shall deliver the Business together with the Assets as at the Closing Date to the Purchaser or its Nominee in accordance with the following provisions:

12.1.1          The Seller shall make the delivery on the Closing Date at the Premises.

12.1.2          The Seller shall take all such steps and do everything that is reasonably required of it to put the Purchaser or its Nominee in actual undisturbed possession and operating control of the Business and all the Assets as at the Closing Date on the Closing Date.

12.1.3          The Purchaser shall be liable for any costs and expenses which will have to be incurred in complying with any requirement of the National Road Traffic Act 1996 or any other road traffic ordinance or other law for the registration of transfer to it of any motor vehicle included among the Assets, if any. The Seller shall be obliged to sign all such documents and to do everything else which may reasonably be required by the Purchaser or its Nominee for the registration of any transfers to be effected in terms of this clause 11.3.

12.1.4          The Seller hereby cedes to the Purchaser or its Nominee, with effect from the Closing Date, its right, title and interest in and to the Receivables. The Seller shall sign all such documents and do everything else which may be required by the Purchaser or its Nominee to record or otherwise give effect to the cession of the Receivables or any of them.

12.1.5          The Seller hereby assigns to the Purchaser or its Nominee all the rights in and to the Intellectual Property with effect from the Closing Date, and if any of those rights are registered in any statutory register, it shall sign all such documents and do everything else which the Purchaser or its Nominee may require for the registration of the assignment of the rights in the statutory register.

12.2            The Parties agree that irrespective of the order in which the actions to be taken pursuant to clause 12.1 actually taken, all the actions shall be deemed to have been taken simultaneously, and that none of them shall be deemed to have been taken unless all of them have been taken.

13.        **OWNERSHIP, BENEFIT AND RISK**

13.1            The benefit to and risk in the Business and all the Assets shall pass to the Purchaser

or its Nominee upon delivery of the Business to the Purchaser or its Nominee in accordance with the provisions of clause 11.3.

13.2      The ownership of the Business and all the Assets shall pass to the Purchaser or its Nominee upon payment of the Net SA Purchase Price in accordance with clause 11.

## 14.      LIABILITIES

14.1      The Purchaser or its Nominee agrees to assume and discharge on due date all of the Trade Liabilities and the Seller's Overdraft as at the Closing Date as disclosed in the Final Closing Statement and each other liability which the Purchaser or its Nominee has agreed to assume and discharge in terms of clauses 16 and 17.

14.2      Notwithstanding anything to the contrary contained in this Agreement, the Purchaser or its Nominee shall not assume any liability of the Seller other than the liabilities referred to in clause 14.1, such that all liabilities, whether actual or contingent, of the Seller other than the liabilities referred to in clause 14.1 shall be excluded from this Agreement and retained by the Seller.

14.3      The Purchaser and/or its Nominee in turn agrees to indemnify and hold the Seller harmless against any and all liabilities, whether actual or contingent, which the Purchaser or its Nominee is obliged to assume and discharge in terms of clause 14.1 above and against any demand, claim, action or other legal proceedings made or instituted against the Seller in respect of any of them, and against all costs incurred by the Seller or awarded against the Seller in respect of any such demand, claim, action or other legal proceedings.

## 15.      WARRANTIES AND REPRESENTATIONS

15.1      Each of the Parties gives to the other the respective warranties and makes the representations set out in Schedule 3.

15.2      Each warranty given by the Parties in terms of this Agreement shall be a separate and severable warranty and shall in no way be limited to or restricted by reference to or by inference from the terms of any other warranty.

15.3     The parties agree that neither party shall have any right of cancellation or termination after the Closing Date.

15.4     Neither of the Parties shall have any claim or right of action arising from any undertaking, representation or warranty not specifically included in this Agreement.

## 16.     ASSIGNMENT OF CONTINUING CONTRACTS

16.1     On and with effect from the Closing Date the Seller hereby cedes and assigns to the Purchaser or its Nominee all the Seller's rights and obligations under every Continuing Contract; and the Purchaser or its Nominee hereby accepts the cession and assignment of all those rights and obligations under each such Continuing Contract with effect from the Closing Date.

16.2     The Seller and the Purchaser shall be obliged to enter into all such agreements and sign all such documents and do all such things as may reasonably be required of them to give effect to the provisions of clause 16.1.

16.3     Where any other party to any Continuing Contract to be ceded and assigned to the Purchaser or its Nominee in terms of clause 16.1 does not consent to its cession and assignment prior to the Closing Date then:

16.3.1     the Purchaser or its Nominee shall perform timeously all the Seller's obligations under the Continuing Contract in question which arise on or after the Closing Date, in accordance with all the provisions of that contract, as if the Purchaser or its Nominee were a subcontractor to the Seller for the performance of all those obligations;

16.3.2     the Seller shall exercise all its rights under the Continuing Contract for the benefit of the Purchaser or its Nominee and shall collect and pay to the Purchaser or its Nominee promptly all amounts due to be paid to the Seller under or in respect of the Continuing Contract; and

16.3.3     if the terms of the Continuing Contract in question do not permit the provisions of clause 16.3.1 to be carried into effect, the Purchaser (or its

- 24 -

Nominee) and the Seller shall co-operate with each other to enable the object of this clause 16 to be achieved for the contract in question as far as it is possible to do so lawfully and without constituting any breach or default of that contract.

16.4   The Purchaser and/or its Nominee indemnifies the Seller against all claims which may be made against the Seller and all liability which may be incurred by the Seller under or in respect of any Continuing Contract, but only if and to the extent that the claim or liability is in respect of an obligation incurred by or for the Purchaser on or after the Closing Date under the Continuing Contract in question as contemplated in this clause 16, and is properly attributable to the Purchaser for the purposes of this Agreement.

17.   **EMPLOYEES**

17.1   The Parties record that:

17.1.1   the Business will be transferred from the Seller to the Purchaser or its Nominee as a going concern and that the provisions of section 197(2) of the Labour Relations Act are accordingly applicable;

17.1.2   upon the transfer of the Business on the Closing Date, the employment of all the employees employed in the Business immediately before the Closing Date (the **Transferring Employees**) will continue in force with the Purchaser or its Nominee; and

17.1.3   no agreement as contemplated in section 197(6) of the Labour Relations Act has been concluded.

17.2   Schedule 4 reflects the following amounts, as agreed between the Purchaser and the Seller before the Signature Date, in respect of each of the employees of the Business as at the Signature Date and the principles applied in calculating those amounts:

17.2.1   the aggregate leave pay accrued but not paid as at the Signature Date;

17.2.2          the aggregate annual bonus payments accrued but not paid as at the Signature Date;

17.2.3          any other amounts accrued but not paid as at the Signature Date; and

17.2.4          the severance pay that would have been payable to such employees had they been retrenched with effect from the Signature Date.

17.3          On the Closing Date, the Seller shall calculate the aggregate leave pay, annual bonus payments and any other amounts accrued to the Transferring Employees as at the Closing Date, and the severance payments that would have been payable to such employees had they been retrenched with effect from the Closing Date, applying the same principles as those applied in calculating the amounts referred to in clause 17.2.

17.4          The Purchaser shall be liable to the Transferring Employees for the payment of all amounts referred to in clause 17.2, as calculated pursuant to clause 17.3, provided that the Purchaser shall only be liable for the amount referred to in 17.2.4 if any Transferring Employees are in fact retrenched.

17.5          As soon as reasonably practicable after the conclusion of this Agreement, the Parties shall jointly advise the employees of the Business of the transfer of their contracts of employment from the Seller to the Purchaser or its Nominee with effect from the Closing Date, and the Seller shall inform them of the contents of Schedule 4 and the provisions of clauses 17.3 and 17.4 in accordance with the provisions of section 197 of the Labour Relations Act.

17.6          The Seller undertakes to co-operate with the Purchaser or its Nominee and to do all such things and to sign and provide all such documents as may reasonably be required by the Purchaser or its Nominee to procure the transfer after the Closing Date of the Transferring Employees employed in the Business immediately before the Closing Date, from the pension and/or provident fund and medical aid fund of the Seller, if any (the **Seller Funds**) of which they are members to the pension and/or provident fund and medical aid fund of the Purchaser or any third party pension, provident or preservation fund nominated by the Purchaser for that purpose (the **Purchaser Funds**), provided the Transferring Employees of the Business are in fact members of the Seller Funds at the Closing Date.

17.7        The Purchaser or its Nominee undertakes to use or procure that its Nominee uses its reasonable commercial endeavours to procure that the trustees of the Seller Funds permit the Transferring Employees to remain members of the Seller Funds pending the commencement of their membership in the Purchaser Funds.

18.    **INTERIM PERIOD**

18.1        During the Interim Period the Seller shall procure that it continues to operate its Business in the ordinary and regular course and in the manner it was conducted in the period of 12 (twelve) months immediately preceding the Closing Date, including the maintenance of Stock levels and the placing of Stock orders that are sufficient for the continued operation of the Business as a going concern in the ordinary and regular course of the Seller's business.

18.2        Without limiting anything in clause 18.1, during the Interim Period, the Seller undertakes and confirms, so far as it is lawfully able or permitted to do so, that none of the following matters will be undertaken by the Seller during the Interim Period:

18.2.1            the declaration, payment or other making by the Seller of any dividend or other distribution or return of capital to the US Company or any repurchase or buy-back of any or all of the Seller's shares; or

18.2.2            the repayment of any shareholder loan accounts owing by the Seller to the US Company,

provided that the Seller shall not be required to comply with such provisions should any of the restrictions contained therein conflict with the US Agency Agreement or any judgment, order or award of the US Court or any other court or administrative authority having jurisdiction over the Seller or the Business.

18.3        Nothing in this clause 18 shall restrict the Seller from renewing contracts as and when these come up for renewal during the Interim Period (including the negotiation or renegotiation of any terms thereof to the extent required by the third party concerned) provided that such renewals shall be effected in the ordinary and regular course of Business on terms no more onerous than those applicable to the contracts prior to the Signature Date.

19.      **GENERAL PROVISIONS FOR INDEMNITIES**

19.1     If the Seller becomes aware of any matter which may give rise to a claim by the Seller against the Purchaser or its Nominee in terms of any indemnity given under this Agreement, notice of the claim and full details of it shall be given by the Seller to the Purchaser or its Nominee as soon as reasonably practicable after the Seller becomes aware of it and, if the claim in question arises out of or is connected with a claim by, or liability to, a third party, the claim shall not be compromised or settled without the consent of the Purchaser.

19.2     The Purchaser or its Nominee shall be entitled to avoid, dispute, resist, appeal, compromise or contest any claim by a third party in the name of the Seller and to control any proceedings arising out of the exercise of any of those rights by the Purchaser, provided that:

19.2.1           the Purchaser and/or its Nominee shall indemnify the Seller against all costs, charges, liabilities and expenses which may be incurred by the Seller for the purposes of or in connection with anything done by the Purchaser or its Nominee in its name in accordance with the provisions of this clause 19; and

19.2.2           the Purchaser and/or its Nominee shall keep the Seller informed of the way in which it exercises its rights under this clause 19 and shall at all times exercise those rights in such manner as the Seller may reasonably require to avoid or to minimise any damage to its relationship with any of its own suppliers or customers or those of any of the Seller's Affiliates.

19.3     The Seller shall make available to the Purchaser or its Nominee all such information and assistance and sign all such documentation as may reasonably be required by the Purchaser or its Nominee for the purposes of avoiding, disputing, resisting, appealing, compromising or contesting any such claim or liability.

19.4     The Seller shall have all the same rights against the Purchaser or its Nominee as the Purchaser or its Nominee has against the Seller in terms of clauses 19.1, 19.2 and 19.3 and all the provisions of those clauses shall accordingly apply *mutatis mutandis* for the purposes of this clause 19.4.

20.      **CANCELLATION**

20.1      The Seller shall be entitled to claim specific performance or to cancel this Agreement summarily by giving written notice to that effect to the Purchaser or its Nominee if the Purchaser or its Nominee fails to pay on due date any amount which becomes payable in terms of clause 11 and remains in default for 10 (ten) Business Days after receiving written notice to remedy the default.

20.2      Should the Purchaser or its Nominee commit any other breach of this Agreement, the Seller shall not be entitled to cancel it unless the breach is material and cannot be remedied adequately by the payment of damages and, being such a breach, it is not remedied or is not capable of being remedied by specific performance within a reasonable time after the Purchaser receives written notice to remedy the breach.

20.3      Should the Seller commit any breach of this Agreement, the Purchaser shall not be entitled to cancel it unless the breach is material and cannot be remedied adequately by the payment of damages and, being such a breach, it is not remedied or is not capable of being remedied by specific performance within a reasonable time after the Seller receives written notice to remedy the breach.

20.4      The remedies of each party in terms of this clause 20, shall not be exhaustive and shall be in addition and without prejudice to any other remedies it has under or in consequence of this Agreement.

20.5      In the event that the US Asset Purchase Agreement is duly cancelled or terminated in accordance with its terms, this Agreement shall terminate automatically without any further action being required by either Party.

20.6      In the event of termination or cancellation of this Agreement pursuant to this clause 20, this Agreement shall terminate and be cancelled, and the purchase of the Business hereunder shall be abandoned, without further action by any of the Parties. In the event that this Agreement is validly terminated or cancelled in accordance with this clause 20, each of the Parties shall be relieved of its respective duties and obligations arising under this Agreement from and after the date of such termination or cancellation, and such termination or cancellation shall be without liability to the

other Parties; provided that no such termination or cancellation shall relieve any Party from liability (including any liability for damages) for any breach of this Agreement or other liability arising prior to termination or cancellation hereof; and provided further that the provisions and obligations of the Parties set out in clauses 1, 3, 15, 20, 21, 22, 23 and 24 of this Agreement shall survive any such termination or cancellation and shall be enforceable under this Agreement.

21.      **CONFIDENTIALITY**

21.1     The Purchaser acknowledges and agrees to be bound by the confidentiality letter agreement entered into on 23 September 2014 between the Purchaser and the US Company (the **Confidentiality Agreement**), acknowledges and agrees that the Confidentiality Agreement remains in full force and effect, and in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to the Purchaser pursuant to the Confidentiality Agreement and this Agreement. If this Agreement is, for any reason, cancelled prior to Closing, the Confidentiality Agreement and the provisions of this clause 21.1 shall nonetheless continue in full force and effect.

21.2     Nothing in clause 21.1 shall preclude the Purchaser, if it so elects, to make a suitable JSE SENS or other media announcement regarding the transactions contemplated in this Agreement and the US Asset Purchase Agreement, following the execution of those Agreements by the Parties thereto, provided that the contents of any such draft announcement shall be sent to the Seller for its prior approval before publication, which approval shall not be unreasonably delayed or withheld and provided further that any such announcement shall not be made before 25 November 2014.

21.3     Each of the Parties shall use reasonable endeavours to procure that its directors, officers, employees and agents observe a corresponding obligation of confidence to that set out in clause 21.1 above.

22.      **GENERAL**

22.1     **Communications between the Parties**

All notices, demands and other oral or written communications given or made by or on behalf of either of the Parties to the other Party shall be in English or accompanied by a certified translation into English.

22.2     **Remedies**

Subject to the provisions of clauses 20 and 22.10, no remedy conferred by this Agreement is intended to be exclusive of any other remedy which is otherwise available at law, by statute or otherwise.  Each remedy is cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law, by statute or otherwise.  The election of any one or more remedies by either of the Parties does not constitute a waiver by such Party of the right to pursue any other remedy.

22.3     **Entire Agreement**

22.3.1     Other than as expressly provided herein, this Agreement constitutes the entire agreement between the Parties in regard to its subject matter.

22.3.2     Neither of the Parties shall have any claim or right of action arising from any undertaking, representation or warranty not included in this Agreement.

22.4     **Variations**

No agreement to vary, add to or cancel this Agreement shall be of any force or effect unless recorded in writing, signed by or on behalf of both the Parties and, if necessary, approved by the US Court.

22.5     **No Waiver**

22.5.1     A waiver of any right or remedy under this Agreement or by law is only effective if given in writing and is not deemed a waiver of any subsequent breach or default.

22.5.2     A failure to exercise or a delay by a Party in exercising any right or remedy provided under this Agreement or by law does not constitute a waiver of that

or any other right or remedy, nor does it prevent or restrict any further exercise of that or any other right or remedy. No single or partial exercise of any right or remedy provided under this Agreement or by law prevents or restricts the further exercise of that or any other right or remedy.

22.6      **Survival of Rights, Duties and Obligations**

Termination or expiry of this Agreement for any cause does not release either Party from any liability which at the time of termination or expiry has already accrued to such Party or which thereafter may accrue in respect of any act or omission prior to such termination or expiry.

22.7      **Severance**

If any provision of this Agreement that is not material to its efficacy as a whole is rendered void, illegal or unenforceable in any respect under any law of any jurisdiction, the validity, legality and enforceability of the remaining provisions are not in any way affected or impaired thereby and the legality, validity and unenforceability of such provision under the law of any other jurisdiction are not in any way affected or impaired.

22.8      **Assignment**

Save as permitted by the provisions of this Agreement, neither Party may cede, assign or otherwise transfer any of its rights nor delegate any of its obligations under this Agreement.

22.9      **Counterparts**

This Agreement may be signed in any number of counterparts. Each counterpart is an original and all counterparts taken together constitute one and the same instrument. Any Party may enter into this Agreement by signing any such counterpart.

22.10     **Applicable law**

22.10.1          This Agreement is governed by and shall be construed in accordance with the laws of South Africa.

22.10.2          Subject to the provisions of this Agreement, the Parties consent and submit to the exclusive jurisdiction of the Western Cape High Court, Cape Town in any dispute arising from or in connection with this Agreement, save where such dispute is required by the Code to be referred to the US Court.

22.11      **General Co-operation**

The Parties shall co-operate with each other and execute and deliver to the other Parties such other instruments and documents and take such other actions as may be necessary or reasonably requested from time to time in order to carry out, evidence and confirm their rights and the intended purpose of this Agreement.

22.12      **Rights of Third Parties**

22.12.1          This is an agreement between the Parties only and no rights are stipulated for the benefit of any third party.

22.12.2          Notwithstanding any term of this Agreement, the consent of any person who is not a Party is not required to amend, vary, cancel or rescind this Agreement at any time except to the extent that the relevant amendment, variation, cancellation or rescission (as the case may be) relates directly to the right conferred upon any applicable third party under a stipulation for the benefit of that party contained in this Agreement that has been accepted by that third party.

22.13      **Set-off**

Each Party waives and relinquishes any right of set-off or counterclaim, deduction or retention which it might otherwise have in respect of any payment which it may be obliged to make or procure to be made to another Party pursuant to this Agreement or otherwise.

23.      **ADDRESSES FOR LEGAL PROCESSES AND NOTICES**

23.1      The parties choose for the purposes of this Agreement the following addresses, telefax numbers and email addresses:

> Seller:
>
> ZA One (Pty) Ltd.
>
> 3676 California Ave, Suite D-100
>
> Salt Lake City, UT  84104
>
> Telefax No:  801-974-4688
>
> Email address: glenn@naartjie.com
>
> Marked for the attention of Glenn Wood
>
> Purchaser:
>
> Truworths Limited
>
> 1 Mostert Street
>
> Cape Town, South Africa
>
> Telefax No:  +27 21 460 7188
>
> Email address:
>
> mmark@truworths.co.za / dpfaff@truworths.co.za
>
> Marked for the attention of  Mr. MS Mark / Mr. DB Pfaff

23.2      Any legal process to be served on either of the Parties may be served on it at the address specified for it in clause 23.1 and it chooses that address as its domicilium citandi et executandi for all purposes under this Agreement.

23.3      Any notice or other communication to be given to either of the Parties in terms of this Agreement is valid and effective only if it is given in writing, provided that any notice given by telefax or email is regarded for this purpose as having been given in writing.

23.4      A notice to any Party which is sent by registered post in a correctly addressed envelope to the address specified for it in clause 23.1 is deemed to have been received within 10 (ten) Business Days from the date it was posted, or which is delivered to the Party by hand at that address is deemed to have been received on the day of delivery, provided it was delivered to a responsible person during ordinary business hours.

23.5        Each notice by telefax or email to a Party at the telefax number or email address specified for it in clause 23.1 is deemed to have been received within 4 (four) hours of transmission if it is transmitted during normal business hours of the receiving Party or within 4 (four) hours of the beginning of the next business day at the destination after it is transmitted, if it is transmitted outside those business hours.

23.6        A notice to any Party which is sent by overnight courier in a correctly addressed envelope to the address specified for it in clause 23.1 is deemed to have been received on the business day following the date it is sent.

23.7        Notwithstanding anything to the contrary in this clause 23, a written notice or other communication actually received by any Party is adequate written notice or communication to it notwithstanding that the notice was not sent to or delivered at its chosen address.

23.8        Any Party may by written notice to the other Party change its address or telefax number or email address for the purposes of clause 23.1 to any other address (other than a post office box number) provided that the change will become effective on the day following receipt of the notice.

24.     **COSTS**

Except as provided in Section 6.02 of the US Asset Purchase Agreement, each Party is responsible for its own costs, legal fees and other expenses incurred in the negotiation, preparation and execution of this Agreement.

SIGNED at _SALT LAKE CITY_ on this the _21st_ day of _November_ 2014.

For and on behalf of
**Z A ONE (PROPRIETARY) LIMITED**

Signatory: Glenn Shenton Wood
Capacity: CEO
Who warrants his authority hereto

SIGNED at _Cape Town_ on this the _22nd_ day of _November_ 2014.

For and on behalf of
**TRUWORTHS LIMITED**

Signatory: CHRISTOPHER DURHAM
Capacity: COMPANY SECRETARY
Who warrants his authority hereto

## SCHEDULE 1
### Continuing Contracts

1.      Lease Agreement entered into between the Company and Corporate Business Automation, dated 25 October 2011.

2.      Maintenance and Service Agreement entered into between the Company and Corporate Business Automation, dated 25 October 2011.

3.      Master Rental Agreement entered into between the Company and Technologies Acceptances (Pty) Ltd, dated 16 March 2012.

4.      Facility Agreement with First National Bank Limited, dated 14 January 2014.

5.      Client Services Agreement : Drawcard (Pty) Ltd and the Company, dated 25 June 2014.

6.      Service Level Agreement: Fifth Factor Technologies CC and the Company, dated August 2009.

7.      Supply Agreement : Target Ease International Limited, dated 25 June 2004.

8.      Licencing Agreement: iSync Solutions, dated 20 April 2010.

9.      Service Level Agreement: Connect Brandcraft (Pty) Ltd, dated 16 October 2013.

10.     All lease agreements in respect of the Premises between various third party lessors and the Seller as tenant.

## SCHEDULE 2
### Fixed and Other Assets

1.      All financial assets of the Seller.

2.      All furniture, fixtures and equipment.

3.      All fixed deposits for lease security in respect of any lease agreements entered into by the Seller.

4.      All marketing materials and sundry assets used in the operation of the Business.

**SCHEDULE 3**
**Warranties**

1.      The Seller warrants that as at the Signature Date and the Closing Date:

1.1      The Seller is duly organised and validly exists under the laws of the Republic of South Africa.

1.2      Except as set forth in the conditions stated in clause 3, the Seller has the power and authority to enter into this Agreement and has taken all necessary action, including obtaining all relevant consents or internal approvals and authorisations, in order that it may execute this Agreement and perform all obligations required of it under the terms of this Agreement.

1.3      There are no pending, or to the knowledge of the Seller, threatened court actions, administrative or regulatory actions, or arbitrations involving the Seller that relate to the Business or the Seller, which if determined adversely to the Business or the Seller would result in a material adverse effect on the Business.

1.4      There are no outstanding governmental orders and no unsatisfied judgments, penalties or awards against or effecting the Business or the Assets which would have a material adverse effect on the Business or the Assets.

1.5      Except as set forth in the conditions stated in clause 3, the Seller has the legal right and the authority to sell, convey and transfer the Business and the Assets free and clear of any and all encumbrances, save for the existing general notarial bond over movable goods of the Seller in favour of FNB ("**the FNB General Notarial Bond**"), and the Seller is able to give the Purchaser free and unencumbered title to and undisturbed possession of the Business and the Assets and on all relevant dates between the Signature Date and the Closing Date.

1.6      To the extent that there has been any actual breach by the Seller of any of the provisions of the FNB General Notarial Bond, such breach has been remedied to the satisfaction of FNB, as evidenced by a letter from FNB to that effect.

1.7      To Seller's knowledge, having made all reasonable enquiries, diligently, the Continuing Contracts set forth on Schedule 1 is an accurate and complete list of all material Continuing Contracts as of the Signature Date.

2.      The Purchaser warrants that as at the Signature Date and the Closing Date:

2.1          The Purchaser is duly organised and validly exists under the laws of the Republic of South Africa.

2.2          The Purchaser has the power and authority to enter into this Agreement and has taken all necessary action, including obtaining all relevant consents or internal approvals and authorisations, in order that it may execute this Agreement and perform all obligations required of it under the terms of this Agreement.

3.      Save as specifically set out in paragraph 1:

3.1          the Seller gives no warranties or representations whatsoever to the Purchaser or its Nominee in relation to the Business, the Assets, the Continuing Contracts or the Liabilities and the sale thereof to the Purchaser or its Nominee is "*voetstoots*" (on an "as is basis") in all respects;

3.2          the Purchaser acknowledges that it does not rely on any representation, statement or warranty other than the representations and warranties set out in paragraph 1 and more specifically, the Purchaser shall not be entitled to rely on any information provided to it by or on behalf of the Seller; and

3.3          notwithstanding the foregoing, the Seller does not make any representation or warranty as to the correctness of any forecasts, estimates, or projections provided in any way to the Purchaser.

## SCHEDULE 4
### Employees

A provisional list of Employees was disclosed to the Purchaser during the Due Diligence
Investigation ("**Provisional List**"). The final list of Employees shall be substantially the same as the
Provisional List and shall be delivered to the Purchaser within three Business Days of the Signature
Date ("**Final List**"). Once the Seller and the Purchaser has initialled the Final List for identification
purposes, it shall be substituted for this Schedule 4 and be incorporated in the Agreement for al
intents and purposes as if it were incorporated on the Signature Date.

# **EXHIBIT C**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

between

**NAARTJIE CUSTOM KIDS, INC.**

and

**TRUWORTHS LIMITED**

dated as of

November 21, 2014

# TABLE OF CONTENTS

**Page**

ARTICLE I Definitions ...............................................................................................1

ARTICLE II Purchase and Sale ..................................................................................6
    Section 2.01    Purchase and Sale of Assets..........................................6
    Section 2.02    Excluded Assets ............................................................6
    Section 2.03    Assumed Liabilities ......................................................7
    Section 2.04    Excluded Liabilities .....................................................8
    Section 2.05    US Purchase Price .........................................................8
    Section 2.06    Allocation of US Purchase Price...................................8
    Section 2.07    Purchase Price Adjustment ...........................................8
    Section 2.08    Buyer's Bid Deposit......................................................9
    Section 2.09    Indivisible Mutually Conditioned Transaction ..........10

ARTICLE III Closing ...............................................................................................10
    Section 3.01    Closing ........................................................................10
    Section 3.02    Closing Deliverables ..................................................10

ARTICLE IV Statements of Seller ...........................................................................11
    Section 4.01    Organization and Qualification of Seller ...................11
    Section 4.02    Authority of Seller ......................................................11
    Section 4.03    Title to the Purchased Assets ......................................11
    Section 4.04    Legal Proceedings; Governmental Orders..................11
    Section 4.05    No Other Representations and Warranties...................11

ARTICLE V Statements of Buyer .............................................................................12
    Section 5.01    Organization and Authority of Buyer .........................12
    Section 5.02    Authority of Buyer......................................................12
    Section 5.03    No Conflicts; Consents ...............................................12
    Section 5.04    Sufficiency of Funds ...................................................13
    Section 5.05    Solvency......................................................................13
    Section 5.06    Legal Proceedings ......................................................13
    Section 5.07    Independent Investigation ...........................................13

ARTICLE VI Bankruptcy Court Proceedings ...........................................................13
    Section 6.01    Bidding Procedures.....................................................13
    Section 6.02    Bid Protections............................................................13
    Section 6.03    Assumption of Executory Contracts ...........................14
    Section 6.04    Sale Approval Order ...................................................14

ARTICLE VII Covenants ..........................................................................................15
    Section 7.01    Conduct of Business Prior to the Closing....................15
    Section 7.02    Taxes...........................................................................15
    Section 7.03    Other Bankruptcy Covenants......................................15
    Section 7.04    Closing Conditions .....................................................16

i

Section 7.05   Notices ........................................................................................16
Section 7.06   Confidentiality ............................................................................16
Section 7.07   Post-Closing Access.....................................................................16
Section 7.08   Synclaire License Termination ....................................................16
Section 7.09   Soxnet License Termination ........................................................16

ARTICLE VIII Conditions to Closing..........................................................................16
Section 8.01   Conditions to Obligations of All Parties......................................16
Section 8.02   Conditions to Obligations of Buyer .............................................17
Section 8.03   Conditions to Obligations of Seller..............................................17

ARTICLE IX Termination.............................................................................................18
Section 9.01   Termination ..................................................................................18
Section 9.02   Effect of Termination....................................................................18

ARTICLE X Miscellaneous...........................................................................................19
Section 10.01   Survival .......................................................................................19
Section 10.02   Expenses ......................................................................................19
Section 10.03   Notices .........................................................................................19
Section 10.04   Severability ..................................................................................20
Section 10.05   Interpretation ...............................................................................20
Section 10.06   Headings .......................................................................................20
Section 10.07   Entire Agreement .........................................................................20
Section 10.08   Successors and Assigns.................................................................20
Section 10.09   No Third Party Beneficiaries .......................................................21
Section 10.10   Amendment and Modification; Waiver ........................................21
Section 10.11   Governing Law; Submission to Jurisdiction................................21
Section 10.12   Counterparts..................................................................................21
Section 10.13   Non-recourse.................................................................................21

EXHIBITS

Exhibit A    -    Form of IP Assignment
Exhibit B    -    Bid Procedures Motion

4826-9355-6000\15

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of November __, 2014, is entered into between Naartjie Custom Kids, Inc., a Delaware corporation ("**Seller**") and Truworths Limited, registration number 1940/013923/06, a public company incorporated under the laws of the Republic of South Africa or its nominee ("**Buyer**").

## RECITALS

WHEREAS, Seller has filed a voluntary petition for reorganization pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Utah (the "**Bankruptcy Court**") styled as *In re Naartjie Custom Kids, Inc.*, Case No. 14-29666 (Bankr. D. Utah) (the "**Bankruptcy Case**"), and shall seek entry of an order by the Bankruptcy Court authorizing and approving Seller's entry into this Agreement and consummation of the transactions contemplated by this Agreement;

WHEREAS, Seller and its subsidiary, ZA One (Pty) Ltd., registration number 1944/018097/07, a private company incorporated under the laws of the Republic of South Africa ("**ZA One**"), are jointly engaged in the business of designing and marketing children's clothing through retail stores in the United States and the Republic of South Africa and through web orders in the United States and Canada (the "**Business**"); and

WHEREAS, subject to the terms and conditions set forth herein, Seller wishes to sell, and Buyer wishes to purchase from Seller, certain of Seller's assets as set out in Section 2.01 and assume certain liabilities as set forth in Section 2.03; and

WHEREAS, simultaneously herewith, and subject to the terms and conditions set forth in the Sale of Business Agreement between ZA One and Buyer (the "**ZA One Agreement**"), ZA One will sell and assign to Buyer, and Buyer will purchase from ZA One the business of ZA One as a going concern ("**ZA One Business**").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

4826-9355-6000\15

"**Agency Agreement**" means that certain Court-approved Agency Agreement entered into October 3, 2014 between Seller and Great American.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.06.

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Auction**" means the auction for the sale of the substantially all assets used by Seller in its operation of the E-Commerce Business as well as the Intellectual Property Assets, as scheduled by the Bankruptcy Court in the Bid Procedures Order to occur on November 25, 2014.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Procedures Motion**" means that certain motion filed by Seller on October 24, 2014 seeking Bankruptcy Court approval of certain bidding procedures to be used in the Auction.

"**Bid Procedures Order**" means that certain order entered by the Bankruptcy Court on November 4, 2014 approving the bidding procedures set forth in the Bid Procedures Motion.

"**Bid Protections**" means $100,000.

"**Business**" has the meaning set forth in the recitals.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in the state of Utah or the Republic of South Africa are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Certificate**" has the meaning set forth in Section 8.03(c).

"**Buyer's Bid Deposit**" has the meaning set forth in Section 2.08.

"**Closing**" has the meaning set forth in Section 3.01.

"**Closing Date**" has the meaning set forth in Section 3.01.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means the confidentiality agreement, dated as of September 23, 2014 between Buyer and Seller.

4826-9355-6000\15

"**Contracts**" means all legally binding written contracts, leases, mortgages, licenses, instruments, notes, commitments, undertakings, indentures and other agreements to which Seller is a party.

"**Data Room**" means the electronic documentation site established by Smart Room BMC Group on behalf of Seller.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or $**" means the lawful currency of the United States.

"**Due Diligence Investigation**" means the comprehensive operational, financial and legal due diligence investigation of Seller, and the Purchased Assets and Assumed Liabilities, undertaken by the Buyer and completed by November 20, 2014.

"**E-Commerce Business**" has the meaning set forth in the Recitals.

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"**Escrow Account**" has the meaning set forth in Section 2.08.

"**Escrow Agent**" has the meaning set forth in Section 2.08.

"**Escrow Agreement**" has the meaning set forth in Section 2.08.

"**Escrow Bank**" has the meaning set forth in Section 2.08.

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Executory Contracts**" has the meaning set forth in Section 2.01(d).

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Great American**" means Great American Group, LLC, a California limited liability company.

3

"**Inetz**" has the meaning set forth in Section 2.01(d).

"**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world:  (a)  trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable; (c) trade secrets and confidential know-how; (d) patents and patent applications; (e) patterns and logos; (f) websites and internet domain name registrations; (g) all other intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Seller and used in connection with the Business, including, without limitation (a) the Intellectual Property Registrations set forth on Section 1.01 of the Disclosure Schedules; (b) the Naartjie and Naartjie Kids trademarks; and (c) the exclusive rights to use the names "Naartjie", "Naartjie Kids" and all other names used in the operation of the Business.

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names, and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**IP Assignment**" has the meaning set forth in Section 3.02(a)(i).

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual knowledge of Glenn Wood and Jeff Nerland.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" means all material real property leased by Seller and used exclusively in connection with the E-Commerce Business.

"**Leases**" means all lease agreements relating to the Leased Real Property.

"**LOI**" means the letter of intent entered into between Buyer and Seller on October 31, 2014.

"**Menderes**" means Menderes Holding Ltd.

"**Net SA Purchase Price**" means the estimated net purchase price, due and payable by the Purchaser to ZA One for the ZA One business pursuant to the terms of the ZA One Agreement, determined pursuant to clause 9.2 of the ZA One Agreement;

"**Outside Date**" has the meaning set forth in Section 9.01(a).

4

4826-9355-6000\15

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Purchased Assets**" has the meaning set forth in Section 2.01.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**RSA**" has the meaning set forth in Section 8.01(e).

"**Sale Approval Order**" means an order entered by the Bankruptcy Court approving the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Closing Certificate**" has the meaning set forth in Section 8.02(c).

"**Signature Date**" means the date of signature of this Agreement by the party last signing it.

"**Synclaire**" has the meaning set forth in Section 8.01(f).

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement, the IP Assignment, and the other agreements, instruments and documents required to be delivered at the Closing.

"**U.S. Location**" means any United States retail location of the Business.

"**US Purchase Price**" has the meaning set forth in Section 2.05.

"**ZA One**" has the meaning set forth in the Recitals.

"**ZA One Agreement**" has the meaning set forth in the Recitals.

5

## ARTICLE II
### PURCHASE AND SALE

**Section 2.01   Purchase and Sale of Assets.**  Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances, all of Seller's right, title and interest in, to and under the following assets, properties and rights of Seller (collectively, the "**Purchased Assets**"):

(a)      all Intellectual Property Assets, subject to the license granted to Great American pursuant to the Agency Agreement to use Seller's primary domain name (www.naartjie.com) and website (www.naartjiekids.com) until January 15, 2015;

(b)      all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to the Purchased Assets;

(c)      originals, or where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that exclusively relate to the Purchased Assets, other than books and records set forth in Section 2.02(d);

(d)      all of Seller's rights under (i) the web site hosting services contract with Inetz Media Group Inc. ("**Inetz**") in terms of which contract such services are provided to Seller and ZA One and (ii) the license and maintenance agreement with Inetz, to the extent to which such rights are assignable (the "**Executory Contracts**");

(e)      the website and domain name and all related information technology, hardware and software, pertaining thereto, if any of the E-Commerce Business; and

(f)      all goodwill associated with any of the assets described in the foregoing clauses.

**Section 2.02   Excluded Assets.**  Other than the Purchased Assets subject to Section 2.01, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties of Seller, and all such other assets and properties shall be excluded from the Purchased Assets (the "**Excluded Assets**").  Excluded Assets include, but are not limited to, the following assets and properties of Seller:

(a)      all cash and cash equivalents, bank accounts and securities of Seller;

(b)      all Contracts other than the Executory Contracts;

(c)      all Intellectual Property other than the Intellectual Property Assets;

(d)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related files or records, and any other books and records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(e)    all insurance policies of Seller and all rights to applicable claims and proceeds thereunder;

(f)    all Tax assets (including duty and Tax refunds and prepayments) of Seller;

(g)    all rights to any action, suit or claim of any nature available to or being pursued by Seller, whether arising by way of counterclaim or otherwise;

(h)    the rights which accrue or will accrue to Seller under the Transaction Documents, the ZA One Agreement, or any of the other documents and agreements to be entered into in connection with the ZA One Agreement;

(i)    except as set forth in Section 2.01(e), the E-Commerce Business;

(j)    accounts or notes receivable of the E-Commerce Business or any U.S. Location;

(k)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories of the E-Commerce Business or any U.S. Location, including without any limitation any inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories sold to Great American pursuant to the Agency Agreement, if any;

(l)    all of Seller's furniture, fixtures, equipment, supplies and other tangible personal property used in the E-Commerce Business or in any U.S. Location; and

(m)    all prepaid expenses, credits, advance payments, security, deposits, charges, sums and fees to the extent related to the Purchased Assets.

**Section 2.03    Assumed Liabilities**.  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due any and all liabilities and obligations of Seller arising out of or relating to the Purchased Assets on or after the Closing (collectively, the "**Assumed Liabilities**"), including, without limitation, the following:

(a)    all liabilities and obligations arising under or relating to the Executory Contracts, provided, with respect only to such liabilities and obligations arising on or prior to the Closing Date as contemplated in Section 6.03, Buyer's assumption shall be limited to an aggregate value not exceeding $8,000;

(b)    all liabilities and obligations for Taxes relating to the Purchased Assets or the Assumed Liabilities for any taxable period commencing after the Closing Date; and

7

(c)      all other liabilities and obligations accruing on or after the Closing Date arising out of or relating to Buyer's ownership or operation of the Purchased Assets from and after the Closing Date.

**Section 2.04   Excluded Liabilities**.  Other than the Assumed Liabilities, Buyer shall not assume and shall not be responsible to pay, perform or discharge any liabilities or obligations of Seller, whether actual or contingent, including without limitation, the following:

(a)      all trade accounts payable of Seller to third parties in connection with the E-Commerce Business that remain unpaid as of the Closing Date;

(b)      all liabilities and obligations arising under or relating to the Contracts that are not Executory Contracts;

(c)      all liabilities and obligations for Taxes relating to the E-Commerce Business, the Purchased Assets or the liabilities (that are not Assumed Liabilities) for any taxable period ending on or prior to the Closing Date; and

(d)      all other liabilities and obligations arising out of or relating to Seller's ownership or operation of the E-Commerce Business and the Purchased Assets on or prior to the Closing Date.

(e)      any and all liabilities of Seller, whether in relation to the payment of royalties or otherwise owing to Menderes under the Menderes Licence Agreement (as defined in Section 8.01(i)).

**Section 2.05   US Purchase Price**.  The aggregate purchase price for the Purchased Assets shall be the greater of (i) $500,000 or (ii) $2,700,000 (two million seven hundred thousand United States dollars) <u>less</u> any amounts deducted pursuant to clauses 9.1.2 and/or 9.1.3 of the ZA One Agreement ("**Adjusted Aggregate Purchase Price**") and <u>less</u> the Net SA Purchase Price for the business sold pursuant to the ZA One Agreement (as such term is defined therein) (the "**US Purchase Price**").  The US Purchase Price shall be settled as follows: an amount of $500 000 less the Buyers Bid Deposit shall be paid by the Buyer to the Seller on the Closing Date by wire transfer of immediately available funds to an account, designated in writing by Seller to Buyer no later than two Business Days prior to the Closing Date. The balance of the US Purchase Price, if any, shall be settled when the Net SA Purchase Price is finally determined, and shall be transferred to the Seller by the Escrow Agent in terms of clause 11.1.3 of the ZA One Agreement.

**Section 2.06   Allocation of US Purchase Price**.  The US Purchase Price shall be allocated among the Purchased Assets as proposed in writing by Buyer and approved by Seller prior to the Closing Date (the "**Allocation Schedule**").  Seller and Buyer agree to file their respective IRS Forms 8594 and all federal, state and local Tax Returns in accordance with the Allocation Schedule.

**Section 2.07   Purchase Price Adjustment**.  The final US Purchase Price shall be the Overall Purchase Price (as defined in 9.1 of the ZA One Agreement) less the Net SA Purchase Price, as determined based on the values in the Final Closing Statement delivered under the ZA

8

One Agreement, and shall be paid to Seller from the Escrow Account, less the $500,000 paid at Closing, in accordance with the terms of the Escrow Agreement.

**Section 2.08   Buyer's Bid Deposit**.  Buyer shall be obliged to make payment in escrow, as a bid deposit, with the Seller's South African legal advisors or another mutually agreeable escrow agent (the "**Escrow Agent**") pursuant to the terms of an Escrow Agreement that is mutually acceptable to Buyer and Seller the "**Escrow Agreement**"), the South African Rand ("**ZAR**") equivalent of $270,000 (two hundred and seventy thousand United States dollars) converted at the rate of exchange quoted by FNB as the market selling rate of ZAR against the United States Dollar at or around 11am CAT on the payment date ("**Buyer's Bid Deposit**") by wire transfer of immediately available funds to a South African account designated in writing by the Escrow Agent to the Buyer not later than one business day after the Signature Date or as soon thereafter as reasonably practicable (the "**Escrow Account**").  Forthwith upon receipt of the Buyer's Bid Deposit, the Escrow Agent shall deposit the Buyer's Bid Deposit into a new separate interest-bearing account, bearing interest at a rate not less than the ruling call deposit rate of [•] Bank Limited (the "**Escrow Bank**"), as certified by any manager at that Bank whose capacity or authority need not be proved, to be opened in the joint names of the Seller and the Buyer with the Escrow Bank, and shall keep the Buyer's Bid Deposit invested in the Escrow Account until:

(a)      Buyer elects to terminate this Agreement in accordance with Section 9.01(f), in which event the Escrow Agent shall be obliged to release the Buyer's Bid Deposit, together with all interest accrued thereon, to the Buyer within five Business Days after such termination by wire transfer of immediately available funds to an account designated in writing by the Buyer to the Escrow Agent not later than one Business Day following the date of such termination; or

(b)      the Closing Date, if all the conditions in Article VIII are fulfilled or waived, to the extent capable of waiver in law before the Closing Date, in which event the Escrow Agent shall be obliged to (i) release the Buyer's Bid Deposit to the Seller, in part payment of the US Purchase Price pursuant to Section 2.05, by wire transfer of immediately available funds to an account, designated in writing by the Seller to the Escrow Agent not later than one Business Day before the Closing Date; and (ii) release all accrued interest on the Buyer's Bid Deposit to the Buyer by wire transfer of immediately available funds to an account designated in writing by the Buyer to the Escrow Agent not later than one Business Day before the Closing Date; or

(c)      the Outside Date, if this Agreement is terminated in accordance with Section 9.01(a) due to any one of the conditions in Article VIII having not been fulfilled or waived prior to the Outside Date, provided that the fulfillment or waiver of such condition was in the sole control of the Buyer, then the Escrow Agent shall be obliged to release the Buyer's Bid Deposit, together with all interest accrued thereon, to the Seller within five Business Days of the Outside Date by wire transfer of immediately available funds to an account designated in writing by the Seller to the Escrow Agent not later than one Business Day before the Outside Date; or

(d)      until the date upon which Seller elects to terminate this Agreement in accordance with Section 9.01(e), the Escrow Agent shall be obliged to release the Buyer's Bid Deposit, together with all interest accrued thereon, to the Seller within five Business Days of the termination date by wire transfer of immediately available funds to an account designated in

writing by the Seller to the Escrow Agent not later than one Business Day after the termination date;

(e)     the Outside Date if this Agreement is terminated in accordance with Section 9.01(a) due to any one of the conditions in Article VIII having not been fulfilled or waived, provided that the fulfillment or waiver of such condition was not in the sole control of the Buyer, the Escrow Agent shall be obliged to release the Buyer's Bid Deposit, together with all interest accrued thereon to the Buyer within five Business Days of the Outside Date by wire transfer of immediately available funds to an account designated in writing by the Buyer to the Escrow Agent not later than one Business Day before the Outside Date.

**Section 2.09   Indivisible Mutually Conditioned Transaction**.  The acquisition by the Buyer of the Purchased Assets in terms of this Agreement constitutes one indivisible, mutually conditioned transaction with the acquisition by the Buyer of the ZA One Business as a going concern in terms of the ZA One Agreement.  As a consequence, if the ZA One Agreement is not entered into or does not become unconditional in all respects for whatever reason, this Agreement shall be deemed to have been terminated and subject to the effect of termination set forth in Section 9.02.

# ARTICLE III
## CLOSING

**Section 3.01   Closing**.  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Dorsey & Whitney LLP at 08:00, Mountain Standard Time (equivalent to 16:00 Central African Time) on the Business Day after ZA One delivers the Estimated Closing Statement, as defined in the ZA One Agreement, to Buyer or at such other time, date or place as Seller and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 3.02   Closing Deliverables**.

(a)     At the Closing, Seller shall deliver to Buyer the following:

(i)     an assignment, in a form mutually acceptable to Buyer and Seller, and duly executed by Seller, effecting assignment of the Intellectual Property Assets to Buyer (the "**IP Assignment**");

(ii)     the Seller Closing Certificate; and

(iii)     such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)     At the Closing, Buyer shall deliver to Seller the following:

(i)     the US Purchase Price, through the instrumentality of the Escrow Agent, at least in part, as set forth in the Escrow Agreement; and

(ii)      the Buyer Closing Certificate.

# ARTICLE IV
## STATEMENTS OF SELLER

Seller makes the following statements to Buyer, which, subject to the items set forth in the Disclosure Schedules, are true and correct as of the date hereof:

**Section 4.01   Organization and Qualification of Seller**.  Seller is a corporation duly organized and validly existing under the Laws of the state of Delaware and, subject to approval of the Bankruptcy Court, as necessary, has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the E-Commerce Business as currently conducted.

**Section 4.02   Authority of Seller**.  Subject to obtaining approval of the Bankruptcy Court pursuant to the Sale Approval Order, Seller has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents and to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Without limiting the generality of the foregoing and subject to obtaining the Sale Approval Order, the execution and delivery by Seller of this Agreement and the other Transaction Documents and the consummation by Seller of the transactions contemplated hereby and thereby has been duly and validly authorized by all requisite action.  This Agreement has been duly executed and delivered by or on behalf of Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.03   Title to the Purchased Assets**.  Subject to Bankruptcy Court Approval pursuant to the Sale Approval Order, Seller has the legal right and authority to sell, convey and transfer the Purchased Assets, free and clear of Encumbrances.

**Section 4.04   Legal Proceedings; Governmental Orders**.

(a)      Except for adversary proceedings and other matters pending before the Bankruptcy Court, there are no pending or, to the Knowledge of Seller, threatened court actions, administrative or regulatory actions, or arbitrations involving Seller that relate to the Purchased Assets, which if determined adversely to Seller would result in a material adverse effect on the Purchased Assets.

(b)      There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting the Purchased Assets which would have a material adverse effect on the Purchased Assets.

**Section 4.05   No Other Representations and Warranties**.  Seller conveys the Purchased assets as-is, where-is, and disclaims any representation or warranty arising from statute or otherwise in law, including any warranty of merchantability or fitness for a particular

11

4826-9355-6000\15

purpose.  Except for the statements contained in this Article IV (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has made or makes any express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Purchased Assets furnished or made available to Buyer and its Representatives (including any information, documents or material made available to Buyer in the Data Room or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Purchased Assets.

## ARTICLE V
### STATEMENTS OF BUYER

Buyer makes the following statements to Seller, which, subject to the items set forth in the Disclosure Schedules, are true and correct as of the date hereof:

**Section 5.01   Organization and Authority of Buyer**.  Buyer is a public company duly incorporated, validly existing and in good standing under the Laws of the Republic of South Africa.

**Section 5.02   Authority of Buyer**.  Buyer has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.03   No Conflicts; Consents**.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the memorandum of incorporation of Buyer; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.  Except as noted in Section 8.01(c), no consent, approval, permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other

Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 5.04   Sufficiency of Funds**.  Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the US Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 5.05   Solvency**.  Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall:  (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller.  In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 5.06   Legal Proceedings**.  There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 5.07   Independent Investigation**.  Buyer has conducted its own independent investigation, review and analysis of the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose.  Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express statements of Seller set forth in Article IV of this Agreement; and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Purchased Assets or this Agreement, except for the statements expressly set forth in Article IV of this Agreement.

## ARTICLE VI
### BANKRUPTCY COURT PROCEEDINGS

**Section 6.01   Bidding Procedures**.  Seller filed the Bid Procedures Motion attached hereto as Exhibit B with the Bankruptcy Court on October 24, 2014.  On November 4, 2014, the Court entered the Bid Procedures Order approving the bid procedures proposed in the Bid Procedures Motion.  Buyer has reviewed the Bid Procedures Motion and finds its form and terms acceptable.

**Section 6.02   Bid Protections**.

(a)      Provided Buyer participates in the Auction, then upon acceptance and approval of a higher and better offer from a Competing Bidder (as such term is defined in the Bid Procedures Motion) in the Auction, and upon approval of the Bankruptcy Court, Buyer shall be entitled to claim reimbursement as an administrative priority expense to be paid from the purchase proceeds from the Competing Bidder of up to the amount of the Bid Protections for documented costs and

4826-9355-6000\15

expenses, including reasonable fees and expenses of its agents, attorneys, accountants and other professionals and advisors actually incurred in connection with the drafting and negotiating of the LOI, the Due Diligence Investigation, the drafting and negotiation of the Transaction Documents, and its involvement in the Bankruptcy Case.

(b)    Buyer shall be permitted at any time during the Auction to place a bid exceeding the immediately preceding bid, with no requirement that such Buyer bid comply with the Individual Asset Bid or All Assets Overbid (as such terms are defined in the Bid Procedures Motion), which shall be declared the highest and best offer if, after adding to such Buyer bid the amount of the Bid Protections, such Buyer bid exceeds the amount of such immediately preceding bid.

(c)    Every Competing Bidder shall be obligated to increase the value of the Buyer's stalking horse offer with a higher and better offer in an amount greater than (i) the Buyer's stalking horse offer plus an amount equal to the Bid Protections plus (ii) an additional Overbid Amount equal to or not less than 1.0% above the stalking horse offer.

(d)    Every Competing Bidder shall be obligated to make a bid deposit to a bank account specified by Seller of a cash amount equal to 10% of the value of such Competing Bid.

(e)    Every Competing Bidder and the Buyer, if either of them wishes to make any further higher or better offer during the Auction, at any time after such Competing Bidder's first bid pursuant to Section 6.02(c) above, is to ensure that each new incremental offer thereafter would exceed the cash value of the immediately preceding bid made during the Auction, by at least 0.10%.

**Section 6.03   Assumption of Executory Contracts**.  In connection with Buyer's purchase of the Purchased Assets, Buyer wishes to assume the Executory Contracts.  Seller shall elect to assume the Executory Contracts and assign such assumed Executory Contracts to Buyer in accordance with the procedures set forth in Section 365 of the Bankruptcy Code.  As part of these procedures, Buyer, as assignee of the Executory Contracts, shall provide adequate assurance that any defaults under the Executory Contracts will be promptly cured and future obligations will be performed.  In order to provide adequate assurance, on or prior to the date Seller assumes the Executory Contracts, Buyer shall pay directly to counterparties all amounts necessary to cure any defaults under the Executory Contracts, up to an aggregate value not exceeding $8,000 on the Closing Date.  Buyer shall then perform all future obligations of Seller under the Assumed Executory Contracts in accordance with the terms thereof.

**Section 6.04   Sale Approval Order**.  The Sale Approval Order shall be reasonably acceptable in form and substance to Buyer and shall include provisions, among others (i) providing that Buyer shall not incur any liability as a successor to Seller unless such liability is expressly assumed and to the extent permitted by applicable law permanently enjoining each and every holder of any claim for such liabilities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Buyer or the Purchased Assets related thereto, (ii) approving the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement, or such higher and better terms and conditions offered by Buyer at the Auction, and authorizing Seller to proceed with this transaction,

14

(iii) stating that any objections timely filed with respect to the sale of the Purchased Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the US Purchase Price represents fair value for the Purchased Assets, (v) finding that the sale is in the best interests of Seller's estate and creditors, (vi) finding that Buyer is a good faith purchaser of the Purchased Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(m) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Purchased Assets to Purchaser shall be free and clear of all liens, claims, interests, obligations and encumbrances whatsoever under Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Purchased Assets to Buyer and protecting Buyer against any liens, claims, interests, obligations and encumbrances against Seller or the Purchased Assetsother than in connection with the Assumed Liabilities, and (ix) authorizing and directing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing.  Seller shall use commercially reasonable efforts to obtain entry of the Sale Approval Order in the form described hereto.  To the extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

## ARTICLE VII
### COVENANTS

**Section 7.01   Conduct of Business Prior to the Closing**.  To the extent permitted by orders and directives of the Bankruptcy Court, applicable provisions of the Bankruptcy Code, and the Agency Agreement, between the date of this Agreement and the Closing, Seller shall use its commercially reasonable efforts to preserve the Purchased Assets.  Seller shall consult with Buyer prior to implementing any decisions reasonably anticipated to materially and adversely affect any of the Purchased Assets.

**Section 7.02   Taxes**.  Buyer shall pay any transfer taxes in connection with the purchase and sale of the Purchased Assets.

**Section 7.03   Other Bankruptcy Covenants**.  Seller shall promptly make all filings, take all actions, and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets consistent with the terms of this Agreement.  In the event that any third party appeals, or requests a stay pending appeal, from any order relating to the transaction, Seller shall promptly notify Buyer of such appeal or stay request.  Seller shall also provide Buyer with written notice of any motion, application, brief or other pleading filed in connection with any appeal relating to the transactions contemplated hereunder.  Neither party shall willfully take any action that could reasonably be expected to have the effect of delaying, impairing or impeding the receipt of any authorizations, orders and approvals of the Bankruptcy Court.

15

4826-9355-6000\15

**Section 7.04    Closing Conditions**.  From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VIII hereof.

**Section 7.05    Notices**.  Seller shall provide all notices required under the Bankruptcy Code to all parties in interest to the Bankruptcy Case, including notices of the pendency of and all hearings before the Bankruptcy Court regarding the motions for entry of the Sale Approval Order, for authorization to make the Cash Transfer, and to assume the Executory Contracts.

**Section 7.06    Confidentiality**.  Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement.  If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 7.04 shall nonetheless continue in full force and effect.

**Section 7.07    Post-Closing Access**.  Following the Closing, Buyer will provide Seller and Great American reasonable access to software, hardware, servers, business e-mail, and back-up files relating to the Business.

**Section 7.08    Synclaire License Termination**.  Seller shall use commercially reasonable efforts to cause the cancellation or termination by Seller of the US Merchandise Licence Agreement dated February 1, 2011, entered into between Seller and Synclaire Brands Inc., ("Synclaire") and pursuant to which agreement Synclaire was provided with a license until December 31, 2015 to use certain trademarks and designs of Seller in relation to the manufacture, distribution and sale of infants and children's footwear, coordinated accessories, such as bags, hats and other related products.  **Soxnet License Termination**.  Seller shall use commercially reasonable efforts to cause the cancellation or termination by Seller of the Licence Agreement dated October 28, 2010, entered into between Seller and Soxnext Inc ("Soxnet").

## ARTICLE VIII
### CONDITIONS TO CLOSING

**Section 8.01    Conditions to Obligations of All Parties**.  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    The Bankruptcy Court shall have granted Seller's motion for entry of the Sale Approval Order and authorized assumption of the Executory Contracts.

(b)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(c)    All closing conditions contained in the ZA One Agreement shall have been satisfied or, as permitted, waived.

16

4826-9355-6000\15

(d)    Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 5.03, if any, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

(e)    The obtaining of all the regulatory approvals or waivers required in terms of the laws of the Republic of South Africa ("**RSA**") including, without being limited to, (i) the approval of the provisions of this Agreement and its implementation, by the Surveillance Department of the South African Reserve Bank; and

(f)    The cancellation or termination by the Seller of (i) the Trademark Licence Agreement dated approximately August 25, 2006 entered into between Seller and Menderes and pursuant to which agreement Seller was provided with a licence to use the Naartjie trademark in the United States relating to personal care products (the "**Menderes Licence Agreement**").

**Section 8.02    Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(b)    Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.02(a).

(c)    Seller shall have delivered to Buyer a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 8.02(a) have been satisfied (the "**Seller Closing Certificate**").

**Section 8.03    Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(b)    Buyer shall have delivered to Seller the US Purchase Price, duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.02(b).

(c)    Buyer shall have delivered to Seller a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 8.03(a) have been satisfied (the "**Buyer Closing Certificate**").

17

## ARTICLE IX
### TERMINATION

**Section 9.01    Termination**.  This Agreement may be terminated at any time prior to the Closing:

(a)      by Seller or Buyer if all of the conditions to Closing set forth in Article VIII have not been satisfied or, as permitted, waived, on or prior to April 30, 2015 (the "**Outside Date**");

(b)      by the mutual written consent of Seller and Buyer;

(c)      by Seller if Buyer is not the Successful Bidder or the Back-Up Bidder (as such terms are defined in the Bid Procedures Motion) at the Auction;

(d)      by Buyer by written notice to Seller if Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VIII and such breach, inaccuracy or failure cannot be cured by Seller within 30 days;

(e)      by Seller by written notice to Buyer if Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VIII and such breach, inaccuracy or failure cannot be cured by Buyer within 30 days;

(f)      by Buyer on or before November 28, 2014 if the condition set forth in Section 8.01(a) is not satisfied on or before November 26, 2014; or

(g)      by Buyer or Seller in the event that:

(i)      the Bankruptcy Court denies, without opportunity to cure deficiencies and without right of appeal, Seller's motion for entry of the Sale Approval Order;

(ii)      there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(iii)      any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or the ZA One Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 9.02    Effect of Termination**.  Other than the parties' obligations under Section 2.08, Section 7.06, and Section 10.02, the provisions of this Agreement shall not survive termination of this Agreement.  In no event shall Seller's liability to Buyer exceed the amount of the Bid Protections.

4826-9355-6000\15

## ARTICLE X
### MISCELLANEOUS

**Section 10.01 Survival**.  Seller's statements, covenants and agreements contained in this Agreement shall not survive the Closing Date.

**Section 10.02 Expenses**.  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred. For the avoidance of doubt, the Buyer shall not be liable for any costs or expenses in relation to the Bankruptcy Case.

**Section 10.03 Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when delivered to the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the tenth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.03):

| | |
|---|---|
| If to Seller: | Naartjie Custom Kids, Inc. |
| | 3676 W. California Ave D-100 |
| | Salt Lake City, UT 84104 |
| | Facsimile:  (801) 974-4688 |
| | E-mail:  glenn@naartjie.com |
| | Attention:  Glenn Wood, Chief Executive Officer |
| | |
| with a copy to: | Dorsey & Whitney LLP |
| | 136 S. Main Street, Suite 1000 |
| | Salt Lake City, UT 84101 |
| | Facsimile:  (801) 933-7373 |
| | E-mail:  jarvis.annette@dorsey.com |
| | Attention:  Annette Jarvis, |
| | |
| If to Buyer: | Truworths Limited |
| | No.1 Mostert Street |
| | Cape Town, South Africa, 8001 |
| | |
| | Facsimile:  (+27) 214607188 |
| | E-mail:  mmark@truworths.co.za and dpfaff@truworths.co.za |

19

4826-9355-6000\15

Attention:  Mr MS Mark and Mr DB Pfaff

with a copy to:                   Parr Brown Gee & Loveless
                                  Facsimile:  (801) 532 7750
                                  E-mail:  blloyd@parrbrown.com and
                                  jcovey@parrbrown.com
                                  Attention:  Brian Lloyd and Joseph Covey

**Section 10.04 Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.05 Interpretation**.  For purposes of this Agreement:  (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.06 Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.07 Entire Agreement**.  Except as expressly set forth herein, this Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.08 Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed.  No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 10.09 No Third Party Beneficiaries**.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.10  Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto and, as necessary, approved by the Bankruptcy Court.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.11  Governing Law; Submission to Jurisdiction**.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the state of Utah, without regard to conflicts of law principles thereof.  Any dispute regarding the interpretation or enforcement of this Agreement shall be heard by the Bankruptcy Court, applying the laws of the state of Utah and the parties hereby irrevocable consent to the jurisdiction of the Bankruptcy Court for all such matters.

**Section 10.12  Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 10.13  Non-recourse**.  This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party.  No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Naartjie Custom Kids, Inc.

By _____
Name: Glenn Wood
Title: Chief Executive Officer

TRUWORTHS LIMITED

By _____
Name: C. DURHAM
Title: COMPANY SECRETARY

23

**EXHIBIT A**

**FORM OF IP ASSIGNMENT**

(To be delivered.)

**EXHIBIT B**

**BID PROCEDURES MOTION**

(See attached.)

Annette W. Jarvis (Utah State Bar No. 01649)
Peggy Hunt (Utah State Bar No. 6060)
Michael F. Thomson (Utah State Bar No. 9707)
Jeffrey M. Armington (Utah State Bar No. 14050)
DORSEY & WHITNEY LLP
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
        hunt.peggy@dorsey.com
        thomson.michael@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Debtor Naartjie Custom Kids, Inc.*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>NAARTJIE CUSTOM KIDS, INC.,<br><br>Debtor. | Bankr. Case No. 14-29666<br><br>Chapter 11<br><br>The Honorable William T. Thurman |

---

### DEBTOR'S MOTION FOR ORDER (A) AUTHORIZING
### BIDDING PROCEDURES AND AUCTION, (B) AUTHORIZING DEBTOR TO
### PROVIDE BID PROTECTIONS TO STALKING HORSE, (C) SCHEDULING SALE
### HEARING AND APPROVING NOTICE THEREOF, AND
### (D) GRANTING RELATED RELIEF

---

Naartjie Custom Kids, Inc. ("<u>Naartjie</u>" or "<u>Debtor</u>"), the debtor in possession in the above captioned bankruptcy case hereby submits this motion (the "<u>Motion</u>"), pursuant to Sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "<u>Bankruptcy Code</u>") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") seeking entry of an Order (a) authorizing and approving bidding procedures and related auction, (b) authorizing the Debtor to provide bid protections to a stalking horse, (c) scheduling a sale

hearing and approving notice thereof, and (d) granting related relief (the "Order").  In support of

this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§

157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core

proceeding pursuant to 28 U.S.C. §§ 157.

2.      The statutory bases for the relief requested herein are sections 105 and 363 of the

Bankruptcy Code and Bankruptcy Rule 6004, and the Local Bankruptcy Rules of the United

States Bankruptcy Court for the District of Utah, Central Division (the "Court").

## GENERAL BACKGROUND

3.      On September 12, 2014, the Debtor filed a voluntary petition with the Court for

relief under chapter 11 of title 11 of the Bankruptcy Code. The Debtor continues to operate its

business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

No trustee or examiner has been appointed in this case.  An official committee of unsecured

creditors (the "UCC") was appointed in this case on September 22, 2014.

4.      Founded in Cape Town, South Africa in 1989, Naartjie is a children's clothing

brand that embraces bright, colorful, kid-friendly clothes. Naartjie designs, manufactures and

sells children's clothing, accessories and footwear for ages newborn through 10 years old.

5.      The Debtor owns 100% of the 1,426 outstanding shares of ZA One (Pty) Ltd.

("ZA One"), a South African subsidiary of Naartjie, which operates stores in South Africa and

supplies designs to the Debtor.

6.      Additional information about the Debtor's business, the events leading up to the

Petition Date and the facts and circumstances surrounding the Debtor's chapter 11 case can be

found in the First Day Declaration on file in this case. The First Day Declaration is incorporated by reference as if fully set forth herein.

### FACTS SPECIFIC TO THE RELIEF REQUESTED

7.      Following the Court's entry of the Order approving the Debtor's entry into the Agency Agreement [Docket No. 132] (the "Agency Agreement Order"), the Debtor has transitioned control of the liquidation of its inventory assets in the United States and Canada to Great American Group, LLC ("Great American") pursuant to the terms of the "Agency Agreement" attached to the Agency Agreement Order as Exhibit A.

8.      Under the Agency Agreement, Great American will liquidate the Debtor's North American inventory through both the Debtor's retail stores and the Debtor's e-commerce platform through January 15, 2015.

9.      Now, through this Motion, the Debtor is seeking Court approval to solicit offers and conduct an auction for its other primary assets – its stock in ZA One,[1] all of its intellectual property assets including various trademarks, copyrights, domain names, customer lists, and related data, and the right to acquire the Debtor's e-commerce platform after January 15, 2015 (collectively, the "Intellectual Property"[2] and together with the Debtor's stock in ZA One, the "Assets").

10.      In order to expedite the process to sell the Assets and to preserve value for the Debtor's creditor constituents, the Debtor, in consultation with the Official Committee of

---

[1]      However, if there are no acceptable offers for the stock in ZA One, the Debtor may consider other sale structures.  Further, the Debtor notes that if a buyer purchases the Debtor's interests in ZA One, without purchasing the Intellectual Property, such buyer will also acquire the trademarks, licenses and intellectual property required to continue to operate ZA One as a going concern.

[2]      Similarly, if a buyer purchases the e-commerce platform without purchasing the Debtor's interests in ZA One such purchaser will be required to negotiate a design share ability based on payment of a royalty or other cost sharing basis with the purchaser of ZA One.

3

Unsecured Creditors (the "UCC"), solicited offers from potentially interested parties. Offers have been presented to the Debtor to acquire the Assets, but, to date, no purchase agreement has been executed.

11. However, because the Debtor, and the UCC, believe that time is of the essence, the Debtor has filed the current Motion seeking Court approval of the bidding procedures outlined below that would govern an auction for the Assets, would approve bid protections to a stalking horse, and would set a hearing date to seek approval of the sale after the auction. The Debtor submits that this process will allow parties who are interested in the Assets to conduct diligence in an expedited fashion while preserving the value of the Assets.

12. The Debtor also seeks authority to consummate the sale of the Assets after the Court approves the highest and best bid as a result of the auction. South African counsel for ZA One has informed the Debtor that any sale of the Debtor's interests in ZA One may be subject to regulatory approval in South Africa. As such approval could take a significant amount of time, it is necessary to complete a timely auction of the Assets in order not to delay administration of the Debtor's estate.

**The Proposed Bidding Procedures and Auction**

13. In order to maximize value for the estate and the Debtor's creditors, as well as to ensure a fair and transparent opportunity for all potentially interested parties to participate in the Sale process, the Debtor and its advisors will seek to hold an auction at 10:00 a.m. prevailing Mountain Time on November 24, 2014 (the "Auction"), pursuant to the proposed Bidding Procedures that are attached hereto as **Exhibit A** ("Bidding Procedures").[3] The Bidding

---

[3] In the event of any inconsistencies between the description of the Bidding Procedures in this Motion and the proposed Bidding Procedures attached hereto as **Exhibit A**, the proposed Bidding Procedures attached hereto

Procedures will provide that the Debtor may, after consultation with the UCC, at any time prior to the conclusion of the Auction, (a) modify the Bidding Procedures and (b) determine the highest and/or best offer.

14.    Subject to the Bankruptcy Court's availability and docket, the Debtor has proposed the following timeline:

a.    Deadline to object to the Motion no later than October 28, 2014;

b.    A hearing on the Motion on October 29, 2014;

c.    Delivery of the Auction Notice (as defined below) no later than October 31, 2014;

d.    Deadline for Potential Bidder (as defined in the Bidding Procedures) who intends to bid to assume any of the Debtor's real property leases to provide adequate assurance to the applicable landlord(s) of November 14, 2014;

e.    Bid Deadline (as defined below) of 4:00 p.m. prevailing Mountain time on November 21, 2014;

f.    The conduct of the Auction and the selection of a winning bid no later than November 24, 2014; and

g.    Conduct of the Sale Hearing, and entry of an Order approving the sale transaction by November 25, 2014.

15.    Within two business days after the entry of an Order approving this Motion and setting the Auction date and the date of the Sale Hearing, the Debtor will serve a notice of the Auction (the "Auction Notice") and notice of the date of the Sale Hearing by personal service, regular mail, electronic mail or facsimile upon the Debtor's creditor matrix.

---

shall control. The Debtor will attach a Court approved copy of the Bidding Procedures as an Exhibit to the Order, which shall be the Bidding Procedures that govern the Auction.

16.     Any bidder that desires to make a bid will deliver written copies of its Competing Bid to the Debtor, so as to be received by the Debtor not later than 4:00 p.m. prevailing Mountain Time on November 21, 2014 (the "Bid Deadline").  The Debtor will accept any and all offers for the Assets prior to the Bid Deadline.

17.     Through this Motion the Debtor also seeks authority to select, after consultation with the UCC, a stalking horse bidder for the Assets and to negotiate and enter into a definitive purchase agreement with such stalking horse bidder.  Through this motion, the Debtor also seeks authority to negotiate and enter into an agreement for bid protections with the  stalking horse bidder, after consultation with  the UCC, which may include expense reimbursement and a break-up fee in a total amount up to 5.0% of the total purchase price for the Assets (the "Bid Protections").  The Bid Protections will be payable to such stalking horse in certain circumstances where the stalking horse is not the successful bidder after the Auction.

18.     At the Auction, in order for a bid to constitute a "Competing Bid", such bid must initially be in an amount greater than (a) the stalking horse offer, plus an amount equal to the amount of any Bid Protections, plus (b) an additional overbid amount equal to not less than 1.0% above the stalking horse offer.  Bid increments during the Auction shall be established by the Debtor in consultation with the Committee.[4]

## RELIEF REQUESTED AND BASIS THEREFOR

19.     By this Motion, the Debtor seeks the entry of an Order (a) authorizing and approving bidding procedures and setting the time, date and place of the Auction, and approving notice thereof, (b) authorizing the Debtor to provide bid protections to a stalking horse, (c)

---

[4]     In calculating whether a Competing Bid is a higher and better offer, the Debtor may combine bids for individual Assets to create an aggregated Competing Bid between different bidders.

scheduling a sale hearing, to be held on November 25, 2014 (the "Sale Hearing"), and (d) granting related relief.

## APPLICABLE AUTHORITY

**A.      Authorizing and Approving the Bid Protections, Bidding Procedures and Auction**

20.      Ample authority exists for the approval of the proposed sale of the Debtor's assets.  Section 363 of the Bankruptcy Code authorizes a debtor to use or sell assets of the estate other than in the ordinary course of business, free and clear of liens, claims and encumbrances, provides. In relevant part, section 363 of the Bankruptcy Code states that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").  Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

21.      In order to approve a sale of a debtor's assets outside the ordinary course of business, the debtor must show that: (a) a sound business reason exists for the sale; (b) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale terms and the Debtor's relationship with the buyer; (c) the sale price is fair and reasonable; and (d) the proposed buyer is proceeding in good faith.  *See In re Med. Software Solutions*, 286 B.R. 431, 439–40 (Bankr. D. Utah 2002).

22.      Moreover, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir.

1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (finding that the sale

of substantially all of the Debtor's assets satisfied the sound business reason test); s*ee also*

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.

1983) ("The rule we adopt requires that a judge determining a §363(b) application expressly find

from the evidence presented before him at the hearing a good business reason to grant such an

application."); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-*

*Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a

reasonable basis for its business decisions (as distinct from a decision made arbitrarily or

capriciously), courts will generally not entertain objections to the debtor's conduct.").

23.     The decision to sell assets outside the ordinary course of business is based upon

the business judgment of the debtor.  *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir.

1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 772 F.2d 1063, 1071

(2d Cir. 1983); *In re Adelphia Communications Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y.

July 31, 2002).  If a debtor's actions satisfy the business judgment rule, then the transaction in

question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when

applying the "business judgment" standard, courts show great deference to a debtor's business

decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*,

No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's

business judgment . . . must be accorded deference unless shown that the bankrupt's decision

was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

### 1.     *Entry of the Requested Bid Protections is Reasonable and Justified*

24.     If the Debtor selects a stalking horse and the stalking horse is not the Successful

Bidder at the Auction, the Debtor proposes to provide the stalking horse with certain Bid

Protections.  The Bid Protections will be in consideration for the stalking horse conducting its

due diligence, negotiating and entering into a stalking horse agreement and agreeing to subject

its bid to the Auction.  Any Bid Protections will be negotiated at arm's-length and in good faith

between the Debtor and the stalking horse, subject to consultation with the UCC, and will be

necessary to secure the stalking horse's participation in the Debtor's sale process.

25.     The Debtor has determined that providing Bid Protections to a stalking horse will

be an actual, necessary cost of going forward with the Asset sale.  Those Bid Protections have

been fashioned to enable the Debtor to secure an adequate consideration floor for the Assets with

the goal of generating competing bids that will be materially higher or better than any bid

proposed in a stalking horse agreement.  Therefore, the Debtor hereby respectfully requests that

the Court approve the Debtor's ability, after consultation with the UCC, to offer Bid Protections

to its selected stalking horse.

26.     Those Bid Protections should be approved and accorded administrative expense

status under section 503 of the Bankruptcy Code, because they provide a clear benefit to the

Debtor's estate.

27.     The Debtor submits that, by limiting the amount of the Bid Protections to an

amount negotiated, after prior consultation with the UCC, which cannot be greater than 5.0% of

the total purchase price of the assets, such Bid Protections will be reasonable in light of the

efforts and expenses that any stalking horse will undertake in its due diligence review and

negotiating the terms of a stalking horse agreement.

### 2.     *Entry of the Requested Bidding Procedures is Reasonable and Justified*

28.      The Debtor believes that the solicitation of bids to sell the Assets is the best way

to maximize the value of those Assets, and that holding an Auction for those Assets will result in

the most beneficial arrangement for the Debtor and its estate.  Based on the Auction results, the Debtor will consummate a purchase agreement with the Successful Bidder.  Accordingly, the Debtor respectfully requests that the Court approve the Bidding Procedures, as set forth in the Bidding Procedures Order.

29.     Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify their creditors of the Auction and the Sale, including a disclosure of the date, time, and place of the Auction, the terms and conditions of the Asset Sale, the date, time, and place of the Sale Hearing, and the deadline for filing any objections to the relief requested herein.  As stated above, within two days after the entry of an Order approving this Motion, the Debtor will serve the Auction Notice by personal service, regular mail, electronic mail or facsimile upon the Debtor's creditor matrix.

30.     Attached hereto as **Exhibit B** is a form of Auction Notice, which is reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction and the Sale Hearing to the Debtor's creditors and all other parties-in-interest that are entitled to notice. Accordingly, the Debtor requests that the Court approve the notice procedures set forth in this Motion, including the form and manner of service of the Auction Notice, and that no other or further notice of the Bidding Procedures or the Auction is required.

**B.      Scheduling Sale Hearing**

31.     The Debtor requests that the Court hold the Sale Hearing on November 25, 2014. As mentioned above, any sale of the Debtor's interests in ZA One, may require regulatory approval in South Africa.  As such regulatory approval process could take a significant amount of time that could delay the administration of the Debtor's estate, the Debtor seeks to facilitate the consummation of the Asset sale quickly in order to allow the purchaser of the Debtor's

interests in ZA One, to timely obtain regulatory approval of such purchase so as to be able to take over ZA One's operations as quickly as possible and thus avoiding further expense to the Debtor's estate.

## REQUEST OF WAIVER OF STAY

32.     The Debtor requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, time is of the essence and it is imperative that the Debtor be able to enter into a stalking horse agreement and provide Bid Protections prior to the Auction to deliver a committed party at the Auction and to maximize the value of the Assets.  In order to maximize the value of the Assets and minimize the estate's unnecessary administrative expenses, the Debtor believes a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply, is in the best interest of the Debtor's estate and stakeholders.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter orders granting the relief requested in this Motion and such other and further relief as may be just and proper.

DATED this 24th day of October, 2014.

**DORSEY & WHITNEY LLP**

_/s/ Annette W. Jarvis_____
Annette W. Jarvis
Peggy Hunt
Michael F. Thomson
Jeffrey M. Armington
*Attorneys for Debtor Naartjie Custom Kids,*
*Inc.*

# EXHIBIT A

# BIDDING PROCEDURES

Set forth below are the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the sale (the "**Sale**") of the following assets (each an "**Asset**" and collectively, the "**Assets**") of Naartjie Custom Kids, Inc., on behalf of itself and as debtor in possession (the "**Debtor**") in connection with the chapter 11 case pending in the United States Bankruptcy Court for the District of Utah (the "**Bankruptcy Court**"), case number 14-29666: (i) all of the Debtor's stock in ZA One (Pty) Ltd. ("ZA One"),[1] and (ii) all of the Debtor's intellectual property assets including various trademarks, copyrights, domain names, customer lists, and related data including the right to acquire the Debtor's e-commerce platform after January 15, 2015, and related assets (the "Intellectual Property").[2]

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT THE DEBTOR'S ADVISORS, AS FOLLOWS:**

**Dorsey & Whitney LLP**, Annette W. Jarvis Esq. (jarvis.annette@dorsey.com) (801) 933-7360 and **Hilco Streambank**, David Peress (dperess@hilcoglobal.com) (781) 444-4940

## A.    Stalking Horse Agreement and Sale

In connection with the Sale, the Debtor, after consultation with and approval by the Official Committee of Unsecured Creditors (the "Committee"),[3] may enter into a stalking horse agreement (a "Stalking Horse Agreement") with an offeror for the Assets (the "Stalking Horse"). The ability to undertake and consummate the Sale pursuant to a Stalking Horse Agreement shall be subject to competitive bidding as set forth herein and approval by the Bankruptcy Court. The Debtor may consider bids for all or a portion of the Assets in a single bid from a single bidder, or multiple bids from multiple bidders. Within two (2) business days after entering into a Stalking Horse Agreement, the Debtor shall file a Notice of Selection of Stalking Horse Agreement ("Stalking Horse Selection Notice") with the Bankruptcy Court, which Stalking Horse Selection Notice shall be in form and substance acceptable by the Committee. All Potential Bidders shall be informed of the Stalking Horse Agreement and provided a copy upon request.

## B.    The Bidding Procedures

### 1.    *Provisions Governing Qualifications of Bidders*

---

[1]    However, if there are no acceptable offers for the stock in ZA One, the Debtor may consider other sale structures. Further, the Debtor notes that if a buyer purchases the Debtor's interests in ZA One, without purchasing the Intellectual Property, such buyer will also acquire the trademarks, licenses and intellectual property required to continue to operate ZA One as a going concern

[2]    Similarly, if a buyer purchases the e-commerce platform without purchasing the Debtor's interests in ZA One, such purchaser will be required to negotiate a design share ability based on payment of a royalty or other cost sharing basis with the purchaser of ZA One.

[3]    In the event of a disagreement between the Debtor and the Committee over: (a) which agreement shall be designated the Stalking Horse Agreement; (b) whether a bid constitutes a higher and better offer; (c) which bid is deemed the Successful Bid; or (d) which bidder is deemed the Back-Up Bidder, the decision of Jeff Nerland, the Debtor's Chief Restructuring Officer, in consultation with David Peress, of Hilco Streambank, shall control.

Unless otherwise ordered by the Bankruptcy Court, prior to **4:00 p.m. prevailing Mountain Time on November 21, 2014** (the "**Bid Deadline**"), each party that wishes to submit a bid to acquire some or all of the Assets must deliver the following to the Notice Parties (defined below):

  (a)  a written disclosure of the identity of each party, including involvement in any joint venture, that will be bidding (or participating in a bid) on the Assets;

  (b)  adequate assurance information, including (i) adequate information (in the Debtor's and Committee's reasonable business judgment) about the financial condition of the Potential Bidder, such as federal tax returns for the previous two years, a current financial statement, and/or current bank account statements; and (ii) information demonstrating (in the Debtor's and Committee's reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed transaction;

  (c)  an executed confidentiality agreement in form and substance satisfactory to the Debtor, which will inure to the benefit of any purchaser of the Assets; and

  (d)  a letter summarizing the key terms and conditions of the Potential Bidders bid.

A bidder that the Debtor and Committee determine, in their reasonable business judgment, is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "**Qualified Bidder**."

**2.**  *Due Diligence*

The Debtor will afford any potential bidder that the Debtor believes, in the exercise of its reasonable business judgment, is pursuing a proposed transaction in good faith such due diligence access or additional information as the Debtor deems appropriate, in its reasonable discretion after execution by such potential bidder of a non-disclosure agreement in form and substance satisfactory to the Debtor.

The due diligence period will extend through and include the date of the Bid Deadline, after which no bid may be contingent on any further due diligence; *provided further*, that any Competing Bid (defined below) submitted will be irrevocable until the selection of the Successful Bidder (defined below) and the Back-Up Bidder (defined below) as described herein.

**3.**  *Additional Adequate Assurance*

In the event that any Potential Bidder intends to bid to assume any of the Debtor's real property leases in the United States, such Potential Bidder must provide adequate assurance to the landlord(s) of the real property leases that the Potential Bidder intends to bid to assume by **November 14, 2014**, and to provide such landlord(s) with the name and contact information of a

person that the landlord(s) can contact to discuss any issues related to such Potential Bidder's assumption and assignment of such real property leases.

**4.** *Provisions Governing Competing Bids*

A bid will be considered a competing bid (a "**Competing Bid**") only if the bid is submitted by a Qualified Bidder and complies with all of the following:

(a)      must (i) be in an amount greater than (x) the Stalking Horse's Bid, plus an amount equal to the amount of any Bid Protections, plus (y) an additional overbid amount equal to not less than 1.0% above the stalking horse offer;[4]

(b)      is accompanied by a mark-up of the Stalking Horse Agreement; including in the case of a Bidder submitting a bid to purchase less than all of the Assets, identification with specificity the Assets upon which such Bidder is submitting its bid and the liabilities and obligations to be assumed by the Bidder (as the case may be, the **"Qualified Bidder Agreement"**);

(c)      discloses any connection or agreements with the Debtor, the Stalking Horse, any other known Potential Bidder and/or any officer, director or equity security holder of the Debtor;

(d)      includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder; *provided that* if such Qualified Bidder is selected as the Successful Bidder or Back-Up Bidder, its offer will remain irrevocable until the date that is ten (10) business days after the Sale;

(e)      contains written confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement, including, but not limited to, any additional due diligence, inventory evaluation or financing conditions, and that all necessary approvals have been obtained prior to the date of submission of the bid;

(f)      includes evidence, in form and substance reasonably satisfactory to the Debtor and the Committee, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Stalking Horse Agreement or Qualified Bidder Agreement;

(g)      includes a duly authorized and executed copy of a Qualified Bidder Agreement (including all exhibits and schedules thereto) and proposed Sale Order, together with copies marked to show any amendments and

---

[4]      In calculating whether a Competing Bid is a higher and better offer, the Debtor may combine bids for individual Assets to create an aggregated Competing Bid between different bidders.

modifications to (a) the Stalking Horse Agreement and (b) any Sale Order proposed by the Stalking Horse;

(h)　　　includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the Sale, that will allow the Debtor to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Sale;

(i)　　　includes an acknowledgement and representation that the Qualified Bidder: (a) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets; (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, regarding the Assets or the completeness of any information provided except as expressly stated in the Stalking Horse Agreement or Qualified Bidder Agreement; (d) is not entitled to any expense reimbursement, break-up fee or similar type of payment in connection with its bid and (e) has (i) consented and submitted to the core jurisdiction of the Bankruptcy Court, (ii) waived and released any and all disputes or objections relating to the marketing or solicitation process, the Auction and the construction and enforcement of such party's contemplated transaction documents, and (iii) consented to the jurisdiction of the Bankruptcy Court in all respects in connection with such matters included in clause (ii) and its bid;

(j)　　　is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtor), certified check or such other form acceptable to the Debtor, in an amount equal to ten percent (10%) of the value of such Qualified Bidder's Competing Bid (the "**Deposit**");

(k)　　　is accompanied by a letter (a) stating with specificity the Assets such Qualified Bidder wishes to bid on and the liabilities and obligations to be assumed by such Qualified Bidder, (b) specifying all material terms of the bid that are better than those of the Stalking Horse's bid pursuant to the terms of the Stalking Horse Agreement (the "**Stalking Horse Bid**"), (c) stating that its offer is a *bona fide* offer that it intends to consummate if it is selected as the Successful Bidder and (d) stating that such Qualified Bidder has not engaged in any collusion with respect to the bidding process;

(l)　　　contains such other information as is requested by the Debtor in its sole business judgment; and

(m)　　　is received on or prior to the Bid Deadline.

4

The Debtor will notify each Qualified Bidder after the Bid Deadline as to whether or not *any* bids constitute Competing Bids with respect to any Assets and whether *such* Qualified Bidder's bid constitutes a Competing Bid (such Qualified Bidder shall be referred to as a "Competing Bidder"). The Debtor retains the right, after consultation with the Committee, to waive or modify the terms of the Bidding Procedures when determining which bids may be deemed Competing Bids.

**5.** *Bid Deadline*

A Qualified Bidder that desires to make a bid must deliver written copies of its bid to the following parties (collectively, the "**Notice Parties**") so as to be actually received not later than the Bid Deadline of **4:00 p.m. prevailing Mountain Time on November 21, 2014**:

**Dorsey & Whitney LLP**
136 South Main Street
Suite 1000
Salt Lake City, UT 84101-1655
Attn: Annette W. Jarvis, Esq.
Email: jarvis.annette@dorsey.com
*Attorneys for Debtor Naartjie Custom Kids,*
*Inc.*

*With a copy to*
**Hilco Streambank**
74 Crescent Road, 2nd Floor
Needham, MA 02494
Attn: David Peress
Email: dperess@hilcoglobal.com

**Pachulski Stang Ziehl & Jones LLP**
Jeffrey N. Pomerantz
Bradford J. Sandler
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067-4003
Email: jpomerantz@psjlaw.com
        bsandler@psjlaw.com
*Counsel for the Official Committee of*
*Unsecured Creditors*

**Office of The United States Trustee**
Peter J. Kuhn
John T. Morgan
405 South Main Street, Suite 300

Salt Lake City, Utah 84111
Email: peter.j.kuhn@usdoj.gov
*Office of the United States Trustee*

The Bid Deadline may be extended by the Debtor, after consultation with the Committee.

**6.**      *Evaluation of Competing Bids*

A Competing Bid may be valued based upon several factors including, without limitation: (a) the amount of such bid; (b) the Assets included in such bid, (c) the structure of the bid; (d) the risks and timing associated with consummating such bid; (e) any proposed revisions to a Stalking Horse Agreement and/or any Sale Order proposed by the Stalking Horse; and (f) any other factors deemed relevant by the Debtor in its reasonable business judgment, after consultation with the Committee.

**7.**      *No Auction if No Competing Bids*

If the Debtor receives no Competing Bid, and receives a Stalking Horse Bid, the Debtor will not hold the Auction and instead shall request at the Sale Hearing (defined below) that the Bankruptcy Court approve the Stalking Horse Agreement.

**8.**      *Auction Process*

If the Debtor receives at least one Competing Bid for the Assets or any Asset, the Debtor will conduct an auction at **10:00 a.m. prevailing Mountain Time on November 24, 2014** (the "**Auction**") at the offices of Dorsey & Whitney LLP, 136 South Main Street, Suite 1000, Salt Lake City, UT 84101-1685, or such other location as will be timely communicated to all Qualified Bidders. The Auction will be conducted in accordance with the following procedures:

> (a)      Only the Debtor, the Committee and its members, any Competing Bidder, and the respective advisors to each of the foregoing, will be entitled to attend the Auction, and only the Qualified Bidders will be entitled to make any bids at the Auction.

> (b)      Each Qualified Bidder will be required to confirm in writing that it has not engaged in any collusion with respect to the bidding at the Auction.

> (c)      As soon as practicable prior to the Auction, but in no event no later than 24 hours prior to the Auction, each Competing Bidder shall inform the Debtor whether it intends to attend the Auction; *provided that* in the event a Competing Bidder elects not to attend the Auction, such Competing Bidder's Competing Bid nevertheless will remain fully enforceable until the selection of the Successful Bidder and the Back-Up Bidder.

> (d)      As soon as practicable prior to the Auction, the Debtor and the Committee, in their reasonable discretion, , shall determine which Competing Bid(s)

are the highest and/or otherwise best Competing Bid(s) for (x) all of the Assets (the "**Highest and/or Best All Asset Bid**"), and/or (y) each Asset (each highest and/or best Competing Bid for an Asset, the "**Highest and/or Best Individual Asset Bid**"), and will provide copies of the Highest and/or Best All Asset Bid and/or the Highest and/or Best Individual Asset Bid to the other Competing Bidders.

(e)  To the extent that there is at least one Competing Bid for an Asset, the bidding at the Auction will continue in increments of at least 0.10% over the Highest and/or Best Individual Asset Bid (each successive bid, an "**Individual Asset Overbid**"); *provided*, *however*, that the Debtor, after consultation with the Committee, may consider other economic factors when determining whether a Competing Bid for an Asset is a higher and/or better Competing Bid. An Individual Asset Overbid shall remain open and binding on the Qualified Bidder(s) until and unless the Debtor accepts an alternate Competing Bid as the Highest and/or Best Individual Asset Bid. During the course of the Auction, the Debtor shall, after submission of each Individual Asset Overbid, promptly inform each Qualified Bidder which Individual Asset Overbid reflects, in the Debtor's view, the Highest and/or Best Individual Asset Bid.

(f)  When bidding on individual Assets concludes, the Debtor, after consultation with the Committee, shall determine the Highest and/or Best Individual Asset Bid with respect to each Asset (each Highest and/or Best Asset Class Bid, the "**Winning Individual Asset Bid**"). To the extent a particular Asset did not receive at least one Competing Bid (and accordingly, was not subject to the auction procedures set forth above), the Highest and/or Best Individual Asset Bid shall be deemed to be the Stalking Horse Bid for such Asset, subject to the provisions of these Bidding Procedures.

(g)  If there is a Highest and/or Best All Asset Bid, after determination of each Winning Individual Asset Bid, the Debtor shall hold an auction for all of the Assets. If the Winning Individual Asset Bids, in the aggregate, or a Competing Bidder for the all of the Assets, are selected as the Highest and/or Best All Asset Bid, the bidding at the Auction will continue in increments of at least 0.10% over the Highest and/or Best All Asset Bid (each successive bid, an "**All Assets Overbid**"). An All Assets Overbid shall remain open and binding on the Competing Bidder(s) until and unless the Debtor and Committee accepts Competing Bid(s) as the Highest and/or Best All Asset Bid. During the course of the Auction, the Debtor shall, after submission of each All Assets Overbid, promptly inform each Competing Bidder which All Assets Overbid reflects, in the Debtor's and Committee's view, the Highest and/or Best All Asset Bid. For the avoidance of doubt, Asset bidders may make joint All Assets Overbids.

(h)    The Debtor, after consultation with and approval by the Committee, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction; *provided that* such rules are (a) not inconsistent with any order of the Bankruptcy Court entered in this case and (b) disclosed to each Competing Bidder during or prior to the Auction.

(i)    Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by each Individual Asset Overbid and/or All Assets Overbid, the Debtor will give effect to any additional costs to be assumed by a Qualified Bidder and any additional costs or risks which may be imposed on the Debtor by any such Individual Asset Overbid and/or All Assets Overbid.

Each Competing Bidder and the Stalking Horse shall be deemed to have (i) consented and submitted to the core jurisdiction of the Bankruptcy Court, (ii) waived and released any and all disputes or objections relating to the marketing or solicitation process, the Auction and the construction and enforcement of such party's contemplated transaction documents, and (iii) consented to the jurisdiction of the Bankruptcy Court in all respects in connection with such matters included in clause (ii) and its bid.

**9.**    *Selection of Successful Bid*

Prior to the conclusion of the Auction, the Debtor, after consultation with and approval by the Committee, will review and evaluate each Competing Bid in accordance with these Bidding Procedures and determine in its reasonable business judgment which offer is the highest and/or otherwise best offer from among the Competing Bids for all of the Assets or for each of the individual Assets submitted at the Auction (each, a "**Successful Bid**" and the bidder(s) making such bid, the "**Successful Bidder**"), and communicate to the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid(s).  The determination of the Successful Bid(s) by the Debtor at the conclusion of the Auction will be final, subject only to approval by the Bankruptcy Court.

As soon as practicable after the Auction, (a) the Successful Bidder will complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions of the Successful Bid and (b) the Debtor will file a notice with the Bankruptcy Court identifying the Successful Bidder(s) and the Successful Bid(s), which will include copies of the Stalking Horse Agreement or applicable Competing Bidder's agreement and proposed Sale Order, in each case in the forms agreed to between the Debtor and the Successful Bidder, and marked to show all amendments and modifications, if any, made to the Stalking Horse Agreement submitted by the Stalking Horse (the "**Successful Bidder Agreement**") and to any Sale Order proposed by the Stalking Horse.

The Debtor will sell the Assets to the Successful Bidder(s) pursuant to the terms of the Successful Bid(s) as set forth in each Successful Bidder Agreement if and as approved by the Bankruptcy Court at the Sale Hearing.  The presentation of a particular Competing Bid to the Bankruptcy Court as a Successful Bid for approval does not constitute the Debtor's acceptance

of the Competing Bid. The Debtor will be deemed to have accepted a Competing Bid as a Successful Bid only after such bid has been approved by the Bankruptcy Court pursuant to entry of the Sale Order.

### 10. *Return of Deposits*

All Deposits will be returned to each Competing Bidder not selected by the Debtor as the Successful Bidder no later than ten (10) business days after the Sale.

### 11. *Forfeit of Deposits*

A Successful Bidder that breaches any of its obligations under the applicable Successful Bidder Agreement shall forfeit its Deposit, which shall become property of the Debtor's estate without any further order of the Bankruptcy Court. The forfeiture of the Deposit shall be in addition to any other rights, claims and remedies that the Debtor and its estate may have against such Successful Bidder, including, but not limited to, the terms of any Successful Bidder Agreement and any orders entered by the Bankruptcy Court in connection therewith.

### 12. *Back-Up Bidder*

If an Auction is conducted, the Competing Bidder(s) with the second highest and/or otherwise best Competing Bid at the Auction for the Assets or for any Individual Asset, as determined by the Debtor and the Committee in the exercise of their business judgment, shall be required to serve as a back-up bidder (a "**Back-Up Bidder**") and keep such bid open and irrevocable until the date that is ten (10) business days after the Sale. Following the Sale Hearing, if the Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of such Successful Bidder, the applicable Back-Up Bidder will be deemed to be the new Successful Bidder for the Assets or applicable Asset, and the Debtor will be authorized, but not required, to consummate the Sale with such Back-Up Bidder without further order of the Bankruptcy Court.

## C. **The Sale Hearing**

The Debtor will seek entry of an order (the "**Sale Order**") from the Bankruptcy Court approving the Sale at a hearing (the "**Sale Hearing**") no later than November 25, 2014 to request that the Bankruptcy Court approve and authorize the Sale on terms and conditions determined in accordance with these Bidding Procedures, the Auction and the executed form of the Stalking Horse Agreement or Qualified Bidder Agreement, as applicable.

# EXHIBIT B

Annette W. Jarvis (Utah State Bar No. 01649)
Jeffrey M. Armington (Utah State Bar No. 14050)
Peggy Hunt (Utah State Bar No. 6060)
Michael F. Thomson (Utah State Bar No. 9707)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: jarvis.annette@dorsey.com
        hunt.peggy@dorsey.com
        thomson.michael@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Debtor Naartjie Custom Kids, Inc.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankr. Case No. 14-29666 |
| NAARTJIE CUSTOM KIDS, INC., | Chapter 11 |
| Debtor. | The Honorable William T. Thurman |

### AUCTION NOTICE

### AND

### NOTICE OF SALE HEARING

**Auction Date: November 24, 2014 at 10:00 a.m. (Mountain Time)**
**Sale Hearing Date: November 25, 2014 at 2:00 p.m. (Mountain Time)**

     **PLEASE TAKE NOTICE** that on October 29, 2014, the Court entered its, on October 24, 2014, filed a *Order Granting Debtor's Motion for Order (A) Authorizing Bidding Procedures and Auction, (B) Authorizing Debtor to Provide Bid Protections to Stalking Horse, (C) Scheduling Sale Hearing and Approving Notice Thereof, and (D) Granting Related Relief* (the "Order"), which approved the *Debtor's Motion for Order (A) Authorizing Bidding Procedures and Auction, (B) Authorizing Debtor to Provide Bid Protections to Stalking Horse, (C)*

*Scheduling Sale Hearing and Approving Notice Thereof, and (D) Granting Related Relief* (the "Motion")[1] filed by Naartjie Custom Kids, Inc., on behalf of itself and as debtor in possession in the above-captioned case (the "Debtor").

**PLEASE TAKE FURTHER NOTICE THAT YOUR RIGHTS MAY BE AFFECTED. You should read this Notice, as well as the Motion, and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE FURTHER NOTICE** that the Order approved, among other things, the Bidding Procedures attached to the Order as Exhibit 1, which governs selection of one or more Successful Bidders for the Assets through the Auction.

**PLEASE TAKE FURTHER NOTICE** that within two (2) business days after entering into a Stalking Horse Agreement, the Debtor shall file a Notice of Selection of Stalking Horse Agreement ("Stalking Horse Selection Notice") with the Bankruptcy Court and a motion to approve the sale of the Assets to the Stalking Horse (the "Sale Motion").

**PLEASE TAKE FURTHER NOTICE** that any bidder that desires to make a bid in the Auction must deliver written copies of its bid to the Notice Parties (defined below) so as to be received by each of the Notice Parties not later than **4:00 p.m. prevailing Mountain Time on November 21, 2014** (the "Bid Deadline").

**PLEASE TAKE FURTHER NOTICE** that the Auction will be held at **10:00 a.m. prevailing Mountain Time on November 24, 2014** at the offices of Dorsey & Whitney LLP, 136 South Main Street, Suite 1000, Salt Lake City, UT 84101-1685.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider, among other things, a sale agreement for the purchase of the Assets with the parties submitting the highest and/or otherwise best bid at the Auction, as determined by the Debtor with the consent of the UCC (each a "Successful Bidder") will be held at **2:00 p.m. prevailing Mountain Time on November 25, 2014** before The Honorable William T. Thurman, United States Bankruptcy Judge, in his courtroom, Room 376, 350 South Main Street, Salt Lake City, UT 84101, or as soon thereafter as the Debtor may be heard (the "Sale Hearing").

**PLEASE TAKE FURTHER NOTICE** that objections to the Sale Motion must be in writing, conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and be filed with the Bankruptcy Court and served upon the "Notice Parties": (a) counsel to the UCC, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067-4003 Attn: Jeffrey N. Pomerantz, email: jpomerantz@pszlaw.com; (b) counsel to the Debtor, Dorsey & Whitney LLP, 136 South Main St. Suite 1000, Salt Lake City, Utah 84101 Attn: Annette Jarvis, email: jarvis.annette@dorsey.com; and (c) the Office of the United States Trustee for the District of Utah (collectively, the "Notice Parties").

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures as applicable.

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Court to grant the relief requested in the Motion, or if you want the Court to consider your views on the Sale Motion, then you or your attorney must do each of the following:

(1)     On or before **4:00 p.m. prevailing Mountain Time on November 20, 2014** (the "Objection Deadline"), file a written objection specifically delineating the nature of your objection at:

> Clerk of the Court
> United States Bankruptcy Court
> 350 South Main Street, Room 301
> Salt Lake City, UT 84101

If you mail your objection to the Court for filing, you must mail it early enough so that the Court will receive it on or before the Objection Deadline specified above.  You must also serve a copy on the Notice Parties at the addresses specified above.

(2)     Attend the Sale Hearing on the Sale Motion at **2:00 p.m. prevailing Mountain Time on November 25, 2014**, before the Honorable William T. Thurman, in his courtroom, Room 376, of the Frank E. Moss United States Courthouse, 350 South Main Street, Salt Lake City, Utah 84101.  Failure to attend the hearings will be deemed a waiver of your objection.

**PLEASE TAKE FURTHER NOTICE THAT THE FAILURE TO ABIDE BY THE PROCEDURES AND DEADLINES SET FORTH IN THE ORDER AND BIDDING PROCEDURES MAY RESULT IN THE FAILURE OF THE COURT TO CONSIDER A COMPETING BID OR AN OBJECTION TO THE PROPOSED SALE TRANSACTION.**

**PLEASE TAKE FURTHER NOTICE** that this Notice and the Sale Hearing are subject to the fuller terms and conditions of the Motion, the Order and the Bidding Procedures, which shall control in the event of any conflict, and the Debtor encourages parties-in-interest to review such documents in their entirety.  The Motion, Order, Bidding Procedures and any other pleadings may be found for a fee at the Court's website (http://www.utb.uscourts.gov/) for registered users of the Public Access to Court Electronic Records (PACER) System.

DATED this 24th day of October, 2014.

**DORSEY & WHITNEY LLP**

*/s/ Annette W. Jarvis*
Annette W. Jarvis
Peggy Hunt
Michael F. Thomson
Jeffrey M. Armington
*Attorneys for Debtor Naartjie Custom Kids, Inc.*

**Schedule 1.01**

**Intellectual Property**

**Trademarks:**

| Country | Trademark | Reg. # | Reg. Date |
|---------|-----------|--------|-----------|
| Australia | CUSTOM KID NAARTJIE & Design  | 655856 | March 15, 1995 |
| Canada | NAARTJIE | 597549 | December 15, 2003 |
| China | NAARTJIE | 5421736 | October 28, 2009 |
| China | NAARTJIE | 5421735 | September 14, 2009 |
| China | NAARTJIE (in Chinese Characters)  | 5421738 | October 28, 2009 |
| China | NAARTJIE (in Chinese Characters)  | 5421737 | July 21, 2010 |
| China | NAARTJIE (Stylized)  | 5421734 | October 28, 2009 |
| China | NAARTJIE (Stylized)  | 5421733 | September 14, 2009 |
| European Union | NAARTJIE | 2322428 | July 30, 2001 |
| India | NAARTJIE | 1454300 | May 26, 2006 |
| India | NAARTJIE (Stylized)  | 1454299 | May 26, 2009 |
| Israel | NAARTJIE | 246050 | February 4, 2014 |
| Japan | NAARTJIE | 5004625 | November 17, 2006 |
| Japan | NAARTJIE (Stylized) | 5004624 | November 17, 2006 |

| | naartjie | | |
|---|---|---|---|
| New Zealand | CUSTOM KID NAARTJIE & Design | 246638 | March 9, 1995 |
| New Zealand | CUSTOM KID NAARTJIE & Design | 229234 | August 11, 1993 |
| Saudi Arabia | NAARTJIE | 1400/96 | February 11, 2013 |
| South Africa | JIE JIE | 2010/09235 | May 7, 2012 |
| South Africa | NAARTJIE | 2010/09233 | January 5, 2012 |
| South Africa | NAARTJIE | 2010/09234 | January 5, 2012 |
| United Kingdom | CUSTOM KID NAARTJIE & Design | 2014637 | March 17, 1995 |
| United Kingdom | NAARTJIE | 2266100 | April 2, 2001 |
| United Kingdom | NAARTJIE (Stylized) naartjie | 2266098 | April 2, 2001 |
| United States of America | JIE JIE | 3958858 | May 10, 2011 |
| United States of America | NAARTJIE | 2634605 | October 15, 2002 |

| United States of America | NAARTJIE (Stylized)  | 2634604 | October 15, 2002 |
|---|---|---|---|
| United States of America | NAARTJIE KIDS | 3,866,388 | October 26, 2010 |
| United States of America | NAARTJIE KIDS & Design  | 3,866,389 | October 26, 2010 |